Nico Banks, Esq.
nico@bankslawoffice.com
Filing on behalf of all Plaintiffs
CA Bar No. 344705
Banks Law Office
712 H St NE,
Unit #8571,
Washington, DC 20002
Tel.: 971-678-0036

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

DAVID HOUGH;
MOULOUD HOCINE;
JENNIFER LEHMKUHL HILL;
AMUND THOMPSON;
PAUL PANICO

              Plaintiffs,

    vs.

RYAN CARROLL;
MAX K. DAY;
MAX O. DAY;
MICHAEL DAY;
YAX ECOMMERCE LLC;
PRECISION TRADING GROUP, LLC;
WA DISTRIBUTION LLC;
PROVIDENCE OAK PROPERTIES,
LLC;
WA AMAZON SELLER LLC;
MKD INVESTMENT ADVISOR, LLC;
MKD FAMILY BENEFICIARY, LLC;
MKD FAMILY PRIVATE
MANAGEMENT COMPANY, LLC;
MAX DAY CONSULTING, LLC;
HOUTEX FARM EQUITY PARTNERS
LLC;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 2:24-cv-02886

**COMPLAINT FOR:**
1. **FRAUD CONSPIRACY**
2. **FRAUDULENT TRANSFERS IN FURTHERANCE OF CONSPIRACY**
3. **CONSPIRACY TO VIOLATE BUSINESS AND PROFESSIONS CODE § 17200**
4. **VIOLATIONS OF SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

BUSINESS FINANCIAL SOLUTIONS
ADVISORY LLC;
EVO MAXX LLC;
YAX IP AND MANAGEMENT INC.
(D.B.A. "FULFILLABLE");
WWKB LLC;
DREAMS TO REALITY LLC;

                         Defendants.

_____

Plaintiffs—Molund Hocine; Jennifer Lehmkuhl Hill; Amund Thompson; David Hough; and Paul Panico—by and through their undersigned attorney, hereby bring this action against Defendants—Ryan Carroll; Max K. Day; Max O. Day; Michael Day; Yax Ecommerce LLC; Precision Trading Group, LLC; WA Distribution LLC; Providence Oak Properties, LLC; WA Amazon Seller LLC; MKD Investment Advisor, LLC; MKD Family Beneficiary, LLC; MKD Family Private Management Company, LLC; Max Day Consulting, LLC; HouTex Farm Equity Partners LLC; Business Financial Solutions Advisory LLC; Evo Maxx LLC; Yax IP and Management Inc; Dreams To Reality LLC; and WWKB LLC—and allege as follows:

## JURISDICTION AND VENUE

1. Plaintiffs invoke the diversity jurisdiction of the Court pursuant to 28 U.S.C. § 1332 because no Plaintiffs in this action reside in the same state as any Defendants, and the amount in controversy in each Plaintiff's claim exceeds $75,000.

2. Furthermore, Plaintiffs invoke the federal-question jurisdiction of this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs bring a cause of action for violations of the federal securities laws, and all Plaintiffs' other causes of action are directly related to the securities-law cause of action.

3. Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiff Paul Panico has resided in Thousand Oaks, California at all times relevant to this dispute.

## SUMMARY OF CASE

4. Wealth Assistants defrauded Plaintiffs and hundreds of other individuals out of millions of dollars. Specifically, Wealth Assistants advertised that it would provide its clients with substantial income by setting up and managing lucrative online Amazon stores that the clients would own. But Wealth Assistants did not provide the promised services. Instead, it used the fees it collected from Plaintiffs and its other clients for the benefit of its principals.

5. Wealth Assistants' clients would pay it an upfront fee of up to $125,000 to set up an online Amazon store in the client's name and manage it. After that, the client would pay for the store's inventory, along with certain other smaller fees. In return, the individual would be entitled to collect between 50 percent and 70 percent of the online store's gross profits.

6. Wealth Assistants advertised that the profits of an online store it managed should grow to more than $10,000 per month by the end of the store's first year.

7. Hundreds of individuals, including Plaintiffs, purchased the business opportunity Wealth Assistants offered. Most of these purchasers were middle class, and many had to use all their retirement savings or take out home equity loans to make the purchase.

