Nico Banks, Esq.
nico@bankslawoffice.com
Filing on behalf of all Plaintiffs
CA Bar No. 344705
Banks Law Office
712 H St NE,
Unit #8571,
Washington, DC 20002
Tel.: 971-678-0036

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID HOUGH; <br> MOULOUD HOCINE; <br> JENNIFER LEHMKUHL HILL; <br> AMUND THOMPSON; <br> PAUL PANICO <br><br>                   Plaintiffs, <br><br>     vs. <br><br> RYAN CARROLL; <br> MAX K. DAY; <br> MAX O. DAY; <br> MICHAEL DAY; <br> YAX ECOMMERCE LLC; <br> PRECISION TRADING GROUP, LLC; <br> WA DISTRIBUTION LLC; <br> PROVIDENCE OAK PROPERTIES, LLC; <br> WA AMAZON SELLER LLC; <br> MKD INVESTMENT ADVISOR, LLC; <br> MKD FAMILY BENEFICIARY, LLC; <br> MKD FAMILY PRIVATE MANAGEMENT COMPANY, LLC; <br> MAX DAY CONSULTING, LLC; | Case No.: 2:24-cv-02886 <br><br> **EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

1  HOUTEX FARM EQUITY PARTNERS LLC;
2  BUSINESS FINANCIAL SOLUTIONS ADVISORY LLC;
3  EVO MAXX LLC;
4  YAX IP AND MANAGEMENT INC. (D.B.A. "FULFILLABLE");
5  WWKB LLC;
6  DREAMS TO REALITY LLC;

7
8                          Defendants.

9  ## EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

10
11        To preserve the possibility of effective final relief, Plaintiffs respectfully
12  request that the Court issue a temporary restraining order ("TRO") that:

13      1. Orders all of the entity defendants not to transfer, liquidate, or otherwise
14
15          dispose of any assets owned by or held for the benefit of defendants without
16
           leave of the Court.
17
18      2. Orders all of the individual defendants not to transfer, liquidate, or
19
           otherwise dispose of any assets beyond what is necessary for ordinary
20
           personal or household expenditures, which expenditures may not exceed
21
22          $9,000 per month without leave of the Court.
23      3. Orders all Defendants to provide to Plaintiffs, within five days of receiving
24
           the order, information sufficient to identify accounts holding any and all
25
26          assets for the benefit of any defendant.
27
28

Plaintiffs also respectfully request that the Court order all Defendants to show cause ("OSC") why a preliminary injunction that extends the relief sought in the temporary restraining order until the close of the case should not be issued.

Plaintiffs bring this motion *ex parte* pursuant to Federal Rule of Civil Procedure 65. The requested TRO and OSC are warranted for the reasons discussed in the accompanying memorandum and exhibits, including the declarations by the undersigned, Plaintiffs, and other victims of Defendants.

As attested to in the undersigned's sworn statement attached to this motion, Defendants received notice of this motion.

Plaintiffs believe that attorney Rachel Crockett represents or will represent all Defendants. Rachel Crockett can be reached at 214-930-9249 and rachel@lloydmousilli.com. Her address is 11807 Westheimer Rd #550, Houston, TX 77077.

DATED: April 9, 2024

/s/Nico Banks
Nico Banks, Esq.
Banks Law Office
Bar No. 344705
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

**<u>TABLE OF CONTENTS</u>**

**INTRODUCTION AND BACKGROUND** ........................................................ - 7 -

**LEGAL STANDARD** ................................................................................... - 8 -

**ARGUMENT** ............................................................................................... - 9 -

   **A.**   Plaintiffs Have A High Likelihood Of Prevailing On The Merits ............. - 9 -

   B.   Plaintiffs Would Suffer Great Harm If Their Request For An Asset Freeze Were Denied Because Defendants Have A History Of Fraud And Money Laundering.................................................................................................. - 16 -

   C.   The Balance Of Hardships Favors Granting The Injunctive Relief ......... - 19 -

   D.   The Requested Injunctive Relief Is In The Public Interest....................... - 20 -

   E.   In Nearly Identical Cases, Courts Have Issued Temporary Restraining Orders - 20 -

   F.   Plaintiffs Should Not Be Required To Post Any Security In Connection With The Temporary Restraining Order ................................................................... - 24 -

**CONCLUSION** .......................................................................................... - 25 -

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**

California v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1326 (9th Cir. 1985).- 25 -

Conn. Gen. Life Ins. Co. v. New Images, 321 F.3d 878, 882 (9th Cir. 2003) ....... - 25 -

Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984)...................... - 11 -

FTC v. Automators, 23-cv-1444 (S. D. Cal. 2023) ................................................. - 22 -

FTC v. World Wide Factors, Ltd., 882 F.2d 344, 347 (9th Cir. 1989) ....... - 20 -, - 21 -

Gaponyuk v. Alferov, 2:23-cv-01317-KJM-JDP, at *5 (E.D. Cal. July 20, 2023) - 21 -

Hardware, Inc. v. Alimia Light, 23-cv-00948-HSG, at *5 (N.D. Cal. May 24, 2023) ..- 10 -

Hilao v. Estate of Marcos, 25 F.3d 1467, 1480 (9th Cir. 1994) .................. - 10 -, - 17 -

Johnson v. Couturier, 572 F.3d 1067, 1078 (9th Cir. 2009)..................................- 9 -

United States v. Diapulse Corp. of Am., 457 F.2d 25, 29 (2d Cir. 1972) .............. - 20 -

Wood v. Greenberry Fin. Servs., Inc., 907 F. Supp. 2d 1165, 1181 (D. Haw. 2012) ....- 11 -

**Statutes**

California Business and Professions Code § 17200 and §17500 ........................... - 10 -

**Treatises**

9 Wright Miller, Federal Practice Procedure § 2949 (2011) .................................. - 11 -

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

## **TABLE OF EXHIBITS**

| **Exhibit** | **Description** |
|---|---|
| PX A | Declaration of Nico Banks |
| PX B | Declaration of David Hough |
| PX C | Declaration of Jennifer Lehmkuhl Hill |
| PX D | Declaration of Mouloud Hocine |
| PX E | Declaration of Amund Thompson |
| PX F | Declaration of Philip Harrinarine |
| PX G | Declaration of Jameson Croney |
| PX H | Declaration of Shanon McAlister |
| PX I | Declaration of John Cundiff |
| PX J | Declaration of Benjamin David |
| PX K | Declaration of Philip Stoops |
| PX L | Declaration of Dominic Camany |
| PX M | Declaration of Paul Panico |
| PX N | Form Declarations of Various Other Former Wealth Assistants Clients |

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

### INTRODUCTION AND BACKGROUND

Defendants Max K. Day, Max O. Day, and Michael Day (collectively, "the Day Family Defendants") are career criminals who, for decades, have stolen the savings of thousands of individuals through various fraudulent schemes. Their latest fraudulent enterprise, and the subject of this case, is Wealth Assistants. From 2022 to 2023, Wealth Assistants lured hundreds of individuals, including Plaintiffs, to pay an upfront fee of $35,000 to $125,000 to invest in online stores that Wealth Assistants would purportedly manage. But Wealth Assistants did not manage those stores. Instead, Defendants, including the Day Family Defendants, stole most of the money that Plaintiffs and the other victims thought they were investing in the stores.

Wealth Assistants and the Day Family Defendants then requested payments from Plaintiffs for the stores' "inventory." But many of the invoices for the inventory that Defendants sent turned out to be fake; after Plaintiffs paid the invoices, no inventory ever actually appeared in the stores. Again, the individual defendants used that inventory money for their own personal gain instead.

Wealth Assistants shut down in October of 2023, and Defendants are in the process of laundering the proceeds of their fraudulent scheme. Defendants' efforts to launder the proceeds of their fraudulent scheme include their use of an "escrow agent" that mailed Wealth Assistants' clients a credit card reader and asked the clients to use the credit card reader to make small discrete payments into an "escrow account" for the benefit of Wealth Assistants.

Notably, Wealth Assistants' fraudulent scheme is a cookie-cutter copy of at least two other fraudulent schemes that have been prosecuted within the last six years. Moreover, at least two commercial banks have frozen Wealth Assistants' assets, but Defendants have been able to continue their money-laundering activities because of the lack of a more general asset-freeze order from a court.

Plaintiffs therefore respectfully request that the Court enter an order temporarily freezing all Defendants' assets except the assets they must spend for necessary personal expenses. Without the requested partial asset freeze, Defendants will continue their money-laundering process and further diminish the funds available to pay Wealth Assistants' victims when a judgment is eventually entered against Defendants.

## LEGAL STANDARD

To obtain injunctive relief freezing assets, a plaintiff must show: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009) (internal citations omitted).

