# EXHIBIT K

**DECLARATION OF PHILIP STOOPS  IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

I, Philip Stoops, have personal knowledge of the facts set forth below and if called to testify about them, I would do so competently.

1. My name is Philip Stoops. I am over the age of 18.

2. In the spring of 2023, I discovered Wealth Assistants by viewing advertisements on TikTok promoting Wealth Assistants.

3. On June 27, 2023, I received an email from Eveleen Toner, a Wealth Assistants representative. Toner's email stated, in part, that a "new store" managed by Wealth Assistants would "get you to approx. $10k+ clear profit per month by early year 2 . . ." Toner's email also stated that "'AAA' stores are valuable assets we have already acquired and will transfer over to your Business, should you want to go this route. They are high performing shell stores, that allow for immediate scalability and fast growth, utilizing a minimum of $50k+ working capital inventory spend in the first 4 months."

4. Relying on the representations in Toner's email, I agreed to pay Wealth Assistants to set up and manage an online store on my behalf. Exhibit 1 to this Declaration is a true and correct copy of the Services Agreement I signed with Wealth Assistants.

5. Pursuant to the agreement referenced in the paragraph above, I was required to pay Wealth Assistants a $75,000 onboarding fee.

6. On July 12, 2023, I paid the $75,000 onboarding fee. Exhibit 2 to this Declaration is a true and correct copy of my wire-transfer request to transfer a $75,000 onboarding fee from my bank account to Precision Trading Group LLC.

7. Wealth Assistants never set up an online store for me and never refunded my fee.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Signature: _Philip Stoops (Dec 23, 2023 14:03 EST)_

Date: 23/12/2023

# EXHIBIT 1

SERVICE AGREEMENT

FOR ECOMMERCE STORE MANAGEMENT

This Service Agreement for Ecommerce Store Management (together with its Exhibits, the "**Agreement**"), effective as of the date of last signature below (the "**Effective Date**"), is by and between Wealth Assistants LLC, a Wyoming limited liability company at 5830 E. 2d Street, Suite 7000 #4224, Casper, WY 82609 (the "**Service Provider**"), and the entity specified in the signature block below (the "**Client**").  Service Provider and Client may be referred to herein collectively as the "Parties" or individually as a "**Party.**"

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Services.  Upon receipt of the Fees (described in Exhibit B) as they are due and payable, Service Provider will undertake the management of Client's "seller ID / merchant token" account hosted on the internet (the "**Store**") by an ecommerce merchant platform provider (the "**Host**") by providing the services described in Exhibit A (the "**Services**").

   A. Service Provider will provide the Services in a timely and workmanlike manner, using knowledge and recommendations for performing the Services that meet generally acceptable standards in Service Provider's community and region.

   B. Proprietary Rights.  As part of the Services, at its sole discretion, Service Provider may utilize its work, software, inventions, know-how and trade secrets for the limited purpose of Service Provider's provision of the Services during the Term; however, except for the Transfer, no proprietary rights are conveyed (express or implied) and no work made for hire is undertaken hereunder.

   With respect to any intangible proprietary rights (such as copyrights, trademark rights, etc.) associated with the Store and owned or licensable by Client ("**Client IP Rights**"), Client hereby conveys to Service Provider the right to utilize the Client IP Rights for the limited purpose of Service Provider's provision of Services during the Term, and for archival purposes thereafter.

   C. Relationships.  Neither provision of the Services, nor anything in this Agreement shall be construed as creating any agency, partnership, joint venture, or other forms of joint enterprise, exclusive, employment, or fiduciary relationship between the Service Provider and its agents and employees on the one hand, and Client and its agents and employees on the other.

   Client understands and acknowledges that Service Provider may engage subcontractors in its provision of the Services but doing so will not relieve Service Provider of its obligations hereunder.

   D. Force Majeure.  If the performance of this Contract or any obligation under it (other than payment obligations) is prevented, restricted, or interfered with by

Initials:  Client ___*P.S.*___  Service Provider ___*R.C.*___

Exhibit K to Motion for TRO
227

causes beyond either Party's reasonable control ("**Force Majeure Event**"), the non-performing Party will be excused from performing the obligation(s) hereunder for as long as such circumstances prevail.

2. Client Responsibilities.

   A. Hold Harmless.  Client assumes all and exclusive responsibility for (including the holding harmless and indemnification of Service Provider (and its affiliates) for all losses due to) lapses or failures of Compliance.

   B. Compliance.  Time is of the essence with respect to the maintenance of "**Compliance**," which requires that Client shall:

      i. Provide to Service Provider copies of all communications from third parties regarding the Store;

      ii. Maintain Confidential Information as confidential;

      iii. Refrain from (a) the publication of any information relating to the Store or the Services or Service Provider in violation of applicable law, or of any guidelines or terms of service applicable to the Store, and (b) all activity which (in the reasonable opinion of Service Provider) would either compromise the integrity or value of the Store, or interfere with Service Provider's reputation or its provision of services generally;

      iv. Maintain a Host seller account in good standing with respect to Host fees and Host insurance requirements;

      v. Pay Fees in accordance with Exhibit B;

      vi. Maintain Store inventory at or above the Inventory Levels (as described at Exhibit A – Inventory Levels); and

      vii. Assure the continuous ownership of Store, free of all liens, by a legal US business entity over which Client has control (the "**Owner**"), and assure that Owner remains in good standing with its affiliates, creditors, and other taxing and legal authorities with proper jurisdiction over it.

