# EXHIBIT D

SERVICE AGREEMENT

FOR ECOMMERCE STORE MANAGEMENT

This Service Agreement for Ecommerce Store Management (together with its Exhibits, the "**Agreement**"), effective as of the date of last signature below (the "**Effective Date**"), is by and between Wealth Assistants LLC, a Wyoming limited liability company at 5830 E. 2d Street, Suite 7000 #4224, Casper, WY 82609 (the "**Service Provider**"), and the entity specified in the signature block below (the "**Client**"). Service Provider and Client may be referred to herein collectively as the "Parties" or individually as a "**Party**."

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Services.  Upon receipt of the Fees (described in Exhibit B) as they are due and payable, Service Provider will undertake the management of Client's "seller ID / merchant token" account hosted on the internet (the "**Store**") by an ecommerce merchant platform provider (the "**Host**") by providing the services described in Exhibit A (the "**Services**").

   A. Service Provider will provide the Services in a timely and workmanlike manner, using knowledge and recommendations for performing the Services that meet generally acceptable standards in Service Provider's community and region.

   B. Proprietary Rights.  As part of the Services, at its sole discretion, Service Provider may utilize its work, software, inventions, know-how and trade secrets for the limited purpose of Service Provider's provision of the Services during the Term; however, no proprietary rights are conveyed (express or implied) and no work made for hire is undertaken hereunder.

      With respect to any intangible proprietary rights (such as copyrights, trademark rights, etc.) associated with the Store and owned or licensable by Client ("**Client IP Rights**"), Client hereby conveys to Service Provider the right to utilize the Client IP Rights for the limited purpose of Service Provider's provision of Services during the Term, and for archival purposes thereafter.

   C. Relationships.  Neither provision of the Services, nor anything in this Agreement shall be construed as creating any agency, partnership, joint venture, or other forms of joint enterprise, exclusive, employment, or fiduciary relationship between the Service Provider and its agents and employees on the one hand, and Client and its agents and employees on the other.

      Client understands and acknowledges that Service Provider may engage subcontractors in its provision of the Services but doing so will not relieve Service Provider of its obligations hereunder.

   D. Force Majeure.  If the performance of this Contract or any obligation under it (other than payment obligations) is prevented, restricted, or interfered with by

EXHIBIT D

Initials:  Client _J.L.H_  Service Provider _R.C._

causes beyond either Party's reasonable control ("**Force Majeure Event**"), the non-performing Party will be excused from performing the obligation(s) hereunder for as long as such circumstances prevail.

2. <u>Client Responsibilities</u>.

   A. <u>Hold Harmless</u>.  Client assumes all and exclusive responsibility for (including the holding harmless and indemnification of Service Provider (and its affiliates) for all losses due to) lapses or failures of Compliance.

   B. <u>Compliance</u>.  Time is of the essence with respect to the maintenance of "**Compliance**," which requires that Client shall:

      i. Provide to Service Provider copies of all communications from third parties regarding the Store;

      ii. Maintain Confidential Information as confidential;

      iii. Refrain from (a) the publication of any information relating to the Store or the Services or Service Provider in violation of applicable law, or of any guidelines or terms of service applicable to the Store, and (b) all activity which (in the reasonable opinion of Service Provider) would either compromise the integrity or value of the Store, or interfere with Service Provider's reputation or its provision of services generally;

      iv. Maintain a Host seller account in good standing with respect to Host fees and Host insurance requirements;

      v. Make on-time payments;

      vi. Maintain Store inventory at or above the Inventory Levels (as described at Exhibit A – Inventory Levels); and

      vii. Assure the continuous ownership of Store, free of all liens, by a legal US business entity over which Client has control (the "**Owner**"), and assure that Owner remains in good standing with its affiliates, creditors, and other taxing and legal authorities with proper jurisdiction over it.

   C. <u>Inventory Planning Reports</u>.  Service Provider shall provide Inventory Planning Reports summarizing the proposed inventory purchases, along with an invoice for such purchases, which Client shall approve within 5 days of receipt.

