Nico Banks, Esq.
nico@bankslawoffice.com
Filing on behalf of all Plaintiffs
CA Bar No. 344705
Banks Law Office
712 H St NE,
Unit #8571,
Washington, DC 20002
Tel.: 971-678-0036

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID HOUGH; AMUND THOMPSON; ISABEL RAMOS; ANTHONY RAMOS; MICHAEL NIBARGER | ) Case No.: 2:24-cv-02886-WLH |
| Plaintiffs, | ) **FIRST AMENDED COMPLAINT FOR:** |
| vs. | ) **1. FRAUD CONSPIRACY** |
| RYAN CARROLL; MAX K. DAY; MAX O. DAY; MICHAEL DAY; JARED DAY; MATTHEW CROUCH; CHRISTINE CARROLL; TROY MARCHAND; BONNIE NICHOLS; TRAVIS MARKER; REYHAN PASINLI; YAX ECOMMERCE LLC; PRECISION TRADING GROUP, LLC; WA DISTRIBUTION LLC; PROVIDENCE OAK PROPERTIES, LLC; WA AMAZON SELLER LLC; | ) **2. AIDING AND ABETTING FRAUD** ) **3. FRAUDULENT TRANSFERS IN FURTHERANCE OF CONSPIRACY** ) **CLASS ACTION** ) **DEMAND FOR JURY TRIAL** |

YAX IP AND MANAGEMENT INC.
(D.B.A. "FULFILLABLE");
MKD INVESTMENT ADVISOR, LLC;
MKD FAMILY BENEFICIARY, LLC;
MKD FAMILY PRIVATE
MANAGEMENT COMPANY, LLC;
MAX DAY CONSULTING, LLC;
HOUTEX FARM EQUITY PARTNERS
LLC;
BUSINESS FINANCIAL SOLUTIONS
ADVISORY LLC;
EVO MAXX LLC;
WWKB LLC;
DREAMS TO REALITY LLC;
QUANTUM ECOMMERCE, LLC;
WHOLESALE UNIVERSE, INC.;
THE LAW OFFICE OF TRAVIS R.
MARKER, A PROFESSIONAL
CORPORATION (D.B.A. "MARKER
LAW AND MEDIATION");
PARLAY LAW GROUP A
PROFESSIONAL CORPORATION;
TOTAL-APPS, INC.;
WELLS FARGO BANK, N.A.

Defendants.

## FIRST AMENDED COMPLAINT — CLASS ACTION

Plaintiffs David Hough, Amund Thompson, Isabel Ramos and Anthony

Ramos, and Michael Nibarger (collectively, "Plaintiffs" or "Class Representatives"),

individually and on behalf of others similarly situated, by and through their attorneys,

bring this class action complaint against the following Defendants: (1) Ryan Carroll;

Max K. Day; Max O. Day; Michael Day; Jared Day; Matthew Crouch; Christine

Carroll; Troy Marchand; Bonnie Nichols; Travis Marker; and Reyhan Pasinli

(collectively, the "Human Defendants"); (2) Yax Ecommerce LLC; Precision Trading Group, LLC; WA Distribution LLC; Providence Oak Properties, LLC; WA Amazon Seller LLC; and Yax IP and Management Inc.;  (collectively, the "Wealth Assistants Entity Defendants"); (3) MKD Investment Advisor, LLC; MKD Family Beneficiary, LLC; MKD Family Private Management Company, LLC; Max Day Consulting, LLC; HouTex Farm Equity Partners LLC; Business Financial Solutions Advisory LLC; Evo Maxx LLC; Dreams To Reality LLC; and WWKB LLC (collectively, the "Alter Ego Defendants"); (4) Quantum Ecommerce, LLC; and Wholesale Universe, Inc. (collectively, the "Quantum-Wholesale Partnership"); and (5) The Law Office of Travis R. Marker, a Professional Corporation (d.b.a. "Marker Law and Mediation"); Parlay Law Group, A Professional Corporation; Total-Apps, Inc.; and Wells Fargo Bank, N.A. (collectively, the "Payment Processing Defendants"). Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1. Plaintiffs invoke the diversity jurisdiction of the Court pursuant to 28 U.S.C. § 1332(d) because: (1) at least one Plaintiff in this putative class action resides in a different state from at least one defendant, (2) there are more than 100 putative class members, and (3) there are more than $5 million in controversy.

2. Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiff Michael Nibarger has resided in Los Angeles County at all times relevant to this dispute.

3. Personal Jurisdiction over the Wealth Assistants Entity Defendants is proper because they purposely defrauded many California residents, collecting over $1,000,000 from those residents.

4. Personal Jurisdiction over the Human Defendants, the Quantum-Wholesale Partnership, and the Payment Processing Defendants is proper because they conspired with the Wealth Assistants Entity Defendants and others to defraud individuals across the country. Carrying out that conspiracy included—foreseeably—intentionally defrauding dozens of California residents out of more than $1,000,000.

5. Moreover, the Human Defendants, the Quantum-Wholesale Partnership, and the Payment Processing Defendants all knew or should have known that Wealth Assistants' conspiracy to conceal assets was centered in California. In particular, Christine Carroll—Wealth Assistants' Finance Manager—resided in and worked in California at all times relevant to this dispute. Moreover, Total Apps—which, upon information and belief, directed and planned the scheme to conceal assets—was headquartered in and did business in California at all times relevant to this dispute.

6. The Quantum-Wholesale Partnership is subject to personal jurisdiction in California for the additional reason that it intentionally made misstatements to many California residents in furtherance of the conspiracy's aim to defraud those residents. For example, the Quantum-Wholesale Partnership intentionally

sent emails to many California residents telling them—falsely—that Wealth Assistants had purchased valuable inventory packages for those residents.

7.  Personal Jurisdiction over the Alter Ego Defendants is proper because they are the alter egos of other defendants who are subject to personal jurisdiction in California, as described in more detail below.

## SUMMARY OF CASE

8.  Wealth Assistants obtained more than $50 million by defrauding more than 600 individuals.

9.  Specifically, Wealth Assistants advertised that it would provide its clients with substantial income by setting up and managing lucrative online Amazon stores that the clients would own. But Wealth Assistants did not provide the promised services. Instead, it used the fees it collected from Plaintiffs and its other clients for the benefit of the Human Defendants.

10. Wealth Assistants' clients would pay it an upfront fee of up to $125,000 to set up an online Amazon store in the client's name and manage it. After that, the client would pay for the store's inventory, along with certain other smaller fees. In return, the individual would be entitled to collect between 50 percent and 70 percent of the online store's gross profits.

11. Wealth Assistants advertised that the profits of an online store it managed should grow to more than $10,000 per month by the end of the store's first year.

FIRST AMENDED COMPLAINT — CLASS ACTION

12. Hundreds of individuals purchased the business opportunity Wealth Assistants offered. Most of these purchasers were middle class, and many had to use all their retirement savings or take out home equity loans to make the purchase.

13. Wealth Assistants never intended to follow through on its promises.

14. Some of Wealth Assistants' clients never even received an online store after paying the fee. Others received stores (which themselves are valueless and can be easily and freely set up), but their stores were never stocked with any inventory. Others paid Wealth Assistants for inventory after receiving inventory invoices from Wealth Assistants that turned out to be fake; the inventory never actually appeared in their stores.

