# EXHIBIT A

# SERVICE AGREEMENT FOR AMAZON STORE MANAGEMENT WEALTH ASSISTANTS, LLC

The **Wealth Assistants LLC**, its owners, principals, operators, employees, independent contractors, agents, representatives, successors, and heirs (hereinafter referred to as the **"Service Provider"**), and the electronically undersigned Client _____, accepting these "Terms and Conditions," (hereinafter referred to as the **"Client"**), acknowledge and agree that this is a binding and enforceable contract between them; consisting exclusively of the "Terms and Conditions" set forth in the Contract and the attached Exhibit A "Description of Services," (hereinafter, referred as collectively the **"Contract" or the "Agreement"**).

This Contract shall be deemed effective on _____ (hereinafter, the "**Effective Date**"). As a result of this, the Client engages Service Provider as a Service Provider for the Client's business in exchange for Service Provider's services, and Service Provider accepts the engagement. Both parties agree as follows in consideration of the mutual benefits and liabilities stated herein. The Client electronically signs this Contract and pays Service Provider the consideration described in Clause 2 below. Electronically signing shall constitute acceptance of these terms and conditions.

## TERMS AND CONDITIONS

1. **DESCRIPTION OF SERVICES.** Beginning on the Effective Date, Service Provider will provide to the Client the services described in **Exhibit A** (attached to Agreement). Client must maintain a legal U.S. business entity in good standing and establish an Amazon seller account owned by the Client's business entity to receive the Service. In addition, the Client is responsible for obtaining the necessary business licenses, state sales tax exemption certificates, paying any legally required taxes, and filing any lawfully required tax returns.

2. **PAYMENT.** Client agrees to pay Service Provider as follows:

**A.** The Client will pay Service Provider a set-up fee of $55,000 (Fifty-Five Thousand Dollars) upon execution of this Contract. If the Client has already paid any money for this Service to the Service Provider, such as a deposit, the Client will pay the difference equal to $55,000 total.

**B.** Within fourteen (14) days following the end of each month, if the Client's Amazon Retail Store has sales exceeding $0 (Zero Dollars), Client will pay a Monthly Success Fee rate of 30% of net profits from the Client's Amazon Retail Store for that completed month.

**C.** Within fourteen (14) days following the Anniversary Date of the Effective Date of this Contract marking the end of the active Annual Service Period, Client will pay Service Provider an Annual Continuation Fee of $2,500 (Two Thousand Five Hundred Dollars).

**D.** In addition to any other right or remedy provided by law, if the Client fails to pay the Monthly Success Fee when due, Service Provider can treat such failure to pay as a material breach of this Contract and may cancel this Contract and seek legal remedies.

**E.** There are no refunds of Monthly Success Fees paid to the Service Provider or refunds on the one-time set-up fee of $55,000 paid to the Service Provider unless Client requests and is qualified for a buyback of their Amazon Retail Store based on Exhibit A.

**F.** The Client is responsible for paying Amazon seller account fees directly to Amazon to maintain an active Amazon Retail Store, plus any website hosting fees (approx. $39 per month for both).

G. The Client is responsible for setting up their legal business entity. The Service Provider will absorb the costs of the business entity (LLC) and Tax Exemption Certificates for the client. In addition, if necessary, Service Provider may also assist client with guidance to obtain the aforementioned LLC and Tax Exemption Certificates.

H. The Client is responsible during this Contract and thereafter for covering all costs associated with the client's Amazon store.

I. Client must make all payments of the following approved methods: EFTs (Wires & ACH), Checks, Cashier Checks, or Cryptocurrency (payment instructions attached to the Agreement). These forms of payment may change from time to time as provided by Service Provider. Sending money, but failing to consent to the Contract, as required herein, within five (5) days, will result in funds refunded to Client, less any third-party charges and a 15% administrative fee.

**3. LIMITATION OF SERVICES:**

A. The final approval for the design, theme, and niche for the Client's Amazon store will be the Client. The Service Provider will not be responsible or liable for any such selections made. The Service Provider is not liable for any specific outcomes and makes no claims about the amount of success the Client will achieve. Results may vary depending on many factors, such as market trends, conditions, and third-party algorithms over which the Service Provider has no influence.

