**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID HOUGH, et al.,<br><br>            Plaintiffs,<br><br>     v.<br><br>RYAN CARROLL, et al.,<br><br>            Defendants. | Case No.: 2:24-cv-02886-WLH-SKx<br><br>**ORDER RE JURISDICTIONAL DEFENDANTS' MOTION TO COMPEL ARBITRATION [85]** |

ORDER

Before the Court is the Amended Motion to Compel Arbitration and to Stay (the "Motion," Docket No. 85) brought by Defendants Ryan Carroll; Max K. Day; Max O. Day; Michael Day; Yax Ecommerce LLC; Precision Trading Group, LLC; and WA Distribution LLC (collectively, "Jurisdictional Defendants"). On August 23, 2024, the Court held a hearing and heard oral argument from the parties. For the following reasons, the Motion is **GRANTED** in part and **DENIED** in part.

## I.   BACKGROUND

The parties are well aware of the details of this case, which have been discussed in detail in the Courts' previous orders. (*See, e.g.*, Order re Pls.' *Ex Parte* Mot. for TRO and Order to Show Cause re: Prelim. Inj., Docket No. 17; Order re Plaintiffs' Mot. for Leave to Conduct Expedited Discovery, Docket No. 42). In short, this case is about an ecommerce business opportunity that Defendant Yax Ecommerce (formerly known as "Wealth Assistants") sold to Plaintiffs for a buy-in of $50,000 to $75,000. (First Am. Compl. ("FAC"), Docket No. 56 ¶¶ 80–100). Plaintiffs allege that Wealth Assistants promised Plaintiffs would make up to $10,000 per month by the end of their first year with Wealth Assistants, or Wealth Assistants would pay back Plaintiffs' initial investment. (*Id.* ¶¶ 74–79). Plaintiffs contend that they have received less than $5,000 each in connection with Wealth Assistants and that Wealth Assistants has failed to honor the buyback guarantee. (*Id.* ¶¶ 80–104).

On May 20, 2024, Plaintiffs, with leave of Court, filed a First Amended Complaint that turned this case into a putative class action for fraud conspiracy, aiding and abetting fraud, and fraudulent transfers in furtherance of conspiracy. (*See generally id.*). The named Plaintiffs in this action are now David Hough, Amund Thompson, Isabel Ramos, Anthony Ramos, and Michael Nibarger (collectively, "Plaintiffs"). (*Id.*). At all relevant times, Plaintiffs were California residents. (*Id.* ¶¶ 21–24).

All named Plaintiffs in this action signed agreements with Wealth Assistants when they purchased the business opportunity. (*See* Aff. of Max O. Day, Docket No.

85-2 ¶¶ 5–6). The agreements Plaintiffs signed contain arbitration agreements and have either a Florida choice-of-law provision (the "Florida Agreement") or a Texas choice-of-law provision (the "Texas Agreement"). Plaintiffs Amund Thompson, Michael Nibarger, and David Hough signed the Florida Agreement,[1] which contain the following provisions regarding arbitration:

> […]
>
> 14. GOVERNING LAW AND DISPUTE RESOLUTION. This Contract shall be construed in accordance with the laws of the State of Florida. Any dispute arising out of or connected to this Contract will be resolved by friendly talks between the parties. If the case is not addressed through negotiation within thirty (30) days, the parties will use the Alternative Dispute Resolution (ADR) procedure outlined below to resolve the dispute. Any controversies or disputes arising out of or connected to this Contract will be handled by binding arbitration in accordance with the "Arbitration Provision" in Exhibit B of this Agreement. The arbitrator's decision will be final, and any court with sufficient jurisdiction may enter judgment on it.
>
> […]
>
> **"EXHIBIT B ARBITRATION PROVISION"**
> ARBITRATION PROVISION.
> ANY CONTROVERSY OR CLAIM BETWEEN OR AMONG THE PARTIES HERETO INCLUDING BUT NOT LIMITED TO THOSE ARISING OUT OF OR RELATING TO THIS INSTRUMENT,