8. Wealth Assistants never intended to follow through on its promises.

9. Some of Wealth Assistants' clients never even received an online store after paying the fee. Others received stores (which themselves are valueless and can be easily and freely set up), but their stores were never stocked with any inventory. Others paid Wealth Assistants for inventory after receiving inventory invoices from Wealth Assistants that turned out to be fake; the inventory never actually appeared in their stores.

10. Ultimately, the vast majority of Wealth Assistants' clients have received less than $10,000 in profits from their online stores, and many never received a single dollar of revenue from their stores (if they received stores at all).

11. Wealth Assistants perpetuated its fraudulent enterprise for as long as it could. When Plaintiffs and other individuals complained, Wealth Assistants invented excuses. It blamed "supply chain disruption," for example. It asked its clients for patience.

12. Eventually, however, Plaintiffs and other individuals realized that they had been defrauded. Many of the Wealth Assistants' clients demanded their money back, complained to their banks, or alerted government agencies about the ongoing fraud.

13. Realizing that its fraud was being exposed, Wealth Assistants shut down. In October of 2023, Wealth Assistants announced to all of its clients that it was going out of business. The announcement told Plaintiffs that they would not receive further services and would not receive their money back.

14. Throughout this fraudulent scheme, instead of using the money collected from Wealth Assistants' clients to provide the promised services, Wealth Assistants used much of the money it collected from its clients for the benefit of its principals. For example, Wealth Assistants' CEO, Ryan Carroll, has recently flaunted his new Lamborghini.

## **PLAINTIFFS**

15. Molund Hocine is an individual who has resided in Fremont, California at all times relevant to this dispute.

16. Jennifer Lehmkuhl Hill is an individual who has resided in Grass Valley, California at all times relevant to this dispute.

17. Amund Thompson is an individual who has resided in Grass Valley, California at all times relevant to this dispute.

18. David Hough is an individual who has resided in Temecula, California at all times relevant to this dispute.

19. Paul Panico is an individual who has resided in Thousand Oaks California at all times relevant to this dispute.

## DEFENDANTS

20. Defendant Ryan Carroll is an individual who has resided in Florida at all times relevant to this dispute.

21. Defendant, Max K. Day is an individual who has resided in Texas at all times relevant to this dispute.

22. Defendant Max O. Day is an individual who has resided in Texas at all times relevant to this dispute.

23. Defendant Michael Day is an individual who has resided in Texas at all times relevant to this dispute.

24. Defendant Yax Ecommerce LLC, formerly known as Wealth Assistance, LLC is a limited liability company. Its members are Ryan Carroll, Max K. Day, and Michael Day.

25. Defendant Precision Trading Group, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

26. Defendant Providence Oak Properties, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

27. Defendant WA Distribution, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

28. Defendant WWKB, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

29. Defendant Dreams to Reality, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

30. Defendant WA Amazon Sellers LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

31. Defendant Business Financial Solutions Advisory, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

32. Defendant, EvoMaxx, LLC, is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

33. Defendant HouTex Farm Equity Partners LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

34. Defendant Max Day Consulting, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

35. Defendant MKD Investment Advisor, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

36. Defendant MKD Family Beneficiary, LLC is a limited liability company. Its members are one more of the following individuals: Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

37. Defendant Yax IP and Management a/k/a Pithy Productions, Inc., is a limited liability company. Its members are one more of the following individuals:

Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. Upon information and belief, nobody else is a member.

## **FACTS**

**A. Wealth Assistants Purported To Sell Online Store Management Services**

38. The following is a summary of Wealth Assistants' agreements with its clients, including Plaintiffs:

   a. Wealth Assistants' clients would pay it to set up an online store on the Amazon platform that the clients would own. These stores offered goods for shoppers to purchase online.

   b. Wealth Assistants' clients would pay for the online store's inventory.

   c. Wealth Assistants' clients were required to pay certain other fees, such as annual fees and a "success fee" when the store was successfully set up.

   d. Wealth Assistants would manage the store, including by providing customer service, maintaining relationships with suppliers, and managing the inventory.

   e.  Wealth Assistants' clients would keep between 50 percent and 70 percent of the gross profits generated by the stores, and Wealth Assistants would take the remaining profits for itself as a management fee.

39. Until around November of 2022, most or all of Wealth Assistants' clients signed a standardized contract very similar to the one shown in Exhibit A of this Complaint.