More specifically, an *ex parte* temporary restraining order freezing assets may be proper—even where, unlike in this case, defendants have not received notice of the hearing—where plaintiffs are seeking equitable remedies, and they can establish that the defendant has engaged in a pattern of dissipating assets, because that order may

be necessary to preserve the possibility of final remedies. *Id.* at 1085; *Hilao v. Estate of Marcos,* 25 F.3d 1467, 1480 (9th Cir. 1994).

Likewise, an *ex parte* temporary restraining order may order defendants to quickly identify their assets when the defendants have a pattern of dissipating assets. Fed R. Civ. P. 26(d)(1) (allowing for expedited discovery when a plaintiff shows good cause); *Hardware, Inc. v. Alimia Light*, 23-cv-00948-HSG, at *5 (N.D. Cal. May 24, 2023) ("As to expedited discovery, Plaintiffs seek information from third parties that may hold funds associated with infringing sales. Courts have discretion to expedite discovery for good cause, particularly in cases where plaintiffs seek temporary or preliminary injunctive relief.").

## ARGUMENT

### A. Plaintiffs Have A High Likelihood Of Prevailing On The Merits

Plaintiffs have brought a cause of action alleging that Defendants conspired to violate the California Unfair Competition Law ("UCL"), and Plaintiffs seek the equitable remedy of restitution as a remedy. *See* California Business and Professions Code § 17200 and §17500. To prevail on the merits, Plaintiffs must show that Defendants conspired to misrepresent the business opportunities offered to Plaintiffs, and that Plaintiffs suffered harm as a result. *See id*. To show the existence of a conspiracy, Plaintiffs must show the existence of "'an agreement . . . No formal agreement between the parties is essential to the formation of the conspiracy, for the agreement may be shown if there be concert of action, all the parties working

together understandingly, with a single design for the accomplishment of a common purpose.'" *Wood v. Greenberry Fin. Servs., Inc.*, 907 F. Supp. 2d 1165, 1181 (D. Haw. 2012) (quoting *Marino v. United States*, 91 F.2d 691, 694 (9th Cir.1937)).

   To show a likelihood of prevailing on the merits, a motion for a temporary restraining order must be supported by "[e]vidence that goes beyond the unverified allegations of the pleadings." *See* 9 Wright Miller, Federal Practice Procedure § 2949 (2011). However, in deciding a preliminary injunction, a district court may consider hearsay and other inadmissible evidence "if doing so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *see also Johnson*, 572 F.3d at 1083.

   Here, ample evidence in the declarations accompanying this motion demonstrates that Defendants not only violated California Business and Professions Code § 17200 and §17500 by misleading their clients, but defrauded their clients, including Plaintiffs.

   To begin with, there is ample evidence of Wealth Assistants' false promises. The declarations show that every Plaintiff, and many other individuals, received statements from Wealth Assistants projecting that stores managed by Wealth Assistants should be expected to generate thousands of dollars per month in passive income for each Plaintiff.[1] There is also ample evidence demonstrating that Wealth

---

[1] *E.g.*, PX B at ¶ 1; PX C at ¶ 1; PX D at ¶ 1-2; PX E at ¶ 1.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Assistants never provided—and never intended to provide—Plaintiffs with the highly profitable store-management services that Wealth Assistants advertised and that Plaintiffs invested in. Some of Wealth Assistants' customers never even received an online store after paying the fee.[2] Others received stores (which themselves are valueless and can be easily and freely set up),[3] but their stores were never stocked with any inventory.[4]  Others paid Wealth Assistants for inventory after receiving inventory invoices from Wealth Assistants that turned out to be fake; the inventory never actually appeared in their stores.[5] Ultimately, dozens of declarations—as well as information collected in an online form from more than 100 other victims of Wealth Assistants—show that the vast majority of Wealth Assistants clients have received less than $10,000 in revenue from their online stores, and many never received a single dollar of revenue from their stores (if they received stores at all).[6]

The declarations also evidence that each defendant individually violated the California Unfair Competition Law, and each defendant also conspired with the other Defendants to operate the Wealth Assistants fraudulent enterprise. To begin with, **Defendant Ryan Carroll** is the Chief Executive Officer and an owner of Wealth