   C. Inventory Planning Reports.  Service Provider shall provide Inventory Planning Reports summarizing the proposed inventory purchases, along with an invoice for such purchases, which Client shall approve within 5 days of receipt.

   D. Taxes.  Client is solely responsible for obtaining all applicable business licenses, state sales tax exemption certificates, paying any legally required taxes, filing any lawfully required tax returns, and paying all Store-related account fees, hosting fees.

Initials:  Client _P.S._  Service Provider _R.C._
Exhibit K to Motion for TRO
228

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

3. <u>Payments</u>.

   A. <u>Payment of Fees</u>.  Client shall pay Service Provider in the time, manner and amounts described at Exhibit B – Schedule of Fees (the "**Fees**").  Invoices shall contain reasonable detail.

   B. <u>Non-Refundable</u>.  All payments due hereunder are non-refundable except as otherwise specified.

   C. <u>Taxes</u>.  Prices in this Agreement do not include taxes.  Client shall be responsible for all taxes imposed on Client's income or property.

   D. <u>Late Payments</u>.  Client shall pay interest on all late payments, calculated daily and compounded monthly at the lesser of the rate of one and one-half percent (1.5%) per month or the highest rate permissible under applicable law.

   E. <u>Security Interest</u>.  As security for all Client's payment obligations hereunder, Client hereby pledges to Service Provider and grants a security interest in any and all of its ownership interest in the Store and associated proceeds, accounts, and inventory to be reflected in a UCC-1 filed by Service Provider.

4. <u>Term & Termination</u>.

   A. <u>Expiration</u>.  Unless earlier terminated or Renewed in accordance with this Agreement, this Agreement will automatically expire three years after the Effective Date (the "**Initial Term**").  To be "**Renewed**," Client must:  (i) remain in Compliance; and (ii) provide Notice of renewal thirty days prior to termination, and (iii) remit payment to Service Provider of the Annual Fee.  This Agreement may be Renewed with Service Provider's approval perpetually, and if Renewed, the new term (the "**Renewal Term**") shall be three years.  "**Term**" means the Initial Term plus the Renewal Terms.

   B. <u>Termination for Cause</u>.  Failure to pay or perform a material obligation within the time prescribed shall constitute an event of default.  Either Party may terminate this Agreement upon default by the other Party subject to:  (i) giving Notice to the defaulting Party describing the non-performance; and (ii) a 30 day cure period for the defaulting Party to re-establish compliance, if possible (during which time, in the event of late payments, Service Provider may terminate or suspend all or part of any agreements between the Parties).

   C. <u>Termination for Buyback</u>.  This Agreement shall terminate in the event Client receives the Buyback Amount (as described in Exhibit C).

   D. <u>Effect of Termination</u>.  Upon termination, Client's Store account information including login credentials, Client supplier and customer information, Client sales and financial data, Client customer data, and other Client data necessary for Client to continue to operate the Store in its original condition, shall be promptly delivered to Client.  Sections 1C, 2A, 2B(iii), 2D, 3 (with respect to all obligations arising prior to termination), 4, 5, 7, 8, and 9, shall survive termination.

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO

229

5. <u>Confidentiality</u>.

A. "**Confidential Information**" means all business or technical information disclosed by Disclosing Party to Receiving Party in connection with the Agreement, including but not limited to: (i) customer lists and data, sales data, financial data, product catalog and supplier data unique to the Store, and any other business or technical information uniquely associated with the Store generally recognized as confidential in the e-commerce industry, and (ii) business practices, methods, descriptions, theories of operation and identity of subtractors employed by Service Provider in its conduct of the Services, and (iii) Personal Data, and (iv) this Agreement. "**Personal Data**" means any information relating to an identified or identifiable natural person.

Except for Personal Data, Confidential Information shall not include information that: (i) was previously known; (ii) is a matter of public knowledge; (iii) was or is independently developed without reference to or use of the other party's Confidential Information; or (iv) is received from a third party to whom it was disclosed by the Disclosing Party without restriction.

B. The party receiving Confidential Information ("**Receiving Party**") of the other ("**Disclosing Party**") shall not use Confidential Information for any purpose except as necessary to implement, perform or enforce the Agreement. Receiving Party shall: (i) keep all Confidential Information of Disclosing Party strictly confidential; (ii) not disclose the Confidential Information of Disclosing Party to anyone other than its Authorized Recipients; and (iii) only use Personal Data as permitted by applicable Laws. Receiving Party will promptly notify Disclosing Party if Receiving Party discovers any improper use or disclosure of Confidential Information and will promptly commence all reasonable efforts to investigate and correct the causes of such improper use or disclosure.

"**Authorized Recipient**" means: (i) with respect to Client, Client and any employee of Client; and (ii) with respect to Service Provider, Service Provider, its affiliates and their respective employees, contractors, or agents, in the case of (i) or (ii) that has a reasonable need to know the Confidential Information in connection with the use or provision of the Services and who are required to protect and restrict the use of the other party's Confidential Information in accordance with terms substantially similar to the requirements of this Agreement.

C. If Receiving Party believes the Confidential Information must be disclosed or made publicly available under applicable Law, an order of a court of competent jurisdiction or in response to a valid request from a governmental regulator, Receiving Party may do so provided that, to the extent permitted by such applicable Law, court of competent jurisdiction or governmental regulator, the Disclosing Party is given a reasonable opportunity to contest such disclosure and obtain a protective order, and shall in any event omit all pricing, service level or Solution specific information from any such disclosure or public filing, unless such omission is prohibited by Law.