   D. <u>Taxes</u>.  Client is solely responsible for obtaining all applicable business licenses, state sales tax exemption certificates, paying any legally required taxes, filing any lawfully required tax returns, and paying all Store-related account fees, hosting fees.

   E. Client is solely responsible for all costs, charges, or losses incurred by Client resulting from the inability of Service Provider to complete its responsibilities under this Agreement to the extent such inability results from failures of Client or third-party service providers.

Initials:  Client _J.L.H_  Service Provider _R.C._

3. <u>Payments</u>.

   A. <u>Payments</u>.  Client shall pay Service Provider in the time, manner and amounts described at Exhibit B – Schedule of Fees (the "**Fees**").

   B. <u>Non-Refundable</u>.  All payments due hereunder are non-refundable except as otherwise specified.

   C. <u>Taxes</u>.  Prices in this Agreement do not include taxes.  Client shall be responsible for all taxes imposed on Client's income or property.

   D. <u>Late Payments</u>.  Client shall pay interest on all late payments, calculated daily and compounded monthly at the lesser of the rate of one and one-half percent (1.5%) per month or the highest rate permissible under applicable law.

   E. <u>Security Interest</u>.  As security for all Client's payment obligations hereunder, Client hereby grants to Service Provider a security interest in the Store revenue to be reflected in a UCC-1 filed by Service Provider.

4. <u>Term & Termination</u>.

   A. <u>Expiration</u>.  Unless earlier terminated or Renewed in accordance with this Agreement, this Agreement will automatically expire three years after the Effective Date (the "**Initial Term**").  To be "**Renewed**," Client must:  (i) remain in Compliance; and (ii) provide Notice of renewal thirty days prior to termination, and (iii) remit payment to Service Provider of the Annual Fee.  This Agreement may be Renewed perpetually, and if Renewed, the new term (the "**Renewal Term**") shall be three years (unless otherwise notified in writing prior to renewal by Service Provider).   "**Term**" means the Initial Term plus the Renewal Terms.

   B. <u>Termination for Cause</u>.  Failure to pay or perform a material obligation within the time prescribed shall constitute an event of default.  Either Party may terminate this Agreement upon default by the other Party subject to:  (i) giving Notice to the defaulting Party describing the non-performance; and (ii) a 30 day cure period for the defaulting Party to re-establish compliance, if possible (during which time, in the event of late payments, Service Provider may terminate or suspend all or part of any agreements between the Parties).  Events of default include, but are not limited to:  (i) failure to make a mandatory payment when due, (ii) the bankruptcy or insolvency of either Party, (iii) any levy, seizure, general assignment for the benefit of creditors, application, or sale for or by any creditor or government agency on any of either Party's property, (iv) Client's failure to remain in Compliance, and (v) Service Provider's failure to make the Services available or deliver them in a time and manner specified in this Agreement.

   C. <u>Termination for Buyback</u>.  This Agreement shall terminate in the event Client receives the Buyback Amount (as described in Exhibit C).

   D. <u>Effect of Termination</u>.  Upon termination, Client's Store account information including login credentials, Client supplier and customer information, Client sales and financial data, Client customer data, and other Client data necessary for Client to continue to operate the Store in its original condition, shall be promptly

Initials:  Client _J.L.H_  Service Provider _R.C._

delivered to Client.  The Parties' confidentiality obligations, the Client's indemnity and payment obligations (to the extent unpaid), Sections 1C, 2A, 2B(iii), 2D, 2E, 3 (with respect to all obligations arising prior to termination), 4, 5, 7, 8, and 9, shall survive termination.

5. Confidentiality.

A. "**Confidential Information**" means all business or technical information disclosed by Disclosing Party to Receiving Party in connection with the Agreement, including but not limited to: (i) customer lists and data, sales data, financial data, product catalog and supplier data unique to the Store, and any other business or technical information uniquely associated with the Store generally recognized as confidential in the e-commerce industry, and (ii) business practices, methods, descriptions, theories of operation and identity of subtractors employed by Service Provider in its conduct of the Services, and (iii) Personal Data, and (iv) this Agreement.  Except for Personal Data, neither party shall be obligated to preserve the confidentiality of any information that: (a) was previously known; (b) is a matter of public knowledge; (c) was or is independently developed without reference to or use of the other party's Confidential Information; (d) is released for disclosure with the other party's written consent; or (e) is received from a third party to whom it was disclosed by the Disclosing Party without restriction.  In connection with its performance of the Services, Service Provider may use and disclose Client's name and logo as reasonably necessary, and may publicize and promote non-identifiable performance summaries of the Store.  "**Personal Data**" means any information relating to an identified or identifiable natural person.