15. Ultimately, the vast majority of Wealth Assistants' clients have received less than $10,000 in profits from their online stores, and many never received a single dollar of revenue from their stores (if they received stores at all).

16. Wealth Assistants perpetuated its fraudulent enterprise for as long as it could. When Plaintiffs and other individuals complained, Wealth Assistants invented excuses. It blamed "supply chain disruption," for example. It asked its clients for patience.

17. Eventually, however, Plaintiffs and other individuals realized that they had been defrauded. Many of Wealth Assistants' clients demanded their money back, complained to their banks, or alerted government agencies about the ongoing fraud.

FIRST AMENDED COMPLAINT — CLASS ACTION

18. Realizing that its fraud was being exposed, Wealth Assistants shut down. In October of 2023, Wealth Assistants announced to all of its clients that it was going out of business. The announcement told Plaintiffs that they would not receive further services and would not receive their money back.

19. Throughout this fraudulent scheme, instead of using the money collected from Wealth Assistants' clients to provide the promised services, Wealth Assistants used much of the money it collected from its clients for the benefit of the Human Defendants. For example, Wealth Assistants' CEO, Ryan Carroll, has recently flaunted his new Lamborghini.

20. The Payment Processing Defendants helped Wealth Assistants avoid scrutiny from regulators, conceal assets, and launder the proceeds of the fraudulent scheme to the Human Defendants.

## **CLASS REPRESENTATIVES**

21. Amund Thompson is an individual who has resided in Grass Valley, California at all times relevant to this dispute.

22. David Hough is an individual who has resided in Temecula, California at all times relevant to this dispute.

23. Isabel Ramos is an individual who has resided in Clovis, California at all times relevant to this dispute.

24. Michael Nibarger is an individual who has resided in Los Angeles County at all times relevant to this dispute.

## **DEFENDANTS**

**A. Human Defendants**

25. Defendant Ryan Carroll is an individual who has resided in Florida at all times relevant to this dispute.

26. Defendant Max K. Day is an individual who has resided in Texas at all times relevant to this dispute.

27. Defendant Max O. Day is an individual who has resided in Texas at all times relevant to this dispute.

28. Defendant Michael Day is an individual who has resided in Texas at all times relevant to this dispute.

29. Defendant Jared Day is an individual who has resided in Texas at all times relevant to this dispute.

30. Defendant Matthew Crouch is an individual who has resided in New York at all times relevant to this dispute.

31. Defendant Christine Carroll is an individual who has resided in California at all times relevant to this dispute.

32. Defendant Troy Marchand is an individual who has resided in Indiana at all times relevant to this dispute.

33. Defendant Bonnie Nichols is an individual who has resided in Texas at all times relevant to this dispute.

34. Defendant Reyhan Pasinli is an individual who has resided in California at all times relevant to this dispute.

35. Defendant Travis Marker is an individual who has resided in Utah at all times relevant to this dispute.

**B. Wealth Assistants Entity Defendants**

36. Each of the following entities did business as "Wealth Assistants:" **Yax Ecommerce LLC; Precision Trading Group, LLC; WA Distribution LLC; Providence Oak Properties, LLC; and WA Amazon Seller LLC**.

37. Upon information and belief, **Yax IP and Management Inc.** also did business as "Wealth Assistants."

38. Upon information and belief, those Wealth Assistants Entity Defendants did not have operations distinct from one another and did not follow corporate formalities; instead, they acted as each others' alter egos at all times.

39. Upon information and belief, the Wealth Assistants Entity Defendants were created as separate entities solely for the purpose of making it more difficult for their creditors to find and collect the Wealth Assistants Entity Defendants' assets.

40. Upon Information and belief, the Wealth Assistants Entity Defendants were also inadequately capitalized at all times relevant to this dispute.

41. Each of the Wealth Assistants Entity Defendants was owned, directly or indirectly, solely by one or more of the following individuals: Max K. Day, Max O. Day, Michael Day, and/or Ryan Carroll.

**C. Alter Ego Defendants**

42. Defendant MKD Investment Advisor, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

43. Defendant MKD Family Beneficiary, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

44. Defendant MKD Family Private Management Company, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

45. Defendant Max Day Consulting, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

46. Defendant HouTex Farm Equity Partners LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

47. Defendant Business Financial Solutions Advisory, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

48. Defendant EvoMaxx, LLC, is a limited liability company. Upon information and belief, its sole member is Max K. Day.

FIRST AMENDED COMPLAINT — CLASS ACTION

49. Defendant Dreams to Reality, LLC is a limited liability company. Upon information and belief, its sole member is Ryan Carroll.

50. Defendant WWKB, LLC is a limited liability company. Upon information and belief, its sole member is Michael Day.

51. Upon information and belief, each of the Alter Ego Defendants acted as their owner's alter ego.

52. Upon information and belief, each of the Alter Ego Defendants were undercapitalized.

53. Upon information and belief, none of the Alter Ego Defendants had any operations.

54. Upon information and belief, none of the Alter Ego Defendants followed corporate formalities, such as maintaining their own by-laws or accurate books and records.

**D. Quantum-Wholesale Partnership Defendants**

55. Defendant Quantum Ecommerce is a limited liability company incorporated in Indiana. Its sole member is Troy Marchand.

56. Defendant Wholesale Universe is a company incorporated in Texas.

**E. Payment Processing Defendants**

57. Defendant Travis Marker acted on behalf of himself and Defendants The Law Office of Travis R. Marker ("Marker Law") and Parlay Law Group at all times relevant to this dispute. Those two entities are incorporated in Utah.

58. Defendant Total-Apps, Inc. ("Total-Apps") is a corporation that is headquartered in California.

59. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a corporation that is headquartered in California.

## **FACTS**

**A. Wealth Assistants' Misrepresentations About Its Services**

60. The following is a summary of Wealth Assistants' agreements with its clients, including Plaintiffs:

   a. Wealth Assistants' clients would pay it to set up an online store on the Amazon platform that the clients would own. These stores offered goods for shoppers to purchase online.

   b. Wealth Assistants' clients would pay for the online store's inventory.

   c. Wealth Assistants' clients were required to pay certain other fees, such as annual fees and a "success fee" when the store was successfully set up.

   d. Wealth Assistants would manage the store, including by providing customer service, maintaining relationships with suppliers, and managing the inventory.

   e. Wealth Assistants' clients would keep between 50 percent and 70 percent of the gross profits generated by the stores, and Wealth

FIRST AMENDED COMPLAINT — CLASS ACTION

Assistants would take the remaining profits for itself as a management fee.

61. Until around November of 2022, most or all of Wealth Assistants' clients signed a standardized contract very similar to the one shown in Exhibit A of this Complaint.

62. The contract referenced in the paragraph above contained numerous statements that Wealth Assistants knew were false. For example, the contract stated:

> The Client will own a turnkey automated drop shipping Amazon retail store, which will be built and operated by the Service Provider. Product research, supplier negotiations, supplier relationships, product listing, day-to-day price updates, quality control, processing returns, customer service, financial reporting, and business growth in the direction of $10,000+ net profit monthly (assuming Client has the necessary resources, cash/credit) are among the services provided.

63. The contract also stated "In months 12 – 60+, the goal will be to net the Client upwards of multiple 6-figures per year ($350-$600K+ per year) if Client remains with the Service Provider and this Contract is not terminated for any such reason."