B. The ability of the Service Provider to complete its responsibilities under the Agreement may be contingent on the Client's responsibilities. Accordingly, Service Provider is not responsible for any costs, charges, or losses incurred by Client due to Client's failure to meet its duties under this Agreement.

C. If the performance of this Contract or any obligation under it is prevented, restricted, or interfered with by causes beyond either party's reasonable control ("Force Majeure"), and if the party unable to carry out its obligations gives the other party prompt written notice of such event, the party invoking this provision's obligations shall be suspended to the extent necessary by such event.

**4. TERM & TERMINATION**

A. Except as otherwise provided in this contract, this contract will automatically expire in **three (3) years** after the Effective Date. However, this contract can be renewed for additional three (3) year periods, provided that client is in good standing with the Service Provider. Nevertheless, portions that are out to survive will continue and remain enforceable after the Contract expires. Additionally, the client must renew within 30 days of the termination date of the current contract agreement, and must remit payment of the annual $2,500 renewal fee, and for each subsequent year thereafter until the termination of the current contract.

B. The Client may terminate this Contract only upon thirty (30) days prior written notice to the Service Provider. Suppose the client does not renew this Contract for another Annual Service Period by paying the Annual Continuation Fee applicable to the currently active Package within fourteen (14) days after the Anniversary Date. In that case, this Contract will terminate at the end of the current Annual Service Period on the Anniversary Date. Client's Amazon Retail Store data, including Amazon login credentials, supplier information, and login credentials for products listed on Client's Amazon Retail Store, Client sales data, Client customer data, Client financial data, and other Client data necessary for Client to continue to operate Client's Amazon Retail Store, shall be promptly delivered to Client upon the termination of the Contract.

C. Service Provider may also terminate this contract for client gross misconduct, and will provide client with 30 days written notice to terminate. Service Provider shall not provide Client with Service Provider's confidential business or technical policies, procedures, documentation, or software that Service Provider uses in conducting Service Provider's business and providing services to other clients.

D. This Contract may also be terminated if the Client qualifies for, and wishes to take advantage of Service Providers buyback guarantee (Exhibit A) at Client's first anniversary of opening their Amazon Retail Store. If the Client does qualify, and decides to take advantage of (Exhibit A), then the Service Provider is entitled to 100% ownership of the Amazon Retail Store. Transfer of store ownership to the Service Provider will be within 30 days of Client requests of a buyback. The client is responsible for working with the Service Provider during the Amazon Retail Store transferring phase, until completed.

5. **WORK APPROVAL.** While providing services, Service Provider may create Work(s), or concepts, ideas, designs, proposals, and other materials (collectively, "Work") for the benefit of the Client.

A. Both parties acknowledge that time is of the essence, and that cooperation and timeliness are required to meet everyone's goals and aspirations on time.

B. Within five business days of receiving any deliverables, the Client will give either (a) written approval and acceptance of such deliverable (which will not be withheld unreasonably) or (b) a written list of acceptable modification parameters that will bring the deliverables into compliance. If Service Provider does not receive the preceding written notice within five business days of delivery to Client, each deliverable hereunder will be deemed accepted by Client.

6. **INTEGRATION AND WARRANTY DISCLAIMERS.** The Terms and Conditions govern exclusively the terms and conditions relating to the services described herein. They constitute the entire Agreement and understanding between Service Provider and Client, canceling, terminating, and superseding any prior agreement or understanding relating to the subject matter. Other than those set forth above, there are no representations, promises, agreements, guarantees, covenants, or undertakings. Finally, no prior dealings between the parties shall be relevant to supplement, interpret, or explain any word used herein, and no usage of the trade shall be applicable to supplement, interpret, or explain any term used herein. No advice, information, or content obtained from Service Provider by oral or written communication shall be construed as creating or conveying any warranty or representation on Service Provider's part other than what is provided in this agreement.