---

[1] There is some apparent confusion in the briefing regarding which Plaintiffs signed the Florida Agreement and which Plaintiffs signed the Texas Agreement. (*Compare* Mot. ¶ 3 (stating that three Plaintiffs signed the Texas Agreement and two Plaintiffs, Hough and Nibarger, signed the Florida Agreement) *with id.* ¶ 14 (stating that four Plaintiffs signed the Texas Agreement) *and* Opp'n, Docket No. 109 at 19 n.4 (stating that "[a]ll Plaintiffs' arbitration agreements state that arbitration claims must be filed with the [American Arbitration Association ("AAA")], except that Plaintiff David Hough's arbitration agreement does not specify any arbitration forum," even though none of the three Florida Agreements the Court reviewed compel filing with AAA)). The Court therefore bases its understanding of the contents of the agreements and the Plaintiffs who signed them on the attachments to the Affidavit of Defendant Max O. Day (Docket No. 85-2; *id.*, Exs. A–D), which the parties agree are true and correct copies of the agreements Plaintiffs signed. (Mot. ¶ 2; Opp'n at 4).

AGREEMENT OR DOCUMENT OR ANY RELATED INSTRUMENTS, AGREEMENTS OR DOCUMENTS, INCLUDING ANY CLAIM BASED ON OR ARISING FROM AN ALLEGED TORT, SHALL BE DETERMINED BY BINDING ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT (OR IF NOT APPLICABLE, THE APPLICABLE STATE LAW).

[…]

ANY PARTNER TO THIS INSTRUMENT, AGREEMENT, OR DOCUMENT MAY BRING AN ACTION, INCLUDING A SUMMARY OR EXPEDITED PROCEEDING, TO COMPEL ARBITRATION OF ANY CONTROVERSY OR CLAIM TO WHICH THIS AGREEMENT APPLIES IN ANY COURT HAVING JURISDICTION OVER SUCH ACTION.

BOTH PARTIES AGREE TO NO MORE THAN ONE SET OF INTERROGATORIES EACH, CONSISTING OF NO MORE THAN 30 QUESTIONS EACH, TO BE COMPLETED BY 45 DAYS FOLLOWING THE DEMAND FOR ARBITRATION.

[…]

BOTH PARTIES AGREE TO DIVIDE EQUALLY THE COSTS OF THE INITIAL ARBITRATION FEES.

[…]

ANY PARTY BRINGING AN ACTION IN FEDERAL, OR STATE COURT IN CONTRAVENTION OF THIS ARBITRATION PROVISION, SHALL BEAR THE ENTIRE EXPENSES AND FEES OF THE OTHER PARTY, INCLUDING, BUT NOT LIMITED TO, ATTORNEY'S FEES, COSTS, AND EXPENSES OF ARBITRATION FEES. ANY ARBITRATOR MAY AWARD THOSE AS MENTIONED ABOVE TO THE PREVAILING PARTY IN ADDITION TO ANY ADDITIONAL AWARD IN EITHER PARTY'S FAVOR.

[…]

SPECIAL RULES. THE ARBITRATION SHALL BE CONDUCTED IN THE COUNTY OF MIAMI-DADE, MIAMI, FLORIDA. BOTH

> PARTIES AGREE TO SELECT AN ARBITRATOR FROM A LIST OF QUALIFIED ARBITRATORS WITHIN MIAMI-DADE COUNTY. IF THE PARTIES CAN NOT AGREE, THE TWO ARBITRATORS CHOSEN BY EACH PARTY WILL SELECT A THIRD ARBITRATOR. ALL THREE ARBITRATORS WILL HEAR THE COMPLAINT; A MAJORITY OF TWO THREE ARBITRATORS IS REQUIRED TO RENDER A DECISION.

(Aff. of Max O. Day, Ex. A, Docket No. 85-3 (Amund Thompson Agreement) at 7, 11[2]; *id.*, Ex. C, Docket No. 85-5 (Michael Nibarger Agreement) at 7, 11; *id.*, Ex. D, Docket No. 85-6 (David Hough Agreement) at 7, 11 (collectively, the "Florida Agreement")).

Plaintiff Anthony Ramos signed the Texas Agreement, which contains the following provision regarding arbitration:

> 9.C. <u>Dispute Resolution.</u>
> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.
>
> Claims shall be heard by a single arbitrator. The place of arbitration shall be Harris County, Texas. The arbitration shall be governed by the laws of the State of Texas. Each party will, upon written request of the other party, promptly provide the other with copies of all relevant documents. There shall be no other discovery allowed. The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute.
>
> The arbitrator shall not award consequential damages in any arbitration initiated under this section. Each party shall bear its own costs and expenses and an equal share of the arbitrator's and administrative fees of arbitration. The award of the arbitrator shall be accompanied by a reasoned opinion. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

---

[2] Citations are to ECF-stamped page numbers.