40. The contract referenced in the paragraph above contained numerous statements that Wealth Assistants knew were false. For example, the contract stated:

> The Client will own a turnkey automated drop shipping Amazon retail store, which will be built and operated by the Service Provider. Product research, supplier negotiations, supplier relationships, product listing, day-to-day price updates, quality control, processing returns, customer service, financial reporting, and business growth in the direction of $10,000+ net profit monthly (assuming Client has the necessary resources, cash/credit) are among the services provided.

41. The contract also stated "In months 12 – 60+, the goal will be to net the Client upwards of multiple 6-figures per year ($350-$600K+ per year) if Client remains with the Service Provider and this Contract is not terminated for any such reason."

42. Wealth Assistants knew that nobody planned to provide Wealth Assistants' clients with the full set of services Wealth Assistants was promising in that contract. For example, Wealth Assistants knew that it did not have a goal of generating $10,000 of monthly profit in its clients' stores. Wealth Assistants knew that it instead intended to neglect its clients' stores so that the stores would generate little or no profits.

43. The contract also contained the following "Buyback" clause:

If Client has substantially complied with all the provisions of this Service Agreement, and after the Client's 1st anniversary of getting their first Amazon sale, they have not made back their initial $55,000 (fifty-five thousand dollars) investment from net profit on their business, the Service Provider will offer them a buy-back of their Amazon retail store or waive their two thousand five hundred dollars ($2,500) annual store renewal fee if they have not yet paid it or credit them their annual renewal fee in full if they have already paid it.

44. Wealth Assistants knew that it never intended to honor its Buyback clause.

45. Around November of 2022, Wealth Assistants began using a different standardized contract for its new clients. An example of that standardized contract is Exhibit B to this Complaint. This later standard contract stated that "The Service Provider's principal aims are to provide a 'done for you' operation for Client, focusing on high-quality lawfully commercialized products offered at competitive prices accompanied by excellent customer service for end-user customers in a manner that promotes growth."

46. The following "description of services" appeared in those contracts:

A. Initial Phase. Initially, Service Provider will manage the process of transferring the Store to Client (the "Migration"). Migration includes but is not limited to: finalizing the Transfer (described at Exhibit D), changing account names, email address, bank account information, payment information, and other steps required by the Host. Migration generally takes 1 to 2 weeks but may be substantially delayed if issues arise. Migration completes upon delivery of new account credentials and the training manual.

B. Ramp-Up. During the remainder of the first year, Service Provider will steadily encourage and support ramping up the scale of the Store by, for example, increasing product listings, optimizing SEO, and exploring advertising opportunities. Increased inventory will be required to meet

increased demand as described below. The focus of this period is to lay the groundwork for future success.

| MONTHS | COST OF INVENTORY PER MONTH |
|---|---|
| 1 | $15,000 |
| 2 - 3 | $30,000 |
| 4 - 6 | $50,000 |
| 7 - 12 | $70,000 |
| 13 – 18 * | $90,000 |
| * The end of this period is the "**Milestone**." | |

47. Wealth Assistants knew that it would not be able to "ramp up" stores at the rate it promised in its contracts.

48. Likewise, the following description of Wealth Assistants' "Management" services appeared in the same contract:

> B. <u>Management.</u> Service Provider will serve as a business consultant for the Store; performing for example:
> ● Product research and analysis of market data to identify top-selling products,
> ● Supplier relationships,
> ● Strategic sourcing or bulk-ordering products from optimal suppliers,
> ● Planning warehousing and fulfillment options,
> ● Product listings including, pricing decisions, and pricing updates,
> ● Deployment of Store look and feel (including Store name which may change from time to time),
> ● Customer service including quality control, and processing returns, and
> ● Internal financial reporting.

> Service Provider shall make commercially reasonable efforts to maintain the uniqueness of the Store. In the event Client discovers certain inventory overlap with other stores, Client agrees to notify Service Provider.

49. Wealth Assistants knew that it would not provide the "Management" services described in that portion of the contract.