---

[2] *E.g.*, PX K at ¶ 7 ("Wealth Assistants never set up an online store for me and never refunded my fee.").
[3] Amazon, "How To Build An Online Store In 5 Steps," available at https://sell.amazon.com/build-an-online-store (last accessed April 8, 2024).
[4] *E.g.*, PX C at ¶ 5-6; PX D at ¶ 4; PX H at ¶ 6.
[5] *E.g.*, PX C at ¶ 5-6; PX F at ¶ 13-14 ("I told a representative of Wealth Assistants that I had paid the $5,000 charge for the Jackson Home Goods inventory . . . Wealth Assistants never listed a product for sale in Jackson Home Goods."); PX J at ¶ 9.
[6] *See* PX A at ¶ 2-6 (discussing the online form); PX B-N (declarations of more than 25 clients of Wealth Assistants, none of whom received more than $10,000 in total in connection with their stores).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Assistants.[7] Carroll claims that he founded Wealth Assistants and led the company's growth.[8] Moreover, Carroll used videos of himself to recruit new clients for Wealth Assistants.[9] He made intentionally false statements in those videos. For example, he stated in at least one of those recorded videos that Wealth Assistants' stores could be expected to generate more than $10,000 in profits per month.[10]

Ryan Carroll also managed many of the entity defendants that did business as Wealth Assistants. Specifically, according to corporate registrations, he managed **Defendant Yax Ecommerce LLC**,[11] **Defendant WA Amazon Seller LLC**,[12] and the North Carolina branch of Defendant **WA Distribution LLC,**[13] all of which did business as Wealth Assistants.[14] Ryan Carroll also owns Defendant **Dreams To Reality LLC**, which is an owner of Wealth Assistants.[15]

Next, Defendant **Max K. Day** is an owner of Wealth Assistants. Ryan Carroll has described Max K. Day as his "mentor" and "business partner" in starting and managing Wealth Assistants.[16] Max K. Day formed and managed Defendant

---

[7] *Wealth Assistants v. Thread Bank*, No. 4:24-cv-00040, ECF 13 (S.D. Tex. 2024) (Wealth Assistants' amended complaint alleging that its owners are Ryan Carroll, Max K. Day, and Michael Day).
[8] PX A, Ex. 18 (Ryan Carroll's biography on Forbes).
[9] Many of those videos are available at https://vimeo.com/wealthassistants (last accessed April 8, 2024).
[10] Wealth Assistants, "Wealth Assistants Amazon Automation Overview," available at https://vimeo.com/wealthassistants (last accessed April 8, 2023). Carroll's discussion of financial projections begins at approximately 6:00 in the video.
[11] PX A, Ex. 3;
[12] PX A, Ex. 15.
[13] PX I, Ex. 4.
[14] Yax Ecommerce was formerly known as Wealth Assistants LLC. *See* PX A, Ex. 3. WA Distribution LLC sent invoices to Plaintiffs and collected payments from them. E.g., PX F, ¶ 17 ("We made the payment to WA Distribution LLC for $1,205.82.").
[15] *Wealth Assistants v. Thread Bank*, No. 4:24-cv-00040, ECF 13 (S.D. Tex. 2024).
[16] PX A, ¶ 13-15.

**Precision Trading Group, LLC**.[17] According to Precision Trading Group's corporate registration, it operated under the "assumed names" of "Wealth Assistants LLC," "WA Distribution, LLC," "WA Brand Management, LLC," and "WA Amazon Seller, LLC" beginning on December 14, 2022.[18]

Max K. Day is also the Director of Defendant **Providence Oak Properties, LLC.**[19] Providence Oak Properties, LLC accepted payments on behalf of Wealth Assistants from many of Wealth Assistants' customers.[20] Furthermore, a representative of Wealth Assistants stated, "Providence Oak Properties is a part of Wealth Assistants."[21]

Max K. Day also "manages" all of the following companies, which do not appear to have real operations and appear to serve solely to conceal or dissipate assets for the reasons described below:

- **Yax IP and Management Inc., f.k.a. Pithy Productions, Inc., f.k.a. "Yax IP and Management Inc.," d.b.a. Fulfillable**
    - Yax IP/Fulfillable appears to be Wealth Assistants' alter ego for the following reasons: (1) it has the same law firm of record (Mac Leckrone) as many of the Defendant entities; (2) it also has the same registered agent ("Cogency Global Inc.") as many of the defendant entities; (3) its name's prefix ("Yax") matches the prefix of the current name of Wealth Assistants LLC (which changed its corporate name to "Yax

---

[17] PX A, Ex. 2.
[18] *Id*.
[19] PX A, Ex. 5.
[20] PX F, ¶ 13.
[21] *Id*.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Ecommerce"); (4) a press release indicates that "Max Day" is the "CEO of Fulfillable."[22]

- **HouTex Farm Equity Partners LLC**
  - o HouTex is a cricket farm according to its website. According to its corporate registration, it is managed by Max K. Day and has its corporate headquarters listed as Max K. Day's home.[23] However, its phone line on its website does not seem to accept calls.[24] Because there is no evidence that it has real operations, is likely engaged in money laundering rather than cricket farming.