Initials: Client _P.S._ Service Provider _R.C._
Exhibit K to Motion for TRO
230

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

D. Notwithstanding the foregoing, Client authorizes Service Provider to store (where applicable) and use all data provided by or on behalf of Client and/or its users of the Store, including customers, in connection with the Services, and all information that is derived from such data, in order to provide the Services, to create and provide Anonymized Information to third parties, and for other purposes permissible under applicable law. "**Anonymized Information**" means data provided by or on behalf of Client or the Store in connection with the Services, including without limitation customers, suppliers, sales and like, and all information that is derived from such data, that has been rendered anonymous by removing names and other personal information such that it does not relate to nor is reasonably linkable to Client. Service Provider may use its affiliates in creating the Anonymized Information.

6. Representations and Warranties.

A. Authority. The Parties each represent and warrant the signatory below is authorized to bind the Party for whom it is signing, and the Party has the authority to enter this Agreement.

B. Disclaimer. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE SERVICES ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, TITLE, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, AND SUCH IMPLIED WARRANTIES, ANY OTHER WARRANTIES, REPRESENTATIONS, CONDITIONS AND TERMS, EXPRESS OR IMPLIED (AND WHETHER IMPLIED BY STATUTE, COMMON LAW, COURSE OF DEALING, TRADE USAGE OR OTHERWISE) ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW.

C. No Reliance. SERVICE PROVIDER MAKES NO GUARANTEE OF ANY KIND OR NATURE REGARDING THE EFFECTIVENESS OR RESULTS OF THE SERVICES OR STORE, INCLUDING SPECIFICALLY WHETHER OR NOT FEES WILL EXCEED GROSS INCOME OR BE RECOUPED. Accordingly, no Store success, earnings, or results can be viewed as typical, average, expected, or be reasonably relied upon. The performance of each store managed by Service Provider, including Client's Store, is determined by factors both known and unknown, both manageable and unmanageable, including but not limited to (i) the amount and value of Client's efforts, (ii) Client's acts and omissions and adherence to Service Provider's guidelines, (iii) the availability, timing and use of Client working capital, (iv) the quality and desirability of Store products and variable market conditions relevant to such products, (v) general economic conditions and fluctuations, (vi) Host policies and enforcement, and (vii) third party search and review algorithms.

D. Buyback Warranty. Provided Client is in Compliance, Service Provider guarantees Client a Store Buyback, as described at Exhibit C, entitled, "Store Buyback."

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO

231

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

7. <u>Indemnification</u>.  Client shall indemnify, hold harmless, and, at Service Provider's option, defend Service Provider (including its employees, agents, officers and directors) from and against any Losses resulting from any third-party claim that the Store infringes or misappropriates such third party's intellectual property rights and any third-party claims based on Client's (i) tortious or unlawful misconduct, (ii) use of the Services in a manner not authorized by this Agreement, (iii) modifications to the Services not made by Service Provider, or (iv) the introduction of an outside contractor; provided that Client may not settle any third-party claim against Service Provider unless Service Provider consents to such settlement, and further provided that Service Provider will have the right, at its option, to defend itself against any such third-party claim or to participate in the defense thereof by counsel of its own choice.  "**Losses**" means losses, damages, liabilities and costs (including reasonable attorney fees).  Service Provider shall hold harmless and indemnify Client for its Losses resulting from third party claims directly related to Service Provider's grossly negligent provision of Services hereunder.

8. <u>Limitation of Liability</u>.  IN NO EVENT WILL SERVICE PROVIDER BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY:  (i) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES; (ii) INCREASED COSTS, DIMINUTION IN VALUE OR LOST BUSINESS, PRODUCTION, REVENUES, OR PROFITS; (iii) LOSS OF GOODWILL OR REPUTATION; (iv) USE, INABILITY TO USE, LOSS, INTERRUPTION, DELAY, OR RECOVERY OF ANY DATA, OR BREACH OF DATA OR SYSTEM SECURITY, INCLUDING FOR EXAMPLE ANY OF THE FOREGOING RESULTING FROM A SERVICE SUSPENSION; OR (v) COST OF REPLACEMENT GOODS OR SERVICES, IN EACH CASE REGARDLESS OF WHETHER SERVICE PROVIDER WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE.  IN NO EVENT WILL SERVICE PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE EXCEED THE TOTAL AMOUNTS PAID TO SERVICE PROVIDER UNDER THIS AGREEMENT IN THE TWELVE-MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $100,000, WHICHEVER IS LESS.

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO

232

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

9.  <u>General</u>.

A.  <u>Entire Agreement</u>.  This Agreement exclusively governs the relationship
between the Parties with respect to the subject matter hereof, and constitutes
the entire agreement and understanding between the Parties, superseding all
previous such agreements and understandings.  No prior dealings between the
Parties shall be relevant to supplement, interpret, or explain any word used
herein, and no usage of the trade shall be applicable to supplement, interpret, or
explain any term used herein.  All exhibits hereto are part of this Agreement,
and to the extent they contain capitalized terms not defined therein, such terms
shall have the meaning as defined herein.