B. The party receiving Confidential Information ("**Receiving Party**") of the other ("**Disclosing Party**") shall not use Confidential Information for any purpose except as necessary to implement, perform or enforce the Agreement.  Receiving Party will use the same reasonable efforts as it uses to protect its own proprietary information and data (but in any event not less than a reasonable standard of care) to:  (i) keep all Confidential Information of Disclosing Party strictly confidential; (ii) not disclose the Confidential Information of Disclosing Party to anyone other than its Authorized Recipients; and (iii) only use Personal Data as permitted by applicable Laws. Receiving Party will promptly notify Disclosing Party if Receiving Party discovers any improper use or disclosure of Confidential Information and will promptly commence all reasonable efforts to investigate and correct the causes of such improper use or disclosure. "**Authorized Recipient**" means:  (a) with respect to Client, Client and any employee of Client; and (b) with respect to Service Provider, Service Provider, its Affiliates and their respective employees, contractors, or agents, in the case of (a) or (b) that has a reasonable need to know the Confidential Information in connection with the use or provision of the Services and who are required to protect and restrict the use of the other party's Confidential Information in accordance with terms substantially similar to the requirements of the Agreement.

Initials:  Client _J.L.H_   Service Provider _R.C._

C.  If Receiving Party believes the Confidential Information must be disclosed or made publicly available under applicable Law, an order of a court of competent jurisdiction or in response to a request from a governmental regulator, Receiving Party may do so provided that, to the extent permitted by such applicable Law, court of competent jurisdiction or governmental regulator, the Disclosing Party is given a reasonable opportunity to contest such disclosure and obtain a protective order, and shall in any event omit all pricing, service level or Solution specific information from any such disclosure or public filing, unless such omission is prohibited by Law.

D.  Notwithstanding the foregoing, Client authorizes Service Provider to store (where applicable) and use all data provided by or on behalf of Client and/or its users of the Store, including customers, in connection with the Services, and all information that is derived from such data, in order to provide the Services, to create Anonymized Information, and for other purposes permissible under applicable law, and to disclose and provide Anonymized Information to third parties.  "**Anonymized Information**" means data provided by or on behalf of Client, its users of the Services, including customers, suppliers and like, in connection with the Services, and all information that is derived from such data, that has been rendered anonymous by removing names and other personal information such that it does not relate to nor is reasonably linkable to Client. Service Provider may use its affiliates in creating the Anonymized Information.

6.  Representations and Warranties.

A.  Authority.  The Parties each represent and warrant the signatory below is authorized to bind the Party for whom it is signing, and the Party has the authority to enter this Agreement.

B.  Disclaimer.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE SERVICES ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, TITLE, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE, AND SUCH IMPLIED WARRANTIES, ANY OTHER WARRANTIES, REPRESENTATIONS, CONDITIONS AND TERMS, EXPRESS OR IMPLIED (AND WHETHER IMPLIED BY STATUTE, COMMON LAW, COURSE OF DEALING, TRADE USAGE OR OTHERWISE) ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW.

C.  No Reliance.  SERVICE PROVIDER MAKES NO GUARANTEE OF ANY KIND OR NATURE REGARDING THE EFFECTIVENESS OR RESULTS OF THE SERVICES OR STORE, INCLUDING SPECIFICALLY WHETHER OR NOT FEES WILL EXCEED GROSS INCOME OR BE RECOUPED.  Accordingly, no Store success, earnings, or results can be viewed as typical, average, expected, or be reasonably relied upon.  The performance of each store managed by Service Provider, including Client's Store, is determined by factors both known and unknown, both manageable and unmanageable, including but not limited to

Initials:  Client  *J.L.H*   Service Provider  *R.C.*

(i) the amount and value of Client's efforts, (ii) Client's acts and omissions and adherence to Service Provider's guidelines, (iii) the availability, timing and use of Client working capital, (iv) the quality and desirability of Store products and variable market conditions relevant to such products, (v) general economic conditions and fluctuations, (vi) Host policies and enforcement, and (vii) third party search and review algorithms.