64. Wealth Assistants knew that nobody planned to provide Wealth Assistants' clients with the full set of services Wealth Assistants was promising in that contract. For example, Wealth Assistants knew that it did not have a goal of generating $10,000 of monthly profit in its clients' stores. Wealth Assistants knew that it instead intended to neglect its clients' stores so that the stores would generate little or no profits.

FIRST AMENDED COMPLAINT — CLASS ACTION

65. The contract also contained the following "Buyback" clause:

> If Client has substantially complied with all the provisions of this Service Agreement, and after the Client's 1st anniversary of getting their first Amazon sale, they have not made back their initial $55,000 (fifty-five thousand dollars) investment from net profit on their business, the Service Provider will offer them a buy-back of their Amazon retail store or waive their two thousand five hundred dollars ($2,500) annual store renewal fee if they have not yet paid it or credit them their annual renewal fee in full if they have already paid it.

66. Wealth Assistants knew that it never intended to honor its Buyback clause.

67. Around November of 2022, Wealth Assistants began using a different standardized contract for its new clients. An example of that standardized contract is Exhibit B to this Complaint. This later standard contract stated that "The Service Provider's principal aims are to provide a 'done for you' operation for Client, focusing on high-quality lawfully commercialized products offered at competitive prices accompanied by excellent customer service for end-user customers in a manner that promotes growth."

68. The following "description of services" appeared in those contracts:

A. Initial Phase. Initially, Service Provider will manage the process of transferring the Store to Client (the "Migration"). Migration includes but is not limited to: finalizing the Transfer (described at Exhibit D), changing account names, email address, bank account information, payment information, and other steps required by the Host. Migration generally takes 1 to 2 weeks but may be substantially delayed if issues arise. Migration completes upon delivery of new account credentials and the training manual.

B. Ramp-Up. During the remainder of the first year, Service Provider will steadily encourage and support ramping up the scale of the Store by, for

example, increasing product listings, optimizing SEO, and exploring advertising opportunities. Increased inventory will be required to meet increased demand as described below. The focus of this period is to lay the groundwork for future success.

| MONTHS | COST OF INVENTORY PER MONTH |
|---|---|
| 1 | $15,000 |
| 2 - 3 | $30,000 |
| 4 - 6 | $50,000 |
| 7 - 12 | $70,000 |
| 13 – 18 * | $90,000 |
| * The end of this period is the "**Milestone**." | |

69. Wealth Assistants knew that it would not be able to "ramp up" stores at the rate it promised in its contracts.

70. Likewise, the following description of Wealth Assistants' "Management" services appeared in the same contract:

B. <u>Management.</u> Service Provider will serve as a business consultant for the Store; performing for example:
● Product research and analysis of market data to identify top-selling products,
● Supplier relationships,
● Strategic sourcing or bulk-ordering products from optimal suppliers,
● Planning warehousing and fulfillment options,
● Product listings including, pricing decisions, and pricing updates,
● Deployment of Store look and feel (including Store name which may change from time to time),
● Customer service including quality control, and processing returns, and

● Internal financial reporting.
Service Provider shall make commercially reasonable efforts to maintain the uniqueness of the Store. In the event Client discovers certain inventory overlap with other stores, Client agrees to notify Service Provider.

71. Wealth Assistants knew that it would not provide the "Management" services described in that portion of the contract.

72. The same contract also promised a purported "Buyback Warranty," which stated, in part, as follows:

In the event Profit does not exceed the Threshold by the Milestone, Client may elect to receive from Service Provider: (1) a Credit, or (2) the Buyback Amount.
**"Profit"** means Gross Income less the Success Fee received by the Milestone.
**"Threshold"** means the Set-Up Fee.
**"Credit"** means an amount equivalent to the Annual Fee, and redeemable, at Client's option, by refund if already paid, or by application to Client's account.
**"Buyback Amount"** means an amount equivalent to the Threshold less the Profit.

73. Wealth Assistants knew that it never intended to honor the terms of its Buyback Warranty, and Wealth Assistants in fact did not honor the terms of its Buyback Warranties with Plaintiffs.

**B. Wealth Assistants' Marketing**

74. Wealth Assistants sent most of its prospective clients projections showing that the stores Wealth Assistants managed would generate more than $10,000 per month. An example of such a slide is shown below:

FIRST AMENDED COMPLAINT — CLASS ACTION

75. Very few, if any, of Wealth Assistants' investors ever achieved the "monthly profit totals" advertised by Wealth Assistants.

76. Wealth Assistants knew that its clients could not reasonably expect to achieve more than $10,000 per month in profits.

77. The slide deck also included the following slide:



78. Wealth Assistants knew that it did not intend to honor the "Buy Back" guarantee advertised in the slide above.

79. Wealth Assistants also lured clients with false advertising on social media. For example, on March 28, 2023, Wealth Assistants posted on its Facebook account that "you'll have the opportunity to sell your business 2-3 years from opening up your Amazon store (once your sales are $100K+/monthly)."

**C. Plaintiffs' Experiences With Wealth Assistants**

80. In July of 2022, a representative from Wealth Assistants named Charles Fitzgerald Butler emailed Plaintiff **Amund Thompson** and attached a PowerPoint that projected stores managed by Wealth Assistants would generate more than $10,000 per month in profits by the end of the store's first year.

81. In November of 2022, Thompson signed a contract to purchase the business opportunity Wealth Assistants was offering.

82. In or around November of 2022, Thompson paid Wealth Assistants $50,000 to cover the onboarding fee.

83. In early 2023, Thompson paid $5,000 to Wealth Assistants for inventory. Thompson paid Wealth Assistants that money by wiring the money to an escrow agent called Marker Law.

84. In total, to date, Thompson has received no more than $5,000 in connection with the business opportunity that Thompson purchased from Wealth Assistants.

85. In August of 2022, a representative of Wealth Assistants named Mack McKaughan told Plaintiff **David Hough** that if Wealth Assistants managed a store for Hough, Wealth Assistants projected that the store would generate $10,000 of income per month by the end of the store's first year.

86. Hough signed a contract to purchase the business opportunity Wealth Assistants was offering in August of 2022, and around the same time Hough paid Wealth Assistants $55,000 for the onboarding fee.

87. Hough later wired approximately $10,000 to Wealth Assistants for inventory.

88. Hough has received less than $4,000 in connection with the business opportunity he purchased from Wealth Assistants.

89. **Isabel Ramos and Anthony Ramos** are married and have several children.

90. Anthony Ramos spoke to Defendant Jared Day around January of 2023. Prior to when Anthony and Isabel purchased the business opportunity Wealth Assistants was selling, Jared Day told Anthony that if he purchased that business opportunity, his store would generate around $10,000 of passive income per month.

91. In January of 2023, Anthony and Isabel purchased the business opportunity Wealth Assistants was offering.

92. In or around January of 2023, Isabel and Anthony paid Wealth Assistants $75,000 as the onboarding fee for the business opportunity.

93. Thereafter, Isabel and Anthony paid many inventory invoices that they received from Wealth Assistants. Isabel and Anthony paid those inventory invoices, which totaled approximately $18,000.

94. Isabel and Anthony received less than $5,000 in connection with the business opportunity they purchased from Wealth Assistants.

95. Plaintiff **Michael Nibarger** is a retired California Patrol Officer.

96. In or around September of 2022, Nibarger spoke to a representative of Wealth Assistants named Brayton Bushby. Bushby sent Nibarger a PowerPoint stating that Wealth Assistants' stores could be expected to generate up to $10,000 per month in profits.