**WARRANTY CONDITIONS**:

THE WARRANTIES SPECIFIED IN THIS AGREEMENT ARE CONTINGENT ON THE PROPER USE OF THE PRODUCT IN ACCORDANCE WITH THE INSTRUCTIONS AND SPECIFICATIONS PUBLISHED BY WEALTH ASSISTANTS, LLC OR BY THE MANUFACTURERS OF THE COMPONENT PARTS OF THE PRODUCT AND SHALL NOT APPLY TO ANY PRODUCT THAT HAS BEEN MODIFIED BY PERSONS OTHER THAN WEALTH ASSISTANTS, LLC.

**WARRANTY DISCLAIMER**:

THE EXPRESS, LIMITED WARRANTIES SPECIFIED IN THIS AGREEMENT ARE IN LIEU OF AND NOT IN ADDITION TO ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WEALTH ASSISTANTS, LLC EXPRESSLY HEREBY DENIES ANY WARRANTY OF OR FOR ANY LOSS OF BUSINESS OPPORTUNITIES OR INTERRUPTION, OR FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.

**TESTIMONIALS AND INCOME STATEMENTS**

NO CLIENT'S SUCCESS, EARNINGS, OR PRODUCTION RESULTS SHOULD BE VIEWED AS TYPICAL, AVERAGE, OR EXPECTED. NOT ALL CLIENTS ACHIEVE THE SAME OR SIMILAR RESULTS, AND NO RESULTS ARE GUARANTEED EXCEPT AS DESCRIBED IN EXHIBIT A OF THIS AGREEMENT "DESCRIPTION OF SERVICES" CLAUSE A11 STORE BUY BACK CLAUSE. YOUR LEVEL OF SUCCESS WILL BE DETERMINED BY SEVERAL FACTORS, INCLUDING THE AMOUNT OF WORK YOU PUT IN, YOUR ABILITY TO SUCCESSFULLY FOLLOW AND IMPLEMENT ANY INSTRUCTION PROVIDED BY SERVICE PROVIDER, PROVIDE PROPER WORKING CAPITAL AND FUNDING TO ADEQUATELY SCALE AND GROW THE AMAZON STORE MANAGEMENT SYSTEM PER SERVICE PROVIDERS REPRESENTATION, AND ENGAGE WITH OUR AMAZON STORE MANAGEMENT SYSTEM, AND THE PRODUCTS NEEDS OF THE CUSTOMERS IN THE GEOGRAPHIC AREAS IN WHICH YOUR PRODUCTS ARE OFFERED.

7. **PLACEMENT INTRODUCTION PROVISION.** The client understands and agrees that on behalf of clients, the Service Provider may recruit other Contractors to assist in anyway it deems necessary and maybe required, to fulfill its obligations to client.

8. **RELEASE AND INDEMNIFICATION.** Client agrees to hold Service Provider, its employees, agents, officers, and directors ("Released Parties") harmless from any actions or causes of action arising or relating from the introduction of the outside contractor, including, but not limited to, any damage or injuries sustained as a result of any acts associated with Client retaining, employing, or terminating the outside contractor. Service Provider assumes no responsibility for the outside contractor's compliance with federal or state laws relating to, but not limited to, employment, immigration, residency, insurances, taxes, or other legal requirements. This is the sole and exclusive responsibility of Client, for which Client agrees to indemnify the Released Parties if it incurs any liability. Service provider agrees to hold harmless client, only in the event service provider is found to be responsible for gross negligence.

9. **CUSTOMER CONDUCT AND PROHIBITED ACTIVITIES.** The client agrees not to post, publish (orally or in writing), or otherwise disseminate the following information:

**A.** Trade secrets shared by the Service Provider with the Clients. A trade secret is any information provided by Service Provider to Client, as well as intellectual property in the form of a formula, practice, process, design, instrument, pattern, commercial method, or compilation of information that is not widely known or reasonably ascertainable by others, and through which Client can gain an economic advantage over competitors.

**B.** Information on Amazon Marketplace, Inventory, violations of Amazon Marketplace guidelines or similar platform submissions that Client knows to be false, incorrect, or deceptive; any copyright, patent, trademark, trade secret, right of privacy, right of publicity, or other intellectual

property or other rights of a third party are violated, infringed, or misappropriated; promotes harm to persons or property, is discriminatory, libelous, defamatory, threatening, or harassing as set forth by any municipality, city, county, state, or federal law of the United States of America; attempts to gather personal data in violation of any applicable city, state, or federal law; contains hazardous links with computer viruses or other potentially damaging computer viruses.