(Aff. of Max O. Day, Ex. B, Docket No. 85-4 (the "Texas Agreement") at 8–9).

On March 21, 2024, Plaintiffs Isabel Ramos and Michael Nibarger, along with thirty-one other individuals, brought a consumer mass arbitration against Yax Ecommerce LLC, Ryan Carroll, Max K. Day, Max O. Day, and Michael Day with AAA. (Decl. of Nico Banks in Supp. of Opp'n ("Banks Decl."), Docket No. 109-1 ¶ 2; *id.*, Ex. 1 (Docket No. 109-3)). Claimants alleged that Respondents had defrauded them in selling them the business opportunity that Wealth Assistants offered. (Banks Decl. ¶ 2). According to Plaintiffs, AAA "declined to include the individual defendants in the mass arbitration, so the arbitration continued only as to Yax Ecommerce LLC." (*Id.*). Isabel Ramos, Nibarger, and two other Claimants withdrew their claims when Respondents failed to timely pay the initiation fee by the deadline.[3]

On July 4, 2024, Jurisdictional Defendants filed the instant Motion, seeking to compel arbitration of Plaintiffs' claims. Plaintiffs oppose.

## II.    DISCUSSION

Before the Court can move to the merits and determine the enforceability of the agreement, it must first resolve any disputes regarding contract formation because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citations omitted). Thus, a court must "resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, (2010) (citing *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010)).

---

[3] Defendants contend Respondents in the arbitration paid the fee by the deadline but that the transaction was declined in error. (Decl. of Allauna Gluski, Docket No. 117-1 ¶¶ 3–6). The parties disagree over whether Respondents ever made the payment. Plaintiffs contend Respondents sent AAA a check that bounced and, a month after the due date, the remaining Claimants withdrew their claims. (Banks Decl. ¶¶ 5–6).

- 6 -
ORDER

"When the parties' agreement to delegate threshold arbitrability questions to the arbitrator is 'clear and unmistakable,'" however, "a court 'may not decide the arbitrability issue.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1199 (9th Cir. 2024) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69). Jurisdictional Defendants make a blanket assertion that "[t]he parties here clearly and unmistakably agreed to have an arbitrator determine questions of arbitrability" because "[t]he arbitration agreements mandate arbitration in accordance with the AAA rules." (Mot. ¶ 22). Only the Texas Agreement mandates arbitration in accordance with the AAA rules, however; the Florida Agreement does not, nor does it contain a separate provision delegating the question of arbitrability to the arbitrator (i.e., a "delegation provision"). The Court must therefore decide whether a valid agreement to arbitrate exists as to the Florida Agreement only.

### A. The Florida Agreement

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). To decide the threshold issue of which state's contract law to apply, federal courts sitting in diversity look to the law of the forum state. *Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (per curiam). Here, the forum state is California and as such the Court will apply California law to make this determination.

*1. Choice of Law*

The Florida Agreements contain a choice of law provision stating, "[t]his Contract shall be construed in accordance with the laws of the State of Florida." (*See* Florida Agreement ¶ 14). The California Supreme Court has ruled that when determining the "enforceability of a contractual choice-of-law provision . . . California courts shall apply the principles set forth in Restatement [(Second) of Conflict of Laws] § 187, which reflects a strong policy favoring enforcement of such provisions."

- 7 -
ORDER

*Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 464–65 (1992). Courts look to the following two factors: (1) "whether the chosen state has a substantial relationship to the parties or their transaction," or (2) "whether there is any other reasonable basis for the parties' choice of law." *Id.* at 466. If either test is met, the Court should enforce the choice of law provision unless (1) "the chosen state's law is contrary to a fundamental policy of California" and (2) California has a "materially greater interest than the chosen state in the determination of the particular issue." *Id.*

A chosen state may have a "substantial relationship" to parties that are domiciled, reside, or are incorporated in the state, and to transactions that occurred in the state. *See, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 35 F.4th 734, 744 (9th Cir. 2022) (stating that "a jurisdiction ordinarily has a substantial relationship to a transaction if one of the parties has its principal place of business there"). Even a more tenuous relationship to the state may provide a "reasonable basis" for a contractual provision requiring application of the state's laws. *See id.* Here, there is no "substantial relationship" between the parties or the transaction (i.e., Plaintiffs' purchase of Wealth Assistants' business opportunity) and Florida. The Court is also not convinced there is a "reasonable basis" for applying Florida law, either, because the only connection between this case and Florida is that one defendant (of the thirty-one named in the FAC), Ryan Carroll, lives in Florida. (*See* FAC ¶ 25).