50. The same contract also promised a purported "Buyback Warranty," which stated, in part, as follows:

> In the event Profit does not exceed the Threshold by the Milestone, Client may elect to receive from Service Provider: (1) a Credit, or (2) the Buyback Amount.
> **"Profit"** means Gross Income less the Success Fee received by the Milestone.
> **"Threshold"** means the Set-Up Fee.
> **"Credit"** means an amount equivalent to the Annual Fee, and redeemable, at Client's option, by refund if already paid, or by application to Client's account.
> **"Buyback Amount"** means an amount equivalent to the Threshold less the Profit.

51. Wealth Assistants knew that it never intended to honor the terms of its Buyback Warranty, and Wealth Assistants in fact did not honor the terms of its Buyback Warranties with Plaintiffs.

**B. Wealth Assistants' Marketing**

52. Wealth Assistants sent most or all of its prospective clients projections showing that the stores Wealth Assistants managed would generate more than $10,000 per month. An example of such a slide is shown below:

**OUR AMAZON MANAGEMENT PROJECTIONS**

| MONTH | HYPOTHETICAL GROSS SALES | HYPOTHETICAL PROFIT TOTALS | HYPOTHETICAL MARGINS |
|---|---|---|---|
| 1 to 3 | up to $20,000 | up to $4,000 | 15-20% |
| 3 to 6 | $20,000 to $35,000 | $3,000 to $7,000 | 15-20% |
| 6 to 9 | $35,000 to $50,000 | $5,000 to $10,000 | 15-20% |
| 9 to 12 | $50,000 to $80,000 | $7,500 to $16,000 | 15-20% |
| **First year totals** | **$315,000 to $525,000** | **$49,500 to $105,000** | **15-20%** |
| 12 to 16 | $80,000 to $110,000 | $12,000 to $22,000 | 15-20% |
| 16 to 20 | $110,000 to $135,000 | $16,500 to $27,000 | 15-20% |
| 20 to 24+ | $135,000 to $185,000+ | $20,250 to $37,000+ | 15-20% |

These images and sales summary are not actual and are used for example purposes only.
Wealth Assistants is in no way affiliated, associated, authorized, or endorsed by, or any way officially connected with Amazon INC. No client's success, earnings, or production results should be viewed as typical, average, or expected. Not all clients achieve the same or similar results, due to many factors including, but not limited to, the amount of inventory purchased per month to be sold on your store, margin of products sold, and your results may be higher or lower than those stated in our clients testimonials. This is why we offer a conditional buy back clause described in our service agreements to those that decide to partner with us.

*Please note these numbers are before our profit splits

53. Very few, if any, of Wealth Assistants' investors ever achieved the "monthly profit totals" advertised by Wealth Assistants.

54. Wealth Assistants knew that its clients could not reasonably expect to achieve more than $10,000 per month in profits.

55. The slide deck also included the following slide:



**OUR 100%**
## STORE BUY BACK*

**We're so confident in our ability to build you an income stream on Amazon that we offer all of our clients a 12–18 month buyback on their initial onboarding investment.**

**How it works:**
If you have not recouped your initial investment back within 12–18 months from your first sale we will give you the opportunity to either:

 Have us buy back your Amazon store from you at the price difference you didn't make back or...

 We will waive your annual store renewal fee and continue operating and scaling your Amazon Store free of charge.

\* See "buy-back" clause in our service agreements
\*\* Please request and read our service agreement so you understand our buy back clause prior to hiring us to manage your store

56. Wealth Assistants knew that it did not intend to honor the "Buy Back" guarantee advertised in the slide above.

57. Wealth Assistants also lured clients with false advertising on social media. For example, on March 28, 2023, Wealth Assistants posted on its Facebook account that "you'll have the opportunity to sell your business 2-3 years from opening up your Amazon store (once your sales are $100K+/monthly)."

**C. Plaintiffs' Experiences With Wealth Assistants**

58. In or around November of 2022, a representative of Wealth Assistants named Jennifer Schertferger told **Plaintiff Jennifer Lehmkuhl Hill** that Wealth Assistants projected that if it managed an online store for Hill, the online store would generate thousands of dollars of income each month.

59. After receiving that representation from Schertferger, and relying on it, Hill signed a contract to purchase the business opportunity Wealth Assistants was offering in or around November of 2022.