- **MKD Investment Adviser**;
  - o MKD Investment Adviser appears to be Max K. Day's alter ego not only because of its name but also because MKD Investment Adviser is the registered owner of Max K. Day's home.[25]

- **MKD Family Beneficiary**;
  - o MKD Family Beneficiary appears to be Max K. Day's alter ego not just because of the initials at the beginning of the corporate name, but also because it has the same registered address as MKD Investment Adviser.[26]

- **MKD Family Private Management Company;**
  - o MKD Family Beneficiary appears to be Max K. Day's alter ego not just because of the initials at the beginning of the corporate name, but also because it has the same registered address as MKD Investment Adviser.[27]

- **Max Day Consulting**
  - o Max Day Consulting appears to be Max K. Day's alter ego not only because of its name but also because its address is also Precision Trading Group, LLC's address.[28]

- **Business Financial Solutions Advisory LLC**

---

[22] PX A, Ex. 6, 16.
[23] PX A, Ex. 10.
[24] PX A, Ex. 12, 17.
[25] PX A, Ex. 14.
[26] PX A, Ex. 26.
[27] PX A, Ex. 13.
[28] PX A, Ex. 11.

- o Business Financial Solutions Advisory LLC appears to be Max K. Day's alter ego because it is managed by Max K. Day  and has the same corporate address as Max K. Day's home address.[29]
- **Evo Maxx LLC**
  - o Either Defendant Max K. Day or Defendant Max O. Day is the manager of this corporation. The attorney of record is Feras Mousilli, who is the principal of the law firm that is the attorney of record on many of the entity defendants' corporate registrations. The agent is Cogency Global Inc., which is the same agent as many of the entity defendants' corporate registrations. The address is the same as WA Amazon Seller LLC's address.[30]

Moreover, Max K. Day falsely represented to one or more of Wealth Assistants' clients that they would receive a refund on their store.[31]

Next, Defendant **Max O. Day** was the Chief Growth Officer at Wealth Assistants.[32] Max O. Day not only served as an executive of the company, but he also met with many Wealth Assistants clients and intentionally made misrepresentations to them. For example, in or around August of 2023, Max O. Day helped convince an individual named Craig Dillehay to purchase the business opportunity Wealth Assistants was offering, in part by telling Dillehay that the stores Wealth Assistants was managing were very profitable.[33] Max O. Day also helped convince an individual named Korey McAleejergins to purchase the business opportunity Wealth Assistants was offering.[34]

---

[29] PX A, Ex. 8.
[30] PX A, Ex. 9.
[31] PX L, ¶ 4.
[32] PX A, ¶. 16, Ex. 19.
[33] PX A, ¶ 17, Ex. 19.
[34] PX A, ¶ 18.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Defendant **Michael Day** was another owner of Wealth Assistants.[35] His involvement in the Wealth Assistants fraud included recruiting clients with false promises. For example, he recruited Wealth Assistants' client Haider Istanbouli with false statements about Wealth Assistants' ability to generate passive income for its clients.[36] Defendant Michael Day also owns WWKB LLC, which is an owner of Wealth Assistants.[37]

### B. Plaintiffs Would Suffer Great Harm If Their Request For An Asset Freeze Were Denied Because Defendants Have A History Of Fraud And Money Laundering

Plaintiffs would suffer great harm if the TRO were denied because Defendants would likely dissipate recoverable assets. Indeed, the limited documents available to Plaintiffs in this emergency motion already amply demonstrate that Defendants have a history of dissipating assets. *See Hilao,* 25 F.3d at 1480  (holding that temporary restraining orders are proper where plaintiffs can establish that defendant has engaged in a pattern of dissipating assets).

The Day Family defendants have a long history of fraud. In 1992, Max K. Day agreed to injunctive relief sought by the Federal Trade Commission regarding a fraudulent credit card scheme.[38] In 2006, a company called Today's Destiny—run by the Day Family defendants and other members of their family—declared bankruptcy,

---

[35] *Wealth Assistants v. Thread Bank*, No. 4:24-cv-00040, ECF 13 (S.D. Tex. 2024).
[36] PX A, Ex. 22.
[37] *Wealth Assistants v. Thread Bank*, No. 4:24-cv-00040, ECF 13 (S.D. Tex. 2024).
[38] *See Hill v. Day*, No. 06-cv-03285, ECF 1 at ¶ 14 (Bankr. S.D. Tex., 2006).