B.  <u>Notice</u>.  "**Notice**" means a notification or other communication hereunder that is:
(i) in writing, and (ii) addressed to a Party at their address set forth in this
section (or to such other address (or email address) as such Party may later
designate pursuant to Notice), and (iii) timely delivered via nationally recognized
overnight courier (with all fees pre-paid) providing proof of delivery, or via email
if so designated, and (iv) effective upon receipt of such Party.

| Service Provider | Client |
|---|---|
| Attention:  Notices<br>Wealth Assistants, LLC<br>1334 Brittmoore Rd #1001<br>Houston, TX 77043<br><br>with a copy to:<br>legal@wealthassistants.com | Philip Stoops<br>2 Winding Way<br>Glen Mills, PA 19342 |

C.  <u>Dispute Resolution</u>.

Any controversy or claim arising out of or relating to this Agreement, or the
breach thereof, shall be settled by arbitration administered by the American
Arbitration Association in accordance with its Commercial Arbitration Rules and
judgment on the award rendered by the arbitrator(s) may be entered in any court
having jurisdiction thereof.

Claims shall be heard by a single arbitrator.  The place of arbitration shall be
Harris County, Texas.  The arbitration shall be governed by the laws of the State
of Texas.  Each party will, upon written request of the other party, promptly
provide the other with copies of all relevant documents.  There shall be no other
discovery allowed.  The arbitrator will have no authority to award punitive or
other damages not measured by the prevailing party's actual damages, except
as may be required by statute.

The arbitrator shall not award consequential damages in any arbitration initiated
under this section.  Each party shall bear its own costs and expenses and an
equal share of the arbitrator's and administrative fees of arbitration. The award
of the arbitrator shall be accompanied by a reasoned opinion. Except as may be
required by law, neither a party nor an arbitrator may disclose the existence,

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO

233

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

content, or results of any arbitration hereunder without the prior written consent of both parties.

D. <u>Amendment.</u>  This Agreement may not be modified except by written mutual agreement executed by authorized representatives of the Parties and indicating its intent to serve as such an amendment.

E. <u>Assignment</u>.  This Agreement shall be freely transferable by the Parties; provided that any purported assignment by Client (i) must be an assignment of all Client's rights and obligations hereunder, and (ii) must be preceded by 30 days Notice to Service Provider, and (iii) shall entitle Service Provider to a Transfer Fee (as described in Exhibit B).

F. <u>Waiver</u>.  No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving; and unless otherwise provided in such writing shall be limited to such specific instance and circumstances.  Except as otherwise set forth in this Agreement, (i) no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, and (ii) no single or partial exercise of any right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

G. <u>Severability</u>.  If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO

234

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

**IN** WITNESS WHEREOF, duly authorized representatives of the Parties have executed this Agreement (electronically or in writing) as of the Effective Date.

| SERVICE PROVIDER<br>Wealth Assistants, LLC | CLIENT<br>Philip Stoops |
|---|---|
| By: _____<br>*(signature)* | By: *Philip Stoops*<br>*(signature)* |
| Name: Ryan Carroll<br>Title: CEO<br>Date: 07-10-2023 | Name: Philip Stoops<br>Title: Owner<br>Date: 07-10-2023<br>Address: 2 Winding Way<br><br>Glen Mills, PA 19342 |

Acknowledged and agreed:

| | |
|---|---|
| By: _____<br>*(signature)* | By: _____<br>*(signature)* |
| Name: _____<br>Title: _____<br>Date: _____ | Name: _____<br>Title: _____<br>Date: _____ |

Initials:  Client *P.S.*   Service Provider *R.C.*

Exhibit K to Motion for TRO

235

## EXHIBIT A

### DESCRIPTION OF SERVICES – TRIPLE 'A' STORE

1. <u>Overview</u>.  Service Provider will be responsible for Store operations.  The Service Provider's principal aims are to provide a "done for you" operation for Client, focusing on high-quality lawfully commercialized products offered at competitive prices accompanied by excellent customer service for end-user customers in a manner that promotes growth.

   A. <u>Initial Phase</u>.  Initially, Service Provider will manage the process of transferring the Store to Client (the "**Migration**").  Migration includes but is not limited to: finalizing the Transfer (described at Exhibit D), changing account names, email address, bank account information, payment information, and other steps required by the Host.  Migration generally takes 1 to 2 weeks but may be substantially delayed if issues arise.  Migration completes upon delivery of new account credentials and the training manual.

   B. <u>Ramp-Up</u>.  During the remainder of the first year, Service Provider will steadily encourage and support ramping up the scale of the Store by, for example, increasing product listings, optimizing SEO, and exploring advertising opportunities.  Increased inventory will be required to meet increased demand as described below.  The focus of this period is to lay the groundwork for future success.

| MONTHS | COST OF INVENTORY PER MONTH |
|--------|------------------------------|
| 1 | $15,000 |
| 2 - 3 | $30,000 |
| 4 - 6 | $50,000 |
| 7 - 12 | $70,000 |
| 13 – 18 * | $90,000 |
| * The end of this period is the "**Milestone.**" | |

2. <u>Logistics</u>.