D. <u>Buyback Warranty</u>.  Provided Client is in Compliance, Service Provider guarantees Client a Store Buyback, as described at Exhibit C, entitled, "Store Buyback."

7. <u>Indemnification</u>.  Client shall indemnify, hold harmless, and, at Service Provider's option, defend Service Provider (including its employees, agents, officers and directors) from and against any Losses resulting from any third-party claim that the Store infringes or misappropriates such third party's intellectual property rights and any third-party claims based on Client's (i) tortious or unlawful misconduct, (ii) use of the Services in a manner not authorized by this Agreement, (iii) modifications to the Services not made by Service Provider, or (iv) the introduction of an outside contractor; provided that Client may not settle any third-party claim against Service Provider unless Service Provider consents to such settlement, and further provided that Service Provider will have the right, at its option, to defend itself against any such third-party claim or to participate in the defense thereof by counsel of its own choice.  "**Losses**" means losses, damages, liabilities and costs (including reasonable attorney fees).  Service Provider shall hold harmless and indemnify Client for its Losses resulting from third party claims directly related to Service Provider's grossly negligent provision of Services hereunder.

8. <u>Limitation of Liability</u>.  IN NO EVENT WILL SERVICE PROVIDER BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY:  (i) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES; (ii) INCREASED COSTS, DIMINUTION IN VALUE OR LOST BUSINESS, PRODUCTION, REVENUES, OR PROFITS; (iii) LOSS OF GOODWILL OR REPUTATION; (iv) USE, INABILITY TO USE, LOSS, INTERRUPTION, DELAY, OR RECOVERY OF ANY DATA, OR BREACH OF DATA OR SYSTEM SECURITY, INCLUDING FOR EXAMPLE ANY OF THE FOREGOING RESULTING FROM A SERVICE SUSPENSION; OR (v) COST OF REPLACEMENT GOODS OR SERVICES, IN EACH CASE REGARDLESS OF WHETHER SERVICE PROVIDER WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE.  IN NO EVENT WILL SERVICE PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE EXCEED THE TOTAL AMOUNTS PAID TO SERVICE PROVIDER UNDER THIS

Initials:  Client _J.L.H_  Service Provider _R.C._

Document Ref: QTDEF-CGBF3-TH9NK-AWEEP

AGREEMENT IN THE TWELVE-MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $100,000, WHICHEVER IS LESS.

9.   <u>General</u>.

A.   <u>Entire Agreement</u>.  This Agreement exclusively governs the relationship between the Parties with respect to the subject matter hereof, and constitutes the entire agreement and understanding between the Parties, superseding all previous such agreements and understandings.  No prior dealings between the Parties shall be relevant to supplement, interpret, or explain any word used herein, and no usage of the trade shall be applicable to supplement, interpret, or explain any term used herein.  All exhibits hereto are part of this Agreement, and to the extent they contain capitalized terms not defined therein, such terms shall have the meaning as defined herein.

B.   <u>Notice</u>.  "**Notice**" means a notification or other communication hereunder that is: (a) in writing, and (b) addressed to a Party at their address set forth in this section (or to such other address (or email address) as such Party may later designate pursuant to Notice), and (c) timely delivered via nationally recognized overnight courier (with all fees pre-paid) providing proof of delivery, or via email if so designated, and (d) effective upon receipt of such Party.

| Service Provider | Client |
|---|---|
| Attention:  Notices<br>Wealth Assistants, LLC<br>1001 Brickell Bay Drive, Suite 2700 C-8<br>Miami, FL  33131 | 239 Fairmont Drive<br>Grass Valley,<br>CA, 95945 |

C.   <u>Dispute Resolution</u>.

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Claims shall be heard by a single arbitrator.  The place of arbitration shall be Harris County, Texas.  The arbitration shall be governed by the laws of the State of Texas.  Each party will, upon written request of the other party, promptly provide the other with copies of all relevant documents.  There shall be no other discovery allowed.  The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute.