97. Nibarger then decided to purchase the business opportunity Wealth Assistants was offering in September of 2022. Nibarger paid Wealth Assistants $55,000

as the onboarding fee for the business opportunity Wealth Assistants was offering.

98. A Wealth Assistants representative named Ashley Nydam—who now works for Defendant Wholesale Universe—assisted Nibarger in setting up his store.

99. Thereafter, Nibarger paid two inventory invoices he received from Wealth Assistants for $5,000 each.

100.    Nibarger received less than $3,000 in connection with the business opportunity he purchased from Wealth Assistants.

**D. Wealth Assistants Announced It Was Shutting Down And Fraudulently Transferred Many Of Its Assets To Ryan Carroll, Michael Day, Max K. Day, and Max O. Day**

101.    On October 23, 2023, Wealth Assistants wrote to its clients that it "will not be able to honor any more Buyback Guarantees" and would "cease all operations before December 1, 2023."

102.    Wealth Assistants did in fact shut down. For example, it fired all or nearly all of its employees and stopped corresponding with its clients.

103.    Wealth Assistants has not honored Plaintiffs' Buyback agreements.

104.    Many of Wealth Assistants' clients have complained, requested refunds, or requested that Wealth Assistants honor its Buyback agreements, but have not received a response from Wealth Assistants.

105.    Wealth Assistants transferred its funds—either directly or indirectly with fraudulent transfers through entity Defendants—to Defendants Ryan Carroll, Max K. Day, Max O. Day, and Michael Day for them to personally use.

106.    Wealth Assistants also took steps to conceal the fraudulent transfers of funds to its principals Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. For example, Wealth Assistants used "payment processors" to receive payments from Wealth Assistants' clients and transfer the funds to hidden bank accounts not disclosed to its clients.

**E. When Wealth Assistants Shut Down, It Transitioned Many Of Its Clients' Accounts And Assets To Quantum Ecommerce and Wholesale Universe**

107.    Wholesale Universe and Quantum Ecommerce operate a partnership that purports to provide store-management services similar to the store-management services that Wealth Assistants used to purport to provide.

108.    Bonnie Nichols, the owner of Wholesale Universe, has described Wholesale Universe and Quantum Ecommerce as "like a brother-sister company" in which Bonnie Nichols—acting through Wholesale Universe—"lock[s] down the inventory" and Troy Marchand—acting through Quantum Ecommerce—"provides the account management services," such as monitoring the online stores, handling returns and refunds, and helping to reactivate any online stores that Amazon has deactivated.

109.    Wholesale Universe and Quantum Ecommerce have presented themselves as a joint partnership operating a single business when presenting contracts to clients.

110.    Moreover, Precision Trading LLC (one of the Wealth Assistants Entity Defendants) has done business as "Quantum Ecom" according to its corporate registration.

111.    On October 27, 2023—approximately four days after Wealth Assistants announced that it was shutting down—Bonnie Nichols described the manner in which she (acting through Wholesale Universe) and Troy Marchand (acting through Quantum Ecommerce) aided Wealth Assistants as follows, in an online webinar presented publicly and targeted at Wealth Assistants' former clients:

> The way that we actually met Wealth Assistants is they reached out to us about 90 days ago, because they were having issues with supply chain, and with inventory and getting that product uploaded into their clients stores. And because they know that we've got that locked down, they reached out to us and they said, hey, we need your help. And so we came on board about 90 days ago, and we started servicing about 100 to 175 clients with our products and services. We didn't have access to your information, we had access to be able to upload the product into your store as quickly as possible.

112.    Upon information and belief, Bonnie Nichols' statement is true insofar as Bonnie Nichols and Troy Machand—acting through the Quantum-Wholesale Partnership—did help Wealth Assistants. For example, upon information and belief, Bonnie Nichols and Troy Marchand helped Wealth

Assistants recruit new clients and/or process payments from those clients to Wealth Assistants.

113.    However, the Quantum-Wholesale Partnership did not provide reasonable inventory or store-management services to 100 clients. For example, it is not true that the Quantum-Wholesale Partnership provided $10,000 or more of inventory to 100 stores that Wealth Assistants was managing.

114.    As discussed above, on October 23, 2023, Defendant Ryan Carroll—the CEO of Wealth Assistants—emailed Wealth Assistants' clients, including Plaintiffs, stating Wealth Assistants "will not be able to honor any more Buyback Guarantees" and would "cease all operations before December 1, 2023." The same email also stated that Wealth Assistants was offering its clients a "Transition Agreement." Specifically, Wealth Assistants offered its clients the opportunity to transition their stores to management by another e-commerce firm on "favorable terms." The email also attached a "comparison of vendor proposals," which purportedly compared three e-commerce firms that had offered "favorable terms" to manage Wealth Assistants' clients' stores. But the only e-commerce firms actually identified in the "vendor proposals" were "Quantum Ecom" and "Wholesale Universe," which jointly offered a proposal. The other "vendors" offering the proposal were anonymous.

115.     After Wealth Assistants shut down, many former clients of Wealth Assistants began receiving unsolicited emails from Wholesale Universe, acting on behalf of the Wholesale Universe and Quantum Ecommerce joint partnership. Some of those emails stated that "prior to going out of business, Wealth Assistants purchased an inventory package for you valued at $35,000. It is now ready for upload to your Amazon FBA account."

116.     The statement about the inventory-package purchases was false because Wealth Assistants had not in fact purchased $35,000 inventory packages for all of the recipients of that email before it shut down.

117.     However, Wealth Assistants did in fact transfer assets from itself to Wholesale Universe. Wealth Assistants and Wholesale Universe made that transfer for the purpose of preventing Wealth Assistants' current and future creditors, including Plaintiffs, from accessing Wealth Assistants' assets.

118.     In the October 27th, 2023 webinar noted above, Bonnie Nichols described the Quantum-Wholesale Partnership's reaction to hearing that Wealth Assistants was shutting down by stating:

> We were kind of like, you know, caught off guard just like you guys were over the last couple of weeks when all this happened. And so, so we're kind of right now, filling, figuring out how we can reach out to you guys, but we have a ton of product— it's at our warehouse right now—that's ready to be uploaded into your accounts.
>
> And so all we need is to be able to get you guys onboarded and to get your user permission access to your store so that we can upload the inventory for the funds that was sent over to us from

Wealth Assistants, since that's still pending to be uploaded into your accounts.

119.     Meanwhile, Bonnie Nichols, Troy Marchand, and either Max K. Day or Max O. Day were instant messaging in a group called "Fulfillable" (the name of one of the Wealth Assistants Entity Defendants) about how the Quantum-Wholesale Partnership could gain to access Wealth Assistants' former clients' online stores.

120.     On December 19, 2023, Wholesale Universe—acting on behalf of the Quantum-Wholesale Partnership—sent an email to many of Wealth Assistants' clients. Although the vast majority of the recipients of the email had not partnered with Wholesale Universe, the email began by stating "We appreciate your partnership with Wholesale Universe and value the opportunity to assist in providing you your Amazon inventory efficiently, as was ordered by Wealth Assistants over the last 100 plus days." The email later stated "to ensure a smooth transition, we kindly request your prompt attention to the following matters: Please provide Wholesale Universe User Access Permission . . ." The email later stated "failure to provide the required information within the next 30 days will result in the initiation of a monthly storage fee of $500, commencing from December 20, 2023. This fee will be deducted from your inventory amount currently on hand at WU."