**C.** If Amazon Marketplace, or a third party, shuts down, limits, or prohibits full, partial, or any use of Client's Amazon store as intended or used by Client to whom Service Provider had provided any service, Client shall assume full responsibility for any damages resulting from such action taken by Amazon Marketplace, or a third party, against the Client and/or the Client's Amazon store. Client acknowledges that Service Provider will bear no liability, other than gross negligence of Service Providers obligations under this agreement, for any action taken by Amazon Marketplace, or any other third party, against the Client, and the Client will fully indemnify Service Provider for any action taken by Amazon Marketplace, or any other third party, for any shutdown or limitation of use of the Client's Amazon store, as against Service Provider.

**10. CONFIDENTIALITY.** Any information that is exclusive to Client will not be used for the personal benefit of Service Provider or divulged, disclosed, or communicated in any way to a third party by Service Provider, its employees, agents, or representatives at any time or in any manner, either directly or indirectly. Proprietary information includes customer lists and data, sales data, financial data, product catalog and supplier data unique to Client's Amazon Retail Store, and any other business or technical information uniquely associated with Client's Amazon Retail Store generally recognized as confidential in the e-commerce industry. The client's private information shall be protected and treated as strictly secret by Service Provider and its employees, agents, and representatives. For periods during which Service Provider offers the Services, Service Provider may publicize and promote non-identifiable performance summaries of Client's Amazon Retail Store. This Confidentiality provision will continue to exist even if the Contract is terminated. Any oral or written waiver by Client of these confidentiality obligations by Service Provider that allows Service Provider to disclose Client's proprietary information to a third party will be limited to a single occurrence tied to the specific information disclosed to the third party, and this Confidentiality provision will remain in effect for all other circumstances.

**11. QUALITY OF SERVICE.** Service Provider will provide its Services and meet its obligations under this Contract in a timely and workmanlike manner, using knowledge and recommendations for performing the Services that meet generally acceptable standards in Service Provider's community and region, and will provide a standard of care that is equal to, or better than, that offered by similar service providers on similar projects.

**12. DEFAULT.** Any of the following events will be considered a substantial default under this Contract:

**A.** Failure to make a mandatory payment when it is due.
**B.** Either party's insolvency or bankruptcy.
**C.** Any levy, seizure, general assignment for the benefit of creditors, application, or sale for or by any creditor or government agency on any of either party's property.
**D.** A client publicly or privately slanders the Service.
**E.** Failure to make the Services available or deliver them in the time and manner specified in this Contract.

**13. REMEDIES.** If a party defaults by failing to substantially perform any provision, term, or condition of this Contract, the other party may terminate the Contract by providing written

notice to the defaulting party, in addition to all other rights available under law. The nature of the default must be described in sufficient clarity in the notice. The party receiving such notice has thirty (30) days from the date of the notice effective date to cure the default (s). Failure to cure the default(s) within such a period will result in the automatic termination of this Contract unless waived in writing by the party providing notice. Wealth Assistants, LLC address for written notice is as follows:

   1001 Brickell Bay Drive
   Suite 2700 C-8
   Miami, FL 33131

**14. GOVERNING LAW AND DISPUTE RESOLUTION.** This Contract shall be construed in accordance with the laws of the State of Florida. Any dispute arising out of or connected to this Contract will be resolved by friendly talks between the parties. If the case is not addressed through negotiation within thirty (30) days, the parties will use the Alternative Dispute Resolution (ADR) procedure outlined below to resolve the dispute. Any controversies or disputes arising out of or connected to this Contract will be handled by binding arbitration in accordance with the "Arbitration Provision" in Exhibit B of this Agreement. The arbitrator's decision will be final, and any court with sufficient jurisdiction may enter judgment on it.

**15. AMENDMENT & ASSIGNMENT.** This Contract may be modified or amended in writing by Mutual Agreement between the parties; any such amendment shall be signed by both the parties. Neither party may assign or transfer this Contract without the non-assigning party's prior written authorization; such approval shall not be withheld arbitrarily.