Even if the Court were to find a reasonable basis to apply Florida law, the Court determines that Florida law is "contrary to a fundamental policy of California" and that California has a "materially greater interest" than Florida in determining this particular issue. *Nedlloyd*, 3 Cal. 4th at 466. Taking the second factor first, California has a "materially greater interest" in resolving this dispute than Florida because the Plaintiffs and four of the Defendants in this case are California residents. (FAC ¶¶ 21–24, 31, 34, 58–59). In contrast, Defendants have one Florida connection. *Cf. Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 419 (N.D. Cal. 2015) (California had materially greater interest in adjudicating unconscionability of arbitration agreements because the

agreements were executed and performed in California, while the only connection to the proposed forum was that one defendant had headquarters there).

The Court also finds that applicable Florida law is contrary to fundamental California policy. Below, the Court explains that the Florida Agreements, including the arbitration provision, are unconscionable under California law because the costs of arbitration are prohibitively expensive, the arbitration agreement includes an oppressive fee-shifting provision, and the contract is one of adhesion. Applying Florida law would lead to a different outcome, in contravention of California public policy. First, California policy dictates that "[w]hile arbitration may be within the reasonable expectations of consumers, a process that builds prohibitively expensive fees into the arbitration process is not." *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 90 (2003), *as modified on denial of reh'g* (Jan. 8, 2004). Under Florida law, on the other hand, "standing alone, the fact that a particular litigant cannot afford to arbitrate her claims does not establish that an arbitration agreement … violates public policy" such that it is unconscionable. *FI-Tampa, LLC v. Kelly-Hall*, 135 So. 3d 563, 568 (Fla. Dist. Ct. App. 2014) (reversing denial of motion to compel arbitration of claims brought by nursing home resident where resident provided evidence that she personally could not afford arbitration).

Second, California courts are skeptical of fee-shifting provisions that put consumers "at risk of incurring greater costs than they would bear if they were to litigate their claims in federal court." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1004 (9th Cir. 2010), *overruled on other grounds by Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1265-66 (9th Cir. 2017). The same is not true of Florida courts, which uphold fee-shifting provisions even when doing so may make arbitration more costly than litigation. *See, e.g.*, *Granados v. Harrison Contracting Co.*, No. 3:21CV511-RV/EMT, 2021 WL 8533029, at *4 (N.D. Fla. Sept. 8, 2021) (enforcing arbitration agreement containing "a so-called 'loser pays' provision that could make [plaintiffs] liable for the defendant's attorney fees and costs if they lose at arbitration, even though they

wouldn't be subject to such liability if they were allowed to proceed under the statute in this court"); *see also Hudson v. P.I.P. Inc.*, 793 F. App'x 935, 937–38 (11th Cir. 2019) (holding that "a loser's pay provision does not defeat the remedial purpose of Title VII, as a plaintiff, if successful, would still be awarded fees and costs as provided by the statute").

Third, under California law, an arbitration agreement may be adhesive even if, as here, there were available alternatives to entering the agreement. *See, e.g., Parada v. Superior Ct.*, 176 Cal. App. 4th 1554, 1572–73 (2009) (holding, in case brought by investors, that even though "Petitioners had many reasonable and realistic market alternatives … including the option of not investing in precious metals at all," the "existence of reasonable alternatives" was not "dispositive of the issue of oppression"); *Chin v. Advanced Fresh Concepts Franchise Corp.*, 194 Cal. App. 4th 704, 710 (2011) ("There is no evidence whether Chin had reasonable alternatives in the franchise marketplace that would not have forced her into arbitration, but the availability of such alternatives is not a decisive factor."); *Armendariz*, 24 Cal. 4th at 115 (recognizing that employment arbitration agreements may be unconscionable because "the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement"). By contrast, Florida courts enforce arbitration agreements if a plaintiff may have had alternatives to entering the agreement, even if those alternatives are speculative. *See, e.g., Bhim v. Rent-A-Center, Inc.*, 655 F. Supp. 2d 1307, 1315 (S.D. Fla. 2009) (finding employment arbitration agreement was not adhesive in part because "even if the Arbitration Agreement was presented on a 'take it or leave it' basis, Bhim has not shown that she lacked employment alternatives to Rent-A-Center in the event that she chose to 'leave it'").