60. Hill later wired more than $7,000 to Wealth Assistants for inventory payments.

61. Hill never received any money in connection with the business opportunity she purchased from Wealth Assistants.

62. In June of 2023, a representative of Wealth Assistants named Peter McLean told Plaintiff **Mouloud Hocine** that Wealth Assistants projected that if it managed an online store for Hocine, the online store would generate more than $10,000 of income per month by the end of the store's first year.

63. In July of 2023, Hocine signed a contract to purchase the business opportunity Wealth Assistants was offering.

64. In or around October of 2023, Wealth Assistants asked Hocine to wire another $5,000 to Wealth Assistants to pay for the store's inventory. He wired that money on October 3, 2023. The inventory was never uploaded into Hocine's store.

65. Hocine never received any revenue in connection with his store.

66. In July of 2022, a representative from Wealth Assistants named Charles Fitzgerald Butler emailed Plaintiff **Amund Thompson** and attached a PowerPoint that projected stores managed by Wealth Assistants would

generate more than $10,000 per month in profits by the end of the store's first year.

67. In November of 2022, Thompson signed a contract to purchase the business opportunity Wealth Assistants was offering.

68. In or around November of 2022, Thompson paid Wealth Assistants $50,000 to cover the onboarding fee.

69. In early 2023, Thompson paid $5,000 to Wealth Assistants for inventory. Thompson paid Wealth Assistants that money by wiring the money to an escrow agent called Marker Law.

70. In total, to date, Thompson has received no more than $5,000 in connection with the business opportunity that Thompson purchased from Wealth Assistants.

71. In August of 2022, a representative of Wealth Assistants named Mack McKaughan told Plaintiff **David Hough** that if Wealth Assistants managed a store for Hough, Wealth Assistants projected that the store would generate $10,000 of income per month by the end of the store's first year.

72. Hough signed a contract to purchase the business opportunity Wealth Assistants was offering in August of 2022, and around the same time Hough paid Wealth Assistants $55,000 for the onboarding fee.

73. Hough later wired approximately $10,000 to Wealth Assistants for inventory.

74. Hough has received less than $4,000 in connection with the business opportunity he purchased from Wealth Assistants.

75. In or around November of 2022, Defendant Max K. Day told Plaintiff Paul Panico over Zoom that Wealth Assistants projected that if it managed an online store, the online store would likely generate thousands of dollars of passive income each month.

76. In or around November of 2022, after his conversation with Max K. Day, Panico signed a contract to purchase the business opportunity Wealth Assistants was offering.

77. Panico later paid Wealth Assistants $5,000 for inventory.

78. Wealth Assistants uploaded inventory into Panico's store and sold all of it, but Panico the sales of the inventory generated less than $2,500 in revenue.

**D. Wealth Assistants Fraudulently Transferred Many Of Its Assets To Ryan Carroll And Max K. Day, And Wealth Assistants Announced It Was Shutting Down**

79. On October 23, 2023, Wealth Assistants wrote to its clients that it "will not be able to honor any more Buyback Guarantees" and would "cease all operations before December 1, 2023."

80. Wealth Assistants did in fact shut down. For example, it fired all or nearly all of its employees and stopped corresponding with its clients.

81. Wealth Assistants has not honored Plaintiffs' Buyback agreements.

82. Many of Wealth Assistants' clients have complained, requested refunds, or requested that Wealth Assistants honor its Buyback agreements, but have not received a response from Wealth Assistants.

83. Wealth Assistants transferred its funds to Defendants Ryan Carroll, Max K. Day, Max O. Day, and Michael Day for them to personally use.

84. Wealth Assistants also took steps to conceal the fraudulent transfers of funds to its principals Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. For example, Wealth Assistants used "payment processors" to receive payments from Wealth Assistants' clients and transfer the funds to hidden bank accounts not disclosed to its clients.