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

and the Day Family defendants were all named as defendants in an adversary pleading by the United States Trustee for Today's Destiny. The trustee stated, in part,[39]

> Through various related entities and individuals, Debtor has attempted to place its assets beyond the reach of its creditors. Debtor, Medicus, IBD, Straightaway, Teamwork, and perhaps other corporate entities, as well as the individuals have shared common addresses, bank accounts, employees, and attorneys. Common to the scheme is the acquisition of large amounts of cash through deception and fraud, and the subsequent liquidation of assets of the corporate shell used to front the deception.

Defendants have used similar tactics to hide their assets in this case. Indeed, from the beginning, Wealth Assistants dispersed across many different accounts assets collected from Wealth Assistants' victims, including Plaintiffs. It used entities that it referred to as "payment processors" to try to hide its assets.[40] "Payment processor" was Wealth Assistants' euphemism to describe a money-laundering mule. That is, a payment processor's role was to receive payments from Wealth Assistants' clients and then pass those payments to other bank accounts not disclosed to Wealth Assistants' clients.

For example, a law firm called Marker Law served as a payment processor for Wealth Assistants.[41] Marker Law received the payments from Wealth Assistants' clients and then passed the payments to other bank accounts, which were affiliated

---

[39] *Id.* at ¶ 18. The Trustee's case was supported by ample evidence, including a declaration from an insider describing how the Day family perpetrated the fraudulent scheme. *See Hill v. Day*, No. 06-cv-03285, ECF 718 (Bankr. S.D. Tex., 2006) (describing much of the evidence presented).
[40] PX A, ¶ 19-21.
[41] PX I, ¶ 4.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

with Wealth Assistants but not disclosed to Plaintiffs.[42] Marker Law collected these payments by shipping Wealth Assistants' clients credit card readers and having the clients make small discrete payments into the credit card readers.[43]

Defendants collected payments from Plaintiffs in plenty of other clandestine accounts. An entity called Mint Solutions was a "payment processor" that, like Marker Law, collected payments from Wealth Assistants clients and passed those payments to unknown accounts.[44] Moreover, an account associated with Defendant WA Distribution LLC accepted some of the credit card payments from Plaintiffs;[45] an account associated with Defendant Precision Trading Corp. LLC accepted some payments from Plaintiffs;[46] and many payments were directed to an account affiliated with "Wealth Assistants LLC," which is the former name of the entity now known as Yax Ecommerce LLC.[47] However, those three accounts were *not* the final destination for payments that were originally sent to payment processor Marker Law.[48]

Wealth Assistants' dispersed accounts also included at least three bank accounts at Bank of America opened by Defendant Ryan Carroll.[49] On or around November 17, 2022, Bank of America froze Wealth Assistants' accounts.[50] After Wealth Assistants

---

[42] *Id.*, ¶ 4-6.
[43] *Id.*
[44] PX A, ¶ 22.
[45] PX F, ¶ 17.
[46] PX K, ¶ 6.
[47] PX K, Ex. 1 (Stoops's contract with Wealth Assistants, which includes wiring instructions to Wealth Assistants LLC at p. 13).
[48] PX A, Ex. 21 (the banking information that Marker Law used to send payments to Wealth Assistants).
[49] *Wealth Assistants LLC v. Bank of America, N.A.*, 4:23-cv-00216 (S. Dist. Tex. 2006), ECF 1.
[50] *Id.*

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

sued Bank of America, the bank closed the accounts by writing a cashier's check to Wealth Assistants for over $3.7 million.[51] Similarly, in or around October of 2023, a bank called Thread Bank froze at least six distinct bank accounts that Wealth Assistants had opened with that bank.[52]

In the end, there is probably no way to identify all of the many accounts to which Defendants have already dispersed the funds they fraudulently collected from Plaintiffs. But there is no doubt that it would cause great harm to Plaintiffs to allow Defendants to continue to disperse and conceal the remaining assets by denying the TRO.

**C. The Balance Of Hardships Favors Granting The Injunctive Relief**

Defendants "can have no vested interest in [a] business activity found to be illegal." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972) (internal quotations and citation omitted); *see also FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).