   A. <u>Set-Up</u>.  Upon the Effective Date, Client may desire assistance related to identifying and communicating with third parties specializing in corporate services such as entity formation, obtaining taxpayer identification numbers, establishing accounts to be used in conjunction with the Services, applying for (re)seller permits, and the like ("**Corporate Services**").  For the convenience of Client, Service Provider agrees to cooperate with Client in identifying and facilitating communications with such providers of Corporate Services, and at other times may also provide various reports (including financial reports) and advice associated with Store operations ("**Administration**").  HOWEVER, (i) CLIENT UNDERSTANDS AND ACKNOWLEDGES THAT SERVICE PROVIDER IS NOT ITSELF A PROVIDER OF CORPORATE SERVICES, AND SERVICE PROVIDER CANNOT AND DOES NOT (AND SHALL FOR PURPOSE BE

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO

236

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

DEEMED TO HAVE) PROVIDE(D) LEGAL ADVICE, TAX ADVICE, FINANCIAL ADVICE OR ANY OTHER RELATED PROFESSIONAL ADVICE, and (ii) CLIENT HEREBY RELEASES AND WAIVES ALL CLAIMS (KNOWN AND UNKNOWN) ARISING OUT OF SERVICE PROVIDER'S ADMINISTRATION, AND (iii) CLIENT AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS SERVICE PROVIDER FROM ALL LOSSES ASSOCIATED WITH ANY THIRD PARTY CLAIMS RELATED TO ADMINISTRATION. All Administration expenses incurred by Service Provider are the responsibility of Client, and when incurred by Service Provider will be added to the next invoice from Service Provider and paid by Client in the same way as the fees associated with such invoice.

B. <u>Purchasing</u>. Inventory Invoices will generally be provided to Client monthly, but may be more frequent in the event additional inventory is required. Delayed payment of Inventory Invoices can put the Store at risk of suspension by Host. Inventory and purchasing responsibilities are assigned as follows:

| INVENTORY AND PURCHASING RESPONSIBILITIES | |
|---|---|
| Service Provider | Client |
| • Send Inventory Invoices to Client<br>• Order inventory for Store | • Approve Inventory Invoices<br>• Pay approved Inventory Invoices within 5 days |

3. <u>Operations</u>.

A. <u>Geography</u>. Service Provider may use but is not limited to using USA-based suppliers, USA-based consultants, and international-based virtual assistants (VAs).

B. <u>Management</u>. Service Provider will serve as a business consultant for the Store; performing for example:

- Product research and analysis of market data to identify top-selling products,
- Supplier relationships,
- Strategic sourcing or bulk-ordering products from optimal suppliers,
- Planning warehousing and fulfillment options,
- Product listings including, pricing decisions, and pricing updates,
- Deployment of Store look and feel (including Store name which may change from time to time),
- Customer service including quality control, and processing returns, and
- Internal financial reporting.

Service Provider shall make commercially reasonable efforts to maintain the uniqueness of the Store. In the event Client discovers certain inventory overlap with other stores, Client agrees to notify Service Provider.

Initials:  Client _P.S._  Service Provider _R.C._

Exhibit K to Motion for TRO
237

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

C. <u>Suspensions</u>.  In the event Client's account with Host becomes "suspended" or
otherwise interrupted by Host, then Service Provider will pause provision of
Services and assign the matter to Service Provider's Suspension Team to pursue
reinstatement.  In the event such pursuit is unsuccessful, Service Provider shall
provide a substitute Store.

Initials:  Client _P.S._    Service Provider _R.C._
Exhibit K to Motion for TRO
238

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

## EXHIBIT B
## SCHEDULE OF FEES

### 1. FEES

| FEES | | |
|---|---|---|
| **ITEM** | **AMOUNT** | **DUE DATE** |
| **Set-Up Fee ($)** | Store 1: $75,000<br>Store 2: `$72,000 | 2 Days from Effective Date |
| **Success Fee (%)** | 50% | 5 Days from receipt of invoice. |
| **Upgrade Fee ($)** | $50,000 | 20 Days after 1st anniversary of Effective Date |
| **Annual Fee ($)** | 2,500 per Store | 10 Days after each anniversary of the Effective Date |
| **Transfer Fee** | 30% of Proceeds if in Years 1–3;<br>20% of Proceeds if in Years 4–6;<br>10% of Proceeds thereafter. | 10 Days after the effective date of the transfer or close of escrow whichever is earlier |

- "**Success Fee**" means a percent of Gross Income.
- "**Gross Income**" means total Store revenue, less the cost of sales returns, allowances, discounts, and cost of goods sold.
- "**Proceeds**" means the gross amount of all consideration paid or payable for the transfer, less any cost of escrow.
- "**Years**" means calendar years since the Effective Date of this Agreement.
- "**Days**" means business days.
- "**Base Model**" means brand new Amazon Seller Account
- Additional Stores.  After the initial Store is set-up, additional Store Set-Up fees are discounted by $3,000 per additional Store.

### 2. PAYMENTS

Client shall make payments in US dollars to:

| FOR PAYMENT BY WIRE | |
|---|---|
| Account Holder's Name | Wealth Assistants LLC |
| Account Holder's Address | 1334 Brittmoore Rd., Suite 1001, Houston, TX 77043 |
| Account # | ██████2209 |
| Bank Name | Wells Fargo |
| ABA / Routing # | 121000248 |
| FOR PAYMENT BY CHECK | |
| Payee Name | Wealth Assistants LLC |
| Send Check to | 1334 Brittmoore Rd., Suite 1001, Houston, TX  77043 |

13 of 16

Initials:  Client _P.S._   Service Provider _R.C._

Exhibit K to Motion for TRO

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

EXHIBIT C

STORE BUYBACK

In the event Profit does not exceed the Threshold by the Milestone, Client may elect to receive from Service Provider:  (1) a Credit, or (2) the Buyback Amount.

"**Profit**" means Gross Income less the Success Fee received by the Milestone.

"**Threshold**" means Gross Income in the amount of the Set-Up Fee.

"**Credit**" means an amount equivalent to the Annual Fee, and redeemable, at Client's option, by refund if already paid, or by application to Client's account.

"**Buyback Amount**" means an amount equivalent to the Threshold less the Profit.