The arbitrator shall not award consequential damages in any arbitration initiated under this section.  Each party shall bear its own costs and expenses and an equal share of the arbitrator's and administrative fees of arbitration. The award of the arbitrator shall be accompanied by a reasoned opinion. Except as may be

Initials:  Client _J.L.H_   Service Provider _R.C._

Document Ref: QTDEF-CGBF3-TH9NK-AWEEP

required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

D. <u>Amendment.</u>  This Agreement may not be modified except by written mutual agreement executed by authorized representatives of the Parties and indicating its intent to serve as such an amendment.

E. <u>Assignment</u>.  This Agreement shall be freely transferable by the Parties; provided that any purported assignment by Client (i) must be an assignment of all Client's rights and obligations hereunder, and (ii) must be preceded by 30 days Notice to Service Provider, and (iii) shall entitle Service Provider to a Transfer Fee (as described in Exhibit B).

F. <u>Waiver</u>.  No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving; and unless otherwise provided in such writing shall be limited to such specific instance and circumstances.  Except as otherwise set forth in this Agreement, (i) no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, and (ii) no single or partial exercise of any right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

G. <u>Severability</u>.  If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Initials:  Client _J.L.H_   Service Provider _R.C._

IN WITNESS WHEREOF, duly authorized representatives of the Parties have executed this Agreement (electronically or in writing) as of the Effective Date.

| SERVICE PROVIDER | CLIENT |
|---|---|
| Wealth Assistants, LLC | Jennifer Lehmkuhl Hill |
| By: _____ _R C M_ _____ <br> *(signature)* | By: _____ _Jeniffer Lehmkuhl Hill_ _____ <br> *(signature)* |
| Name: Ryan Carroll <br> Title: CEO <br> Date: 11-08-2022 | Name: Jennifer Lehmkuhl Hill <br> Title: Owner <br> Date: 11-08-2022 <br> Address: 239 Fairmont Drive <br><br> Grass Valley, CA, 95945 |

Acknowledged and agreed:

| | |
|---|---|
| By: _____ <br> *(signature)* | By: _____ <br> *(signature)* |
| Name: _____ <br> Title: _____ <br> Date: _____ | Name: _____ <br> Title: _____ <br> Date: _____ |

Initials: Client _J.L.H_  Service Provider _R.C._

EXHIBIT A

DESCRIPTION OF SERVICES – NEW STORE

1. <u>Overview</u>.  Service Provider will be responsible for Store operations.  The Service Provider's principal aims are to provide a "done for you" operation for Client, focusing on high-quality lawfully commercialized products offered at competitive prices accompanied by excellent customer service for end-user customers in a manner that promotes growth.

   A. <u>Initial Phase</u>. During the first three (3) months, the Store will be in a probationary phase.  Service Provider will focus on customer satisfaction and other customer metrics such as reliably meeting customer demands and quality control, including but not limited to Host account health parameters such as order defect rate, cancellation rate, late dispatch rate, on-time delivery, and return dissatisfaction rate.  During this period, the Services will be tuned to building the Store's reputation and positioning the operations for successful Store ramp-up.

   B. <u>Ramp-Up</u>.  During the remainder of the first year, Service Provider will steadily encourage and support ramping up the scale of the Store by, for example, increasing product listings, optimizing SEO, and exploring advertising opportunities.  Increased inventory will be required to meet increased demand as described below.  The focus of this period is to lay the groundwork for future success.

| MONTHS | COST OF INVENTORY PER MONTH |
|---|---|
| 1 – 3 | $10,000 |
| 4 – 6 | $30,000 |
| 7 – 9 | $50,000 |
| 10 – 12 * | $70,000 |
| * The end of this period is the "**Milestone**." | |

2. <u>Logistics</u>.