121.     Many of Wealth Assistants' former clients who received Wholesale Universe's email demanded that the Quantum-Wholesale Partnership provide

those former clients with the money that Wealth Assistants had paid the Quantum-Wholesale Partnership for the former clients' respective stores' inventory.

122.    The Quantum-Wholesale Partnership refused to make those payments to the vast majority of former Wealth Assistants clients who asked for them. The Quantum-Wholesale Partnership told at least one former Wealth Assistants client that any such requests must be directed to Wealth Assistants' bankruptcy attorneys, but it would not say who the Wealth Assistants bankruptcy attorney is, and none of the Wealth Assistants Entity Defendants had declared bankruptcy.

**F. The Payment Processor Defendants Conspired With Wealth Assistants To Help It Conceal Assets From Plaintiffs**

123.    <u>**Wealth Assistants' "Payment Processing" Strategy**</u>: Wealth Assistants knew, at all times it existed, that it was operating a fraudulent scheme.

124.    Accordingly, Wealth Assistants suspected that its clients would eventually either attempt to charge back their credit cards to recover their payments, or sue Wealth Assistants to attempt to recover their payments.

125.    Moreover, Wealth Assistants knew that it would likely lose any chargeback disputes or lawsuits commenced against it.

126.    Accordingly, Wealth Assistants attempted to conceal the proceeds of its fraudulent scheme so that, even when it lost chargeback disputes or lawsuits,

its clients would not be able to recover their money because they would not be able to find the assets.

127.    Furthermore, Wealth Assistants knew that it would need to avoid scrutiny from anti-money-laundering regulators and law enforcement because, if it drew scrutiny, it would be easy for regulators and law enforcement officers to detect that Wealth Assistants was a fraudulent scheme.

128.    Wealth Assistants and its payment processors attempted to avoid drawing scrutiny from regulators, and attempted to make its assets more difficult for creditors to find, by: (1) avoiding large transactions, (2) using many different payment processors so that no single payment processor was processing too much money, (3) dividing its assets into many different bank accounts, and (4) upon information and belief, passing money through many different accounts or processors before the money reached its final destination (collectively, the "Payment Processing Strategy").

129.    **Travis Marker**: Defendant Travis Marker, acting on behalf of his companies Marker Law & Mediation and Parlay Law Group, served as an "escrow agent" for Wealth Assistants.

130.    In his capacity as an "escrow agent," Travis Marker collected payments from Wealth Assistants' clients and then passed them to bank accounts controlled by Wealth Assistants.

131.    In order to collect payments from Wealth Assistants' clients, Marker often shipped credit card readers to the clients and instructed them to make discrete small payments.

132.    Sometimes, Marker sent a Wealth Assistants client more than one credit card reader because, he told them, a single credit card reader could only process a small amount of payments at one time.

133.    Marker used different credit card readers to process payments, in small discrete amounts, to attempt to avoid money-laundering detection.

134.    **Total-Apps on behalf of Wells Fargo**:

135.    The Executive Director of Total-Apps is Rey Pasinli. Rey Pasinli. In 2005, the Federal Trade Commission brought an action against Rey Pasinli in the Central District of California in Case Number CV 05-6054. The complaint alleged that Pasinli "provided payment processing services to a fraudulent enterprise known as Pharmacycards, which attempted to steal at least $1.2 million from thousands of consumer checking accounts." Specifically, he "arranged for consumers' accounts to be debited without personally meeting any individual associated with the Pharmacycards operation" and did not "require proof that consumers had authorized the debits to their checking accounts."

136.    To resolve the suit brought by the Federal Trade Commission, Pasinli stipulated to a permanent injunction. He agreed to refrain from "taking any

action to process any payment, directly or on behalf of any client, against any consumer's credit card or bank account without having previously undertaken a reasonable investigation to determine that the consumer has provided defendants or the client with express verifiable authorization."

137.    After stipulating to that permanent injunction, Pasinli became the owner and Executive Director of the company Total-Apps. Total-Apps states on its website that it is "a registered ISO of Wells Fargo Bank, N.A."

138.    Upon information and belief, Total-Apps was in fact a registered independent sales company ("ISO") of Wells Fargo at all times relevant to this dispute, meaning that Wells Fargo was Total-Apps sponsor.

139.    An ISO is an entity that is authorized to market and sell the services of banks.

140.    According to its website, the services that Total Apps provides to merchants as a Wells Fargo-sponsored ISO include:

a.    "if payment processing has been halted, we are able to help you restore payment processing by quickly setting up the new merchant accounts."

b.    "If funds have been frozen, we can recommend the best process to release these funds and resume business operations quickly."

c.    "reduc[ing] reserve rates"

d.    "increas[ing] processing limits"

e.    "fraud chargeback response"

f. "Total-Apps is the expert in providing Merchant Account Services and Advanced Payment Processing Solutions. To optimize your process you can select to outsource payment processing to our team. Alternatively, we can provide on-site and off-site training for your employees."

141.    As Total-Apps' sponsoring bank, Wells Fargo had a duty to supervise and monitor Total-Apps.

142.    Upon information and belief, Total-Apps acted as Wells Fargo's agent whenever it was assisting Wealth Assistants, including when it was helping Wealth Assistants process payments and conceal the proceeds of its fraudulent scheme.

143.    Total-Apps had access to Wealth Assistants' financial records.

144.    Upon information and belief, Total-Apps frequently served As Wealth Assistants' payment processor.

145.    For example, in January of 2023, Max O. Day was attempting to recruit a new "payment processor" called "Mint Solutions." In doing so, Max O. Day sent the email shown below to Mint Solutions and the email addresses Rey@total-apps.com and Alison@total-apps.com:

From: **Max Day** <maxday@wealthassistants.com>
Date: Thu, Jan 5, 2023 at 1:43 PM
Subject: Introductions
To: Zach Henson <zach@mintsolutions.biz>, Alison Schmidt <alison@total-apps.com>, Rey Pasinli <Rey@total-apps.com>


Zach <> Rey & Alison

Zach - I would like to introduce you Rey and Alison with Total Apps. I have known Rey for 15+ years, and he is a trusted friend. They take a very creative and custom approach to processing. They could help with your rapidly expanding business.

Y'all take it from here.

Very Best,
Max

146.    The phrase "very creative and custom approach to processing" in the email shown above was Max O. Day's euphemism to convey that Total-Apps—acting on behalf of Wells Fargo—had helped the Day family and Wealth Assistants process payments in a manner that concealed assets and avoided scrutiny from regulators.

147.    More generally, Total-Apps assisted Wealth Assistants in concealing its assets and avoiding regulatory scrutiny by helping Wealth Assistants and the payment processors implement the Payment Processing Strategy described above.

148.    **Wells Fargo's Obligations**:

149.    Federal law requires banks to know their customers and understand their customers' banking behavior.  Under applicable regulations, a bank must

maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

150. Wells Fargo is obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

151. The BSA requires Wells Fargo to develop, administer, and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

152. Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of

customer's residence to the bank; and (4) explanations for changes in account activity.