**16. RELATIONSHIP OF THE PARTIES**

Nothing in this Agreement shall be construed as creating any agency, partnership, joint venture, or other forms of joint enterprise, employment, or fiduciary relationship between the Service Provider and its agents and employees on the one hand, and Client and its agents and employees on the other. The Terms are not intended to imply any exclusive connection.

**17. SEVERABILITY & WAIVER.** If any provision of this Contract will be held to be invalid or unenforceable for any reason, the remaining provisions will continue to be valid and enforceable. The omission of either party to enforce any aspect of this Contract shall not be regarded as a waiver or limitation of that party's right to enforce and demand strict compliance with all the Contract's provisions in the future.

**18. RIGHTS, OWNERSHIP, AND USAGE:** Subject to Service Provider's receiving full payment under this Agreement, Service Provider assigns to Client, without representation or warranty, all rights, title, and interest Service Provider may have in any Work created explicitly by Service Provider for Client pursuant to the Agreement, with the following exceptions:

**A.** Service Provider may use and distribute such Work as part of its portfolio for promotional purposes.

**B.** Service Provider shall own and retain all rights to Work(s) which have been presented to Client but not included in the final work product or deliverables for whatever reason.

**C.** Service Provider shall own and retain all rights to any technology, technical documentation, inventions, algorithms, software, architecture, logic, navigation, 3D modeling files, animation files (other source files for front-end deliverables), computer programs, source codes, games, engines (or different backend and background elements), and files and features incorporated

into or utilized by the Work (collectively, "Background Technology"). Unless the parties agree otherwise in a written and signed Schedule of Work, Service Provider shall retain ownership of all Background Technology, including all associated intellectual property rights. Service Provider hereby grants Client a nonexclusive, royalty-free, perpetual, irrevocable, worldwide license to use, reproduce, distribute, display, and perform Wealth Assistants Background Technology, in compiled, machine-readable object code form only, to the extent incorporated into deliverables provided hereunder strictly for the purposes and in the territories set out in the applicable Schedule of Work. Use of Background Technology for any other project, on any other website, or in any other medium shall be subject to additional fees and licenses, which may be granted or withheld by Service Provider in its sole discretion.

**D.** Subject to the services provided hereunder, Service Provider shall retain all rights to their training materials, slide decks, questionnaires, handouts, proprietary illustration or layouts, graphics, or other artwork used to provide services to Client.

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be executed by their duly authorized representatives as of the date first above written.

**CLIENT**

By:_____Client,

Print name: _____

Date signed: _____

**SERVICE PROVIDER**

By:_____

Service Provider: Wealth Assistants, LLC.

Ryan Carroll - CEO

Date signed: _____

Wealth Assistants LLC, Representative: _____

*(Under the Electronic Signatures in Global and National Commerce Act (E-Sign), this Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature.)*

7 | Page           Client Initials  [     ]

# EXHIBIT A: DESCRIPTION OF SERVICES

**A1.** The client will own a turnkey automated drop shipping Amazon Retail Store, which will be built and operated by the Service Provider. Product research, supplier negotiations, supplier relationships, product listing, day-to-day price updates, quality control, processing returns, customer service, bookkeeping, and business growth in the direction of $10,000+ net profit monthly (assuming Client has the necessary resources, Cash/Credit) are among the services provided. The Service Provider's principal aim is to provide excellent customer service while also delivering significant outcomes for Clients in the global marketplace.

**A2.** During the first three (3) months after the opening of the Amazon Retail Store, when Amazon has the newly created Store in a "probationary phase," the Service Provider will focus on customer satisfaction and other customer metrics. As a result, the Store's growth will be limited in the first three (3) months, and scaling will be slower.