In sum, the Court finds that the basis for applying Florida law is questionable at best, and applying Florida law would be contrary to California's fundamental policy of

protecting its citizens from unconscionable arbitration provisions. *Cf. Oestreicher v. Alienware Corp.*, 322 F. App'x 489, 491 (9th Cir. 2009) (overruled on other grounds) ("Because … Alienware's class action waiver is unconscionable under California law, enforcement of the waiver under Florida law would be contrary to a fundamental California policy.") The Court therefore applies California law in determining whether the Florida Agreements are unconscionable.

### 2. *Unconscionability*

In California, "[t]he party resisting arbitration bears the burden of proving unconscionability." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 247 (2012) (citations omitted). "Both procedural unconscionability and substantive unconscionability must be shown, but they need not be present in the same degree and are evaluated on 'a sliding scale.'" *Id.* (cleaned up) (citing *Armendariz*, 24 Cal. 4th at 114). That is, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz*, 24 Cal. 4th at 114.

#### a. Procedural Unconscionability

"Procedural unconscionability analysis focuses on oppression or surprise." *Nagrampa v. MailCoups, Inc.* (9th Cir.2006) 469 F.3d 1257, 1280 (internal quotation marks omitted). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice, while surprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Id.* (internal quotation marks omitted).

The Florida Agreement is procedurally unconscionable because it is a contract of adhesion. Under California law, a contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Armendariz*, 24 Cal. 4th at 113. Here, there is no question that the Florida Agreement,

and the arbitration agreement within it, was a "standardized contract." As to "superior bargaining strength," Jurisdictional Defendants assert that Plaintiffs "were not the 'weaker party'" and "were not consumers, but rather commercial investors seeking to create a profit-producing enterprise." (Reply, Docket No. 117 ¶¶ 23–24). They argue that "[a]n adhesion analysis is improper for such arms-length negotiations between business people." (*Id.* ¶ 25).

The Court does not agree that Plaintiffs and Jurisdictional Defendants were on equal footing. The Ninth Circuit's opinion in *Pokorny*, 601 F.3d 987, is instructive here. In that case, the plaintiffs alleged that the defendant, Quixtar, had conscripted them in a pyramid scheme. *Id.* at 991. Quixtar "describe[d] itself as a leader in the e-commerce business" that claimed to "provide[] millions of Americans with the opportunity to own their own businesses as distributors of a variety of nutrition, beauty, household, and related products." *Id.* In reality, the plaintiffs alleged, Quixtar products were so expensive that "any profit through resale is virtually impossible." *Id.* at 992. After suffering significant losses, Plaintiffs brought suit against Quixtar in federal court. *Id.* at 991. Quixtar moved to compel arbitration. *Id.* The district court denied the motion, finding, *inter alia*, that the arbitration agreements Plaintiffs signed were procedurally unconscionable. *Id.* at 996. The Ninth Circuit affirmed. *Id.* at 991. In finding the agreements were adhesive, the court explained that "Quixtar, a large corporation doing business throughout the United States, occupied a superior bargaining position to that of Plaintiffs," that "Plaintiffs did not individually participate in the negotiation of the terms of the ADR agreements," and that "the agreements were presented to Plaintiffs on a take-it-or-leave-it basis." *Id.* at 996. The Ninth Circuit found Quixstar's "oppressive behavior [was] the quintessential characteristic of a procedurally unconscionable agreement." *Id.* at 996–97.

At oral argument, Jurisdictional Defendants distinguished *Pokorny* because the court in *Pokorny* also noted that Quixtar had (1) failed to attach a copy of the arbitration rules to the arbitration agreement at issue and (2) inserted a clause that the rules "were

subject to unilateral amendment by Quixtar at any time." *Id.* at 997. It is true that those problems are not present in this case. That does not move the needle, though, because the court in *Pokorny* explained that "these problems *multiply* the degree of procedural unconscionability of the ADR agreements," not that the agreements would have lacked procedural unconscionability without them. *Id.* (emphasis added). All of the facts of *Pokorny* do not need to be replicated in this case to determine the contracts were adhesive. What matters more is that the "quintessential characteristic[s] of a procedurally unconscionable agreement"—the Jurisdictional Defendants' superior bargaining position and the Plaintiffs' lack of an opportunity to negotiate the terms—are present here.