**E. When Wealth Assistants Shut Down, It Transitioned Many Of Its Clients' Accounts And Assets To Wholesale Universe, Which Operates A Scheme Similar To Wealth Assistants' Scheme**

85. As discussed above, on October 23, 2023, Defendant Ryan Carroll—the CEO of Wealth Assistants—emailed Wealth Assistants' clients, including Plaintiffs, stating Wealth Assistants "will not be able to honor any more Buyback Guarantees" and would "cease all operations before December 1, 2023." The same email also stated that Wealth Assistants was offering its clients a "Transition Agreement." Specifically, Wealth Assistants offered its clients the opportunity to transition their stores to management by another e-commerce firm on "favorable terms." The email also attached a "comparison of vendor proposals," which purportedly compared three e-commerce firms that had

offered "favorable terms" to manage Wealth Assistants' clients' stores. But the only e-commerce firms actually identified in the "vendor proposals" were "Quantum Ecom" and "Wholesale Universe," which jointly offered a proposal. The other "vendors" offering the proposal were anonymous.

86. Thereafter, many former clients of Wealth Assistants began receiving unsolicited emails from Wholesale Universe. Some of those emails stated that "prior to going out of business, Wealth Assistants purchased an inventory package for you valued at $35,000. It is now ready for upload to your Amazon FBA account." The statement was false because Wealth Assistants had not in fact purchased $35,000 inventory packages before it shut down.

87. However, Wealth Assistants did in fact transfer assets from itself to Wholesale Universe. Wealth Assistants and Wholesale Universe made that transfer for the purpose of preventing Wealth Assistants' current and future creditors, including Plaintiffs, from accessing Wealth Assistants' assets.

88. On December 19, 2023, Wholesale Universe sent an email to many of Wealth Assistants' clients. Although most or all the recipients of the email had not partnered with Wholesale Universe, the email began by stating "We appreciate your partnership with Wholesale Universe and value the opportunity to assist in providing you your Amazon inventory efficiently, as was ordered by Wealth Assistants over the last 100 plus days." The email later stated "to ensure a smooth transition, we kindly request your prompt attention to the following

matters: Please provide Wholesale Universe User Access Permission . . ." The email later stated "failure to provide the required information within the next 30 days will result in the initiation of a monthly storage fee of $500, commencing from December 20, 2023. This fee will be deducted from your inventory amount currently on hand at WU."

**F. Defendants All Conspired To Carry Out The Fraud Described Above**

89. Defendant **Ryan Carroll** is the Chief Executive Officer of Wealth Assistants. He participated in the conspiracy described above in the following ways:

    a. Ryan Carroll claims that he founded Wealth Assistants and led the company's growth.

    b. Ryan Carroll used videos of himself to recruit new clients for Wealth Assistants. Those videos included intentionally false statements. For example, he stated in those recorded videos that Wealth Assistants' stores could be expected to generate more than $10,000 in profits per month.

    c. Ryan Carroll fraudulently transferred money from Wealth Assistants to himself and used that money for personal gain. For example, Carroll stated on social media that he had purchased a Lamborghini.

    d. Ryan Carroll is the founder and owner of **Defendant Yax Ecommerce LLC**, which does business as "Wealth Assistants LLC." Carroll is also the owner of **WA Amazon Seller LLC** and the manager of the North

Carolina branch of Defendant **WA Distribution LLC**, both of which collected payments from Wealth Assistants' victims on behalf of Wealth Assistants. Carroll also created the company Daddy Jules LLC which, upon information and belief, serves the purpose of either concealing Wealth Assistants' assets or concealing Ryan Carroll's personal assets. Carroll is also the owner of **Dreams to Reality LLC**, which is an owner of Defendant Yax Ecommerce LLC.

90. **Max K. Day** is an owner of Wealth Assistants. He participated in the conspiracy described above in the following ways:

a. Max K. Day formed and managed Defendant **Precision Trading Group, LLC**. According to Precision Trading Group's corporate registration, it operated under the "assumed names" of "Wealth Assistants LLC," "WA Distribution, LLC," "WA Brand Management, LLC," and "WA Amazon Seller, LLC" beginning on December 14, 2022. Precision Trading accepted payments on behalf of Wealth Assistants from many Wealth Assistants clients.

b. Max K. Day is the Director of Defendant **Providence Oak Properties, LLC.** Providence Oak Properties, LLC accepted payments on behalf of Wealth Assistants from many of Wealth Assistants' clients. A representative of Wealth Assistants stated, "Providence Oak Properties is a part of Wealth Assistants."

c.  Ryan Carroll described Max K. Day as his "mentor" and "business partner" in starting and managing Wealth Assistants.