Here, Plaintiffs will suffer a large degree of harm without injunctive relief from this court because, as discussed above, there is a strong likelihood that Defendants will continue to hide and dissipate their assets, rendering final relief impossible. By contrast, there is no oppressive hardship to Defendants in requiring them to produce basic information about their financial accounts and refrain from concealing their

---

[51] *Wealth Assistants LLC v. Bank of America, N.A.*, 4:23-cv-00216 (S. Dist. Tex. 2006), ECF 27.
[52] *Wealth Assistants v. Thread Bank*, No. 4:24-cv-00040 (S.D. Tex. 2024), ECF 1.

assets or continuing to use those assets in an illegal manner. *See World Wide Factors,* 882 F.2d at 347.

To be sure, an asset freeze may cause significant harm to individual defendants if it prevents them from meeting their basic living expenses. *See Johnson v. Couturier,* 572 F.3d 1067 (9th Cir. 2009). Here, however, the proposed order provides an ample allowance of $9,000 per month for the individual defendants to meet their basic living expenses.

### D. The Requested Injunctive Relief Is In The Public Interest

Asset freezes can "serve the public's interest in stopping, investigating and remedying frauds." *Gaponyuk v. Alferov,* 2:23-cv-01317-KJM-JDP, at *5 (E.D. Cal. July 20, 2023) (citing *Jacobo v. Doe,* No. 22-00672, 2022 WL 2079766, at *2 (E.D. Cal. June 9, 2022). Here, for the reasons discussed above, freezing Defendants' assets would be in the public's interest because it would preserve the possibility of a meaningful remedy not just for Plaintiffs, but also for Defendants' hundreds of other victims.

### E. In Nearly Identical Cases, Courts Have Issued Temporary Restraining Orders

Courts in the Ninth Circuit have granted *ex parte* motions for temporary restraining orders in cases nearly identical to this one that were recently brought by the Federal Trade Commission ("FTC"), and in those cases the courts did so without any notice to the defendants. For example, in *FTC v. Automators,* 23-cv-1444 (S. D.

Cal. 2023), ECF 5, the Federal Trade Commission described the facts this way in its *ex parte* motion for a temporary restraining order:

> Defendants lure consumers into "investing" in a "100% turnkey" Amazon or Walmart Automation store with promises that it will generate passive income and become a "cash flow machine."
> . . .
> Defendants—using the names Automators LLC, Empire Ecommerce LLC, Onyx Distribution LLC, Stryder Holdings LLC, and Pelenea Ventures LLC—have sold online store business opportunities ranging in price from $10,000 to $175,000. In addition to that initial fee, purchasers have had to provide "working capital" for the stores Defendants promised to run for them, ranging from $15,000 to $80,000. The vast majority of Defendants' clients have lost their entire investment and more, and many were left with massive credit card bills.

Incredibly, the *Automators* fraudulent scheme and the *Wealth Assistants* fraudulent scheme were so similar that they even used a virtually identical pitch deck to lure victims. For example, compare the financial projections slide in the *Automators* pitch deck to the financial projections slide in the *Wealth Assistants* pitch deck:

## Automators Pitch Deck Financial Projections[53]

**OUR AMAZON MANAGEMENT**
**FINANCIAL PROJECTION BREAKDOWN**

| Month | Monthly Gross Sales | Monthly Profit Totals | ROI Percentages |
|---|---|---|---|
| 1-2 (Warm Up Period) | up to $10,000 | up to $3,000 | 10 – 25% |
| 3-4 | $3,000 – $20,000 | $300 – $6,000 | 10 – 25% |
| 5-8 | $10,000 – $40,000 | $1,000 – $12,000 | 10 – 25% |
| 9-12 | $20,000 – $80,000 | $2,000 – $24,000 | 10 – 25% |
| First Year Totals: | $125,000 – $540,000 | $12,500 – $162,000 | 10– 25% |
| 12-16 | $60,000 – $110,000 | $6,000 – $33,000 | 10 – 25% |
| 16-20 | $100,000 – $135,000 | $10,000 – $40,500 | 10 – 25% |
| 20-24+ | $135,000 – $185,000+ | $13,500 – $55,500+ | 10 – 25% |

*Please note these numbers are before our profit splits

## Wealth Assistants Pitch Deck Financial Projections[54]

**OUR AMAZON MANAGEMENT**
**FINANCIAL BREAKDOWN**

| Month | Monthly Gross Sales | Monthly Profit Totals | ROI Percentages |
|---|---|---|---|
| 1-3 (Probation Period) | $7,000 - $10,000 | $1,000 - $2,000 | 15 - 20% |
| 3-6 | $20,000 - $35,000 | $3,000 - $7,000 | 15 - 20% |
| 6-9 | $35,000 - $50,000 | $5,000 - $10,000 | 15 - 20% |
| 9-12 | $50,000 - $80,000 | $7,500 - $16,000 | 15 - 20% |
| First Year Totals: | $315,000 – $525,000 | $49,500 – $105,000 | 15 – 20% |
| 12-16 | $80,000 - $110,000 | $12,000 - $22,000 | 15 - 20% |
| 16-20 | $110,000 - $135,000 | $16,500 - $27,000 | 15 - 20% |
| 20-24+ | $135,000 - $185,000+ | $20,250 - $37,000+ | 15 - 20% |