If Client elects to receive the Buyback Amount, then:

- Such election must occur within 30 days of the Milestone by Notice to Service Provider, otherwise Service Provider will issue a Credit.

- The Parties shall cooperate diligently and in good faith to effect the transfer of ownership of the Store to Service Provider within 30 days; and (a) Client shall assist Service Provider, at Service Provider's expense, to further evidence, record and perfect such transfer of ownership, and to perfect, obtain, maintain, enforce and defend any rights transferred; and (b) Client hereby irrevocably designates and appoints Service Provider as its agents and attorneys-in-fact, coupled with an interest, to act for and on Client's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Client.

- Service Provider will buy back the Store inventory at Cost.  "**Cost**" means the manufactured cost of the product only, which will not include shipping costs, fulfillment fees, or removal fees.

Initials:  Client _P.S._  Service Provider _R.C._
Exhibit K to Motion for TRO
240

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

EXHIBIT D

TRANSFER

1. <u>Conveyance</u>.  Subject to this Agreement and Service Provider's receipt of the Set-Up Fee, Service Provider hereby assigns, transfers, sets over and conveys all its right, title and interest in the following Store(s), including their inventory, to the Owner, to be effective and delivered (a) immediately if Owner is specified below, or (b) if Owner is TBD, upon Client's later identification of Owner (such identification and delivery not to be unreasonably delayed); and for no purposes shall Service Provider be deemed to have retained any interest in the Store or its inventory, or any associated liabilities regardless of when arising (all the foregoing, the "**Transfer**").

| Store | Host Account Identifiers "Seller ID" / "Merchant Token" | Store Name (on Effective Date) | Owner |
|---|---|---|---|
| 1 | | | *Identify or TBD* |
| 2 | | | *Identify or TBD* |
| 3 | | | *Identify or TBD* |

2. <u>Cooperation</u>.  The Parties agree to cooperate regarding the Administration and in the execution and filing of such other documents as required to give the Transfer full effect.

3. <u>Migration</u>.  In the event of material issues with the Migration not reasonably capable of being timely cured, Service Provider may substitute a comparable Store; such substitution to represent Client's sole remedy with respect to Migration delay.

Initials:  Client ___*P.S.*___  Service Provider ___*R.C.*___
Exhibit K to Motion for TRO
241

## PROFIT SPLIT CONCESSION ADDENDUM

As you have discussed with your Portfolio Manager, this addendum confirms Wealth
Assistant's offer to you that:

- You will not be billed the Success Fee (as stated in Exhibit B) for the first six
  months after your account starts selling products. The Success Fee will be billed
  beginning in Month 7.
- This Addendum is only active if the effective date of the above Service
  Agreement is within 14 days of your first meeting with your Portfolio Manager.
  The onboarding fee must also be received in that same time frame.

Initials:  Client _P.S._  Service Provider _R.C._
Exhibit K to Motion for TRO
242

Document Ref: HL7UU-G4DRT-WGQCQ-SMJWD

# Signature Certificate

Reference number: HL7UU-G4DRT-WGQCQ-SMJWD

| Signer | Timestamp | Signature |
|---|---|---|
| **Philip Stoops**<br>Email: philstoops@att.net<br>Shared via link | | *Philip Stoops* |
| Sent: | 07 Jul 2023 13:27:25 UTC | |
| Viewed: | 10 Jul 2023 13:37:50 UTC | IP address: 68.80.74.39 |
| Signed: | 10 Jul 2023 14:20:53 UTC | Location: Media, United States |

| | | |
|---|---|---|
| **Ryan Carroll**<br>Email: serviceagreements@wealthassistants.com | | |
| Sent: | 07 Jul 2023 13:27:25 UTC | |
| Viewed: | 10 Jul 2023 15:17:21 UTC | |
| Signed: | 10 Jul 2023 15:18:06 UTC | |
| **Recipient Verification:** | | IP address: 67.241.167.90 |
| ✔Email verified | 10 Jul 2023 15:17:21 UTC | Location: Clarence Center, United States |

Document completed by all parties on:
10 Jul 2023 15:18:06 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.



# EXHIBIT 2

# Wire Transfer Services
## Outgoing Wire Transfer Request



**WELLS FARGO**

| Today's Date: | | | Wells Fargo Reference Number: | | |
|---|---|---|---|---|---|
| 07/12/2023 | | | FW0068122193174322 | | |
| Banker Name: | | | Officer/Portfolio Number: | | |
| RYAN NEWS | | | E0846 | | |
| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: | | |
| 610/358-5652 | 09225 | 0068122 | Y1435-010 | | |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC"), Indian Financial System Code (IFSC) and the International Bank Account Number ("IBAN").

## Originator's Information

| Originator Name: | | | Street Address: | | |
|---|---|---|---|---|---|
| PHILIP C STOOPS | | | 2 WINDING WAY | | |
| Primary ID Type: | Primary ID Description: | | Address Line 2: | | |
| PINV NS | PIN Validation | | | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: | | |
| | NONE | NONE | | | |
| Secondary ID Type: | Secondary ID Description: | | City: | | State: |
| DLIC | 21 943 264 | | GLEN MILLS | | PA |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | | Country: |
| PA | 05/25/2021 | 07/28/2025 | 19342-1119 | | US |
| | | | Home Phone: | | Business Phone: |
| | | | 610/358-1871 | | |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0068122 | $75,000.00 | ▮▮▮▮0558 | 345 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| PRECISION TRADING GROUP LLC | DBA WEALTH ASSISTANTS LLC |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| ▮▮▮2209 | 1334 BRITTMOORE RD SUITE 1001 |
| Purpose of Funds: | Name/Address Line 3: |
| | HOUSTON TX 770434033 |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| PURCHASE OF WEALTH ASSOCIATES | |

Customer Copy

WTR6603 (2-20 SVP)

Exhibit K to Motion for TRO
245

Wire Transfer Services>Outgoing Wire Transfer Request

**Wire Fees**

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.