   A. <u>Set-Up</u>.  Upon the Effective Date, Client may desire assistance related to identifying and communicating with third parties specializing in corporate services such as entity formation, obtaining taxpayer identification numbers, establishing accounts to be used in conjunction with the Services, applying for (re)seller permits, and the like ("**Corporate Services**").  For the convenience of Client, Service Provider agrees to cooperate with Client in identifying and facilitating communications with such providers of Corporate Services, and at other times may also provide various reports (including financial reports) and advice associated with Store operations ("**Administration**").  HOWEVER, (i) CLIENT UNDERSTANDS AND ACKNOWLEDGES THAT SERVICE PROVIDER IS NOT ITSELF A PROVIDER OF CORPORATE SERVICES, AND SERVICE PROVIDER CANNOT AND DOES NOT (AND SHALL FOR PURPOSE BE

Initials:  Client  *J.L.H*   Service Provider  *R.C.*

Document Ref: QTDEF-CGBF3-TH9NK-AWEEP

DEEMED TO HAVE) PROVIDE(D) LEGAL ADVICE, TAX ADVICE, FINANCIAL ADVICE OR ANY OTHER RELATED PROFESSIONAL ADVICE, and (ii) CLIENT HEREBY RELEASES AND WAIVES ALL CLAIMS (KNOW AND UNKNOWN) ARISING OUT OF SERVICE PROVIDER'S ADMINISTRATION, AND (iii) CLIENT AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS SERVICE PROVIDER FROM ALL LOSSES ASSOCIATED WITH ANY THIRD PARTY CLAIMS RELATED TO ADMINISTRATION.  All Administration expenses incurred by Service Provider are the responsibility of Client, and when incurred by Service Provider will be added to the next invoice from Service Provider and paid by Client in the same way as the fees associated with such invoice.

B. <u>Purchasing</u>.  Service Provider is responsible for ordering inventory for the Store; however, Client shall pay for all inventory within five business days of receipt of Inventory Invoices from Service Provider.  Inventory Invoices will generally be provided to Client monthly, but may be more frequent in the event additional inventory is required.  Delayed payment of Inventory Invoices can put the Store at risk of suspension by Host.

3. <u>Operations</u>.

A. <u>Geography</u>.  Service Provider may use but is not limited to using USA-based suppliers, USA-based consultants, and international-based virtual assistants (VAs).

B. <u>Management</u>.  Service Provider will serve as a business consultant for the Store; performing for example:

- Product research and analysis of market data to identify top-selling products,
- Supplier relationships,
- Strategic sourcing or bulk-ordering products from optimal suppliers,
- Planning warehousing and fulfillment options,
- Product listings including, pricing decisions, and pricing updates,
- Deployment of Store look and feel (including Store name which may change from time to time),
- Customer service including quality control, and processing returns, and
- Internal financial reporting.

Service Provider shall make commercially reasonable efforts to maintain the uniqueness of the Store.  In the event Client discovers certain inventory overlap with other stores, Client agrees to notify Service Provider.

C. <u>Suspensions</u>.  In the event Client's account with Host becomes "suspended" or otherwise interrupted by Host, then Service Provider will pause provision of Services and assign the matter to Service Provider's Suspension Team to pursue reinstatement.  In the event such pursuit is unsuccessful, Service Provider shall provide a substitute Store.

Initials:  Client _J.L.H_   Service Provider _R.C._

EXHIBIT B

SCHEDULE OF FEES

1.  **FEES**

| FEES | | |
|---|---|---|
| ITEM | AMOUNT | DUE DATE |
| **Set-Up Fee** ($) | 35,000 for Store 1; 32,000 for Store 2+ | 2 Days from Effective Date |
| **Success Fee** (%) | 50% | 5 Days from receipt of invoice. |
| **Upgrade Fee** ($) | 20,000 | If available, 20 Days after 1st anniversary of Effective Date |
| **Annual Fee** ($) | 2,500 | 10 Days after each anniversary of the Effective Date |
| **Transfer Fee** | 30% of Proceeds if in Years 1–3; 20% of Proceeds if in Years 4–6; 10% of Proceeds thereafter. | 10 Days after the effective date of the transfer or close of escrow whichever is earlier |