153.    Additionally, Wells Fargo must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA.  The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

154.    The federal government established the Federal Financial Institutions Examination Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions.  The FFIEC's Bank Secrecy Anti-Money Laundering Manual (FFIEC Manual) summarizes BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures.  The FFIEC Manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation (FDIC), and the Office of the Comptroller of Currency.  See FFIEC BSA/AML Examination Manual, at p. 5 (2010).

155.    Banks must also ensure that their employees follow BSA guidelines. Banks make compliance a condition of employment and incorporate

FIRST AMENDED COMPLAINT — CLASS ACTION

compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.  Banks are therefore required to train all personnel whose duties may require knowledge of the BSA on that statute's requirements.

156.    Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual.  These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

157.     **<u>Wells Fargo's Illegal Activities And Notice Of Fraudulent Scheme:</u>**
Wells Fargo acted as a co-conspirator in the Wealth Assistants fraudulent scheme through its agent, Total-Apps, as discussed above.

158.     Wells Fargo also participated in the conspiracy by keeping custody of Wealth Assistants' assets and other Defendants' assets.

159.     Upon information and belief, Wells Fargo also processed payments for Wealth Assistants.

160.     Wells Fargo also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

161.     Upon information and belief, Wells Fargo knew that Wealth Assistants was a fraudulent scheme when Wells Fargo custodied Wealth Assistants' assets and processed its payments.

162.     Wells Fargo custodied the following accounts:

a.     A $400,000 account held in the name of Max K. Day.;

b.     A $40,000 account held in the name of Maxpro Marketing LLC (one of Max K. Day's alter egos).

   c.  A $65,000 account held by Business Financial Solutions Advisory LLC.

   d.  A $280,000 account held by Precision Trading Group, LLC (one of the Wealth Assistants Entity Defendants).

   e.  A $600,000 investment account held by Precision Trading Group, LLC d.b.a. Wealth Assistants LLC;

   f.  A $20,000 account held by Precision Trading Group, LLC d.b.a. WA Amazon Seller;

   g.  A $20,000 account held by Precision Trading Group, LLC d.b.a. WA Distribution LLC;

   h.  A $3,400,000 account held by Precision Trading Group, LLC d.b.a. Wells Fargo;

   i.  A $20,000 account held by Precision Trading Group, LLC d.b.a. WA Brand Management LLC

   j.  A $20,000 account held by Precision Trading Group, LLC d.b.a. Carrol Enterprises LLC

163.    The Wealth Assistants Entity Defendants and the Human Defendants' interrogatory responses have indicated that each of those accounts listed above was "closed by Wells Fargo" and now contain no money.

164.    Upon information and belief, Wells Fargo knew that the accounts mentioned above—and other accounts associated with Wealth Assistants and

its principals—were being used to facilitate a fraudulent scheme for the following reasons, among others:

    a.  Wells Fargo received numerous chargeback requests—which contained descriptions of the Wealth Assistants fraudulent scheme—from Wealth Assistants' clients. Those requests requested reversals of payments the clients had made to the accounts listed above. Wells Fargo failed to respond to many of those chargeback requests.

    b.  Many of Wells Fargo's own clients were themselves clients of Wealth Assistants and asked Wells Fargo to reverse wire transfers or chargebacks they had made to the Wealth Assistants accounts listed above. Wells Fargo spoke to those clients about Wealth Assistants' fraudulent activities but still failed to reverse the wire transfers or chargebacks.

    c.  Counsel for Plaintiffs sent Wells Fargo multiple letters describing Wealth Assistants' fraudulent scheme, and informing Wells Fargo that Precision Trading was part of the fraudulent scheme, from January through May of 2024.

    d.  Upon information and belief, Wells Fargo's agent—Total Apps—was corresponding with Wealth Assistants about concealing the fraudulent proceeds of the accounts at issue.

e.  Bank of America froze Wealth Assistants' accounts in 2022. That information was publicly available because Wealth Assistants filed a complaint against Bank of America when the accounts were frozen.

f.  Members of the Day family had previously been the subjects of an adversarial action brought by a bankruptcy trustee alleging that they had perpetrated a fraudulent scheme. Accordingly, Wells Fargo knew that the accounts were high risk and needed to be subject to heightened scrutiny.

165.    Moreover, even when Wells Fargo received an asset freeze order from this Court, Wells Fargo refused to take any immediate action to ensure that it did not participate in a violation of the court order or in further fraudulent activity in the accounts at issue. It instead stated "the bank will not be enjoining or freezing any of the accounts of the jurisdictional defendants" as shown below:

> ← **David.Pinch@wellsfargo.com**    Mon, Apr 15, 6:24 PM    ☆    ←    ⋮
>
> to me, Rory.D.Zamansky, Michael.Lipsitz, David.Pinch ▾
>
> Dear Mr. Banks:
>
> Please know that Wells Fargo Bank, N.A. has received the temporary restraining order that you forwarded this afternoon. The bank appreciates receiving the copy of the order. I have reviewed its terms. The order is directed only at specific defendants within the jurisdiction of California (which the court has deemed the "jurisdictional defendants") and not Wells Fargo or any other bank. The defendants are enjoined from dispersing or removing funds with the monthly exception that each human may draw $9000 per month for living expenses.
>
> The order does not direct Wells Fargo to take any action or otherwise to monitor the accounts. The bank does not have a means to freeze an account and monitor a withdrawal limit of $9000 per month per human.
>
> Please let us know the outcome of the April 19, 2024, hearing on the preliminary injunction. In the meantime, the bank will not be enjoining or freezing any of the accounts of the jurisdictional defendants. The court has not ordered the bank to take that action.
>
> David E. Pinch
> Senior Counsel
> Wells Fargo Legal Department
> david.pinch@wellsfargo.com

## G. The Human Defendants All Conspired To Carry Out The Fraud Described Above

166.    Defendant **Ryan Carroll** is the Chief Executive Officer of Wealth Assistants. He participated in the conspiracy described above in the following ways:

    a.  Ryan Carroll claims that he founded Wealth Assistants and led the company's growth.

b. Ryan Carroll used videos of himself to recruit new clients for Wealth Assistants. Those videos included intentionally false statements. For example, he stated in those recorded videos that Wealth Assistants' stores could be expected to generate more than $10,000 in profits per month.

c. Ryan Carroll fraudulently transferred money from Wealth Assistants to himself and used that money for personal gain. For example, Carroll stated on social media that he had purchased a Lamborghini.

d. Ryan Carroll is the founder and owner of **Defendant Yax Ecommerce LLC**, which did business as "Wealth Assistants LLC."

e. Carroll is also the owner of **WA Amazon Seller LLC** and the manager of the North Carolina branch of Defendant **WA Distribution LLC**, both of which collected payments from Wealth Assistants' victims on behalf of Wealth Assistants.

f. Carroll also created the company Daddy Jules LLC which, upon information and belief, serves the sole purpose of concealing Ryan Carroll's personal assets.

g. Carroll is also the owner of **Dreams to Reality LLC**, which is an owner of Defendant Yax Ecommerce LLC. Upon information and belief, the sole purpose of Dreams to Reality LLC is to serve as an alter ego for

FIRST AMENDED COMPLAINT — CLASS ACTION

Ryan Carroll to make it more difficult for victims of Wealth Assistants to collect judgments from him.