**A3.** During months 3-12, the Service Provider will steadily enhance the Store's growth by increasing product listings, optimizing SEO, potentially running PPC ads on winning products, and by giving the Client the option to place wholesale bulk orders for Amazon FBA (which increases profit margins). The Service Provider will be using the Clients credit or debit card(s) on file to pay for drop shipping inventory and wholesale bulk orders (optional by Client months 3-12). The Client should have the expectation that they will be reinvesting profits back into their business year one, so that the Service Provider can scale the Clients store as needed. When it comes to product selection and store scaling, it's critical to remember that the Service Provider has tested proven methods. The expectation should be that the Service Provider is trying to build Clients a fully "done-for-you" business that will hopefully last decades and give the Client passive income. As a result, the first year is the "ramp-up" year, when you lay the groundwork for your company.

**A4.** The Service Provider will increase the growth of the Amazon Retail Store during months 9-12 months (from the date of the first sale) in the direction of $10,000+ monthly net profit (after the Service Providers profit split). In months 12 - 60+, the goal will be to net Client upwards of multiple 6-figures per year ($350-$600K+ per year) if Client remains a partner with the Service Provider and this Contract is not terminated for any such reason.

**A5.** Client's Store's Return on Investment (ROI) is subject to the Store's monthly performance in sales and profit margin. The average ROI pertaining to Gross Profit Margin is between 15-20 percent. For Example) A store in one month may yield a 20% profit margin with $50,000 in gross sales, providing $10,000 in Net Profit. Service Provider's team is to be paid the appropriate Monthly Success Fee out of the Net Profit, as noted in Section 2.D of this Contract, for their contributions to the success of the Store each month. Keep in mind that this profit share is properly incentivizing us to fully deliver on our end as we are business partners. The better your business performs, the more money we make, so we have a vested interest in your success.

**A6.** Service Provider will list and sell high-quality products at competitive prices in Client's Amazon Retail Store.

**A7.** Service Provider may use but is not limited to using USA-based suppliers, USA-based consultants, and international-based virtual assistants (VAs).

**A8.** Service Provider will serve as a business consultant for the Client's Amazon Retail Store during each Annual Service Period in which the Contract is in force.

**A9. Service Fee Acknowledgement:** The client acknowledges that the agreed purchase amount of this Contract for the service Wealth Assistants, LLC will be paid by Client. The purchase amount covers ONLY

the service fee. The service fee is a ONE TIME FEE for business management services. Annual renewals must be up to date with Wealth Assistants, LLC. The Client acknowledges that they understand this completely; and that to sell products and create profit for their business, they must dedicate additional funds and resources (credit lines) for purchasing products. Wealth Assistants, LLC is NOT providing any investment in the Client's product costs. Without paying the supplier's product costs to ship out customers' orders, the Client will not make any profit.

**A10. Amazon Drop Shipping:** Drop shipping is a business model where the Client only needs to pay suppliers for individual product costs for separate orders that the Client sells on their Amazon Retail Store. Amazon pays out gross sales directly to the Client's bank account twice a month. The Client is responsible for "floating" the supplier's drop shipping product costs as needed while payouts accumulate and are paid twice monthly to Client. The Service Provider is responsible for operating and managing product shipments with suppliers, but the Client is responsible for paying these shipment costs with an active debit or credit card on file or by paying invoices requested by the Service Provider for product shipments. If the Client does not deliver products on time, their Amazon Seller Account may be at risk for suspension (see Clause A12). The Client's refusal to pay inventory and products costs will ultimately delay the Clients sales and profit from this business as well as VOID Clause A11.