Indeed, other courts applying California law have similarly held that consumers investing in an established business venture with no specialized knowledge about that business occupy a weaker bargaining position. *See, e.g.*, *Nagrampa*, 469 F.3d at 1282–83 (finding plaintiff franchisee "was in a substantially weaker bargaining position" than defendant franchisor, where defendant's parent company was a large corporation and plaintiff "had a yearly salary of approximately $100,000 and had never owned her own business"); *Parada*, 176 Cal. App. 4th at 1570 (in case alleging commodities fraud, finding arbitration agreement adhesive in part because when plaintiffs signed it, they "were school teachers, a Federal Express driver, and a school janitor," and defendant "was the party of superior bargaining strength"). Here, Wealth Assistants advertised itself as a successful business that helped individuals and families earn supplemental, passive income. Plaintiffs gave Wealth Assistants substantial sums of money with the promise that they would either make a profit or, at the very least, recover what they invested. As a result of their investment, several Plaintiffs—including David Hough and Isabel and Anthony Ramos—fell into significant debt that they are unable to get out of. (*See* Decl. of David Hough in Supp. of TRO, Docket No. 9-2 ¶ 7; Decl. of Anthony Ramos in Supp. of Opp'n, Docket No. 109-2 ¶ 8). They were indeed the weaker party when it came to bargaining with Wealth Assistants over the agreements.

Nevertheless, the Court recognizes that Plaintiffs were not required to sign the arbitration agreements as opposed to, for example, staying away from Wealth Assistants or avoiding investing altogether. While "the potential availability of other … opportunities alone does not defeat [a plaintiff's] claim of procedural unconscionability," *Nagrampa*, 469 F.3d at 1283, it is still "one factor … used in considering oppression," *Parada*, 176 Cal. App. 4th at 1573. The Court therefore finds that there is minimal procedural unconscionability to the Florida Agreements.

### b. Substantive Unconscionability

The Florida Agreement contains a high degree of substantive unconscionability, however. "Substantive unconscionability centers on the 'terms of the agreement and whether those terms are so one-sided as to shock the conscience.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1172 (9th Cir. 2003) (quoting *Kinney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322, 1330 (1999)). It is not enough for a plaintiff to simply show that one provision of the agreement is substantively unconscionable, as courts routinely sever certain clauses when there are no other objectionable components to the agreement. *See Cable Connection, Inc. v. DIRECTV, Inc.*, 143 Cal. App. 4th 207, 229–33 (2006). To prevent severance and show that the entire agreement is substantively unconscionable, a plaintiff must show that the effect of the defective clause is such that the agreement itself is "tainted with illegality." *Armendariz*, 24 Cal.4th at 124.

Plaintiffs point to two provisions in the Florida Agreement that are substantively unconscionable. First, the Florida Agreement contains a cost-splitting provision that states "BOTH PARTIES AGREE TO DIVIDE EQUALLY THE COSTS OF THE INITIAL ARBITRATION FEES." Plaintiffs state that when they initiated an arbitration against Yax Ecommerce, they learned they were unable to add multiple Respondents in one arbitration. (Opp'n at 6). Thus, they say, "[t]o obtain an award against more than one respondent …, Claimants would have needed to bring separate mass arbitrations" for each respondent. (*Id.*). They calculate that according to the

AAA schedule, 600 Plaintiffs—the number of people Plaintiffs allege Wealth Assistants defrauded—commencing mass arbitrations against all seven Jurisdictional Defendants would cost over half a million dollars. (*Id.*). While this amount seems speculative given the class size is undetermined, the point is understood: the fees to initiate an action with AAA against seven respondents are high. As discussed briefly above, California courts hold that "[i]t is substantively unconscionable to require a consumer to give up the right to utilize the judicial system, while imposing arbitral forum fees that are prohibitively high." *Gutierrez*, 114 Cal. App. 4th at 90.

Jurisdictional Defendants argue that Plaintiffs' share of the arbitration initiation fees are "well within reach" because "[e]ach plaintiff, at the time the arbitration clause was agreed to, had sufficient funds to invest $55,000." (Reply ¶ 28). This argument is unavailing for two reasons, the first and most obvious of which is that Plaintiffs allege that Jurisdictional Defendants kept almost all, if not all, of that money. Indeed, as discussed above, several Plaintiffs are in considerable debt after their encounter with Wealth Assistants. The second reason it is unavailing is that the Jurisdictional Defendants recently moved to stay an arbitration in which an individual asserted similar claims because they could not afford the fees. (Banks Decl., Ex. 4, Docket No. 109-6). According to Jurisdictional Defendants, the asset freeze this Court ordered on April 15, 2024, which froze Jurisdictional Defendants' bank accounts subject to certain exceptions, "deprive[d] them of the financial resources necessary to adequately participate in the arbitration process." (*Id.* at 2). Plaintiffs attest—and Jurisdictional Defendants do not refute—that the bank activity of several of the Jurisdictional Defendants shows they have repeatedly been violating the asset freeze. (Opp'n at 9–10; Banks Decl. ¶¶ 18–19). Nevertheless, the Court is sensitive to Jurisdictional Defendants' financial situation—just as it is sensitive to Plaintiffs'.