d.  Max K. Day represented to one or more of Wealth Assistants' clients that they would receive a refund on their store. When he made that representation to Wealth Assistants' client Dominic Camany in September of 2023, Max K. Day knew that it was not true, and in fact Camany never received a refund.

e.  Max K. Day aided and abetted the fraudulent scheme at issue by drawing on his past experiences in fraudulently transferring assets. For example, in 1992, Max K. Day agreed to injunctive relief after being charged by the Federal Trade Commission with operating a fraudulent credit card scheme. Likewise, in 2006, Max K. Day and his family ran a fraudulent enterprise called "Today's Destiny." Today's Destiny—much like the fraudulent scheme at issue in this case—lured victims by promising to make them rich if they paid for the business opportunity Today's Destiny was offering. Today's Destiny took money from its victims and did not provide the promised services. The Days then transferred the money collected by Today's Destiny to themselves, and they had Today's Destiny declare bankruptcy. The United States Trustee for Today's Destiny brought an adversary complaint against the Days for their fraudulent transfers.

f.   Max K. Day also created each of the following entities, which are defendants in this case: **MKD Investment Advisor, LLC; MKD Family Beneficiary, LLC; MKD Family Private Management Company, LLC; Max Day Consulting, LLC; HouTex Farm Equity Partners LLC; Business Financial Solutions Advisory LLC; and Yax IP and Management Inc.** Either Max K. Day or Max O. Day created the entity Defendant **Evo Maxx LLC**. Upon information and belief, Max K. Day created those entities for the sole purpose of concealing his assets, including concealing proceeds of the fraudulent scheme described above.

91. **Defendant Max O. Day** was the Chief Growth Officer at Wealth Assistants. He participated in the conspiracy described above in the following ways:

a.   Wealth Assistants' "payment processors" accepted payments on behalf of Wealth Assistants' clients and then paid that money to other bank accounts associated with Wealth Assistants or its principals. Upon information and belief, Wealth Assistants used "payment processors" to make it more difficult for its victims to track where their money had gone once the victims realized they had been defrauded. Max O. Day asked an individual named Zach Henson to serve as a "payment processor" for Wealth Assistants.

b. Max O. Day often stated that online stores managed by Wealth Assistants would likely earn tens of thousands of dollars per month. Many of Wealth Assistants' clients relied on Max O. Day's statements when deciding to purchase the business opportunity Wealth Assistants was selling. For example, in or around August of 2023, Max O. Day helped convince an individual named Craig Dillehay to purchase the business opportunity Wealth Assistants was offering, in part by telling Dillehay that stores Wealth Assistants was managing were very profitable. Max O. Day also helped convince an individual named Korey McAleejergins to purchase the business opportunity Wealth Assistants was offering.

c. Like his uncle Max K. Day, Max O. Day brought to Wealth Assistants his experience with similar fraudulent schemes and fraudulent transfers. He, like his uncle, helped perpetrate the "Today's Destiny" fraud described above.

92. **Defendant Michael Day** was another owner of Wealth Assistants and provided financing for the company knowing that it was a fraudulent scheme. He also made false statements to many of Wealth Assistants' clients that they relied upon when deciding to purchase the business opportunities Wealth Assistants offered. For example, on October 12, 2022, Michael Day told Wealth Assistants' former client Haider Istanbouli, "we have developed a 72

point SOP protocol that virtually eliminates any possibility for deactivations or suspensions," when in fact Michael Day knew that Amazon stores that Wealth Assistants set up were frequently deactivated or suspended for not complying with Amazon's policies. Moreover, Michael Day co-owns **WWKB LLC**, which is an owner of Yax Ecommerce LLC. Michael Day was also one of the perpetrators of the Today's Destiny fraud described above.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION, FOR CIVIL CONSPIRACY TO DEFRAUD, BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

93. Plaintiffs incorporate by reference all allegations above.

94. The elements of fraud are a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance, and resulting damage.

95. To establish the element of conspiracy, a plaintiff must show (1) formation and operation of the conspiracy; (2) wrongful act or acts done pursuant thereto; and (3) resulting damage.

96. All Defendants conspired, and agreed among each other, to make misrepresentations to Plaintiffs to entice them to purchase the services of Wealth Assistants.