*Please note these numbers are before our profit splits

---

[53] *See FTC v. Automators*, 23-cv-1444 (S. D. Cal. 2023), ECF 1.
[54] PX A, Ex. 23.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

The Federal Trade Commission moved *ex parte* for a temporary restraining order that included an asset freeze and a requirement for the *Automators* Defendants to produce financial information. *Id.* The legal standard the district court applied to determine whether to issue a temporary restraining order was the same as the standard courts apply to determine whether to issue a temporary restraining order upon the request of a private party.[55]

The court granted the Federal Trade Commission's motion for an *ex parte* temporary restraining order— all the relief that Plaintiffs are requesting in the present case (specifically, an asset freeze and a turnover of financial statements), among other relief—reasoning as follows:[56]

> [T]he current record demonstrates that there is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers—including monetary restitution, rescission, or refunds—will occur from the sale, transfer, destruction or other disposition or concealment by Defendants or Relief Defendant of their assets or records, unless Defendants and Relief Defendant are immediately restrained and enjoined by order of this Court. Thus, there is good cause for relieving the FTC of the duty to provide Defendants and Relief Defendant with prior notice of its Motion for a Temporary Restraining Order.

Likewise, in *FTC v. AWS*, 18-cv-00442 (D. Nev. 2018), the FTC described the facts this way in its *ex parte* motion for a temporary restraining order:

> Defendants prey on consumers who seek the American dream of starting a new business. Defendants lure consumers into purchasing expensive business opportunities with purported "secrets for making money on Amazon." They represent that purchasers are likely to "create financial freedom" and earn thousands of dollars a month by implementing Defendants' "systems for

---

[55] Fed. R. Civ. P. 65(b).
[56] *See Federal Trade Commission v. Automators*, 23-cv-1444 (S. D. Cal. 2023), ECF 8.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

success on Amazon." Contrary to Defendants' promises, most, if not virtually all, purchasers do not earn the advertised income.

The Court summarily granted the plaintiff's *ex parte* motion for a temporary restraining order. The *AWS* court's order included all the relief Plaintiffs are requesting in this case, along with other relief.[57]

### F. Plaintiffs Should Not Be Required To Post Any Security In Connection With The Temporary Restraining Order

Federal Rule of Civil Procedure 65(c) states:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

However, "The district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Conn. Gen. Life Ins. Co. v. New Images*, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted). "Further, a strong likelihood of success on the merits may favor "a minimal bond or no bond at all." *California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

Here, because Plaintiffs have shown that they will succeed on the merits, there is no evidence that Defendants will suffer damages from the injunction. Accordingly,

---

[57] *Id.* at ECF 25.

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Plaintiffs respectfully request that the Court exercise its discretion to not require a bond in connection with the temporary restraining order.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court issue the requested Order to Show Cause and Temporary Restraining Order.

DATED: April 9, 2024

/s/Nico Banks
Nico Banks, Esq.
Banks Law Office
Bar No. 344705
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002

PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

# WORD COUNT COMPLIANCE CERTIFICATION

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains fewer than 7,000 words, which complies with the word limit of L.R. 11-6.1

/s/Nico Banks
Nico Banks
Dated: April 9, 2024

# AFFIRMATION OF NOTICE GIVEN

On April 9, 2024, I emailed Lema Mousilli (lema@lloydmousilli.com) and Rachel Crockett (rachel@lloydmousilli.com)—both of whom are lawyers at the law firm Lloyd Mousilli in Dallas, Texas—with a link to the Complaint, Temporary Restraining Order, and all Exhibits to the Temporary Restraining Order. In other proceedings, those two lawyers have represented all defendants in this matter. In March of 2024, Lema Mousilli requested that I direct communications in all matters to her firm rather than directly to her clients.

I assume that Defendants oppose the motion.

I declare under penalty of perjury under the laws of the State of California that the foregoing statements in this Affirmation of Notice Given are true and correct.

/s/Nico Banks
Nico Banks
Dated: April 9, 2024