Wells Fargo Wire Fee Amount:

$40.00

**Customer Signature**

Originator Name

PHILIP C STOOPS

Originator Signature

[signature redacted]

☐ Submit manually
☐ Signature not required

Date:

07/12/2023

Customer Copy

Exhibit K to Motion for TRO

246

Wire Transfer Service/Outgoing Wire Transfer Request

## Agreement For Outgoing Wire Transfer Requests ("Wire Transfer Agreement")

**Responsibility of Wells Fargo.** The wire transfer described in the Outgoing Wire Transfer Request (Page 1) ("Order") may be sent by wire telegraph, telephone, cable or whatever other transmission method Wells Fargo considers to be reasonable. The wire transfer may be transmitted directly to the Beneficiary Bank (the financial institution designated in the Request as the Beneficiary Bank), or indirectly to the Beneficiary Bank through another bank, government agency, or other third party that Wells Fargo considers to be reasonable. Wells Fargo may utilize any funds transfer system or intermediary bank reasonably selected by Wells Fargo, even if its selection differs from instructions in the request.

**Agent.** Wells Fargo may use agents of its choice to perform any of its obligations.

**Limitation of Liability.** Wells Fargo will not be liable for any loss or damage due to the failure, delay, or error of: (1) the method of transmission selected by Wells Fargo, (2) a third party selected by Wells Fargo to receive the Order, or (3) the Beneficiary Bank. IN NO EVENT WILL WELLS FARGO BE LIABLE FOR DAMAGES ARISING DIRECTLY OR INDIRECTLY IF THE ORDER IS EXECUTED BY WELLS FARGO IN GOOD FAITH AND IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, REGARDLESS OF THE FORM OR NATURE OF ANY CLAIM OR ACTION. IN NO EVENT WILL WELLS FARGO BE LIABLE FOR PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WELLS FARGO SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**Reliance on Information Provided.** You acknowledge that you are responsible for providing Wells Fargo with all information required by the Beneficiary's bank, including the reason for payment, if required. Sending wires without the required information can cause the wire to be delayed, returned, or assessed additional fees. If a wire transfer request describes the person to receive the wire transfer ("Beneficiary") inconsistently by name and account number, the wire transfer may be made on the basis of the account number even if the account number identifies a person different from the Beneficiary. If a wire transfer request describes a financial institution inconsistently by name and identification number, the identification number may be relied upon as the proper identification of the financial institution.

**International Wire Transfers.** A Payment Order expressed in U.S. Dollars will be sent in U.S. Dollars. Company may request that prior to executing a Payment Order. Wells Fargo convert the amount to be transferred from U.S. Dollars to the currency of a designated foreign government or intergovernmental organization ("Foreign Currency"). Wells Fargo makes money when it converts one currency to another currency for you. The exchange rate provided to you is set by Wells Fargo in its sole discretion, and it includes a markup over Wells Fargo's cost of sourcing the relevant currency or currencies. The markup may be based on several factors, including without limitation costs incurred, market risks, services rendered, the client relationship, the transaction and our desired return.

The exchange rate Wells Fargo provides to you may be different from exchange rates you see online, in publications, at other banks or other foreign exchange providers. Also, different customers may receive different exchange rates for transactions that are the same or similar. The exchange rate may depend on the type of transaction being conducted, the dollar amount, type of currency, the date and time of the exchange and/or the factors noted above. The foreign exchange market is dynamic, so exchange rates can change rapidly. If you delay executing a transaction, the exchange rate may change and could even be significantly different. Wells Fargo reserves the right to refuse to process any request for a foreign exchange transaction. Wells Fargo will not be liable for any failure or delay by any financial institution or other third party in the designated foreign country in executing or failing to execute any Payment Order Wells Fargo transmits to a foreign country.

**Refund.** If the Beneficiary Bank does not pay the Beneficiary specified on the Order, a refund will be made only after Wells Fargo has received confirmation of the effective cancellation of the Order and Wells Fargo is in free possession of the funds debited or earmarked in connection with the Order. If the transaction is in Foreign Currency, Wells Fargo will not be liable to you for a sum in excess of the value of the Order after it has been converted back to U.S. Dollars at the exchange rate applied by Wells Fargo at the time the cancellation of the Order is confirmed by Wells Fargo.

**Failure to Transfer Proper Amount.** If Wells Fargo is notified that it did not transfer the full amount stated in the Request, Wells Fargo's sole liability will be to promptly execute a second Payment Order in the amount of the stated deficiency. If Wells Fargo executes an instruction in excess of the amount stated in the Request, to the extent that the originator does not receive the benefit of the Order, Wells Fargo will only be liable for any loss of the principal amount transferred in excess of the amount stated in the Request instructions. Additionally, Wells Fargo will be liable for the amount of interest the originator has lost due to the transfer of the excess amount, computed at the then current Federal Funds rate. However, Wells Fargo's liability for loss of interest shall be limited to twenty (20) calendar day's interest. This section sets forth Wells Fargo's complete liability for the order issued under this agreement.