- "**Success Fee**" means a percent of Gross Income.
- "**Gross Income**" means total Store revenue, less the cost of sales returns, allowances, discounts, and cost of goods sold.
- "**Proceeds**" means the gross amount of all consideration paid or payable for the transfer, less any cost of escrow.
- "**Years**" means calendar years since the Effective Date of this Agreement.
- "**Days**" means business days.
- Additional Stores. After the initial Store is set-up, additional Store Set-Up fees are discounted by $3,000 per additional Store.

2.  **PAYMENTS**

Client shall make payments in US dollars to the following account (or to such other account as specified by Service Provider):

| SERVICE PROVIDER'S ACCOUNT FOR RECEIPT OF PAYMENTS | |
|---|---|
| Account Name | Wealth Assistants LLC |
| Account # | 898132214905 |
| Bank Name | Bank of America |
| ACH Routing # | 063100277 |
| Wire Routing # | 026009593 |
| Bank Address | Bank of America, 222 Broadway New York, New York 10038 |
| WA Address | 1001 Brickell Bay Drive Suite 2700 C-8 Miami, FL 33131 |

12 of 13

Initials:  Client *J.L.H*  Service Provider *R.C.*

EXHIBIT C

STORE BUYBACK

In the event Profit does not exceed the Threshold by the Milestone, Client may elect to receive from Service Provider:  (1) a Credit, or (2) the Buyback Amount.

"**Profit**" means Gross Income less the Success Fee received by the Milestone.

"**Threshold**" means Gross Income exceeding the Set-Up Fee.

"**Credit**" means an amount equivalent to the Annual Fee, and redeemable, at Client's option, by refund if already paid, or by application to Client's account.

"**Buyback Amount**" means an amount equivalent to the Threshold less the Profit.

If Client elects to receive the Buyback Amount, then:

- Such election must occur within 30 days of the Milestone by Notice to Service Provider, otherwise Service Provider will issue a Credit.

- The Parties shall cooperate diligently and in good faith to effect the transfer of ownership of the Store to Service Provider within 30 days; and (a) Client shall assist Service Provider, at Service Provider's expense, to further evidence, record and perfect such transfer of ownership, and to perfect, obtain, maintain, enforce and defend any rights transferred; and (b) Client hereby irrevocably designates and appoints Service Provider as its agents and attorneys-in-fact, coupled with an interest, to act for and on Client's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Client.

- Service Provider will buy back the Store inventory at Cost.  "**Cost**" means the manufactured cost of the product only, which will not include shipping costs, fulfillment fees, or removal fees.

Initials:  Client _J.L.H_  Service Provider _R.C._

Document Ref: QTDEF-CGBF3-TH9NK-AWEEP

# Signature Certificate

Reference number: QTDEF-CGBF3-TH9NK-AWEEP

| Signer | Timestamp | Signature |
|---|---|---|

**Jeniffer Lehmkuhl Hill**
Email: hill.jennifer0@googlemail.com

| | |
|---|---|
| Sent: | 07 Nov 2022 20:36:13 UTC |
| Viewed: | 08 Nov 2022 07:00:25 UTC |
| Signed: | 08 Nov 2022 11:03:17 UTC |

**Recipient Verification:**
✔Email verified          08 Nov 2022 07:00:25 UTC

*Jeniffer Lehmkuhl Hill*

IP address: 81.156.224.11
Location: Ilminster, United Kingdom

**Ryan Carroll**
Email: ryan@wealthassistants.com

| | |
|---|---|
| Sent: | 07 Nov 2022 20:36:13 UTC |
| Viewed: | 08 Nov 2022 19:09:21 UTC |
| Signed: | 08 Nov 2022 19:10:08 UTC |

**Recipient Verification:**
✔Email verified          08 Nov 2022 19:09:21 UTC

IP address: 71.186.221.228
Location: Buffalo, United States

Document completed by all parties on:
08 Nov 2022 19:10:08 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.