167.    **Max K. Day** is an owner of Wealth Assistants. He participated in the conspiracy described above in the following ways:

a.  Max K. Day formed and managed Defendant **Precision Trading Group, LLC**. According to Precision Trading Group's corporate registration, it operated under the "assumed names" of "Wealth Assistants LLC," "WA Distribution, LLC," "WA Brand Management, LLC," and "WA Amazon Seller, LLC" beginning on December 14, 2022. Precision Trading accepted payments on behalf of Wealth Assistants from many Wealth Assistants clients.

b.  Max K. Day is the Director of Defendant **Providence Oak Properties, LLC.** Providence Oak Properties, LLC accepted payments on behalf of Wealth Assistants from many of Wealth Assistants' clients. A representative of Wealth Assistants stated, "Providence Oak Properties is a part of Wealth Assistants."

c.  Ryan Carroll described Max K. Day as his "mentor" and "business partner" in starting and managing Wealth Assistants.

d.  Max K. Day represented to one or more of Wealth Assistants' clients that they would receive a refund on their store. When he made that representation to Wealth Assistants' client Dominic Camany in

September of 2023, Max K. Day knew that it was not true, and in fact Camany never received a refund.

e.  Max K. Day aided and abetted the fraudulent scheme at issue by drawing on his past experiences in fraudulently transferring assets. For example, in 1992, Max K. Day agreed to injunctive relief after being charged by the Federal Trade Commission with operating a fraudulent credit card scheme. Likewise, in 2006, Max K. Day and his family ran a fraudulent enterprise called "Today's Destiny." Today's Destiny—much like the fraudulent scheme at issue in this case—lured victims by promising to make them rich if they paid for the business opportunity Today's Destiny was offering. Today's Destiny took money from its victims and did not provide the promised services. The Days then transferred the money collected by Today's Destiny to themselves, and they had Today's Destiny declare bankruptcy. The United States Trustee for Today's Destiny brought an adversary complaint against the Days for their fraudulent transfers.

f.  Max K. Day also created each of the following entities, which are defendants in this case: **MKD Investment Advisor, LLC; MKD Family Beneficiary, LLC; MKD Family Private Management Company, LLC; Max Day Consulting, LLC; HouTex Farm Equity Partners LLC; Business Financial Solutions Advisory LLC; and Evo**

**Maxx LLC.** Upon information and belief, Max K. Day created those entities for the sole purpose of concealing his assets, including concealing proceeds of the fraudulent scheme described above.

168.    **Defendant Max O. Day** was the Chief Growth Officer at Wealth Assistants. He participated in the conspiracy described above in the following ways:

a.  Wealth Assistants' "payment processors" accepted payments on behalf of Wealth Assistants' clients and then paid that money to other bank accounts associated with Wealth Assistants or its principals. Upon information and belief, Wealth Assistants used "payment processors" to make it more difficult for its victims to track where their money had gone once the victims realized they had been defrauded. Max O. Day asked an individual named Zach Henson to serve as a "payment processor" for Wealth Assistants.

b.  Max O. Day often stated that online stores managed by Wealth Assistants would likely earn tens of thousands of dollars per month. Many of Wealth Assistants' clients relied on Max O. Day's statements when deciding to purchase the business opportunity Wealth Assistants was selling. For example, in or around August of 2023, Max O. Day helped convince an individual named Craig Dillehay to purchase the business opportunity Wealth Assistants was offering, in part by telling

Dillehay that stores Wealth Assistants was managing were very profitable. Max O. Day also helped convince an individual named Korey McAleesejergins to purchase the business opportunity Wealth Assistants was offering by making similar statements.

c. Like his uncle Max K. Day, Max O. Day brought to Wealth Assistants his experience with similar fraudulent schemes and fraudulent transfers. He, like his uncle, helped perpetrate the "Today's Destiny" fraud described above.

d. Max O. Day created the entity Defendant **Yax IP and Management LLC**. Upon information and belief, that entity was an alter ego for the other Wealth Assistants Entity Defendants, and it served no purpose other than helping Defendants conceal the proceeds of the fraudulent scheme from Defendants' creditors.

169.    **Defendant Michael Day** was another owner of Wealth Assistants and provided financing for the company knowing that it was a fraudulent scheme. He also made false statements to many of Wealth Assistants' clients that they relied upon when deciding to purchase the business opportunities Wealth Assistants offered. For example, on October 12, 2022, Michael Day told Wealth Assistants' former client Haider Istanbouli, "we have developed a 72 point SOP protocol that virtually eliminates any possibility for deactivations or suspensions," when in fact Michael Day knew that Amazon stores that Wealth

Assistants set up were frequently deactivated or suspended for not complying with Amazon's policies. Moreover, Michael Day co-owns **WWKB LLC**, which is an owner of Yax Ecommerce LLC. Michael Day was also one of the perpetrators of the Today's Destiny fraud described above.

170.    Defendant **Jared Day** was another Wealth Assistants employee who intentionally made false statements to many of Wealth Assistants' clients. For example, he told Wealth Assistants' former clients Afshin Salehi and Michael Whitten that they would likely be earning more than $10,000 in profits per month one year after they purchased the business opportunity Wealth Assistants was offering. He made similar statements to Isabel Ramos. Moreover, like the other Defendants who are members of the Day family, Jared Day was a central perpetrator of the Today's Destiny fraud, and he used his past experience in perpetrating frauds to assist with the Wealth Assistants fraudulent scheme.

171.    Defendant **Matthew Crouch** was the President of Wealth Assistants beginning sometime in 2022 and continuing until October of 2023. He participated in the conspiracy described above in the following ways:

    a.    Crouch told many of Wealth Assistants' clients that Wealth Assistants was a prudent investment and that most of Wealth Assistants' clients were very satisfied with their investments.

b. Crouch guaranteed Wealth Assistants' former clients that they would be able to exercise their buyback guarantees.

c. Crouch told many of Wealth Assistants' clients that Wealth Assistants would supply their stores with inventory if the clients paid the invoices that Wealth Assistants had sent them.

172.    Defendant Christine Carroll served as Wealth Assistants' Finance Manager. Upon information and belief, she had access to Wealth Assistants' bank accounts, and she initiated many fraudulent transfers from the Wealth Assistants Entity Defendants. Upon information and belief, she was also in charge of maintaining Wealth Assistants' accounting records, and creating and sending invoices. Upon information and belief, she also monitored Wealth Assistants financial accounts and records to help ensure that the assets were conealed from Wealth Assistants' creditors and that the accounts were not drawing scrutiny from government regulators. She performed those tasks knowing that Wealth Assistants was operating the fraudulent scheme described above.

173.    Defendant **Troy Marchand** is the owner of Quantum Ecommerce. He has directed Quantum Ecommerce's conduct described above and aided in that conduct. Upon information and belief, he is also the sole control person of Quantum Ecommerce.

174.    Marchand is also the owner and director of all of the following entities, all of which are alter egos of Quantum Ecommerce: Quantum Health, LLC; Quantum Staffing, LLC; Quantum Distribution, LLC; Quantum Ecommerce, LLC; Quantum Ecom, LLC; Quantum Capital Group, LLC; and Quantum Marketing, LLC.

175.    In 2021, Marchand was permanently barred from serving as a stockbroker or investment advisor after he settled charges brought by the Securities and Exchange Commission alleging that he defrauded investors.

176.    Defendant **Bonnie Nichols** is a co-owner of Wholesale Universe. Bonnie Nichols is Wholesale Universe's sole control person. She has directed Wholesale Universe's conduct described above and aided in that conduct.