**A11. Store Buy Back "Clause":** If Client has complied with all the provisions of this Service Agreement, and after the Clients 1st anniversary of getting their first Amazon sale, they have not made back their initial $55,000 (fifty-five thousand dollars) investment from net sales on their business, the Service Provider will offer them a Buy-Back of their Amazon Retail Store or waive their $2,500 Annual Store Renewal fee if they have not yet paid it or credit them their Annual Renewal fee in full if they have already paid it. The Client will have 30 days after their first anniversary of obtaining their first Amazon sale to contact the Service Provider and request a Buy-Back or free Annual Renewal extension. This clause is only valid if the Client did not terminate this Contract within one year of getting their first Amazon sale or if the Client refused to pay for inventory costs associated with their business (Clause A10). If Service Providers must buy back a Client's Amazon Retail Store, it will be the sum of $55,000 minus the Clients net profit from their Amazon Retail Store. Net profit is based on their 70% cut after all expenses. For example, suppose after 12-months from the Client's first Amazon sale, the Client has not recovered $55k in net profits, then Wealth Assistants LLC in that case, will pay Client the difference between the amount they activated on the Agreement ($55,000) and how much net profit they have recovered. Example: The Client recovered a total of $25,000 in net profits when the period runs out (12-months from the date of the first sale). Wealth Assistants, LLC will pay the Client a total of $30,000 and claim 100% ownership of the Client's Amazon Retail store. Transfer of store ownership (Section 4) to the Service Provider will be completed within 30 days of the Client's requested Buy-Back. The Client is responsible for working with the Service Provider during the Amazon Retail Store transferring phase as needed to complete the transfer. This clause is set in place to fully protect the Client and provide peace of mind during this Service. In addition, If Client is qualified to receive a buy-back option, has FBA inventory and elects to exercise the option to sell their Amazon Retail Store back to Service Provider, Service Provider will buy back the entire inventory at cost. The Service Provider will apply the aforementioned to the manufactured cost of the product only, which will not include shipping costs, FBA fees, or removal fees.

**A12.** If the Client's Amazon account becomes "suspended" or "deactivated" by Amazon, then the Service Provider will pause the Client's Contract, so they lose no management time, and the case will be turned over to our suspension team. If the suspension team cannot overturn the decision, then Wealth Assistants, LLC. will provide payment for a new LLC to re-open a new seller account or "ghost" account for the Client if needed. Additionally, the Service Providers' twelve-month buy-back clause (Clause A11) will be paused at the start of the Client's Amazon suspension and then re-enable upon reactivation of the Client's Amazon seller account. This will and can extend the Client's buy-back clause out past twelve months if the Amazon seller account experiences a delay because of suspension.

**A.13** If the Client decides to sell their Amazon Business to another entity, then Wealth Assistants, LLC is entitled to a 30% profit share in year 1.  If Client sells their Amazon Business in years 2-3 Wealth Assistants,

9

LLC is entitlted to a 20% profit share, and if the client sells their Amazon Business after year 3, Wealth Assistants, LLC is entitlted to a 10% profit share.  All of the aforementioned are minus any escrow fees.  The client must pay Wealth Assistants, LLC within 30 days of successfully closing escrow and selling their Amazon Business.

### "EXHIBIT B ARBITRATION PROVISION"

**ARBITRATION PROVISION.**

ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS INSTRUMENT, AGREEMENT OR DOCUMENT OR ANY RELATED INSTRUMENTS, AGREEMENTS OR DOCUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW). JUDGMENT UPON ANY ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. ANY PARTNER TO THIS INSTRUMENT, AGREEMENT, OR DOCUMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS AGREEMENT APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

BOTH PARTIES AGREE TO NO MORE THAN ONE SET OF INTERROGATORIES EACH, CONSISTING OF NO MORE THAN 30 QUESTIONS EACH, TO BE COMPLETED BY 45 DAYS FOLLOWING THE DEMAND FOR ARBITRATION.  ALL CORRESPONDENCE DURING ARBITRATION BETWEEN THE PARTIES SHALL BE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, AT THE ADDRESSES PROVIDED FOR IN THIS AGREEMENT, OR AT ANOTHER ADDRESS PROVIDED BY THE PARTIES, TO THE ARBITRATOR. BOTH PARTIES AGREE TO COMMENCE THE ARBITRATION 15 DAYS AFTER THE LAST DAY FOR DISCOVERY, AS IS STATED IN THE PARAGRAPH MENTIONED ABOVE. BOTH PARTIES AGREE TO DIVIDE EQUALLY THE COSTS OF THE INITIAL ARBITRATION FEES.

ANY PARTY BRINGING AN ACTION IN FEDERAL, OR STATE COURT IN CONTRAVENTION OF THIS ARBITRATION PROVISION, SHALL BEAR THE ENTIRE EXPENSES AND FEES OF THE OTHER PARTY, INCLUDING, BUT NOT LIMITED TO, ATTORNEY'S FEES, COSTS, AND EXPENSES OF ARBITRATION FEES.  ANY ARBITRATOR MAY AWARD THOSE AS MENTIONED ABOVE TO THE PREVAILING PARTY IN ADDITION TO ANY ADDITIONAL AWARD IN EITHER PARTY'S FAVOR.