The other unconscionable provision in the Florida Agreement is really two provisions. It states,

> ANY PARTY BRINGING AN ACTION IN FEDERAL, OR STATE COURT IN CONTRAVENTION OF THIS ARBITRATION PROVISION, SHALL BEAR THE ENTIRE EXPENSES AND FEES OF THE OTHER PARTY, INCLUDING, BUT NOT LIMITED TO, ATTORNEY'S FEES, COSTS, AND EXPENSES OF ARBITRATION FEES. ANY ARBITRATOR MAY AWARD THOSE AS MENTIONED ABOVE TO THE PREVAILING PARTY IN ADDITION TO ANY ADDITIONAL AWARD IN EITHER PARTY'S FAVOR.

In other words, not only may an arbitrator award all "expenses," "fees," "costs," and "any additional award" to either party at the conclusion of the arbitration, but the agreement also appears to compel Plaintiffs to pay every single expense involved in this action *and* the arbitration because they brought this action in federal court. The fee-shifting provision, in and of itself, is plainly substantively unconscionable. *See Pokorny*, 601 F.3d at 1004 (fee-shifting clause that put claimants "who demand arbitration at risk of incurring greater costs than they would bear if they were to litigate their claims in federal court" was unconscionable). Moreover, while the Court has been unable to find any case applying California law to an arbitration provision purporting to shift all litigation and arbitration fees against a party as punishment for bringing a court action, it is confident that California courts would find such a provision highly substantively unconscionable.

The arbitration agreement is "tainted with illegality" in that it has several substantively unconscionable provisions that appear to be intended to "impose arbitration … not simply as an alternative to litigation, but as an inferior forum that works to [Jurisdictional Defendants'] advantage." *Gutierrez*, 114 Cal. App. 4th at 93 (quoting *Armendariz*, 24 Cal.4th at 124). The Court therefore exercises its discretion not to sever the arbitration provision and to **DENY** the Motion as to Plaintiffs who signed the Florida Agreement. *See, e.g., Ramirez v. Charter Commc'ns, Inc.*, 16 Cal.5th 478 (2024) ("If a contractual clause is found unconscionable, the court may, in its discretion, choose to do one of the following: (1) refuse to enforce the contract; (2)

sever any unconscionable clause; or (3) limit the application of any clause to avoid unconscionable results.").

### B. The Texas Agreement

*1. The Delegation Provision*

As discussed briefly above, the Texas Agreement, while containing many similar provisions to the Florida Agreement, has an important difference: it incorporates AAA's Commercial Arbitration Rules. The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Oracle America*, 724 F.3d at 1074 ("Virtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitute clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."). This is because the AAA "provides that the arbitrator shall have the power to rule on his or her own jurisdiction, including may objection with respect to the … validity of the arbitration agreement." *Brennan*, 796 F.3d at 1130 (9th Cir. 2015) (internal quotation marks omitted).

Because the Texas Agreements incorporate the AAA rules, they also incorporate a delegation provision. Jurisdictional Defendants raise this delegation clause in their Motion. (Mot. ¶ 22). Plaintiffs do not oppose the argument. For a court to consider whether a delegation provision is valid, "a party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). Additionally, "a party may challenge the delegation provision and the arbitration agreement for the same reasons, so long as the party specifies why each reason renders the specific provision unenforceable." *Id.* at 1009–10. Plaintiffs do not challenge the delegation provision specifically, so the Court has no discretion to determine the validity of the arbitration clause in the Texas Agreement.