97. Defendants overtly acted in furtherance of that conspiracy.

98. Defendants knew of the falsity of the misrepresentations to Plaintiffs.

99. Plaintiffs relied on those misrepresentations when purchasing services or goods from Wealth Assistants.

100.     Plaintiffs suffered damages as a result of the acts performed pursuant to the conspiracy.

**SECOND CAUSE OF ACTION, FOR CONSPIRACY TO FRAUDULENTLY TRANSFER ASSETS IN VIOLATION OF CALIFORNIA CIV. CODE § 3439, BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

101.     Plaintiffs incorporate by reference all allegations above.

102.     To succeed in a fraudulent transfer claim, a plaintiff must show: (1) he or she had a right to payment from the defendant for damages, (2) defendant transferred property, (3) defendant transferred property with the intent to hinder, delay or defraud plaintiff, (4) plaintiff was harmed, and (5) defendant's conduct was a substantial factor in causing plaintiff harm.

103.     To establish the element of conspiracy, a plaintiff must show (1) formation and operation of the conspiracy; (2) wrongful act or acts done pursuant thereto; and (3) resulting damage.

104.     Here, Defendants agreed to transfer funds from Wealth Assistants to Ryan Carroll, Max K. Day, Max O. Day, and Michael Day for them to personally use, and Wealth Assistants did not receive a reasonably equivalent value in exchange for the transfer.

105.     Furthermore, Defendants agreed to transfer assets from Wealth Assistants to Wholesale Universe without providing Wealth Assistants anything of comparable value in exchange. Defendants made that transfer in

order to prevent Wealth Assistants' current and future creditors, including Plaintiffs, from collecting those assets.

106.    When making those agreements, Defendants believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due;

107.    Defendants intended to deprive Plaintiffs of the opportunity to recover damages via fraud claims against Wealth Assistants;

108.    Defendants did in fact transfer funds from Wealth Assistants to Ryan Carroll, Max K. Day, Max O. Day, Michael Day, Wholesale Universe, and various shell companies, some of which are defendants in this case and discussed above. The transfers harmed Plaintiffs, in part because the transfers caused Wealth Assistants to be undercapitalized and ultimately to go out of business, rendering it unable to pay any judgment that may be entered against it.

**THIRD CAUSE OF ACTION, FOR CONSPIRACY TO VIOLATE BUSINESS AND PROFESSIONS CODE § 17200 and §17500, BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

109.    Plaintiffs incorporate by reference all allegations above.

110.    The Unfair Competition Law defines unfair competition to include any "unlawful," or "fraudulent" business act or practice. *See* California Business and Professions Code § 17200 and §17500. The Act also provides for injunctive relief and restitution for violations.

111.    All Defendants violated California Business and Professions Code §

17200 and §17500 by misrepresenting the business opportunities offered to

Plaintiffs by Wealth Assistants. For example, those defendants misrepresented

the profitability of those business opportunities.

112.    The same defendants' acts and practices as described herein have

deceived members of the public, including Plaintiffs.

113.    As a result, Plaintiffs and others who purchased the business

opportunities offered by Wealth Assistants suffered damages.

**FOURTH CAUSE OF ACTION, FOR VIOLATIONS OF SECURITIES
LAWS PURSUANT TO 15 U.S.C. § 77l, BY ALL PLAINTIFFS
AGAINST ALL DEFENDANTS**

114.    Plaintiffs incorporate by reference all allegations above.

115.    15 U.S.C. § 77l creates a private cause of action for a plaintiff when a

defendant sells the plaintiff unregistered securities, or sells the plaintiff

securities by means of an untrue statement of material fact.

116.    The business opportunities Wealth Assistants sold to Plaintiffs

constituted unregistered securities sold without registration and by means of

untrue statements of material facts.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Award compensatory, consequential, exemplary, and punitive damages to

Plaintiffs in the amount of $1,000,000;

B. Award attorneys' fees and costs to Plaintiffs in an amount to be determined at trial;

C. Enjoin all Defendants from violating business and professions code § 17200 and 17500;

D. Enjoin Defendants from fraudulently transferring assets;

E. Grant to Plaintiffs whatever other relief is just and proper.

**Jury Trial Demanded**

DATED: April 9, 2024

/s/Nico Banks
Nico Banks, Esq.
Banks Law Office
Bar No. 344705
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002