**Finality of orders.** The order will be final and will not be subject to stop payment or recall, except that Wells Fargo may, at the originator's request, make an effort to effect such stop payment or recall. In such case, Wells Fargo will incur no liability for its failure or inability to do so.

**Fees.** In addition to the outgoing wire transfer fee, additional fees may apply. Additional fees can include, but are not limited to: an additional fee for bank initiated transactions, amendment fees, statement fees, fees assessed by beneficiary and intermediary banks, etc. On international outgoing wires, if a SWIFT BIC, IRC, IBAN, or CLABE number is not provided the foreign banks may return the wire or assess a surcharge. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments.

**Acts of God.** Wells Fargo is excused for delays or failure to execute the Order to the extent that the delay or failure results from a cause beyond the reasonable control of Wells Fargo.

## Wire Transfer Information

**General Information: You can NOT have a bank as the final beneficiary,** unless the wire is a payment to Wells Fargo (i.e.: mortgage, auto loan, etc.). We are required to know who the money is going to, to ensure the funds are not being used to support terrorist or drug activity. We need an account number for the beneficiary OR a complete physical address. No PO Boxes may be used when no account number is provided for the Beneficiary.

**International Wires:** Wires going to foreign countries require different numbers depending on the receiving foreign country. All wire transfer payments destined for Europe should include the SWIFT Bank Identifier Code (SWIFT BIC), International Routing Code (IRC) as applicable, and for participating countries the beneficiary's International Bank Account Number (IBAN). Mexican banks may require a CLABE number in addition to the SWIFT BIC.

1. **SWIFT** Bank Identifier Code (SWIFT BIC). The 8 or 11 character SWIFT BIC is a unique series of alpha numeric characters that help to identify a specific financial institution. The SWIFT BIC should be obtained from the beneficiary. To ensure timely delivery please be sure that International Outgoing wires include the SWIFT BIC where applicable.

2. **International Routing Code (IRC):** Some countries throughout the international banking community have created international routing codes, which are used in combination with the SWIFT BIC to aid in routing the payment through a main office to a branch. Each country has a specific name for their routing code (i.e., Sort Code in the United Kingdom, Canadian Payments Association Routing Numbers in Canada). Your beneficiary must provide the international routing code to facilitate receipt of an international payment. Sending a wire without the IRC number can delay the wire, or the receiving bank may return the wire when this number is not included in the payment instructions, and additional fees may be assessed.

3. **International Bank Account Number (IBAN):** The IBAN varies by country/institution. Warning! Only the bank servicing an account can provide the correct IBAN of that account and must be obtained from the beneficiary. Sending a wire to a participating country without the IBAN can delay the wire, or the receiving bank may return the wire when the IBAN is not included in the payment instructions, and additional fees may be assessed.

Customer Copy

WTRG603 (2-20 SVP)

Page 3 of 4

Exhibit K to Motion for TRO
247

Wire Transfer Services Outgoing Wire Transfer Request

Participating Countries that require an IBAN:

For participating IBAN countries and their requirements, please search for the "IBAN REGISTRY" at swift.com. Once located, search the Table of Contents for the appropriate country, and locate the country-specific requirements.

4. **Indian Financial System Code (IFSC):** Every Indian bank has a unique eleven (11) character alpha numeric code identifying the bank branch to receive the wire transfer. To ensure timely delivery, please be sure that international outgoing wires include the IFSC where applicable.

5. **Mexico CLABE Account Number:** Mexican banks may require an 18 digit CLABE account number be added to the Beneficiary instructions to ensure payment. The CLABE number may be required on Mexican Peso (MXN) and USD payments sent to Mexico. The CLABE account number must be obtained from the beneficiary. Wells Fargo does not provide or calculate the CLABE. Sending a wire without a CLABE account number can delay the wire, or the receiving bank may return the wire if the CLABE is not included in the payment instructions, and additional fees may be assessed.

6. **Wells Fargo recommends** that if you do not have a SWIFT BIC, IBAN, IRC, IFSC or Mexican CLABE number, that you contact the beneficiary of the wire. If the beneficiary does not have the needed information, please have the beneficiary contact their bank to obtain the appropriate information. Sending International wires without the required information can cause the wire to be delayed, returned, or assessed additional fees. For International outgoing wires only: When sending in foreign currency, please ensure the beneficiary's account accepts the designated foreign currency.

# Customer Copy

WTR6603 (2-20 SVP)

Exhibit K to Motion for TRO
248

# Stoops Declaration

**Final Audit Report** 2023-12-23

| | |
|---|---|
| Created: | 2023-12-23 |
| By: | Nico Banks (nico@bankslawoffice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAaOR4iL8XBGAOe1WpcHq4y4e4XFhQmSdd |

## "Stoops Declaration" History

📄 Document created by Nico Banks (nico@bankslawoffice.com)
2023-12-23 – 6:46:48 PM GMT

📧 Document emailed to Philip Stoops (philstoops27@gmail.com) for signature
2023-12-23 – 6:46:57 PM GMT

📄 Email viewed by Philip Stoops (philstoops27@gmail.com)
2023-12-23 – 7:02:36 PM GMT

✍️ Document e-signed by Philip Stoops (philstoops27@gmail.com)
Signature Date: 2023-12-23 - 7:03:01 PM GMT - Time Source: server

✅ Agreement completed.
2023-12-23 – 7:03:01 PM GMT

🅰️ **Adobe Acrobat Sign**