177.    Defendant **Travis Marker** is the owner and control person of Marker Law and Parlay Law Group. He directed those entities conduct, as described above.

178.    Defendant Rey Pasinli is the owner and control person of Total-Apps. He directed that entity's conduct, as described above.

## **CLASS ACTION ALLEGATIONS**

179.    Plaintiffs bring this class action pursuant to: (1) Fed. R. Civ. P. 23(a), and (2) either Rule 23(b)(1) (which allows a class to be certified only if adjudicating the matters individually would create a risk of inconsistent adjudications or adjudications that impede other class members' rights) or,

alternatively, Rule 23(b)(3) (which allows a class to be certified only if issues common to the class predominate over individualized issues and a class method of adjudication is superior to other available methods).

180.    **Class Definition:** Plaintiffs bring an action on behalf of a proposed class of all persons who:

   a.  purchased services relating to the setup or management of an online store from the Wealth Assistants Entity Defendants between June of 2021 and November of 2023;

   b.  did not make a profit on their purchase of that business opportunity; and

   c.  have never been owners, employees, legal representatives, or successors of the Wealth Assistants Entity Defendants.

181.    **Numerosity and Superiority:** More than 600 individuals fall within the proposed Class Definition. As a result, a class action is superior to other methods of adjudicating the claims of the putative class members; litigating their claims individually would be impractical.

182.    **Commonality and Predominance:** The issues common to the class—which predominate over issues not common to the class—include:

   a.  whether Defendants agreed with each other to operate Wealth Assistants;

   b.  whether Wealth Assistants included in its marketing materials—which, upon information and belief, were shared with nearly all of Wealth Assistants' clients to induce them to purchase the business opportunity

Wealth Assistants was offering—statements that were not true, or omitted to state material facts about that business opportunity necessary to make statements made not misleading;

c.  whether those misstatements or omissions were material;

d.  whether Defendants knew or should have known that those statements were not true;

e.  whether those misrepresentations and omissions—such as the representation that the business opportunities Wealth Assistants was offering were profitable—were necessarily relied upon by any individual who purchased the business opportunity Wealth Assistants was offering;

f.  whether the Alter Ego Defendants are their owners' alter egos;

g.  whether the Wealth Assistants Entity Defendants are each others' alter egos;

h.  whether the Wealth Assistants Entity Defendants transferred money to or for the benefit of others without receiving a reasonably equivalent value in exchange and, if so, to whom Wealth Assistants made those transfers.

183.  **Typicality:** Like all of the proposed class members, Plaintiffs seek to recover the financial losses they suffered because of Wealth Assistants' misrepresentations regarding the business opportunities sold to them and Defendants' subsequent concealment of assets.

184.   **Adequacy of Representation:** Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of other class members.

185.   Nico Banks and Richard Nervig are competent and experienced attorneys representing Plaintiffs.

186.   **Risk of Inconsistent Or Impeding Adjudications:** Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for at least one party opposing the class.

187.   Moreover, adjudications with respect to individual class members would, as a practical matter, substantially impair the ability of other members to protect their interests because of the limited assets that may be available to remedy harms done to Plaintiffs in this case.

## CAUSES OF ACTION

## COUNT ONE

## CIVIL CONSPIRACY TO DEFRAUD PLAINTIFFS AND CONCEAL ASSETS

## (AGAINST ALL DEFENDANTS)

188.   Plaintiffs incorporate by reference all allegations above.

189.   The elements of fraud are a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance, and resulting damage.

190.     To establish the element of conspiracy, a plaintiff must show (1) formation and operation of the conspiracy; (2) wrongful act or acts done pursuant thereto; and (3) resulting damage.

191.     All Defendants conspired, and agreed among each other, to make misrepresentations to Plaintiffs to entice them to purchase the services of Wealth Assistants.

192.     Defendants overtly acted in furtherance of that conspiracy.

193.     Defendants knew of the falsity of the misrepresentations to Plaintiffs.

194.     Plaintiffs relied on those misrepresentations when purchasing services or goods from Wealth Assistants.

195.     Moreover, Defendants agreed to transfer assets from the Wealth Assistants Entities to the others when the recipients of the transfers did not provide Wealth Assistants anything of comparable value in exchange.

196.     Defendants agreed with each other to make the transfers in order to prevent Wealth Assistants' current and future creditors, including Plaintiffs, from collecting those assets.

197.     When making that agreement to transfer assets, Defendants believed or reasonably should have believed that the Wealth Assistants Entity Defendants would incur debts beyond their ability to pay as they became due.

198.     Defendants did in fact transfer funds from Wealth Assistants directly or indirectly.

FIRST AMENDED COMPLAINT — CLASS ACTION

199.    The transfers harmed Plaintiffs, in part because the transfers caused Wealth Assistants to be undercapitalized and ultimately to go out of business, rendering it unable to pay any judgment that may be entered against it.

200.    Plaintiffs suffered damages as a result of the acts performed pursuant to the conspiracy.

## COUNT TWO

### AIDING AND ABETTING A FRAUD

### (AGAINST ALL DEFENDANTS)

201.    Plaintiffs incorporate by reference all allegations above.

202.    Defendants had knowledge that the Wealth Assistants Entity Defendants were engaged in the fraudulent scheme described above.

203.    Defendants substantially assisted in that fraudulent scheme, either by assisting in the making of fraudulent misrepresentations or assisting in the concealment of assets.

## COUNT THREE

### FRAUDULENTLY TRANSFER OF ASSETS

### (AGAINST THE ALTER EGO DEFENDANTS, THE QUANTUM-WHOLESALE PARTNERSHIP, BONNIE NICHOLS, AND TROY MARCHAND — COLLECTIVELY, THE "RECIPIENT DEFENDANTS")

1.  Plaintiffs incorporate by reference all allegations above.

FIRST AMENDED COMPLAINT — CLASS ACTION

2. Upon information and belief, the Recipient Defendants received payments from the other Defendants.

3. Upon information and belief, the non-Recipient Defendants transferred assets to the Recipient Defendants when the non-Recipient Defendants knew that they were insolvent.

4. The non-Recipient Defendants made those transfers with the intent to hinder, delay or defraud Plaintiffs.

5. Those transfers by the non-Recipient Defendants were a substantial factor in rendering Plaintiffs unable to collect upon debts that Wealth Assistants owes them.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Award compensatory damages to Plaintiffs in the amount of $57,000,000, for which all Defendants are jointly and severally liable;

B. Award attorneys' fees and costs to Plaintiffs in an amount to be determined at trial;

C. Enjoin Defendants from fraudulently transferring assets;

D. Grant to Plaintiffs whatever other relief is just and proper.

### **Jury Trial Demanded**

1

2    DATED: May 20, 2024

3                                                          /s/Nico Banks
                                                          Nico Banks, Esq.
4                                                          Banks Law Office
5                                                          Bar No. 344705
                                                          Tel.: 971-678-0036
6                                                          nico@bankslawoffice.com
7                                                          712 H St NE,
                                                          Unit #8571,
8                                                          Washington, DC 20002

9
                                                          Richard A. Nervig
10                                                         Richard A Nervig, P.C.
11                                                         Bar No. 226449
                                                          Tel.: 760-451-2300
12                                                         richard@nerviglaw.com
13                                                         501 Broadway, Suite 800
                                                          San Diego, CA 92101
14
15                                                         *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT — CLASS ACTION