THE ARBITRATOR SHALL MAKE AND GIVE HIS OR HER DECISION TO BOTH PARTIES WITHIN 10 DAYS OF THE CONCLUSION OF THE ARBITRATION PROCEEDING, BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED TO THE ADDRESSES LISTED IN THIS AGREEMENT, OR AT SUCH OTHER ADDRESS PROVIDED TO THE ARBITRATOR BY THE REQUESTING PARTY.

SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE COUNTY OF MIAMI-DADE, MIAMI, FLORIDA. BOTH PARTIES AGREE TO SELECT AN ARBITRATOR FROM A LIST OF QUALIFIED ARBITRATORS WITHIN MIAMI-DADE COUNTY.  IF THE PARTIES CAN NOT AGREE, THE TWO ARBITRATORS CHOSEN BY EACH PARTY WILL SELECT A THIRD ARBITRATOR.  ALL THREE ARBITRATORS WILL HEAR THE COMPLAINT; A MAJORITY OF TWO THREE ARBITRATORS IS REQUIRED TO RENDER A DECISION.

# Wealth Assistants, LLC - Amazon Seller Management Payment Information

**Notes Before You Send:**
One time (Refundable Guarantee) cost of - **$55,000**
*If you have already paid a $1,000 deposit, then please only send **$54,000** (Also Refundable)
We are not responsible for any fees that may be applied to you when sending funds. Once sent, please notify your point of contact and we will start the onboarding process with you.

**ACH Payment:**

| | |
|---|---|
| Beneficiary Name | **Wealth Assistants LLC** |
| Wealth Assistants Address | **1001 Brickell Bay Drive** <br> **Suite 2700 C-8** <br> **Miami, FL 33131** |
| WA Contact Number | **Jennifer Schwertfeger** <br> **(716) 406-7623** |
| Bank | **Bank of America** |
| Routing Number | **063100277** |
| Account Number | **898132214905** |
| Bank of America Address | **Bank of America, NA** <br> **222 Broadway** <br> **New York, New York 10038** |
| BOA Contact Number | **(212) 393-1030** |

**Domestic Wire Transfer:**

| | |
|---|---|
| Beneficiary Name | **Wealth Assistants LLC** |
| Wealth Assistants Address | **1001 Brickell Bay Drive** <br> **Suite 2700 C-8** <br> **Miami, FL 33131** |
| WA Contact Number | **Jennifer Schwertfeger** <br> **(716) 406-7623** |
| Bank | **Bank of America** |
| Routing Number | **026009593** |

| Account Number | 898132214905 |
|---|---|
| Bank of America Address | **Bank of America, NA<br>222 Broadway<br>New York, New York 10038** |
| BOA Contact Number | **(212) 393-1030** |

**International Wire Transfer:**

| Beneficiary Name | **Wealth Assistants LLC** |
|---|---|
| Wealth Assistants Address | **1001 Brickell Bay Drive<br>Suite 2700 C-8<br>Miami, FL 33131** |
| WA Contact Number | **Jennifer Schwertfeger<br>(716) 406-7623** |
| Bank | **Bank of America** |
| Routing Number | 026009593 |
| Account Number | 898132214905 |
| SWIFT | **BOFAUS3N** |
| Address | **Bank of America, NA<br>222 Broadway<br>New York, New York 10038** |
| BOA Contact Number | **(212) 393-1030** |

**CASHIERS CHECK:**

| Beneficiary Name | **Wealth Assistants LLC** |
|---|---|
| Address | **1001 Brickell Bay Drive<br>Suite 2700 C-8<br>Miami, FL 33131** |

**CRYPTOCURRENCY PAYMENT:**

We use Coinbase Commerce to make cryptocurrency payment transactions easy for you. We accept 7 different types of crypto currencies.

Simply follow the *Correct* payment link below based on if you've already put a $1,000 deposit down.

- Pay $55,000 via Cryptocurrency here

- Pay $54,000 via Cryptocurrency here (if you've already placed a deposit)