*2. Waiver*

Finally, Plaintiffs argue that Jurisdictional Defendants waived their right to arbitrate both by their conduct and under California statute. As discussed above, Plaintiffs Isabel Ramos (who is subject to the Texas Agreement) and Michael Nibarger (who is subject to the Florida Agreement)—along with thirty-one other individuals—initiated a mass arbitration against Defendant Yax Ecommerce, and Yax Ecommerce failed to timely pay the initiation fees. Plaintiffs assert that Jurisdictional Defendants waived arbitration by failing to participate in arbitrations, i.e., by failing to pay fees and by moving to stay another case bringing the same claims. Plaintiffs also assert that Jurisdictional Defendants waived arbitration under California Code of Civil Procedure § 1281.97, which states that "if the fees or costs to initiate an arbitration proceeding are not paid within 30 days after the due date the drafting party is in material breach of the arbitration agreement, is in default of the arbitration, and waives its right to compel arbitration." Cal. Civ. Proc. Code § 1281.97.

The Court need not consider this argument with regard to the Florida Agreement because it has already determined the arbitration clause in that agreement is void. As to the Texas Agreement, the Court cannot consider this argument because it is for the arbitrator to decide. Even absent a delegation provision, "the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)) (alteration in *Howsam*). The Ninth Circuit has clarified this passage in *Howsam* to mean that an arbitrator should decide "whether a party waived arbitration by failing to comply with the arbitration forum's specific rules," as opposed to "litigation conduct *in front of the district court*." *Martin v. Yasuda*, 829 F.3d 1118, 1123 n.3 (9th Cir. 2016) (emphasis in original); *see also Omar v. Ralphs Grocery Co.,* 118 Cal. App. 4th 955, 964 (2004), *as modified* (May 20, 2004) (applying FAA to conclude that "the issue of waiver must be determined by an arbitrator here because all of respondent's waiver

allegations involve nonlitigation conduct"). Here, Plaintiffs argue that Jurisdictional Defendants waived arbitration by failing to pay the AAA-mandated fees and failing to participate in arbitration. This is not "litigation conduct in front of the district court," but conduct in front of the arbitrator, so the arbitrator presumptively decides if it constitutes waiver.

The same principles do not apply to waiver under § 1281.97. *See Belyea v. GreenSky, Inc.*, 637 F. Supp. 3d 745, 754 (N.D. Cal. 2022) (determining that "'waiver' and 'breach' for failure to pay the arbitrator under CCP § 1281.97 are presumptively disputes 'for judicial determination unless the parties clearly and unmistakably provide otherwise'" (quoting *Howsam*, 537 U.S. at 83)). Nevertheless, the Court cannot decide this issue because § 1281.97 provides that the drafting party's failure to pay arbitration initiation fees constitutes a "material breach of the arbitration agreement," and the Texas Agreement assigns to the arbitrator "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof." The parties clearly and unmistakably delegated the issue to the arbitrator. *Dekker v. Vivint Solar, Inc.*, No. 20-16584, 2021 WL 4958856, at *1 (9th Cir. Oct. 26, 2021) ("Regardless of the merits of Plaintiffs' statutory claim under § 1281.97, this dispute concerns whether there has been a 'breach' of the arbitration agreements. Thus, Plaintiffs' § 1281.97 argument falls squarely within the scope of the delegation clause, and it should have been left to the arbitrator to decide."). Because there is a delegation provision leaving questions of arbitrability and breach to the arbitrator, the Motion is **GRANTED** as to those Plaintiffs who signed the Texas Agreement.

### III. CONCLUSION

The Motion is **DENIED** as to Plaintiffs who signed the Florida Agreement. The Motion is **GRANTED** as to Plaintiffs who signed the Texas Agreement so the arbitrator may decide the questions of waiver and arbitrability. This action is stayed as to those Plaintiffs.

As a final matter, in the Court's Preliminary Injunction Order of May 13, 2024, the Court ordered that Jurisdictional Defendants were "prohibited from making further payments for legal costs and fees without leave of the Court" since Jurisdictional Defendants had given their attorneys a substantial retainer. (Docket No. 49 at 11). At the hearing on this Motion, counsel for Jurisdictional Defendants sought leave to allow the Jurisdictional Defendants to pay arbitration fees associated with the Texas Agreements. The Court **GRANTS** leave for the Jurisdictional Defendants to make payments for legal costs and fees *only to the client trust accounts of the attorneys representing them in arbitration and only for the purpose of pursuing arbitration associated with the Texas Agreements*. Payment of any other legal fees and costs will require Jurisdictional Defendants to seek further leave of the Court.

**IT IS SO ORDERED.**

Date: August 26, 2024

                          HON. WESLEY L. HSU
                          UNITED STATES DISTRICT JUDGE