

Nico Banks, Esq.
nico@bankslawoffice.com
Filing on behalf of all Plaintiffs
CA Bar No. 344705
Banks Law Office
712 H St NE,
Unit #8571,
Washington, DC 20002
Tel.: 971-678-0036

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

DAVID HOUGH;
AMUND THOMPSON;
ISABEL RAMOS;
ANTHONY RAMOS;
MICHAEL NIBARGER

   Plaintiffs,

 vs.

RYAN CARROLL;
MAX K. DAY;
MAX O. DAY;
MICHAEL DAY;
JARED DAY;
MATTHEW CROUCH;
CHRISTINE CARROLL;
TROY MARCHAND;
BONNIE NICHOLS;
TRAVIS MARKER;
REYHAN PASINLI;
YAX ECOMMERCE LLC;
PRECISION TRADING GROUP, LLC;
WA DISTRIBUTION LLC;
PROVIDENCE OAK PROPERTIES, LLC;
WA AMAZON SELLER LLC;

) Case No.: 2:24-cv-02886-WLH
)
) **SECOND AMENDED COMPLAINT**
) **FOR:**
) **1. FRAUD CONSPIRACY**
) **2. AIDING AND ABETTING**
) **FRAUD**
) **3. FRAUDULENT TRANSFERS**
) **IN FURTHERANCE OF**
) **CONSPIRACY**
) **4. AIDING AND ABETTING**
) **BREACH OF FIDUCIARY**
) **DUTY**
) ~~2.~~
) ~~3. FRAUDULENT TRANSFERS~~
) ~~IN FURTHERANCE OF~~
) ~~CONSPIRACY~~

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

> **Formatted:** Indent: Left: 0.25", No bullets or numbering

- 1 -
~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION



YAX IP AND MANAGEMENT INC.
(D.B.A. "FULFILLABLE");

MKD INVESTMENT ADVISOR, LLC;
MKD FAMILY BENEFICIARY, LLC;
MKD FAMILY PRIVATE
MANAGEMENT COMPANY, LLC;
MAX DAY CONSULTING, LLC;
HOUTEX FARM EQUITY PARTNERS
LLC;
BUSINESS FINANCIAL SOLUTIONS
ADVISORY LLC;
EVO MAXX LLC;
WWKB LLC;
DREAMS TO REALITY LLC;
PROFICIENT SUPPLY LLC;
QUANTUM ECOMMERCE, LLC;
WHOLESALE UNIVERSE, INC.;
THE LAW OFFICE OF TRAVIS R.
MARKER, A PROFESSIONAL
CORPORATION (D.B.A. "MARKER
LAW AND MEDIATION");
PARLAY LAW GROUP A
PROFESSIONAL CORPORATION;
TOTAL-APPS, INC.;
WELLS FARGO BANK, N.A.;
BANK OF AMERICA;
FIRST CITIZENS BANCSHARES, INC.;

                Defendants.

### ~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

Plaintiffs David Hough, Amund Thompson, Isabel Ramos and Anthony

Ramos, and Michael Nibarger (collectively, "Plaintiffs" or "Class Representatives"),

individually and on behalf of others similarly situated, by and through their attorneys,

bring this class action complaint against the following Defendants: (1) Ryan Carroll;

Max K. Day; Max O. Day; Michael Day; Jared Day; Matthew Crouch; Christine Carroll; Troy Marchand; Bonnie Nichols; Travis Marker; and Reyhan Pasinli (collectively, the "Human Defendants"); (2) Yax Ecommerce LLC; Precision Trading Group, LLC; WA Distribution LLC; Providence Oak Properties, LLC; WA Amazon Seller LLC; and Yax IP and Management Inc.;  (collectively, the "Wealth Assistants Entity Defendants" or "Wealth Assistants"); (3) MKD Investment Advisor, LLC; MKD Family Beneficiary, LLC; MKD Family Private Management Company, LLC; Max Day Consulting, LLC; HouTex Farm Equity Partners LLC; Business Financial Solutions Advisory LLC; Evo Maxx LLC; Dreams To Reality LLC; and WWKB LLC (collectively, the "Alter Ego Defendants"); (4) Proficient Supply LLC; (54) Quantum Ecommerce, LLC; and Wholesale Universe, Inc. (collectively, the "Quantum-Wholesale Partnership"); and (and (65) The Law Office of  Travis R. Marker, a Professional Corporation (d.b.a. "Marker Law and Mediation"); Parlay Law Group, A Professional Corporation; Total-Apps, Inc.; and Wells Fargo Bank, N.A.; Bank of America; and First Citizens Bancshares, Inc. (collectively, the "Payment Processing Defendants"). Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.  Plaintiffs invoke the diversity jurisdiction of the Court pursuant to 28 U.S.C. § 1332(d) because: (1) at least one Plaintiff in this putative class action resides in a different state from at least one defendant, (2) there are more than 100 putative class members, and (3) there are more than $5 million in controversy.

2.  Venue is proper in this district under 28 U.S.C. § 1391 because Plaintiff Michael Nibarger has resided in Los Angeles County at all times relevant to this dispute.

3.  Personal Jurisdiction over the Wealth Assistants Entity Defendants is proper because they purposely defrauded many California residents, collecting over $1,000,000 from those residents.

3.4.  Moreover, until at least May of 2022, Wealth Assistants was located in California according to its Bank of America account statements. Wealth Assistants' CEO, Defendant Ryan Carroll, frequently resided in California and operated the company in California.

4.5.  Personal Jurisdiction over the Human Defendants, the Quantum-Wholesale Partnership, and the Payment Processing Defendants is proper because they conspired with the Wealth Assistants Entity Defendants and others to defraud individuals across the country. Carrying out that conspiracy included—foreseeably—intentionally defrauding dozens of California residents out of more than $1,000,000.

6.  Moreover, the Human Defendants, the Quantum-Wholesale Partnership, and the Payment Processing Defendants all knew or should have known that Wealth Assistants' conspiracy to conceal assets was centered in California. In particular, Christine Carroll—Wealth Assistants' Finance Manager—resided in and worked in California at all times relevant to this dispute.

~~Moreover~~Furthermore, Total Apps—which, upon information and belief, directed and planned the scheme to conceal assets—was headquartered in and did business in California at all times relevant to this dispute.

**Formatted:** Font: Bold, Underline

~~5.~~7.    Personal Jurisdiction over the Alter Ego Defendants and Proficient Supply LLC is proper because they are the alter egos of other defendants who are subject to personal jurisdiction in California, as described in more detail below.

**Formatted:** Font: 14 pt, Bold, Underline

~~6.~~8.    The Quantum-Wholesale Partnership is subject to personal jurisdiction in California for the additional reason that it intentionally made misstatements to many California residents, including some Plaintiffs, in furtherance of the conspiracy's aim to defraud those residents and fraudulently transfer the assets Wealth Assistants had stolen from them. For example, the Quantum-Wholesale Partnership intentionally sent emails to many California residents telling them—falsely—that Wealth Assistants had purchased valuable inventory packages for those residents.

9.    ~~Personal Jurisdiction over the Alter Ego Defendants is proper because they are the alter egos of other defendants who are subject to personal jurisdiction in California, as described in more detail below.~~Personal Jurisdiction over Wells Fargo Bank, N.A. is proper because it is headquartered in California.

**Formatted:** Font: Bold, Underline

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

10. Personal Jurisdiction over Bank of America is proper because it opened and operated Wealth Assistants LLC bank accounts that are the subject of this complaint in California.

11. Personal Jurisdiction over First Citizens BancShares is proper because it knowingly participated in Wealth Assistants' scheme to conceal assets from creditors, which was a scheme centered in California.

12. Furthermore, from May of 2022 through September of 2023, First Citizens processed wire transfers totaling more than $29 million from Providence Oak Properties (one of the Wealth Assistants Entity Defendants) to banks located in California.

13. First Citizens also maintains many branch locations in California.

7.

## SUMMARY OF CASE

14. Wealth Assistants is a fraudulent scheme perpetrated by the Day family: Max K. Day, Max O. Day, Michael Day, and Jared Day. They are career criminals who have perpetrated similar schemes for decades, stealing hundreds of millions of dollars from their victims.

8.15.    Wealth Assistants obtained more than $50 million by defrauding more than 600 individuals.

9.16.    Specifically, Wealth Assistants advertised that it would provide its clients with substantial income by setting up and managing lucrative online

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

Amazon stores that the clients would own. But Wealth Assistants did not provide the promised services. Instead, it used the fees it collected from Plaintiffs and its other clients for the benefit of the Human Defendants.

10.17.    Wealth Assistants' clients would pay it an upfront fee of up to $125,000 to set up an online Amazon store in the client's name and manage it. After that, the client would pay for the store's inventory, along with certain other smaller fees. In return, the individual would be entitled to collect between 50 percent and 70 percent of the online store's gross profits.

11.18.    Wealth Assistants advertised that the profits of an online store it managed should grow to more than $10,000 per month by the end of the store's first year.

12.19.    Hundreds of individuals purchased the business opportunity Wealth Assistants offered. Most of these purchasers were middle class, and many had to use all their retirement savings or take out home equity loans to make the purchase.

13.20.    Wealth Assistants never intended to follow through on its promises.

14.21.    Some of Wealth Assistants' clients never even received an online store after paying the fee. Others received stores (which themselves are valueless and can be easily and freely set up), but their stores were never stocked with any inventory. Others paid Wealth Assistants for inventory after receiving

inventory invoices from Wealth Assistants that turned out to be fake; the inventory never actually appeared in their stores.

15.22.    Ultimately, the vast majority of Wealth Assistants' clients have received less than $10,000 in profits from their online stores, and many never received a single dollar of revenue from their stores (if they received stores at all).

16.23.    Wealth Assistants perpetuated its fraudulent enterprise for as long as it could. When Plaintiffs and other individuals complained, Wealth Assistants invented excuses. It blamed "supply chain disruption," for example. It asked its clients for patience.

17.24.    Eventually, however, Plaintiffs and other individuals realized that they had been defrauded. Many of Wealth Assistants' clients demanded their money back, complained to their banks, or alerted government agencies about the ongoing fraud.

18.25.    Realizing that its fraud was being exposed, Wealth Assistants shut down. In October of 2023, Wealth Assistants announced to all of its clients that it was going out of business. The announcement told Plaintiffs that they would not receive further services and would not receive their money back.

26.Throughout this fraudulent scheme, instead of using the money collected from Wealth Assistants' clients to provide the promised services, Wealth Assistants used much of the money it collected from its clients for the benefit of the

- 8 -
FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

Human Defendants. For example, Wealth Assistants' CEO, Ryan Carroll, has ~~recently~~ flaunted his new Lamborghini.

27. Proficient Supply LLC is an entity that operated a scam nearly identical to Wealth Assistants' scam beginning in 2020, before Wealth Assistants ever existed. Proficient Supply was shut down by the Federal Trade Commission in 2022, but a few months later, it was acquired by Wealth Assistants. Thereafter, as part of Wealth Assistants, it accepted payments from the Wealth Assistants Entity Defendants in transactions that served the sole purpose of helping Wealth Assistants conceal assets. Because of the intermingled assets, common ownership, and lack of distinct operations, Proficient Supply LLC is another alter ego of the Wealth Assistants Entity Defendants.

28. The Quantum-Wholesale Partnership Defendants—led by Defendants Troy Marchand and Bonnie Nichols—worked for Wealth Assistants and helped it carry out its fraudulent scheme. They also helped Wealth Assistants conceal its assets from Defendants by accepting fraudulent transfers totaling more than $1 million in the months before Wealth Assistants went out of business.

29. Defendant Travis Marker—acting through his two law offices, Defendant Law Office of Travis R. Marker and Defendant Parlay Law Group—served as an "escrow agent" to help Wealth Assistants conceal the proceeds of its fraudulent scheme. In particular, Travis Marker shipped credit card readers to many of Wealth Assistants' clients for those clients to pay Wealth Assistants by making

- 9 -

small discrete payments into different credit card readers. Those payments went to Travis Marker's "escrow account," and he would then pass those payments from the escrow accounts to undisclosed Wealth Assistants bank accounts, which helped prevent Plaintiffs from recovering the money that Wealth Assistants stole from them.

30. Defendant Bank of America operated bank accounts held by Wealth Assistants and Defendant Ryan Carroll. Bank of America quickly realized that Defendant Ryan Carroll was using those bank accounts to perpetrate a fraud because of blatant red flags, and in November of 2022, Bank of America froze some of those bank accounts. But instead of making efforts to return those funds to the individuals the funds had been stolen from, Bank of America simply wrote a cashier's check to Wealth Assistants for more than $3.7 million so that it could conceal that money elsewhere. Even more egregiously, Bank of America continued operating many bank accounts held by Defendant Ryan Carroll after it had frozen Wealth Assistants' accounts, and Bank of America continued helping Ryan Carroll conceal the proceeds of the Wealth Assistants fraudulent scheme.

31. Defendant Reyhan Pasinli is the owner and operator of Defendant Total Apps. Pasinli and Total Apps orchestrated Wealth Assistants' Payment Processing Strategy (which, as explained below, aimed to conceal the proceeds of the fraudulent scheme and avoid money-laundering detection) by helping Wealth

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

Assistants set up merchant bank accounts, recruiting other merchants to use their bank accounts in furtherance of Wealth Assistants' Payment Processing Strategy, and serving as the "gateway" for transactions involving the various merchant accounts controlled by Wealth Assistants. Pasinli has long helped the Day family defendants conceal the proceeds of their various fraudulent schemes, and he knew that Wealth Assistants was a fraudulent scheme.

32. Total Apps is a registered independent sales organization of Wells Fargo Bank and, upon information and belief, Total Apps acted as Wells Fargo's agent when it orchestrated Wealth Assistants' Payment Processing Strategy. Therefore, Wells Fargo is vicariously liable for Total Apps' participation in the fraudulent scheme.

33. Even if Total Apps were not associated with Wells Fargo, Wells Fargo would still be liable because it knowingly operated many Wealth Assistants bank accounts despite knowing of Wealth Assistants' plan to fraudulently disperse its assets and conceal them from creditors.

19.34.    First Citizens Bank knowingly operated a bank account for Providence Oak Properties, one of the Wealth Assistants Entity Defendants. First Citizens knew that the Providence Oak Properties bank account was being used for money laundering because—although Providence Oak Properties was purportedly a construction company—each of the wire transfers out of the Providence Oak Properties bank account explained that Providence Oak

- 11 -

Properties was simply accepting transfers of cash and then wiring the cash back to the sender after deducting a fee. First Citizens Bank also did not keep records of the millions of dollars in transfers of money into the First Citizens Bank account.

20. The Payment Processing Defendants helped Wealth Assistants avoid scrutiny from regulators, conceal assets, and launder the proceeds of the fraudulent scheme to the Human Defendants.

**CLASS REPRESENTATIVES**

21. 35.    Amund Thompson is an individual who has resided in Grass Valley, California at all times relevant to this dispute.

22. 36.    David Hough is an individual who has resided in Temecula, California at all times relevant to this dispute.

23. 37.    Isabel Ramos is an individual who has resided in Clovis, California at all times relevant to this dispute.

24. 38.    Michael Nibarger is an individual who has resided in Los Angeles County at all times relevant to this dispute.

**DEFENDANTS**

**A. Human Defendants**

25. 39.    Defendant Ryan Carroll is an individual who has resided in Florida California at some all times relevant to this dispute.

- 12 -

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

26.40.    Defendant Max K. Day is an individual who has resided in Texas at all times relevant to this dispute.

27.41.    Defendant Max O. Day is an individual who has resided in Texas at all times relevant to this dispute.

28.42.    Defendant Michael Day is an individual who has resided in Texas at all times relevant to this dispute.

29.43.    Defendant Jared Day is an individual who has resided in Texas at all times relevant to this dispute.

30.44.    Defendant Matthew Crouch is an individual who has resided in New York at all times relevant to this dispute.

31.45.    Defendant Christine Carroll is an individual who has resided in California at all times relevant to this dispute.

32.46.    Defendant Troy Marchand is an individual who has resided in Indiana at all times relevant to this dispute.

33.47.    Defendant Bonnie Nichols is an individual who has resided in Texas at all times relevant to this dispute.

34.48.    Defendant Reyhan Pasinli is an individual who has resided in California at all times relevant to this dispute.

49.Defendant Travis Marker is an individual who has resided in Utah at all times relevant to this dispute.

35.

Formatted: Level 2

**B. Wealth Assistants Entity Defendants**

36.50.    Each of the following entities did business as "Wealth Assistants:" **Yax Ecommerce LLC; Precision Trading Group, LLC; WA Distribution LLC; Providence Oak Properties, LLC;** and WA Amazon Seller LLC**; and Yax IP and Management Inc.**

37.Upon information and belief, **Yax IP and Management Inc.** also did business as "Wealth Assistants."

51.Upon information and belief, those Wealth Assistants Entity Defendants did not have operations distinct from one another and did not follow corporate formalities; instead, they acted as each others' alter egos at all times.

38.

39.52.    Upon information and belief, the Wealth Assistants Entity Defendants were created as separate entities solely for the purpose of making it more difficult for their creditors to find and collect the Wealth Assistants Entity Defendants' assets.

40.53.    Upon Information and belief, the Wealth Assistants Entity Defendants were also inadequately capitalized at all times relevant to this dispute.

41.54.    Each of the Wealth Assistants Entity Defendants was owned, directly or indirectly, solely by one or more of the following individuals: Max K. Day, Max O. Day, Michael Day, and/or Ryan Carroll.

**C. Alter Ego Defendants**

- 14 -

42.55.    Defendant MKD Investment Advisor, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

43.56.    Defendant MKD Family Beneficiary, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

44.57.    Defendant MKD Family Private Management Company, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

45.58.    Defendant Max Day Consulting, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

46.59.    Defendant HouTex Farm Equity Partners LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

47.60.    Defendant Business Financial Solutions Advisory, LLC is a limited liability company. Upon information and belief, its sole member is Max K. Day.

48.Defendant EvoMaxx, LLC, is a limited liability company. Upon information and belief, its sole member is Max K. Day.

61.

49.62.    Defendant Dreams to Reality, LLC is a limited liability company. Upon information and belief, its sole member is Ryan Carroll.

50.63.    Defendant WWKB, LLC is a limited liability company. Upon information and belief, its sole member is Michael Day.

1    ~~51.~~64.    Upon information and belief, each of the Alter Ego Defendants acted as

2    their owner's alter ego.

3    ~~52.~~65.    Upon information and belief, each of the Alter Ego Defendants were

4    undercapitalized.

5

6    ~~53.~~66.    Upon information and belief, none of the Alter Ego Defendants had any

7    operations.

8

9    ~~54.~~67.    Upon information and belief, none of the Alter Ego Defendants followed

10    corporate formalities, such as maintaining their own by-laws or accurate books

11    and records.

12

13    **D. Defendant Precision Trading LLC**

14    68.Defendant Precision Trading LLC is a corporation headquartered in North

15    Carolina.

16

17    ~~D.~~E.    **Quantum-Wholesale Partnership Defendants**

18    ~~55.~~69.    Defendant Quantum Ecommerce is a limited liability company

19    incorporated in Indiana. Its sole member is Troy Marchand.

20

21    ~~56.~~70.    Defendant Wholesale Universe is a company incorporated in Texas.

22    ~~E.~~F.    **Payment Processing Defendants**

23

24    ~~57.~~71.    Defendant Travis Marker acted on behalf of himself and Defendants The

25    Law Office of Travis R. Marker ("Marker Law") and Parlay Law Group at all

26    times relevant to this dispute. Those two entities are incorporated in Utah.

27

28

**Formatted:** None, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Formatted:** Font: 14 pt

**Formatted:** Level 2

**Formatted:** Level 2

58.72.   Defendant Total-Apps, Inc. ("Total-Apps") is a corporation that is headquartered in California.

73. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a corporation that is headquartered in California.

74. Defendant Bank of America Corporation is a corporation that is headquartered in North Carolina.

59.75.   Defendant First Citizens BancShares, Inc. is a corporation headquartered in North Carolina.

## FACTS

**A. Wealth Assistants' Misrepresentations About Its Services**

60.76.   The following is a summary of Wealth Assistants' agreements with its clients, including Plaintiffs:

  a.  Wealth Assistants' clients would pay it to set up an online store on the Amazon platform that the clients would own. These stores offered goods for shoppers to purchase online.

  b.  Wealth Assistants' clients would pay for the online store's inventory.

  c.  Wealth Assistants' clients were required to pay certain other fees, such as annual fees and a "success fee" when the store was successfully set up.

d.  Wealth Assistants would manage the store, including by providing

customer service, maintaining relationships with suppliers, and

managing the inventory.

e.  Wealth Assistants' clients would keep between 50 percent and 70

percent of the gross profits generated by the stores, and Wealth

Assistants would take the remaining profits for itself as a management

fee.

77.Until around November of 2022, most or all of When purchasing the business

opportunities at issue, Wealth Assistants' clients signed a sstandardized

contract very similar to the one shown in Exhibit A of this Complaint.s that

Wealth Assistants drafted. The contracts promised that, in return for Plaintiffs'

investment, Wealth Assistants would deliver Plaintiffs an Amazon retail store

that would be built and operated by Wealth Assistants, without significant

efforts from Plaintiffs.

61.The contracts contained numerous false statements. For example, the contracts

stated that Wealth Assistants' goal was for Plaintiffs to receive around $10,000

or more of profits monthly from their store by the end of the store's first year

of operations.

62. The contract referenced in the paragraph above contained numerous statements

that Wealth Assistants knew were false. For example, the contract stated:

**Formatted:** Font: 14 pt

The Client will own a turnkey automated drop shipping Amazon retail store, which will be built and operated by the Service Provider. Product research, supplier negotiations, supplier relationships, product listing, day-to-day price updates, quality control, processing returns, customer service, financial reporting, and business growth in the direction of $10,000+ net profit monthly (assuming Client has the necessary resources, cash/credit) are among the services provided.

The contracts also listed sophisticated operational services that Wealth Assistants would provide to ensure that the stores flourished.

The contract also stated "In months 12—60+, the goal will be to net the Client upwards of multiple 6-figures per year ($350-$600K+ per year) if Client remains with the Service Provider and this Contract is not terminated for any such reason."

78.

63.79.    Wealth Assistants knew that nobody planned to provide Wealth Assistants' clients with the full set of services Wealth Assistants was promising in theat contracts. For example, Wealth Assistants knew that it did not have a goal of generating $10,000 of monthly profit in its clients' stores. Wealth Assistants knew that it instead intended to neglect its clients' stores (if it provided the clients with stores at all) so that the stores would generate little or no profitsrevenue.

64.The contract also contained the following ts also contained a "Buyback" clause, which stated that if a Wealth Assistants client had not made back their initial investment by the end of the store's first year of operations, the client would have the option to sell the store they purchased back to Wealth Assistants.:

If Client has substantially complied with all the provisions of this Service Agreement, and after the Client's 1st anniversary of getting their first Amazon sale, they have not made back their initial $55,000 (fifty-five thousand dollars) investment from net profit on their business, the Service Provider will offer them a buy-back of their Amazon retail store or waive their two thousand five hundred dollars ($2,500) annual store renewal fee if they have not yet paid it or credit them their annual renewal fee in full if they have already paid it.

80.

65.81.    Wealth Assistants knew that it never intended to honor its Buyback clause.

66.Around November of 2022, Wealth Assistants began using a different standardized contract for its new clients. An example of that standardized contract is Exhibit B to this Complaint. This later standard contract stated that "The Service Provider's principal aims are to provide a 'done for you' operation for Client, focusing on high-quality lawfully commercialized

products offered at competitive prices accompanied by excellent customer service for end-user customers in a manner that promotes growth."

67. The following "description of services" appeared in those contracts:

A. Initial Phase. Initially, Service Provider will manage the process of transferring the Store to Client (the "Migration"). Migration includes but is not limited to: finalizing the Transfer (described at Exhibit D), changing account names, email address, bank account information, payment information, and other steps required by the Host. Migration generally takes 1 to 2 weeks but may be substantially delayed if issues arise. Migration completes upon delivery of new account credentials and the training manual.

B. Ramp-Up. During the remainder of the first year, Service Provider will steadily encourage and support ramping up the scale of the Store by, for example, increasing product listings, optimizing SEO, and exploring advertising opportunities. Increased inventory will be required to meet increased demand as described below. The focus of this period is to lay the groundwork for future success.

| MONTHS | COST OF INVENTORY PER MONTH |
|---|---|
| 1 | $15,000 |
| 2 – 3 | $30,000 |
| 4 – 6 | $50,000 |
| 7 – 12 | $70,000 |
| 13 – 18.* | $90,000 |
| * The end of this period is the "**Milestone**." | |

68. Wealth Assistants knew that it would not be able to "ramp up" stores at the rate it promised in its contracts.

69. Likewise, the following description of Wealth Assistants' "Management" services appeared in the same contract:

> B. Management. Service Provider will serve as a business consultant for the Store; performing for example:
> ● Product research and analysis of market data to identify top-selling products,
> ● Supplier relationships,
> ● Strategic sourcing or bulk-ordering products from optimal suppliers,
> ● Planning warehousing and fulfillment options,
> ● Product listings including, pricing decisions, and pricing updates,
> ● Deployment of Store look and feel (including Store name which may change from time to time),
> ● Customer service including quality control, and processing returns, and
> ● Internal financial reporting.
> Service Provider shall make commercially reasonable efforts to maintain the uniqueness of the Store. In the event Client discovers certain inventory overlap with other stores, Client agrees to notify Service Provider.

70. Wealth Assistants knew that it would not provide the "Management" services described in that portion of the contract.

71. The same contract also promised a purported "Buyback Warranty," which stated, in part, as follows:

> In the event Profit does not exceed the Threshold by the Milestone, Client may elect to receive from Service Provider: (1) a Credit, or (2) the Buyback Amount.
> "Profit" means Gross Income less the Success Fee received by the Milestone.
> "Threshold" means the Set Up Fee.
> "Credit" means an amount equivalent to the Annual Fee, and redeemable, at Client's option, by refund if already paid, or by application to Client's account.
> "Buyback Amount" means an amount equivalent to the Threshold less the Profit.

- 22 -

72. Wealth Assistants knew that it never intended to honor the terms of its Buyback Warranty, and Wealth Assistants in fact did not honor the terms of its Buyback Warranties with Plaintiffs.

**B. Wealth Assistants' Marketing**

73.82.    Wealth Assistants sent most of its prospective clients projections showing that the stores Wealth Assistants managed would generate more than $10,000 per month. An example of such a slide is shown below:



74.83.    Very few, if any, of Wealth Assistants' investors ever achieved the "monthly profit totals" advertised by Wealth Assistants.

75.84.    Wealth Assistants knew that its clients could not reasonably expect to achieve more than $10,000 per month in profits.

76.85.    The slide deck also included the following slide:





77.86.    Wealth Assistants knew that it did not intend to honor the "Buy Back" guarantee advertised in the slide above.

78.87.    Wealth Assistants also lured clients with false advertising on social media. For example, on March 28, 2023, Wealth Assistants posted on its Facebook account that "you'll have the opportunity to sell your business 2-3 years from opening up your Amazon store (once your sales are $100K+/monthly)."

**C. Plaintiffs' Experiences With Wealth Assistants**

Formatted: Level 2

79.88.    In July of 2022, a representative from Wealth Assistants named Charles Fitzgerald Butler emailed Plaintiff **Amund Thompson** and attached a PowerPoint that projected stores managed by Wealth Assistants would

generate more than $10,000 per month in profits by the end of the store's first year.

80.89.    In November of 2022, Thompson signed a contract to purchase the business opportunity Wealth Assistants was offering.

81.90.    In or around November of 2022, Thompson paid Wealth Assistants $50,000 to cover the onboarding fee.

82.91.    In early 2023, Thompson paid $5,000 to Wealth Assistants for inventory. Thompson paid Wealth Assistants that money by wiring the money to an escrow agent called Marker Law.

83.92.    In total, to date, Thompson has received no more than $5,000 in connection with the business opportunity that Thompson purchased from Wealth Assistants.

84.93.    In August of 2022, a representative of Wealth Assistants named Mack McKaughan told Plaintiff **David Hough** that if Wealth Assistants managed a store for Hough, Wealth Assistants projected that the store would generate $10,000 of income per month by the end of the store's first year.

85.94.    Hough signed a contract to purchase the business opportunity Wealth Assistants was offering in August of 2022, and around the same time Hough paid Wealth Assistants $55,000 for the onboarding fee.

86.95.    Hough later wired approximately $10,000 to Wealth Assistants for inventory.

87.96.    Hough has received less than $4,000 in connection with the business opportunity he purchased from Wealth Assistants.

88.97.    **Isabel Ramos and Anthony Ramos** are married and have several children.

89.98.    Anthony Ramos spoke to Defendant Jared Day around January of 2023. Prior to when Anthony and Isabel purchased the business opportunity Wealth Assistants was selling, Jared Day told Anthony that if he purchased that business opportunity, his store would generate around $10,000 of passive income per month.

90.99.    In January of 2023, Anthony and Isabel purchased the business opportunity Wealth Assistants was offering.

91.100.    In or around January of 2023, Isabel and Anthony paid Wealth Assistants $75,000 as the onboarding fee for the business opportunity.

92.101.    Thereafter, Isabel and Anthony paid many inventory invoices that they received from Wealth Assistants. Isabel and Anthony paid those inventory invoices, which totaled approximately $18,000.

93.102.    Isabel and Anthony received less than $5,000 in connection with the business opportunity they purchased from Wealth Assistants.

94.103.    Plaintiff **Michael Nibarger** is a retired California Patrol Officer.

95.104.    In or around September of 2022, Nibarger spoke to a representative of Wealth Assistants named Brayton Bushby. Bushby sent Nibarger a PowerPoint

stating that Wealth Assistants' stores could be expected to generate up to $10,000 per month in profits.

96.105. Nibarger then decided to purchase the business opportunity Wealth Assistants was offering in September of 2022. Nibarger paid Wealth Assistants $55,000 as the onboarding fee for the business opportunity Wealth Assistants was offering.

97.106. A Wealth Assistants representative named Ashley Nydam—who now works for Defendant Wholesale Universe—assisted Nibarger in setting up his store.

98.107. Thereafter, Nibarger paid two inventory invoices he received from Wealth Assistants for $5,000 each.

99.108. Nibarger received less than $3,000 in connection with the business opportunity he purchased from Wealth Assistants.

**D. Wealth Assistants Announced It Was Shutting Down And Fraudulently Transferred Many Of Its Assets To Ryan Carroll, Michael Day, Max K. Day, and Max O. Day**

Formatted: Level 2

100.109. On October 23, 2023, Wealth Assistants wrote to its clients that it "will not be able to honor any more Buyback Guarantees" and would "cease all operations before December 1, 2023."

101.110. Wealth Assistants did in fact shut down. For example, it fired all or nearly all of its employees and stopped corresponding with its clients.

102.111. Wealth Assistants has not honored Plaintiffs' Buyback agreements.

103.112.  Many of Wealth Assistants' clients have complained, requested refunds, or requested that Wealth Assistants honor its Buyback agreements, but have not received a response from Wealth Assistants.

104.113.  Throughout its existence, Wealth Assistants transferred its funds—either directly or indirectly with fraudulent transfers through entity Defendants—to Defendants Ryan Carroll, Max K. Day, Max O. Day, and Michael Day for them to personally use.

105.114.  Wealth Assistants also took steps to conceal the fraudulent transfers of funds to its principals Ryan Carroll, Max K. Day, Max O. Day, and Michael Day. . For example, Wealth Assistants used "payment processors" to receive payments from Wealth Assistants' clients and transfer the funds to hidden bank accounts not disclosed to its clientsas described in more detail in the "Payment Processing Strategy" part of this complaint.

**E. Proficient Supply LLC Is Part Of Wealth Assistants**

115.    From approximately February of 2020 through November of 2022, Proficient Supply LLC operated a scam that was nearly identical to Wealth Assistants' scam. The Federal Trade Commission stated in a complaint that Proficient Supply LLC formed a common enterprise with a company called DK Automation that had:

promise[d] to help set up an Amazon store for purchasers of these Amazon programs, identify proven 'home run products,' negotiate with

Formatted: None

Formatted: Font: Bold

Formatted: Font: 14 pt

suppliers, and order, process, and ship inventory to Amazon. They further promise to expertly manage the Amazon storefront on behalf of purchasers, while Amazon will provide customers for the store. Purchasers need only sit back and receive 'passive income.'

116.    The Complaint noted that Proficient Supply LLC's role in the common enterprise was that it "receives customer payments, pays employees, and stores products related to Defendants' business opportunities."

> **Formatted:** Font: Bold

117.    Almost immediately after the FTC filed the complaint in November of 2022, the Court issued an emergency restraining order freezing Proficient Supply LLC's assets and ordering Proficient Supply LLC to cease engaging in the unlawful activity.

> **Formatted:** Font: Bold

118.    In violation of the Court's order, Proficient Supply kept engaging in the unlawful activity, but it did so as part of the Wealth Assistants common enterprise rather than the DK Automation common enterprise.

> **Formatted:** Font: Bold

119.    In or around March of 2023, Wealth Assistants purchased Proficient Supply LLC. Wealth Assistants sent an update to its clients telling them about the purchase. An example of two such emails are shown below:

> **Formatted:** Font: 14 pt, Bold, Check spelling and grammar, Ligatures: None

> **Formatted:** Indent: Left: 0.5", No bullets or numbering

> **Formatted:** Font: Bold

> **Formatted:** Centered, Indent: Left: 0.5", No bullets or numbering

From: Justin OConnor <justin@wealthassistants.com>
Date: Wed, Mar 29, 2023, 2:43 PM
Subject: Re: Thank you for your time!
To: <nicole.tilot@gmail.com>

Hi Nicole,

Thanks for reaching out. Great questions. To answer some:
1. We have over 600 clients with over 700 stores total. Legit question on your end. However, we are U.S. based and bound by all business laws, banking laws, etc. We have three brick and mortar offices, over 300 employees and are Certified Amazon Providers. We are partnered with Cart.com You can see the write up here. We've also just acquired Proficient Supply in a multi-million dollar purchase so we're growing and growing and growing.

- 29 -



120.    Proficient Supply was listed as Precision Trading Group's (one of the Wealth Assistants Entity Defendants) alias on its corporate registration.

121.    Proficient Supply began accepting large wire transfers from other Wealth Assistants entities. For example;

a.  On March 22, 2022, a Wealth Assistants account at Wells Fargo ending in -2209 sent a $208,000 wire transfer to another Wells Fargo account with an account number ending in -2546. The wire memorandum stated "1st of 12 payments for asset purchase of PROFICIENT SUPPLY LLC." Although the -2209 account is held by "Precision Trading Group" the wire transfer records indicated that the transferor was "Max K. Day."

b.  On April 3, 2022, the -2209 account again sent a $208,000 wire transfer to the -2546 account.

   c.  On May 2, 2023, the -2209 account sent a $208,323.33 wire transfer to a different Proficient Supply account, which was held at Bank of America and had an account number ending in -7927.

   d.  On April 14, 2023, WA Distribution LLC sent a $155,000 wire transfer to a Proficient Supply bank account held at Wells Fargo.

   e.  On April 17, 2023, WA Distribution LLC sent a $300,000 wire transfer payment to a Proficient Supply bank account held at Wells Fargo.

   f.  On May 2, 2023, WA Distribution sent a $99,990 wire transfer payment to a Proficient Supply bank account held at Wells Fargo.

122. In January of 2024, a bank account held by Proficient Supply frequently received payments from Shopify while representing in transactional records that it was doing business as "WA Distribution" sometimes and "WA Brand Management LLC" other times.

123. Ultimately, since Proficient Supply was acquired by Wealth Assistants, it has intermingled its assets with the Wealth Assistants Entity Defendants interchangeably.

124. It is also impossible to distinguish between Proficient Supply's operations and the operations of the Wealth Assistants Entity Defendants.

125. Therefore, Proficient Supply is another alter ego of the Wealth Assistants Entity Defendants.

**E.F.     When Wealth Assistants Shut Down, It Transitioned Many Of Its Clients' Accounts And Assets To The Quantum Ecommerce and Wholesale UniversePartnership**

106.126. Wholesale Universe and Quantum Ecommerce operate a partnership that purports to provide store-management services similar to the store-management services that Wealth Assistants used to purport to provide.

107.127. Bonnie Nichols, the owner of Wholesale Universe, has described Wholesale Universe and Quantum Ecommerce as "like a brother-sister company" in which Bonnie Nichols—acting through Wholesale Universe—"lock[s] down the inventory" and Troy Marchand—acting through Quantum Ecommerce—"provides the account management services," such as monitoring the online stores, handling returns and refunds, and helping to reactivate any online stores that Amazon has deactivated.

108.128. Wholesale Universe and Quantum Ecommerce have presented themselves as a joint partnership operating a single business when presenting contracts to clients.

109.129. Moreover, Precision Trading Group LLC (one of the Wealth Assistants Entity Defendants) has done business as "Quantum Ecom" according to its corporate registration.

110.130. On October 27, 2023—approximately four days after Wealth Assistants announced that it was shutting down—Bonnie Nichols described the manner in which she (acting through Wholesale Universe) and Troy Marchand (acting

through Quantum Ecommerce) aided Wealth Assistants as follows, in an online

webinar presented publicly and targeted at Wealth Assistants' former clients:

> The way that we actually met Wealth Assistants is they reached out to us about 90 days ago, because they were having issues with supply chain, and with inventory and getting that product uploaded into their clients stores. And because they know that we've got that locked down, they reached out to us and they said, hey, we need your help. And so we came on board about 90 days ago, and we started servicing about 100 to 175 clients with our products and services. We didn't have access to your information, we had access to be able to upload the product into your store as quickly as possible.

111.131.  Upon information and belief, Bonnie Nichols' statement is true insofar

as Bonnie Nichols and Troy ~~Machand~~Marchand—acting through the Quantum-

Wholesale Partnership—did help Wealth Assistants while it was operating. For

example, upon information and belief, Bonnie Nichols and Troy Marchand

helped Wealth Assistants recruit new clients and/or ~~process payments from~~

help transfer funds from those clients to Wealth Assistants.

112.132.  However, the Quantum-Wholesale Partnership did not provide

reasonable inventory or store-management services to 100 clients. For

example, it is not true that the Quantum-Wholesale Partnership provided

$10,000 or more of inventory to 100 stores that Wealth Assistants was

managing.

113.133.  As discussed above, on October 23, 2023, Defendant Ryan Carroll—the

CEO of Wealth Assistants—emailed Wealth Assistants' clients, including

Plaintiffs, stating Wealth Assistants "will not be able to honor any more

- 33 -

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

Buyback Guarantees" and would "cease all operations before December 1, 2023." The same email also stated that Wealth Assistants was offering its clients a "Transition Agreement." Specifically, Wealth Assistants offered its clients the opportunity to transition their stores to management by another e-commerce firm on "favorable terms." The email also attached a "comparison of vendor proposals," which purportedly compared three e-commerce firms that had offered "favorable terms" to manage Wealth Assistants' clients' stores. But the only e-commerce firms actually identified in the "vendor proposals" were "Quantum Ecom" and "Wholesale Universe," which jointly offered a proposal. The other "vendors" offering the proposal were anonymous.

~~114.~~134. After Wealth Assistants shut down, many former clients of Wealth Assistants began receiving unsolicited emails from Wholesale Universe, acting on behalf of the Wholesale Universe and Quantum Ecommerce joint partnership. Some of those emails stated that "prior to going out of business, Wealth Assistants purchased an inventory package for you valued at $35,000. It is now ready for upload to your Amazon FBA account."

~~115.~~135. The statement about the inventory-package purchases was false because Wealth Assistants had not in fact purchased $35,000 inventory packages for all of the recipients of that email before it shut down.

~~116.~~136. However, Wealth Assistants did in fact transfer assets from itself to Wholesale Universe. Wealth Assistants and Wholesale Universe made th~~ese~~ose~~at~~

transfers for the purpose of preventing Wealth Assistants' current and future creditors, including Plaintiffs, from accessing Wealth Assistants' assets. For example, on July 27, 2023, the Wealth Assistants Entity Defendant called Providence Oak Properties transferred $250,000 to Wholesale Universe. On September 27, 2023, the Wealth Assistants Entity Defendant called Providence Oak Properties transferred $500,000 to Wholesale Universe, Inc. The wire transfer memorandum stated "For Fulfillable – WA." Another Wealth Assistants Entity Defendant called WA Distribution made a wire transfer to Wholesale Universe for $200,000 on the same day (September 27, 2023) from a WA Distribution account at Thread Bank. On September 28, 2023, the same WA Distribution account transferred $50,000 to Wholesale Universe. Wealth Assistants did not receive anything of comparable value in exchange for those transfers, which totaled $1 million.

117. 137. In the October 27th, 2023 webinar noted above, Bonnie Nichols described the Quantum-Wholesale Partnership's reaction to hearing that Wealth Assistants was shutting down by stating:

> We were kind of like, you know, caught off guard just like you guys were over the last couple of weeks when all this happened. And so, so we're kind of right now, filling, figuring out how we can reach out to you guys, but we have a ton of product—it's at our warehouse right now—that's ready to be uploaded into your accounts.
>
> And so all we need is to be able to get you guys onboarded and to get your user permission access to your store so that we can upload the inventory for the funds that was sent over to us from

Wealth Assistants, since that's still pending to be uploaded into your accounts.

~~118.~~138.  Meanwhile, Bonnie Nichols, Troy Marchand, and either Max K. Day or Max O. Day were instant messaging in a group called "Fulfillable" (the name of one of the Wealth Assistants Entity Defendants) about how the Quantum-Wholesale Partnership could gain to access Wealth Assistants' former clients' online stores.

~~119.~~139.  On December 19, 2023, Wholesale Universe—acting on behalf of the Quantum-Wholesale Partnership—sent an email to many of Wealth Assistants' clients. Although the vast majority of the recipients of the email had not partnered with Wholesale Universe, the email began by stating "We appreciate your partnership with Wholesale Universe and value the opportunity to assist in providing you your Amazon inventory efficiently, as was ordered by Wealth Assistants over the last 100 plus days." The email later stated "to ensure a smooth transition, we kindly request your prompt attention to the following matters: Please provide Wholesale Universe User Access Permission . . ." The email later stated "failure to provide the required information within the next 30 days will result in the initiation of a monthly storage fee of $500, commencing from December 20, 2023. This fee will be deducted from your inventory amount currently on hand at WU."

~~120.~~140.  Many of Wealth Assistants' former clients who received Wholesale Universe's email demanded that the Quantum-Wholesale Partnership provide

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

those former clients with the money that Wealth Assistants had paid the Quantum-Wholesale Partnership for the former clients' respective stores' inventory.

121.141.  The Quantum-Wholesale Partnership refused to make those payments to the vast majority of former Wealth Assistants clients who asked for them. The Quantum-Wholesale Partnership told at least one former Wealth Assistants client that any such requests must be directed to Wealth Assistants' bankruptcy attorneys, but it would not say who the Wealth Assistants bankruptcy attorney is, and none of the Wealth Assistants Entity Defendants had declared bankruptcy.

**G. The Payment Processor Defendants Conspired With Wealth Assistants To Help It Conceal Assets From Plaintiffs**

**F.i.    Wealth Assistants Payment Processing Strategy**

122.142. **Wealth Assistants' "Payment Processing" Strategy:** Wealth Assistants knew, at all times it existed, that it was operating a fraudulent scheme.

123.143. Accordingly, Wealth Assistants suspected that its clients would eventually either attempt to charge back their credit cards to recover their payments, or sue Wealth Assistants to attempt to recover their payments.

124.144. Moreover, Wealth Assistants knew that it would likely lose any chargeback disputes or lawsuits commenced against it.

125.145.  Accordingly, Wealth Assistants attempted to conceal the proceeds of its fraudulent scheme so that, even when it lost chargeback disputes or lawsuits, its clients would not be able to recover their money because they would not be able to find the assets.

126.146.  Furthermore, Wealth Assistants knew that it would need to avoid scrutiny from anti-money-laundering regulators and law enforcement because, if it drew scrutiny, it would be easy for regulators and law enforcement officers to detect that Wealth Assistants was a fraudulent scheme.

147.    Wealth Assistants and its payment processors attempted to avoid drawing scrutiny from regulators, and attempted to make its assets more difficult for creditors to find, by: (1) avoiding often breaking what would be large transactions into multiple small transactions, (2) using many different payment processors so that no single payment processor was processing too much money, (3) dividing its assets into many different bank accounts, and (4) upon information and belief, passing money through many different accounts and paymentor processors before the money reached its final destination (collectively, the "Payment Processing Strategy").

**ii.    Travis Marker's Knowledge Of And Substantial Assistance With The Payment Processing Strategy**

127.

128.148.  Travis Marker: Defendant Travis Marker, acting on behalf of his companies Marker Law & Mediation and Parlay Law Group, served as an "escrow agent" for Wealth Assistants.

129.149. In his capacity as an "escrow agent," Travis Marker collected payments from Wealth Assistants' clients and then passed them to bank accounts controlled by Wealth Assistants.

130.150. In order to collect payments from Wealth Assistants' clients, Marker often shipped credit card readers to the clients and instructed them to make discrete small payments.

131.151. Sometimes, Marker sent a Wealth Assistants client more than one credit card reader because, he told them, a single credit card reader could only process a small amount of payments at one time.

132.152. Marker used different credit card readers to process payments, in small discrete amounts, to attempt to avoid money-laundering detection because he knew that his escrow account was being used to launder money for Wealth Assistants.

133.     Total-Apps on behalf of Wells Fargo:

134.     The Executive Director of Total-Apps is Rey Pasinli. Rey Pasinli. In 2005, the Federal Trade Commission brought an action against Rey Pasinli in the Central District of California in Case Number CV 05-6054. The complaint alleged that Pasinli "provided payment processing services to a fraudulent enterprise known as Pharmacycards, which attempted to steal at least $1.2 million from thousands of consumer checking accounts." Specifically, he "arranged for consumers' accounts to be debited without personally meeting any individual associated with the Pharmacycards operation" and did not "require proof that consumers had authorized the debits to their checking accounts."

135.     To resolve the suit brought by the Federal Trade Commission, Pasinli stipulated to a permanent injunction. He agreed to refrain from "taking any action to process any payment, directly or on behalf of any client, against any consumer's credit card or bank

- 39 -

account without having previously undertaken a reasonable investigation to determine that the consumer has provided defendants or the client with express verifiable authorization."

136.    After stipulating to that permanent injunction, Pasinli became the owner and Executive Director of the company Total-Apps. Total-Apps states on its website that it is "a registered ISO of Wells Fargo Bank, N.A."

137.    Upon information and belief, Total-Apps was in fact a registered independent sales company ("ISO") of Wells Fargo at all times relevant to this dispute, meaning that Wells Fargo was Total-Apps sponsor.

138.    An ISO is an entity that is authorized to market and sell the services of banks.

139.    According to its website, the services that Total Apps provides to merchants as a Wells Fargo-sponsored ISO include:

a.    "if payment processing has been halted, we are able to help you restore payment processing by quickly setting up the new merchant accounts."

b.    "If funds have been frozen, we can recommend the best process to release these funds and resume business operations quickly."

c.    "reduc[ing] reserve rates"

d.    "increas[ing] processing limits"

e.    "fraud chargeback response"

f.    "Total-Apps is the expert in providing Merchant Account Services and Advanced Payment Processing Solutions. To optimize your process you can select to outsource payment processing to our team. Alternatively, we can provide on-site and off-site training for your employees."

140.    As Total-Apps' sponsoring bank, Wells Fargo had a duty to supervise and monitor Total-Apps.

141.    Upon information and belief, Total-Apps acted as Wells Fargo's agent whenever it was assisting Wealth Assistants, including when it was helping Wealth Assistants process payments and conceal the proceeds of its fraudulent scheme.

142.    Total-Apps had access to Wealth Assistants' financial records.

143.    Upon information and belief, Total-Apps frequently served As Wealth Assistants' payment processor.

144.    For example, in January of 2023, Max O. Day was attempting to recruit a new "payment processor" called "Mint Solutions." In doing so, Max O. Day sent the email shown below to Mint Solutions and the email addresses Rey@total-apps.com and Alison@total-apps.com:

- 40 -

Formatted: Font: Bold, Underline

From: **Max Day** <maxday@wealthassistants.com>
Date: Thu, Jan 5, 2023 at 1:43 PM
Subject: Introductions
To: Zach Henson <zach@mintsolutions.biz>, Alison Schmidt <alison@total-apps.com>, Rey Pasinli <Rey@total-apps.com>

Zach <> Rey & Alison

Zach - I would like to introduce you Rey and Alison with Total Apps. I have known Rey for 15+ years, and he is a trusted friend. They take a very creative and custom approach to processing. They could help with your rapidly expanding business.

Y'all take it from here.

Very Best,
Max

145.   ~~The phrase "very creative and custom approach to processing" in the email shown above was Max O. Day's euphemism to convey that Total-Apps—acting on behalf of Wells Fargo—had helped the Day family and Wealth Assistants process payments in a manner that concealed assets and avoided scrutiny from regulators.~~

146.   ~~More generally, Total-Apps assisted Wealth Assistants in concealing its assets and avoiding regulatory scrutiny by helping Wealth Assistants and the payment processors implement the Payment Processing Strategy described above.~~

iii.   ~~Banks'~~**Wells Fargo's Anti Money Laundering** Obligations:

~~147.~~

~~148.~~153.   **Know Your Customer Obligations:** Federal law requires banks to know their customers and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2).  Thus, banks are required to collect information about the holder of each account.  Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

149.154.  Wells Fargo iBanks ares obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

155.    The BSA requires Wells Fargo banks to develop, administer, and maintain a program to ensure compliance.  The program must be approved by the bank's board of directors and noted in the board meeting minutes.  It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

156.    Banks also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer.  The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

157.    When an entity rather than an individual opens an account, banks obtain information about the individual who controls the account.

150.158.  Using the information collected, as well as external resources like internet search engines and public and commercial record databases, banks

- 42 -

create an initial client profile and assign a compliance-related risk rating. Neither the profile nor the risk rating is final or static. When banks become aware that customer information has materially changed, their internal controls require updating the information and, where appropriate, reassessing the customer's risk profile or rating.

> **Formatted:** Font: 14 pt

159.     Customer due diligence programs should be tailored to the risk presented by individual customers, such that the higher the risk presented, the more attention is paid.  WhWhen aere bank determines a customer is determined to be high risk, the banks should gathers additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

151.     **Banks' Controls**:

> **Formatted:** Font: Bold, Underline

152.160.  Additionally, Wells Fargbankso must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA.  The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

153.161.  The federal government established the Federal Financial Institutions Examination Council (FFIEC) in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of

financial institutions.  The FFIEC's Bank Secrecy Anti-Money Laundering

Manual (FFIEC Manual) summarizes BSA and anti-money laundering

compliance program requirements, risks and risk management expectations,

industry sound practices, and examination procedures.  The FFIEC Manual is

based on BSA laws and regulations and BSA and anti-money laundering

directives issued by federal banking agencies, such as the Federal Reserve, the

Federal Deposit Insurance Corporation (FDIC), and the Office of the

Comptroller of Currency.  See FFIEC BSA/AML Examination Manual, at p. 5

(2010).

162.    Banks must also ensure that their employees follow BSA guidelines.

Banks make compliance a condition of employment and incorporate

compliance with the BSA and its implementing regulations into job

descriptions and performance evaluations.  Banks are therefore required to

train all personnel whose duties may require knowledge of the BSA on that

statute's requirements.

163.    Banks maintain systems of controls sufficient to identify broad patterns

of account activity, sometimes spanning several accounts. The substantive

nature of the transactions, the relationships between the transacting parties, and

the parties' identities, are all subject to this examination. Banks contextualize

the scrutiny, analyzing suspicious activity against the backdrop of industry

norms and each customer's background. Banks are expected to use external

sources of information like the internet, commercial database searches, and direct inquiries to ascertain the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

154 164.  Bankers processing outgoing wire transfers are trained to ask the customer questions designed to detect possible money laundering, including the purpose of the transaction and the nature of the relationship between the parties. Typically, wires between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction. A customer service manager who approves outgoing wires often conducts a secondary review, confirming that the checklist questions were adequately addressed. Wire transactions above $100,000 typically require additional approval of a regional employee, and transactions over $500,000 typically also require branch manager authorization.

165.    **Red Flags Triggering Heightened Review:** Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual.  These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account;

(6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

166.    Banks use transaction monitoring software and data analytics to reveal hidden connections and relationships between transacting parties across multiple accounts and transactions. The software automatically reviews transactions against customers' backgrounds and transaction histories, checks for red flags (including the red flags mentioned above), and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel and triggers manual reviews of the account or activity in question.

155.    Wells Fargo also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of

- 46 -

Formatted: Font: 14 pt

the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

156.

**iv.    Banks of America's Participation In And Knowledge Of The Payment Processing Strategy**

167.    Bank of America has operated at least 20 bank accounts controlled by Wealth Assistants or its principals. Bank of America operated those accounts despite knowing that other Defendants were using them in furtherance of a fraudulent scheme.

168.    A Bank of America account held by "Wealth Assistants LLC" that had an account number ending in -4905 accepted millions of dollars in wire transfers from Wealth Assistants LLC's customers as payments for the business opportunities Wealth Assistants was offering. The account began accepting those transfers at least as early as May of 2022.

169.    Many of the wire transfers that the -4905 account received from the putative class members stated that the wire transfers were for an "investment."

170.    According to Bank of America's wire-transfer records and account statements, Wealth Assistants LLC's address was 34428 Yucaipa Blvd, Ste. 273, Yucaipa, CA 92399 in May of 2022.

171.    **Although the -4905 account had been accepting millions of dollars in wire transfers since at least May of 2022, the only account-opening**

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

**documentation for the -4905 account that Bank of America has produced to Plaintiffs is dated and signed September 19, 2022.**

172.    That account-opening documentation for the -4905 account states that the financial center for the documentation is "Aliso Viejo" (in California). The authorized persons for the account, according to the account documentation, were Defendant Ryan Carroll and Defendant Christine R. Johnson (whose title is listed as "Finance Manager" for Wealth Assistants).

173.    The name of the Bank of America associate responsible for the account documentation was Jonathan Ramirez Cabral.

174.    Between May 27, 2022 and September 23, 2022, the -4905 account made five wire transfers of $166,666.67 each to "Empire Ecommerce LLC" or "Automators LLC," which were two of the names for a single company that operated a fraudulent scheme nearly identical to Wealth Assistants' fraudulent scheme from around 2020 to September of 2023, when Automators LLC was shut down by the Federal Trade Commission.

175.    The following images show the account statements for the -4905 account for the month of June:

Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 06/01/22 | WIRE TYPE:WIRE IN DATE: 220601 TIME:0853 ET TRN:2022060100324538 SEQ:2022060100026034/318615 ORIG:BENJAMIN DAVID ID:000009733509559 SND BK:WELL S FARGO BANK NA ID:0407 PMT DET:OW00002236717604 | 25,000.00 |
| 06/02/22 | WIRE TYPE:WIRE IN DATE: 220602 TIME:0845 ET TRN:2022060200257653 SEQ:3182772153ES/008476 ORIG:BC DILLEHAY GROUP, LLC ID:370176528 SND BK:JP MORGAN CHASE BANK, NA ID:021000021 PMT DET:BOH OF 22/06/02 RE: CRAIG DILLEHAY | 34,000.00 |
| 06/02/22 | WIRE TYPE:WIRE IN DATE: 220602 TIME:1025 ET TRN:2022060200309759 SEQ:2022060200025217/358625 ORIG:BENJAMIN DAVID ID:000009733509559 SND BK:WELL S FARGO BANK NA ID:0407 PMT DET:OW00002240665954BA LANCE DUE FOR ONBOARDING | 10,000.00 |
| 06/03/22 | WIRE TYPE:WIRE IN DATE: 220603 TIME:1627 ET TRN:2022060300444176 SEQ:104106693001496/031131 ORIG:EMILY WITTENHAGEN ID:342147 SND BK:BRUNING BA NK ID:104106693 | 55,000.00 |
| 06/03/22 | WIRE TYPE:WIRE IN DATE: 220603 TIME:1648 ET TRN:2022060300453990 SEQ:2022060300007816/004191 ORIG:NIC B ZARBOCK IDAC-0658052162 SND BK:ZIONS B ANCORPORATION, NA DBA ID:124000054 PMT DET:RJPFFSY 5UIKUJULWINITIAL AMAZON SETUP - NIC ZARBOCK | 45,000.00 |
| 06/03/22 | WIRE TYPE:WIRE IN DATE: 220603 TIME:1735 ET TRN:2022060300471175 SEQ: /001908 ORIG:ALEXANDER ZARBOCK ID:0003536053 SND BK:MOUNTA IN AMERICA FCU ID:324079555 PMT DET:ALEX ZARBOCK | 45,000.00 |
| 06/06/22 | WIRE TYPE:WIRE IN DATE: 220606 TIME:1826 ET TRN:2022060600509391 SEQ:2022060600008447/003668 ORIG:BRADLEY E ZARBOCK ID:097998701 3 SND BK:ZIONS BANCORPORATION, NA DBA ID:124000054 PMT DET:BRAD Z ARBOCK INVESTMENT | 45,000.00 |
| 06/06/22 | WIRE TYPE:WIRE IN DATE: 220606 TIME:1409 ET TRN:2022060600398891 SEQ:132601453869078/000188 ORIG:JAMES E BURROWS ID:31096009 SND BK:AMERICA FI RST FEDERAL CREDIT ID:324377516 PMT DET:OPENING AM AZON STORE | 35,000.00 |
| 06/07/22 | WIRE TYPE:WIRE IN DATE: 220607 TIME:1634 ET TRN:2022060700445653 SEQ:2022060700008330/003137 ORIG:CHRISTOPHER B DAVIS ID:0320 18053 SND BK:REGI ONS BANK ID:062005690 | 55,000.00 |
| 06/07/22 | WIRE TYPE:WIRE IN DATE: 220607 TIME:1634 ET TRN:2022060700445990 SEQ:3472972158ES/029508 ORIG:BOUTERIE LAW FIRM A PROFE ID:192962917 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:BPL OF 22/06/07 | 35,000.00 |

- 49 -

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

| Date | Description | Amount |
|---|---|---|
| 06/08/22 | WIRE TYPE:WIRE IN DATE: 220608 TIME:1445 ET TRN:20220608000399276 SEQ:3376542159ES/023978 ORIG:PERNELL W MCGUIRE NANCY F ID:7117718387 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:DCD OF 22/06/08 FOR PERNELL MCGUIRE | 211,000.00 |
| 06/10/22 | WIRE TYPE:WIRE IN DATE: 220610 TIME:1354 ET TRN:20220610000395366 SEQ:220610027510/002736 ORIG:MARIE C OTIS ID:000150874241550 SND BK:US BAN K, NA ID:104000029 PMT DET:220610027510 STARTING A BUSINESS NICHOLAS OTIS WORKING WITH HYSAM | 55,000.00 |
| 06/10/22 | WIRE TYPE:WIRE IN DATE: 220610 TIME:1401 ET TRN:20220610000398316 SEQ:0532740610002672/020322 ORIG:AM VENTURES LLC ID:1003005319 SND BK:FIRST CA PITAL BANK ID:053274061 | 55,000.00 |
| 06/13/22 | WIRE TYPE:WIRE IN DATE: 220613 TIME:1457 ET TRN:20220613004630S0 SEQ: /001321 ORIG:RONALD T MOULDEN ID:10140617 SND BK:VOLUNTEER STATE BANK ID:064102999 PMT DET:061322JG18 RONALD MOULDEN | 107,000.00 |
| 06/13/22 | WIRE TYPE:WIRE IN DATE: 220613 TIME:1630 ET TRN:20220613005098S4 SEQ:0532009831077677/027333 ORIG:SOUTHERN SITE RESTORATION ID:510247201 SND BK:SOUTH STATE BANK, NA ID:053200983 PMT DET:L AWSON | 55,000.00 |
| 06/13/22 | WIRE TYPE:WIRE IN DATE: 220613 TIME:1051 ET TRN:20220613003349Z4 SEQ: /000287 ORIG:SHERRY BERRYHILL ID:1110766 SND BK:SOUTHSTATE BANK, N.A. ID:063116737 | 35,000.00 |
| 06/13/22 | WIRE TYPE:WIRE IN DATE: 220613 TIME:1628 ET TRN:20220613005508S73 SEQ: /001689 ORIG:JOHN NADEAU ID:945877043 SND BK:POLISH NATION AL CREDIT UNION ID:211882091 PMT DET:INVESTMENT | 17,500.00 |
| 06/14/22 | WIRE TYPE:BOOK IN DATE: 220614 TIME:1253 ET TRN:20220614003655S83 SNDR REF:QFZWD39EX ORIG:SCOTT H REYNOLDS ID:483021158354 PMT DET:Othe r | 55,000.00 |
| 06/14/22 | WIRE TYPE:WIRE IN DATE: 220614 TIME:1050 ET TRN:2022061400309064 SEQ:220614101835H300/000268 ORIG:ADAM MECHANICAL LLC ID:8944266654 SND BK:SANT ANDER BANK, N.A. ID:231372691 PMT DET:N606812 NONE | 35,000.00 |
| 06/14/22 | WIRE TYPE:WIRE IN DATE: 220614 TIME:1453 ET TRN:20220614004418S72 SEQ:202206140013Z249/440310 ORIG:PATRICK D MESCALL ID:000009841680755 SND BK:W ELLS FARGO BANK NA ID:0407 PMT DET:007167616524828 8PATRICK MESCALL | 55,000.00 |
| 06/14/22 | WIRE TYPE:WIRE IN DATE: 220614 TIME:1055 ET TRN:2022061400312042 SEQ:220614105522X04/002840 ORIG:JOHN T NADEAU ID:8251243388 SND BK:TD BANK, N A ID:211370545 PMT DET:CS00-CFDK2H | 17,500.00 |
| 06/14/22 | TINKER FCU    DES:HB ACH    ID:JACOBS NICHOLAS INDN:HOMEBRANCH ACH    CO ID:9303085829 WEB | 0.40 |
| 06/14/22 | TINKER FCU    DES:HB ACH    ID:JACOBS NICHOLAS INDN:HOMEBRANCH ACH    CO ID:9303085829 WEB | 0.21 |
| 06/15/22 | Counter Credit | 70,000.00 |
| 06/15/22 | WIRE TYPE:WIRE IN DATE: 220615 TIME:0901 ET TRN:20220615002955S00 SEQ: /000063 ORIG:NICHOLAS JACOBS ID:7467549 SND BK:TINKER FEDE RAL CREDIT UNION ID:303085829 | 55,000.00 |
| 06/15/22 | WIRE TYPE:WIRE IN DATE: 220615 TIME:1304 ET TRN:20220615003227Z42 SEQ:000000000000588627/000027 ORIG:STEVEN R PAUL ID:56632117 SND BK:EASTERN CORP FCU ID:211391773 PMT DET:REASON: INVESTMENTS /REC /222 BROADWAY NEW YORK, NY 10003 | 45,000.00 |
| 06/15/22 | WIRE TYPE:WIRE IN DATE: 220615 TIME:1632 ET TRN:20220615005183O5 SEQ:202206150001Z65/003877 ORIG:BRYAN V HARR ID:8250518258 SND BK:REGIONS BAN K ID:062005690 | 45,000.00 |

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

## Deposits and other credits - continued

| Date | Description | Amount |
|---|---|---|
| 06/15/22 | WIRE TYPE:WIRE IN DATE: 220615 TIME:1804 ET TRN:2022061500551356 SEQ:2022061500222632/025216 ORIG:TEDD R MARTINEAU ID:000008724750099 SND BK:WE LLS FARGO BANK, NA ID:121000248 PMT DET:0004850166 944598INVESTMENT FOR ECOMMERCE BUSINESS CALL JENIF | 35,000.00 |
| 06/16/22 | WIRE TYPE:WIRE IN DATE: 220616 TIME:1046 ET TRN:2022061600308532 SEQ:61622 ER 02/000318 ORIG:SCOTT HOLWAY ID:230096758 SND BK:SEAMEN'S BAN K ID:211373461 PMT DET:START UP BUSINESS ANY QUEST IONS PLEASE CALL 508-487-8414 X2123 | 45,000.00 |
| 06/16/22 | WIRE TYPE:WIRE IN DATE: 220616 TIME:1114 ET TRN:2022061600322182 SEQ:3319800167JO/004478 ORIG:EDWARD D JONES AND COMPAN ID:260618068 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:CAP OF 22/06/16 B/O CUSTOMER 019410850 | 45,000.00 |
| 06/16/22 | WIRE TYPE:WIRE IN DATE: 220616 TIME:1833 ET TRN:2022061600485652 SEQ:2022061600004900/002176 ORIG:VALENTINO I ZOMA ID:0238095898 96 SND BK:THE HU NTINGTON NATIONAL BANK ID:044000024 PMT DET:INVEST MENT. | 35,000.00 |
| 06/16/22 | WIRE TYPE:WIRE IN DATE: 220616 TIME:1247 ET TRN:2022061600362399 SEQ:2022061600006426/001947 ORIG:BRYAN V HARR ID:8250518258 SND BK:REGIONS BAN K ID:062005690 | 10,000.00 |
| 06/21/22 | WIRE TYPE:WIRE IN DATE: 220621 TIME:1004 ET TRN:2022062100570917 SEQ:2621837490020901/005683 ORIG:MITCHELL L. STANALAND ID:711090811 0166 SND BK:ALL IN FEDERAL CREDIT UNION ID:262183749 PMT DET:OPERATIONS CAPITOL | 55,000.00 |
| 06/21/22 | WIRE TYPE:BOOK IN DATE: 220621 TIME:0547 ET TRN:2022062100195251 SNDR REF:392576414 ORIG:KGH CORP ID:501027497739 PMT DET:START UP | 55,000.00 |
| 06/21/22 | WIRE TYPE:WIRE IN DATE: 220621 TIME:1727 ET TRN:2022062100803564 SEQ:2022062100015340/005520 ORIG:CHRISTOPHER B DAVIS ID:0320018053 SND BK:REGI ONS BANK ID:062005690 | 52,000.00 |
| 06/21/22 | WIRE TYPE:WIRE IN DATE: 220621 TIME:1431 ET TRN:2022062100708994 SEQ:3705752172ES/014211 ORIG:NABA MALLICK ID:687169646 SND BK:JPMORGAN CHA SE BANK, NA ID:021000021 PMT DET:BOH OF 22/06/21 N ABA MALLICK NABA MALLICK | 50,000.00 |
| 06/21/22 | WIRE TYPE:WIRE IN DATE: 220621 TIME:0547 ET TRN:2022062100432685 SEQ:3205532172ES/002004 ORIG:NABA MALLICK ID:687169646 SND BK:JPMORGAN CHA SE BANK, NA ID:021000021 PMT DET:BOH OF 22/06/21 N ABA MALLICK NABA MALLICK | 5,000.00 |
| 06/22/22 | WIRE TYPE:WIRE IN DATE: 220622 TIME:1605 ET TRN:2022062200510382 SEQ:226MI0134ISH83A8/012072 ORIG:DION SHARP ID:1235199426 SND BK:PNC BANK, NAT IONAL ASSOCIATIO ID:043000096 PMT DET:226MI0134ISH 83A8/REF/226MI0134ISH83A8 | 52,000.00 |
| 06/22/22 | WIRE TYPE:WIRE IN DATE: 220622 TIME:1605 ET TRN:2022062200510347 SEQ:2206221604544X00/005654 ORIG:JOHN T NADEAU ID:8251248388 SND BK:TD BANK, N A ID:211307045 PMT DET:NEJZ-CFMR7U | 16,000.00 |
| 06/22/22 | WIRE TYPE:WIRE IN DATE: 220622 TIME:1613 ET TRN:2022062200515272 SEQ: /001575 ORIG:JOHN T NADEAU ID:945877043 SND BK:POLISH NATI ONAL CREDIT UNION ID:211882091 PMT DET:INVESTMENT JOHN T NADEAU | 16,000.00 |
| 06/22/22 | melio        DES:Jeremy Sco ID:e4906109  INDN:Wealth Assistants LLC  CO ID:1320565847 CCD PMT INFO:Jeremy Scott business LLdinv #205-354-31  93-B | 10,000.00 |
| 06/22/22 | melio        DES:Jeremy Sco ID:e4906108  INDN:Wealth Assistants LLC  CO ID:1320565847 CCD PMT INFO:Jeremy Scott business LLdinv #205-354-31  93-C | 5,000.00 |

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

### Deposits and other credits - continued

| Date | Description | Amount |
|---|---|---|
| 06/22/22 | Jeremy Scott bus DES:205-354-31 IDe4886235 INDN:Wealth Assistants LLC  CO ID:1294287528 CCD  PMT INFO:205-354-3193-Dinv #205-354-3193-D | 3,000.00 |
| 06/23/22 | WIRE TYPE:WIRE IN DATE: 220623 TIME:1407 ET TRN:2022062300441879 SEQ:0759011340101001:018412 ORIG:ROBERT MCCORMICK ID:44243089 SND BK:BANK FIRS T N.A ID:075901134 PMT DET:RE: INVESTMENTS | 211,000.00 |
| 06/23/22 | VA TLR transfer | 55,000.00 |
| 06/23/22 | WIRE TYPE:WIRE IN DATE: 220623 TIME:1427 ET TRN:2022062300451211 SEQ:220623032273:002937 ORIG:CHRISTOPHER R TAWIL ID:00015346507S536 SND BK:US BANK, NA ID:121122676 PMT DET:2206230322 73 CHRISTOPHER TAWIL | 35,000.00 |
| 06/23/22 | Jeremy Scott bus DES:205-354-31 IDe4942204 INDN:Wealth Assistants LLC  CO ID:1294287528 CCD  PMT INFO:205-354-3193-Ainv #205-354-3193-A | 18,000.00 |
| 06/23/22 | US BANK ONLINE  DES:TRIALCREDT ID:5145431753 INDN:CHRISTOPHER R TAWIL  CO ID:1770527921 PPD | 0.53 |
| 06/23/22 | US BANK ONLINE  DES:TRIALCREDT ID:5145431755 INDN:CHRISTOPHER R TAWIL  CO ID:1770527921 PPD | 0.38 |
| 06/24/22 | WIRE TYPE:WIRE IN DATE: 220624 TIME:0527 ET TRN:2022062400205238 SEQ:3488042174ES/001213 ORIG:JUSTIN W HANSON OR MELISS ID:626382557 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:DCD OF 22/06/23 | 55,000.00 |
| 06/24/22 | WIRE TYPE:WIRE IN DATE:220624 TIME:1220 ET TRN:2022062400351913 SEQ:2313811160037213/011387 ORIG:STANLEY FRANK ID:90304760310001 SND BK:PENNSY LVANIA STATE EMP C U ID:231381116 PMT DET:REFUNDAB LE MANAGEMENT FEE | 55,000.00 |
| 06/24/22 | WIRE TYPE:WIRE IN DATE: 220624 TIME:1503 ET TRN:2022062400400470 SEQ:0012206241114410/001840 ORIG:BART J COLOMBINI ID:0213583399 SND BK:U S A A FEDERAL SAVINGS BANK ID:314074269 PMT DET:REF COL OMBINI ONBOARDING | 55,000.00 |
| 06/24/22 | WIRE TYPE:WIRE IN DATE: 220624 TIME:1223 ET TRN:2022062400364589 SEQ:1419416087216934/000079 ORIG:ADAM COTTLE ID:47273761 SND BK:AMERICA FIRST FEDERAL CREDIT ID:324377516 PMT DET:INVESTMENTS | 45,000.00 |
| 06/24/22 | WIRE TYPE:WIRE IN DATE: 220624 TIME:1528 ET TRN:2022062400451625 SEQ: /000088 ORIG:FRED CRISTIAN MEYER ID:12068106 SND BK:BAYFIR ST NATIONAL BANK ID:063114551 | 35,000.00 |
| 06/24/22 | Jeremy Scott bus DES:205-354-31 IDe5003675 INDN:Wealth Assistants LLC  CO ID:1294287528 CCD  PMT INFO:205-354-3193-Einv #205-354-3193-E | 8,000.00 |
| 06/24/22 | melio    DES:Rynow Reso IDe5052859 INDN:Wealth Assistants LLC  CO ID:1320565847 CCD PMT INFO:Rynow ResourcesInv #RN4503 | 5,000.00 |
| 06/27/22 | WIRE TYPE:WIRE IN DATE: 220627 TIME:0701 ET TRN:2022062700284325 SEQ:20220627000009004/308450 ORIG:TLC REALTY GROUP LLC ID:7244262395 SND BK:FIF TH THIRD BANK, NA ID:0031 PMT DET:RTL023 :6456578 | 55,000.00 |
| 06/28/22 | WIRE TYPE:WIRE IN DATE: 220628 TIME:1439 ET TRN:2022062800420141 SEQ:1283800179ES/474735 ORIG:SASHA M LONG ID:000648961084 SND BK:JPMORGAN CHASE BANK, N.A. ID:0002 PMT DET:OS1 OF 22/06/28 | 55,000.00 |
| 06/28/22 | WIRE TYPE:WIRE IN DATE: 220628 TIME:1746 ET TRN:2022062800507542 SEQ:220628042424/004262 ORIG:ERIC D COOKSEY ID:000153563854220 SND BK:US B ANK, NA ID:125000105 PMT DET:220628042424 SET-UP F EE (ERIC COOKSEY) | 35,000.00 |
| 06/28/22 | WIRE TYPE:WIRE IN DATE: 220628 TIME:1602 ET TRN:2022062800460617 SEQ:3471222179ES/027863 ORIG:MICHAEL DETAVIS ID:619846097 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:POH OF 22/06/2 8 ONBOARDING & SET UP | 17,500.00 |

- 52 -

## Deposits and other credits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 06/29/22 | WIRE TYPE:WIRE IN DATE: 220629 TIME:1010 ET TRN:2022062900314948 SEQ:CB220629000237/000275 ORIG:PATTON CONSULTING LLC ID:203994244 SND BK:COM MERCE BANK ID:101000019 PMT DET:CB220629000237 FOR AMAZON ACCOUNT | 35,000.00 |
| 06/29/22 | WIRE TYPE:WIRE IN DATE: 220629 TIME:1305 ET TRN:2022062900403738 SEQ:37982003/000567 ORIG:RICHARD E BRADFORD ID:2153315581 SND BK:ALLY BANK ID:124003116 PMT DET:2657188 | 35,000.00 |
| 06/29/22 | WIRE TYPE:WIRE IN DATE: 220629 TIME:1708 ET TRN:2022062900530661 SEQ:3149785430072061/033415 ORIG:MACKENZIE A. GUEVARA ID:1774621 SND BK:NAVY A RMY COMMUNITY CREDIT UN ID:314978543 PMT DET:REF: AARON AND MACKENZIE GUEVARA | 35,000.00 |
| 06/30/22 | WIRE TYPE:WIRE IN DATE: 220630 TIME:1651 ET TRN:2022063000747041 SEQ:226UH54423IH8OZB/017192 ORIG:A A PROPERTY GROUP LLC ID:4644526209 SND BK:P NC BANK, NATIONAL ASSOCIATIO ID:043000096 PMT DET: 226UH54423IH8OZBPAYMENT FOR ALLISON A SHARP /REF/2 | 55,000.00 |
| 06/30/22 | WIRE TYPE:WIRE IN DATE: 220630 TIME:0526 ET TRN:2022063000296978 SEQ:3018642181ES/000991 ORIG:MICHAEL DETAVIS ID:619846097 SND BK:JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:POH OF 22/06/3 0 2ND PAYMENT FOR ON BOARDING | 17,500.00 |
| 06/30/22 | Counter Credit | 875.00 |
| **Total deposits and other credits** | | **$2,683,876.52** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 06/01/22 | GUSTO        DES:CND 781416 ID:6semjrmvt1 INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -34,800.00 |
| 06/01/22 | GUSTO        DES:CND 781416 ID:6semjrmvkb INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -34,800.00 |
| 06/01/22 | GUSTO        DES:CND 781416 ID:6semjrmvn5 INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -9,000.00 |
| 06/01/22 | GUSTO        DES:CND 781416 ID:6semjrmvtr INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -7,677.00 |
| 06/01/22 | GUSTO        DES:CND 781405 ID:6semjrmvpp INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -5,750.00 |
| 06/01/22 | GUSTO        DES:CND 781405 ID:6semjrmvqt INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -4,450.00 |
| 06/01/22 | GUSTO        DES:CND 781416 ID:6semjrmvma INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -2,000.00 |
| 06/01/22 | GUSTO        DES:CND 781416 ID:6semjrmvs6 INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -2,000.00 |
| 06/01/22 | GUSTO        DES:CND 784156 ID:6semjrmvo4 INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -1,272.18 |
| 06/01/22 | GUSTO        DES:JCD 773426 ID:6semjrrkg0 INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -1,200.00 |
| 06/01/22 | GUSTO        DES:JCD 773426 ID:6semjrrkg3 INDN:Wealth Assistants LLC CO ID:9138864001 CCD | -1,112.00 |
| 06/01/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXX INDN:Ryan Carroll CO ID:6371551996 CCD | -312.43 |

- 53 -

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

## Withdrawals and other debits - continued

| Date | Description | Amount |
|---|---|---|
| 06/01/22 | GUSTO     DES:CND 781416 ID:6semjrnvf9 INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -103.50 |
| 06/02/22 | WIRE TYPE:WIRE OUT DATE:220602 TIME:1445 ET TRN:2022060200431327 SERVICE REF:013815 BNF:MENTIONWORTH, LLC ID:7574035213 BNF BK:WELLS F ARGO BANK, N.A. ID:121000248 PMT DET:3903952192 PR ARTICLES | -18,000.00 |
| 06/02/22 | GUSTO     DES:CND 800918 ID:6semjrs52gn INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -98,150.00 |
| 06/02/22 | GUSTO     DES:CND 801848 ID:6semjrsbkck INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -68,462.00 |
| 06/02/22 | GUSTO     DES:CND 801848 ID:6semjrsbk5n INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -34,240.00 |
| 06/02/22 | GUSTO     DES:CND 801797 ID:6semjrsbk8s INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -10,500.00 |
| 06/02/22 | GUSTO     DES:CND 802896 ID:6semjrsbk7b INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -7,500.00 |
| 06/02/22 | GUSTO     DES:CND 801797 ID:6semjrsbkad INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -7,250.00 |
| 06/02/22 | GUSTO     DES:CND 802734 ID:6semjrsbkei INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -2,000.00 |
| 06/02/22 | GUSTO     DES:FEE 787805 ID:6semjrs2gvq INDN:Wealth Assistants LLC  CO ID:2453942850 CCD | -84.00 |
| 06/06/22 | GUSTO     DES:CND 960465 ID:6semjrt07eq INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -563.00 |
| 06/07/22 | GUSTO     DES:CND 973353 ID:6semjrt4dsi INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -714.00 |
| 06/07/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX INDN:Ryan Carroll     CO ID:6371551996 CCD | -696.62 |
| 06/10/22 | Wise Ltd     DES:Winning Pr ID:24954001 INDN:Wealth Assistants LLC  CO ID:2453233521 IAT PMT INFO: WEB 00000000000000000000  FOR MORE INFORMATION CONTACT CUSTOMER SERVICE | -2,000.00 |
| 06/13/22 | Zelle Transfer Confir k91si6vk2; MARCELLO | -3,000.00 |
| 06/14/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX INDN:Ryan Carroll     CO ID:6371551996 CCD | -1,523.37 |
| 06/14/22 | TINKER FCU     DES:HB ACH    ID:JACOBS NICHOLAS INDN:HOMEBRANCH ACH     CO ID:9303085829 WEB | -0.61 |
| 06/16/22 | TRANSFER WEALTH ASSISTANTS LL;Mostain Billah Confirmation# 0642004677 | -28,000.00 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1vgf INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -38,800.00 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1vbi INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -38,800.00 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1vgp INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -8,292.25 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1ve9 INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -7,750.00 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1vdh INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -4,050.00 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1veq INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -3,350.00 |
| 06/16/22 | GUSTO     DES:CND 243795 ID:6semjrv1vck INDN:Wealth Assistants LLC  CO ID:9138864001 CCD | -2,000.00 |

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 06/16/22 | GUSTO        DES:CND 243795 ID:6semjrv1vfi  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -2,000.00 |
| 06/16/22 | GUSTO        DES:ICD 243676 ID:6semjruuoua INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -1,200.00 |
| 06/16/22 | GUSTO        DES:ICD 243676 ID:6semjruuous  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -1,200.00 |
| 06/16/22 | GUSTO        DES:ICD 243676 ID:6semjruuoui  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -590.00 |
| 06/16/22 | GUSTO        DES:CND 243795 ID:6semjrv1vc0  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -426.00 |
| 06/21/22 | Zelle Transfer Conf# Ikjyo5vaz; ALEX LADINO GROUP LLC Accounts | -400.00 |
| 06/21/22 | Zelle Transfer Conf# jztSk61ww; TAYLOR | -1,500.00 |
| 06/21/22 | WAV*APPEAL NINJA DES:4236450309 ID:  INDN:Ryan Carroll        CO ID:0010306478 CCD | -5,100.00 |
| 06/21/22 | WAV*APPEAL NINJA DES:4236450309 ID:  INDN:Ryan Carroll        CO ID:0010306478 CCD | -4,250.00 |
| 06/22/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX  INDN:Ryan Carroll        CO ID:6371551996 CCD | -1,910.99 |
| 06/22/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX  INDN:Ryan Carroll        CO ID:6371551996 CCD | -648.90 |
| 06/22/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX  INDN:Ryan Carroll        CO ID:6371551996 CCD | -648.90 |
| 06/22/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX  INDN:Ryan Carroll        CO ID:6371551996 CCD | -648.90 |
| 06/22/22 | melio        DES:Melio     ID:e4913026  INDN:Wealth Assistants LLC   CO ID:1320565847 CCD PMT INFO:Melio | -290.00 |
| 06/22/22 | melio        DES:Melio     ID:e4913030  INDN:Wealth Assistants LLC   CO ID:1320565847 CCD PMT INFO:Melio | -145.00 |
| 06/22/22 | Melio        DES:530407     ID:e4900426  INDN:Wealth Assistants LLC   CO ID:1294287528 CCD PMT INFO:530407 | -87.00 |
| 06/22/22 | Melio        DES:532896     ID:e4957459  INDN:Wealth Assistants LLC   CO ID:1294287528 CCD PMT INFO:532896 | -522.00 |
| 06/23/22 | US BANK ONLINE  DES:TRIALDEBIT ID:5145431757  INDN:CHRISTOPHER R TAWIL     CO ID:3770527921 WEB | -0.91 |
| 06/24/22 | TRANSFER WEALTH ASSISTANTS LL;Mostain Billah Confirmation# 1411527293 | -16,000.00 |
| 06/24/22 | RAMP BUSINESS CO DES:PAYMENT S1 ID:S136316  INDN:BUSINESS ADV RELATIONS  CO ID:9907075000 CCD | -50,930.30 |
| 06/27/22 | Zelle Transfer Conf# k92bkt3z1; HOUSE OF HITS RECORDING STUDIO LLC | -200.00 |
| 06/27/22 | melio        DES:Melio     ID:e5058829  INDN:Wealth Assistants LLC   CO ID:1320565847 CCD PMT INFO:Melio | -145.00 |
| 06/28/22 | Upwork Escrow In DES:EDI PYMNTS ID:ACHXXXXXXXXX  INDN:Ryan Carroll        CO ID:6371551996 CCD | -1,945.85 |
| 06/29/22 | WIRE TYPE:WIRE OUT DATE:220629 TIME:0700 ET TRN:2022062900237938 SERVICE REF:004586 BNF:EMPIRE ECOMMERCE LLC ID:385251720 BNF BK:JPMOR GAN CHASE BANK, NA ID:322271627 PMT DET:393786622 PAYMENTS FOR AMAZON VA TEAM | -166,666.67 |
| 06/30/22 | Zelle Transfer Conf# jy17u34rj; MARCIO | -550.00 |
| 06/30/22 | GUSTO        DES:CND 670819 ID:6semjs1knsr  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -81,950.00 |

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knks  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -81,950.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knt7  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -11,402.25 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knmq  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -7,750.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knju  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -5,865.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knn4  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -4,550.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1kns6  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -2,000.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knlf  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -2,000.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knm0  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -2,000.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knmh  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -1,300.00 |
| 06/30/22 | GUSTO          DES:ICD 670773 ID:6semjs1jcvm  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -1,200.00 |
| 06/30/22 | GUSTO          DES:ICD 670773 ID:6semjs1jct1  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -1,103.00 |
| 06/30/22 | GUSTO          DES:CND 670819 ID:6semjs1knsg  INDN:Wealth Assistants LLC   CO ID:9138864001 CCD | -100.00 |

Card account # XXXX XXXX XXXX 5073

| Date | Description | Amount |
|------|-------------|--------|
| 06/02/22 | CHECKCARD  0602 FACEBK 49G27D3U72 Menlo Park   CA 152702121153000149447234 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/06/22 | CHECKCARD  0604 FACEBK FX7YDDXT72 Menlo Park   CA 152702121155000108961538 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/07/22 | CHECKCARD  0607 FACEBK K6M77DKT72 Menlo Park   CA 152702121158000017757636 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/09/22 | CHECKCARD  0609 FACEBK J49HCD7T72 Menlo Park   CA 152702121600000965177741 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/13/22 | CHECKCARD  0611 FACEBK XLVEKDXT72 Menlo Park   CA 152702121162000162737353 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/14/22 | CHECKCARD  0614 FACEBK LD6XFD7T72 Menlo Park   CA 152702121164445127133636 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/16/22 | CHECKCARD  0616 FACEBK UB4RNDXT72 Menlo Park   CA 152702121167000001507434 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/21/22 | CHECKCARD  0619 HYROS/MARKETHERO AUSTIN      TX 823050921710000001657162 RECURRING CKCD 7392 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -4,000.00 |
| 06/21/22 | CHECKCARD  0620 FACEBK 5SY38DBT72 Menlo Park   CA 152702121171000055207547 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/27/22 | CHECKCARD  0625 FACEBK LNWUTCTT72 Menlo Park   CA 152702121175000086057438 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/29/22 | CHECKCARD  0629 FACEBK S9WFFDBT72 Menlo Park   CA 152702121180000039863828 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -900.00 |
| 06/30/22 | CHECKCARD  0630 FACEBK 9N4BYCTT72 Menlo Park   CA 152702121181000140963524 RECURRING CKCD 7311 XXXXXXXXXXXX5073 XXXX XXXX XXXX 5073 | -184.69 |
| **Subtotal for card account # XXXX XXXX XXXX 5073** | | **-$13,184.69** |
| **Total withdrawals and other debits** | | **-$964,564.32** |

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

Formatted: Font: Bold, Underline

Formatted: Normal,  No bullets or numbering

176.    On the same day that Ryan Carroll opened the -4905 account (September 19, 2022), Ryan Carroll opened a separate account in the name of Wealth Assistants LLC with the same associate. That account number ended in -0434.

177.    Ryan Carroll also opened several other corporate bank accounts at Bank of America around the same time. For example:

  a.  Ryan Carroll opened a "Dreams to Reality" account ending in -1983 on September 8, 2022 at Bank of America's Allapattah, Florida financial center with associate Osman Delgado.

  b.  Ryan Carroll opened two "WA Brand Management LLC" accounts on September 8, 2022 at Bank of America's Allapattah, Florida financial center with associate Osman Delgado. The account numbers of those two accounts ended in -3907 and -3949.

  c.  Ryan Carroll opened *six* "Dreams to Reality" accounts, with account numbers ending in -3864, -8681, -8694, -8704, -8717, and -8720, which Ryan Carroll opened on July 7, 2022 at Bank of America's Downtown Miami financial center with associate Maria Aragon.

  d.  A savings account with a number ending in -3039 held by Wealth Assistants LLC was also opened in July of 2022, but Bank of America did not produce any account opening documentation for that account.

178.    In July and August of 2022, Ryan Carroll used the "Dreams to Reality" bank account at Bank of America with an account number ending in -8720 to

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

receive more than $1 million in wire transfers from the -4905 Wealth

Assistants account at Bank of America, and then disperse most of that money

to various other Bank of America accounts that Ryan Carroll controlled. These

are the account statements in July and August of 2022 for that account;

> **Formatted:** Font: Bold, Underline

### Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 07/07/22 | BKOFAMERICA BC  07/07 #000001172 FR CHKG | 100.00 |
| 07/11/22 | WIRE TYPE:BOOK IN DATE:220711 TIME:0434 ET TRN:2022071100051470 SNDR REF:395388618 ORIG:WEALTH ASSISTANTS LLC ID:898132214905 | 499,757.50 |
| 07/28/22 | WIRE TYPE:BOOK IN DATE:220728 TIME:1349 ET TRN:2022072800425002 SNDR REF:397902716 ORIG:WEALTH ASSISTANTS LLC ID:898132214905 | 594,771.50 |
| **Total deposits and other credits** | | **$1,094,629.00** |

### Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 07/11/22 | Online Banking transfer to CHK 8704 Confirmation# 2258642219 | -191,942.00 |
| 07/11/22 | Online Banking transfer to CHK 8717 Confirmation# 2558648165 | -20,000.00 |
| 07/11/22 | Online Banking transfer to CHK 8681 Confirmation# 2258652567 | -143,957.00 |
| 07/11/22 | Online Banking transfer to CHK 8694 Confirmation# 2258657474 | -47,985.00 |
| 07/11/22 | Online Banking transfer to SAV 3864 Confirmation# 1458662793 | -95,971.00 |
| **Total withdrawals and other debits** | | **-$499,855.00** |

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 08/02/22 | WIRE TYPE:BOOK IN DATE:220802 TIME:1607 ET TRN:2022080200459650 SNDR REF:398757058 ORIG:WEALTH ASSISTANTS LLC ID:898132214905 | 10,221.00 |
| 08/10/22 | WIRE TYPE:BOOK IN DATE:220810 TIME:1145 ET TRN:2022081000316076 SNDR REF:399826688 ORIG:WEALTH ASSISTANTS LLC ID:898132214905 | 105,912.00 |
| 08/22/22 | Online Banking transfer from CHK 8704 Confirmation# 5001619654 | 90,000.00 |
| 08/26/22 | WIRE TYPE:BOOK IN DATE:220826 TIME:0443 ET TRN:2022082500496701 SNDR REF:401827100 ORIG:WEALTH ASSISTANTS LLC ID:898132214905 | 121,128.00 |
| **Total deposits and other credits** | | **$327,261.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 08/03/22 | WIRE TYPE:WIRE OUT DATE:220803 TIME:0442 ET TRN:2022080300037365 SERVICE REF:002511 BNF:RYAN CARROLL ID:10900759078750 BNF BK:ARROWHEA D CENTRAL CREDI ID:322282603 PMT DET:398798942 TRA NSFER MONEY | -51,000.00 |
| 08/08/22 | Online Banking transfer to CHK 8694 Confirmation# 1279953327 | -60,000.00 |
| 08/09/22 | WIRE TYPE:BOOK OUT DATE:220809 TIME:1141 ET TRN:2022080900292917 RELATED REF:399530628 BNF:MEGALODON MARKETING LLC ID:325081399075 PMT DET:WATCH | -72,000.00 |
| 08/15/22 | Online Banking transfer to CHK 8717 Confirmation# 1653487847 | -50,000.00 |
| 08/15/22 | Online Banking transfer to CHK 8704 Confirmation# 1853518290 | -143,354.00 |
| 08/15/22 | Online Banking transfer to CHK 8681 Confirmation# 1353520919 | -143,354.00 |
| 08/15/22 | Online Banking transfer to SAV 3864 Confirmation# 1953524554 | -143,354.00 |
| 08/15/22 | Online Banking transfer to CHK 8694 Confirmation# 1353527495 | -47,785.00 |
| 08/22/22 | Online Banking transfer to CHK 8694 Confirmation# 1521619428 | -40,000.00 |

## Withdrawals and other debits - continued

| Date | Description | Amount |
|---|---|---|
| 08/22/22 | Online Banking transfer to CHK 8681 Confirmation# 1321621874 | -50,000.00 |
| 08/29/22 | Online Banking transfer to CHK 8694 Confirmation# 1872075011 | -12,112.00 |
| **Total withdrawals and other debits** | | **-$812,959.00** |

179.    As of October 1, 2022, the -4905 account had a balance of $5,899,989.52, the vast majority of which had been procured via payments from Wealth Assistants' clients.

180.    In October of 2022, $4,346,122.76 was withdrawn from the -4905 account and transferred to unknown accounts in a series of suspicious transactions. For example, on October 3, 2023, the -4905 account transferred

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

$582,895.20 to another Bank of America account held by Wealth Assistants LLC that had an account number ending in -0434.

181.    According to a lawsuit that Wealth Assistants filed against Bank of America, on or around November 17, 2022, Ryan Carroll lost access to and control over at least one of Wealth Assistants' bank accounts. Defendant Ryan Carroll then began calling Bank of America to discuss the freezing of the account. Bank of America told Carroll that Wealth Assistants' Bank of America accounts would officially be closed on November 22, 2022, and that Carroll would receive a cashier's check for the outstanding balances.

182.    Bank of America froze and then closed bank accounts controlled by Wealth Assistants because Bank of America knew that Wealth Assistants and Ryan Carroll were perpetrating the fraudulent scheme described herein.

183.    Even though Bank of America knew that Wealth Assistants was perpetrating the Wealth Assistants fraud, Bank of America allowed Wealth Assistants to rapidly siphon funds from the Wealth Assistants accounts after the accounts were purportedly frozen on November 17, 2022 (instead of taking steps to return the money that Wealth Assistants had stolen to the individuals from whom Wealth Assistants had stolen the money, or interpleading the funds).

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

184.     For example, on November 18, 2022, the -4905 account controlled by Wealth Assistants transferred more than $100,000 to an unknown bank account using approximately 53 transactions with the description "Payroll."

185.     The same account accepted hundreds of thousands of dollars via additional wire transfers from Wealth Assistants' customers after November 17, 2022.

186.     On January 26, 2023, Bank of America wrote a cashier's check "to the order of Wealth Assistants LLC" for $3,784,191.12.

187.     On January 31, 2023, the cashier's check was cashed at Wells Fargo Bank.

188.     Moreover, even though Bank of America knew of Wealth Assistants and Ryan Carroll's fraud, Bank of America failed to shut down bank accounts controlled by Ryan Carroll and/or his alter ego Dreams To Reality, LLC, which allowed Ryan Carroll to continue concealing the proceeds of Wealth Assistants' fraudulent scheme.

189.     On April 15, 2024, this Court issued an asset-freeze order. Plaintiffs provided Bank of America with notice of the asset-freeze order on April 16, 2024. When the asset-freeze order was converted to a preliminary injunction, Plaintiffs immediately sent Bank of America notice of that preliminary injunction.

190.     Bank of America failed to take any reasonable steps to avoid participating in a violation of the asset-freeze order. Instead, Bank of America ignored the asset-freeze order entirely. As a result, Wealth Assistants' principals used Bank of America accounts to continue transferring and concealing thousands of dollars.

191.     Plaintiffs' counsel called Bank of America's legal processing department on June 14, 2024 to inquire about a subpoena that Plaintiffs had issued to Bank of America. On that call, a Bank of America representative told Plaintiffs' counsel that, although Bank of America had received notice of the asset-freeze order, it had failed to take any steps to process the asset-freeze order by entering the freeze order into its computer system or taking any steps to implement the asset-freeze order.

192.     Approximately a week before Plaintiffs filed a motion to amend their Second Amended Complaint, Plaintiffs received records from Citi Bank showing that on April 11, 2024, a Citi Bank account held by Defendant Ryan Alexander Carroll transferred money to a Bank of America account—with an unknown account number—for the benefit of Ryan Alexander Carroll (i.e., Defendant Ryan Carroll was sending the money from his own Citi Bank account to his own Bank of America account). Bank of America has not disclosed any records associated with whatever bank account received that wire

transfer, even though it was ordered to produce account records for all accounts controlled by Ryan Carroll.

193.    Upon information and belief, Bank of America is continuing to operate bank accounts that it knows are subject to the Court's asset freeze order.

**v.    Wells Fargo's Agent Total-Apps Knew Of And Substantially Assisted With The Payment Processing Strategy**

194.    The Executive Director of Total-Apps is Rey Pasinli. In 2005, the Federal Trade Commission brought an action against Rey Pasinli in the Central District of California in Case Number CV 05-6054. The complaint alleged that Pasinli "provided payment processing services to a fraudulent enterprise known as Pharmacycards, which attempted to steal at least $1.2 million from thousands of consumer checking accounts." Specifically, he "arranged for consumers' accounts to be debited without personally meeting any individual associated with the Pharmacycards operation" and did not "require proof that consumers had authorized the debits to their checking accounts."

195.    To resolve the suit brought by the Federal Trade Commission, Pasinli stipulated to a permanent injunction. He agreed to refrain from "taking any action to process any payment, directly or on behalf of any client, against any consumer's credit card or bank account without having previously undertaken a reasonable investigation to determine that the consumer has provided defendants or the client with express verifiable authorization."

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

196.    After stipulating to that permanent injunction, Pasinli became the owner and Executive Director of the company Total-Apps. At all times that Wealth Assistants operated, Total-Apps stated on its website that it was "a registered ISO of Wells Fargo Bank, N.A."

197.    Upon information and belief, Total-Apps was in fact a registered independent sales company ("ISO") of Wells Fargo at all times relevant to this dispute.

198.    An ISO is an entity that is authorized to market and sell the services of banks and payment processors to merchants. Typically, ISOs do not merely sell the banks or payment processors' services; the ISOs also manage those services for the merchant and provide custom services to the merchant based on their specific needs.

199.    According to its website, the services that Total Apps provides to merchants as a registered ISO of Wells Fargo Bank include:

    a.  "if payment processing has been halted, we are able to help you restore payment processing by quickly setting up the new merchant accounts."

    b.  "If funds have been frozen, we can recommend the best process to release these funds and resume business operations quickly."

    c.  "reduc[ing] reserve rates"

    d.  "increas[ing] processing limits"

    e.  "fraud chargeback response"

Formatted: Numbered + Level: 1 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left + Aligned at: 0.75" + Indent at:  1"

f.   "Total-Apps is the expert in providing Merchant Account Services and Advanced Payment Processing Solutions. To optimize your process you can select to outsource payment processing to our team. Alternatively, we can provide on-site and off-site training for your employees."

200.    Because Total Apps was a registered ISO of Wells Fargo, Wells Fargo had a duty to supervise and monitor Total-Apps.

201.    Upon information and belief, Total-Apps acted as Wells Fargo's agent whenever it was assisting Wealth Assistants, including when it was helping Wealth Assistants process payments and conceal the proceeds of its fraudulent scheme.

202.    Total-Apps had access to Wealth Assistants' financial records.

203.    Total-Apps assisted Wealth Assistants in concealing its assets and avoiding regulatory scrutiny by helping Wealth Assistants and the payment processors implement the Payment Processing Strategy described above.

204.    Total Apps recruited various merchants (which it sometimes referred to, euphemistically, as "payment processors") to serve as intermediaries for some of Wealth Assistants transactions. That is, the merchants would use their merchant accounts to accept a transfer of Wealth Assistants' fraudulently procured assets, and then transfer those assets to a different account controlled by Wealth Assistants.

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

205.     For example, in January of 2023, Max O. Day was attempting to recruit a new intermediary for Wealth Assistants called "Mint Solutions." By way of background, in January of 2023, Wealth Assistants was unable to accept payments from individuals who wanted to purchase the business opportunity Wealth Assistants was offering because, according to Max O. Day, all of Wealth Assistants' "payment processors" had "maxed out." It is unclear exactly what Max O. Day meant by that, but it is likely that he was referring—at least in part—to the fact that Bank of America had shut down Wealth Assistants' primary bank account that Wealth Assistants had used to accept wire transfers from its clients. Now, Wealth Assistants was having difficulty finding another bank that would operate a merchant account for Wealth Assistants and accept millions of dollars every month in highly suspicious wire transfers. Accordingly, Wealth Assistants was asking more "intermediaries"—such as Mint Solutions—to accept the money from Wealth Assistants' clients.

206.     In attempting to recruit Mint Solutions, Max O. Day sent the email shown below to Mint Solutions and the email addresses Rey@total-apps.com and Alison@total-apps.com:

From: **Max Day** <maxday@wealthassistants.com>
Date: Thu, Jan 5, 2023 at 1:43 PM
Subject: Introductions
To: Zach Henson <zach@mintsolutions.biz>, Alison Schmidt <alison@total-apps.com>, Rey Pasinli <Rey@total-apps.com>


Zach <> Rey & Alison

Zach - I would like to introduce you Rey and Alison with Total Apps. I have known Rey for 15+ years, and he is a trusted friend. They take a very creative and custom approach to processing. They could help with your rapidly expanding business.

Y'all take it from here.

Very Best,
Max

207.    The phrase "very creative and custom approach to processing" in the email shown above was Max O. Day's euphemism to convey that Total-Apps—acting on behalf of Wells Fargo—had helped the Day family and Wealth Assistants process payments in a manner that concealed assets and avoided scrutiny from regulators.

208.    Notably, Mint Solutions is not a registered payment processor. Instead, as noted above, Mint Solutions' role in the Payment Processing Strategy was to use its merchant account to receive payments from Wealth Assistants' customers and then use payment processors to pass those payments to other accounts controlled by Wealth Assistants.

209.    Mint Solutions ultimately decided not to serve as an intermediary for Wealth Assistants or Total Apps because it was suspicious of their activities.

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

However, Mint Solutions did serve as an intermediary for one of Mint Solutions' legacy clients who wanted to purchase Wealth Assistants' business opportunities. Mint Solutions accepted that one client's funds and transferred it to Wealth Assistants.

210.    As discussed in more detail below (in the "Wells Fargo" section), on January 31, 2023—about three months after Bank of America had frozen Wealth Assistants' bank accounts—Wealth Assistants finally managed to open a bank account at a Wells Fargo branch that would immediately accept a cash deposit of $3.7 million, accept more than a million dollars each month in wire transfers from Wealth Assistants' clients, and allow Wealth Assistants to then transfer that money to its principals, despite mountains of red flags in all of those transactions (described in more detail below) that inevitably triggered manual review.

211.    Upon information and belief, Total Apps—in its capacity as a registered ISO of Wells Fargo—helped Wealth Assistants open and operate the Wells Fargo merchant accounts.

212.    Apart from recruiting intermediaries and setting up merchant accounts, Total Apps also acted as Wealth Assistants payment "gateway" that connected Wealth Assistants' merchant accounts that held assets for Wealth Assistants. As the gateway, Total Apps rotated which merchant accounts were involved in Wealth Assistants' Payment Processing Strategy in a manner designed to help

- 68 -

Wealth Assistants avoid fraud detection. For example, if a Wealth Assistants transaction was flagged or stalled, Total Apps may avoid using the merchant account involved in that transaction in future transactions.

213.    As a mark of Total Apps' "gateway" services, wire transfers from WA Distribution LLC to other Wealth Assistants alter egos often included wire memorandums that stated "WA Distribution LLC | Total Apps" and addenda that stated "Total Apps Processing."

vi.    **Wells Fargo's 's Other Knowledge Of And Substantial Participation In The Payment Processing Activities** Illegal Activities And Notice Of Fraudulent Scheme:

1. 214.    Wells Fargo acted as a co-conspirator in the Wealth Assistants fraudulent scheme through its agent, Total-Apps, as discussed above.

2.    Wells Fargo also participated in the conspiracy by keeping custody of Wealth Assistants' assets and other Defendants' assets.

215.

3. 216.    Upon information and belief, Wells Fargo also processed payments for Wealth Assistants. In particular, Wealth Assistants used the Wells Fargo payment processor branded "Zelle" to process many of its fraudulent transactions. Wells Fargo was also the sponsoring bank for many of Wealth Assistants' other fraudulent transfers of assets, including transactions that sent fraudulently procured assets to the Bank of the Philippine Islands. The payment

processors for those transactions included "Stripe," "Wise," and "Paypal"

which used Wells Fargo as their sponsoring bank for the pertinent transactions.

4.1.    Wells Fargo also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

217.    Upon information and belief, Wells Fargo knew that Wealth Assistants was a fraudulent scheme when Wells Fargo custodied Wealth Assistants' assets and processed its payments.

218.    Wells Fargo custodied the following accounts controlled by the Wealth Assistants Entity Defendants or the Human Defendants (with the last four digits of the account number in parentheses):

g.  MAXPRO MARKETING LLC (-0188)

h.  PRECISION TRADING GROUP LLC (-2183)

i.  PRECISION TRADING GROUP LLC (-2191)

j.  PRECISION TRADING GROUP LLC (DBA WEALTH ASSISTANTS LLC) (-2209)

k.  PRECISION TRADING GROUP LLC (-2365)

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

l.   PRECISION TRADING GROUP LLC (-2373)

m. MAX K. DAY (-3706)

n.   BUSINESS FINANCIAL SOLUTIONS ADVISORY (-6864)

o.   PRECISION TRADING GROUP LLC (-7394)

p.   PITHY PRODUCTIONS INC. (-2255)

q.   PRECISION TRADING GROUP LLC [an investment account] (-8580)

r.   RNJ ENTERPRISE LLC (-8019)

s.   PROFICIENT SUPPLY LLC (-2546)

219.    All of the accounts listed above except the -7394, -2255, and -8019 accounts (and possibly the -2546 and -8418 accounts) listed the same address for the account holder, which was Defendant Max K. Day's home address.

220.    Each of those accounts listed above was eventually closed by Wells Fargo and now contains no money.

*       *       *

221.    Before Wealth Assistants was created, Wells Fargo had aided members of the Day family in other similar fraudulent schemes. For example, in September of 2004, Wealls Fargo loaned $500,000 to a fraudulent venture run by Max K. Day and other members of his family called "Today's Destiny" (described in more detail below). After Today's Destiny's fraud was revealed and it filed for bankruptcy, Wells Fargo filed a proof of claim and sought to

- 71 -

recover the loan. Therefore, even before Wealth Assistants was created, Wells Fargo had first-hand knowledge that Max K. Day was a high-risk client.

222.    As discussed above, Wells Fargo's agent—Total Apps—had long aided the Day family in its efforts to conceal the proceeds of fraudulent schemes. Total Apps also corresponded with Wealth Assistants about concealing the fraudulent proceeds of the accounts at issue. Indeed, upon information and belief, Total Apps orchestrated those concealment efforts while acting as Wells Fargo's agent.

223.    Bank of America froze some of Wealth Assistants' bank accounts in November of 2022, which was publicly available information because Wealth Assistants filed a complaint in federal court against Bank of America when the accounts were frozen.

224.    In or around November of 2022—the same month Wealth Assistants' bank accounts were frozen at Bank of America—several Precision Trading Group bank accounts were opened at Wells Fargo.

225.    In January of 2023, a new Precision Trading Group bank account was opened at Wells Fargo, which had an account number ending in -2209.

226.    Upon information and belief, Precision Trading Group, LLC did not have a website and exhibited no signs of any legitimate business activity.

227.    Wealth Assistants received a cashier's check from Bank of America for more than $3.7 million in January of 2023 and cashed that cashier's check at a

Wells Fargo branch. That money from that cashier's check was then deposited into the -2209 account.

5.   Upon information and belief, receiving a $3.7 million cashier's check caused Wells Fargo to perform increased additional due diligence regarding the Precision Trading Group bank accounts and discover the fraudulent scheme.

6.   Wells Fargo custodied the following accounts:

a.      A $100,000 account held in the name of Max K. Day.;
b.      A $40,000 account held in the name of Maxpro Marketing LLC (one of Max K. Day's alter egos).
c.      A $65,000 account held by Business Financial Solutions Advisory LLC.
d.      A $280,000 account held by Precision Trading Group, LLC (one of the Wealth Assistants Entity Defendants).
e.      A $600,000 investment account held by Precision Trading Group, LLC d.b.a. Wealth Assistants LLC;
f.      A $20,000 account held by Precision Trading Group, LLC d.b.a. WA Amazon Seller;
g.      A $20,000 account held by Precision Trading Group, LLC d.b.a. WA Distribution LLC;
h.      A $3,400,000 account held by Precision Trading Group, LLC d.b.a. Wells Fargo;
i.      A $20,000 account held by Precision Trading Group, LLC d.b.a. WA Brand Management LLC
j.      A $20,000 account held by Precision Trading Group, LLC d.b.a. Carrol Enterprises LLC

228.

229.      The Wealth Assistants Entity Defendants and the Human Defendants' interrogatory responses have indicated that each of those accounts listed above was "closed by Wells Fargo" and now contain no money. Precision Trading Group's account activity exhibited many red flags. For example, the account ending in -2209 accepted large wire transfers from many members of the putative class in large, round, similar amounts (often $55,000). The memorandums of those wire transfers often indicated that they were intended as investments in the business opportunity Wealth Assistants was offering.

- 73 -

230.    In total, the -2209 account accepted more than 200 wire transfers totaling more than $11. Upon information and belief, the vast majority of those wire transfers were from Wealth Assistants' clients.

231.    Many of the confirmations for those wire transfers stated that the purpose of the payment was to purchase an Amazon store from Wealth Assistants,

232.    Shortly after receiving the wire transfers from the members of the putative class, the -2209 account would transfer the money—often in very large transfers—to the Human Defendants, the Alter Ego Defendants, or other accounts controlled by Wealth Assistants via large wire transfers. **Often, the wire transfers would falsely state that the holder of the account was the individual Max K. Day (even though the -2209 account was supposedly an entity account held by Precision Trading Group).** For example, on April 3, 2023, the -2209 account wired $600,000 to an account held by "Carroll Enterprises LLC" at Thread Bank, and the wire transfer stated (falsely) that the debtor in the transaction was "Max K. Day." The memorandum for that transfer stated "christine ops."

233.    The account statements for of the -2209 for the months of January, February and March 2023 are shown below:

- 74 -



**Transaction history**

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|--------------|-------------|-------------------|---------------------|---------------------|
| 1/20 | | Online Transfer From Precision Trading Group LLC Business Checking xxxxxx7394 Ref #Ib0Ihppv8J on 01/20/23 | 10,000.00 | | 10,025.00 |
| 1/31 | | Deposit Made In A Branch/Store | 3,784,191.12 | | 3,794,216.28 |
| 1/31 | | Interest Payment | 0.16 | | 3,794,216.28 |
| **Ending balance on 1/31** | | | | | **3,794,216.28** |
| **Totals** | | | **$3,794,191.28** | **$0.00** | |

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 2/7 | | WT Fed#00654 USAA Fedl SA /Org=Korey E McAleese Jergins Srf# 0012302074911311 Trn#202207060830 Rfb# | 100,000.00 | | |
| 2/7 | | WT Fed#05812 Rogue Credit Union /Org=Scott E. Chadick Srf# 3232747750058455 Trn#230207112894 Rfb# | 55,000.00 | | 3,949,216.28 |
| 2/8 | | WT Fed#00047 Thread Bank /Org=Carroll Enterprises LLC Srf# Trn#230208159836 Rfb# | 100.00 | | 3,949,316.28 |
| 2/9 | | WT Fed#01112 Sikorsky Financial /Org=Edwin R. Garces Srf# 2211808060002264 Trn#2302090952240 Rfb# | 147,000.00 | | |
| 2/9 | | WT Seq101653 Konomos Investments LLC /Org= Srf# 0006797040078703 Trn#230209101653 Rfb# | 45,000.00 | | |
| 2/9 | | Online Transfer to Day M Ref #Ib0Hnzrksv Savings Consultingwa | | 340,000.00 | 3,801,316.28 |
| 2/10 | | WT Fed#00049 American Express N /Org=Designs By Pierre Srf# Opf3550500415 Trn#230210131349 Rfb# 923041675403475 | 55,000.00 | | |
| 2/10 | | WT Fed#07916 Bank of America, N /Ftr/Bnf=Dreams to Reality Inc Srf# 006608804150213 Trn#230210172551 Rfb# | | 740,919.00 | |
| 2/10 | | WT Fed#07350 Zions Bancorporati /Ftr/Bnf=Wwkb LLC Srf# 006608804140361 3 Trn#230210172906 Rfb# | | 340,000.00 | 2,775,397.28 |
| 2/14 | | WT Fed#00017 Fortis Private Ban /Org=Jeffrey D Switzer Srf# Trn#2302140666663 Rfb# | 125,000.00 | | |
| 2/14 | | WT Fed#07330 Jpmorgan Chase Ban /Org=Coldcashindustries LLC Srf# 3565603044Es Trn#2302141432667 Rfb# Dcd of 23/02/13 | 55,000.00 | | 2,955,397.28 |
| 2/15 | | WT Fed#00360 United Community B /Org=John Laforge Srf# 20230460120700 Trn#230215149062 Rfb# | 35,000.00 | | |
| 2/15 | | Online Transfer to Max K Day Business Checking xxxxxx2191 Ref #Ib0Hg6Rk98 on 02/15/23 | | 200,000.00 | 2,790,397.28 |
| 2/16 | | Wire Trans Svc Charge - Sequence: 230216139885 Srf# Ow00002955118200 Trn#230216139885 Rfb# Ow00002955118200 | | 30.00 | |
| 2/16 | | WT Fed#05273 Thread Bank /Ftr/Bnf=WA Amazon Seller LLC Srf# Ow00002955118200 Trn#230216139885 Rfb# Ow00002955118200 | | 100,000.00 | 2,690,367.28 |
| 2/17 | | WT Fed#00924 Navy Federal Credi /Org=James Berry Srf# Opf1499847869 Trn#230217094122 Rfb# Opf7180047646 | 55,000.00 | | |
| 2/17 | | WT Fed#02927 Bank of America, N /Org=Best Smiles, LLC Srf# 202302170040151 Trn#2302171130286 Rfb# Rp4Sesct7 | 45,000.00 | | |
| 2/17 | | Wire Trans Svc Charge - Sequence: 230217185022 Srf# 0068560048707453 Trn#230217185022 Rfb# | | 30.00 | |
| 2/17 | | WT Fed#09170 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# 0068560048707453 Trn#230217185022 Rfb# | | 400,000.00 | 2,390,337.28 |
| 2/21 | | WT Seq#62563 Jacob Allen /Org= Srf# Ow00002965032807 Trn#230221062563 Rfb# Ow00002965032807 | 25,000.00 | | |
| 2/21 | | WT 2023022100025480 Truist Bank /Org=Artful Framing Srf# 20230221000225480 Trn#230221210951 Rfb# 0D-20230221-1454 | 55,000.00 | | 2,470,337.28 |
| 2/22 | | Life Soldier LLC Transfer Wealth Assistants LLC | 50,000.00 | | 2,520,337.28 |

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 2/23 | | WT Seq#24033 Jacob Allen /Org= Srf# Ow00002974316873 Trn#230223024033 Rfb# Ow00002974316873 | 20,000.00 | | 2,540,337.28 |
| 2/24 | | Jeremy Harold Sender 230224 635592266 | 55,000.00 | | 2,595,337.28 |
| 2/27 | | WT 2023022700011748 Truist Bank /Org=NEW Horizons Mental Health LLC Srf# 2023022700011748 Trn#2302270870027 Rfb# Nivedita Mathur | 75,000.00 | | |
| 2/27 | | WT Seq186733 Jeraimy S Petersen /Org= Srf# 0001719058115204 Trn#23022718673 Rfb# | 15,000.00 | | |
| 2/27 | | WT Seq201116 Johnny J Escamilla /Org= Srf# 0006075058604404 Trn#230227201116 Rfb# | 125,000.00 | | 2,810,337.28 |
| 2/28 | | WT Fed#09836 Jpmorgan Chase Ban /Org=Robert J O'Mahony OR Ali C O'Mahony Srf# 3423363059Es Trn#230228130792 Rfb# Bmg of 23/02/28 | 50,000.00 | | |
| 2/28 | | WT Fed#01578 PNC Bank, N.A. /Org=David Jeffrey Wicoff Srf# 232Sh46319M2589M Trn#230228189180 Rfb# 0205057188574100 | 25,000.00 | | |
| 2/28 | | WT Fed#01698 Firefighters First /Org=Colby Allen Jamar Srf# 20230228000042 Trn#230228229558 Rfb# | 55,000.00 | | |
| 2/28 | | Interest Payment | 231.88 | | 2,940,569.16 |
| | | **Ending balance on 2/28** | | | **2,940,569.16** |
| | | **Totals** | **$1,267,331.88** | **$2,120,979.00** | |

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

> Formatted: Centered

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 2/7 | | WT Fed#00654 USAA Fedl SA /Org=Korey E McAleese Jergins Srf# 0012302079913111 Trn#230207060830 Rfb# | 100,000.00 | | |
| 2/7 | | WT Fed#05812 Rogue Credit Union /Org=Scott E. Chadick Srf# 3232747750058455 Trn#230207112894 Rfb# | 55,000.00 | | 3,949,216.28 |
| 2/8 | | WT Fed#00047 Thread Bank /Org=Carroll Enterprises LLC Srf# Trn#230208159836 Rfb# | 100.00 | | 3,949,316.28 |
| 2/8 | | WT Fed#01112 Sikorsky Financial /Org=Edwin R. Garces Srf# 2211808060002264 Trn#230209095240 Rfb# | 147,000.00 | | |
| 2/9 | | WT Seq101653 Konomos Investments LLC /Org= Srf# 0006797040078703 Trn#230209101653 Rfb# | 45,000.00 | | |
| 2/9 | | Online Transfer to Day M Ref #Ib0Hnqrksv Savings Consultingwa | | 340,000.00 | 3,801,316.28 |
| 2/10 | | WT Fed#00049 American Express N /Org=Designs By Pierre Srf# OpF3550504415 Trn#230210131349 Rfb# 9230416754003475 | 55,000.00 | | |
| 2/10 | | WT Fed#07916 Bank of America, N /Ftr/Bnf=Dreams to Reality Inc Srf# 0066088041502613 Trn#230210172551 Rfb# | | 740,919.00 | |
| 2/10 | | WT Fed#07350 Zions Bancorporati /Ftr/Bnf=Wwkb LLC Srf# 0066088041403613 Trn#230210172906 Rfb# | | 340,000.00 | 2,775,397.28 |
| 2/14 | | WT Fed#00017 Fortis Private Ban /Org=Jeffrey D Switzer Srf# Trn#230214066663 Rfb# | 125,000.00 | | |
| 2/14 | | WT Fed#07330 Jpmorgan Chase Ban /Org=Coldcashindustries LLC Srf# 3565603044Es Trn#230214132667 Rfb# Dcd of 23/02/13 | 55,000.00 | | 2,955,397.28 |
| 2/15 | | WT Fed#00360 United Community B /Org=John Laforge Srf# 2023046012070 Trn#230215149062 Rfb# | 35,000.00 | | |
| 2/15 | | Online Transfer to Max K Day Business Checking xxxxxx2191 Ref #Ib0Hq6Rk9Il on 02/15/23 | | 200,000.00 | 2,790,397.28 |
| 2/16 | | Wire Trans Svc Charge - Sequence: 230216139885 Srf# Ow0000295S118200 Trn#230216139885 Rfb# Ow0000295S118200 | | 30.00 | |
| 2/16 | | WT Fed#05273 Thread Bank /Ftr/Bnf=WA Amazon Seller LLC Srf# Ow0000295S118200 Trn#230216139885 Rfb# Ow0000295S118200 | | 100,000.00 | 2,690,367.28 |
| 2/17 | | WT Fed#00924 Navy Federal Credi /Org=James Berry Srf# OpF1499847869 Trn#230217094122 Rfb# OpF1780047646 | | 55,000.00 | |
| 2/17 | | WT Fed#02927 Bank of America, N /Org=Best Smiles, LLC Srf# 2023021700401763 Trn#230217130286 Rfb# Rp4Sesct7 | | 45,000.00 | |
| 2/17 | | Wire Trans Svc Charge - Sequence: 230217185022 Srf# 0068560048707453 Trn#230217185022 Rfb# | | 30.00 | |
| 2/17 | | WT Fed#09170 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# 0068560048707453 Trn#230217185022 Rfb# | | 400,000.00 | 2,390,337.28 |
| 2/21 | | WT Seq#62563 Jacob Allen /Org= Srf# Ow0000296S032807 Trn#230221062563 Rfb# Ow0000296S032807 | | 25,000.00 | |
| 2/21 | | WT 202302210025480 Truist Bank /Org=Artful Framing Srf# 2023022100025480 Trn#230221210951 Rfb# 0D-20230221-1454 | | 55,000.00 | 2,470,337.28 |
| 2/22 | | Life Soldier LLC Transfer Wealth Assistants LLC | | 50,000.00 | 2,520,337.28 |

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

## Credits

**Electronic deposits/bank credits**

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/01 | 10,000.00 | WT Fed#01672 PNC Bank, N.A. /Org=David Jeffrey Wicoff Srf# 2331C4442D420B2A Trn#230301040779 Rfb# 0205125480365457 |
| | 03/01 | 5,000.00 | WT Fed#00736 Jpmorgan Chase Ban /Org=Dominic Camany Srf# 3069963060Es Trn#2303010016227 Rfb# Boh of 23/03/01 |
| | 03/01 | 15,000.00 | WT Fed#04680 Randolph-Brooks FC /Org=Jarrett T. Jecmenek Srf# 3140896810477858 Trn#230301074018 Rfb# |
| | 03/01 | 50,000.00 | WT Fed#06808 Jpmorgan Chase Ban /Org=Ayojoyecomm Ventures Srf# 3577803060Es Trn#230301074018 Rfb# |
| | 03/02 | 10,000.00 | WT Fed#00672 Oregon State Credi /Org=Tri Force Construction LLC Srf# Trn#230302106898 Rfb# |
| | 03/02 | 35,000.00 | WT Fed#08777 Jpmorgan Chase Ban /Org=Jarrett T Jecmenek Linda Marie Srf# 3424143061Es Trn#230302123010 Rfb# Boh of 23/03/02 |
| | 03/03 | 55,000.00 | WT Fed#06313 Jpmorgan Chase Ban /Org=Glenn L Gately OR Patricia A Gately Srf# 3441783062Es Trn#230303111747 Rfb# Dcd of 23/03/03 |
| | 03/03 | 5,000.00 | WT Fed#00272 Jpmorgan Chase Ban /Org=Jarrett T Jecmenek Linda Marie Srf# 3490493062Es Trn#230303126342 Rfb# Boh of 23/03/03 |
| | 03/03 | 100,000.00 | Online Transfer From Max K Day Business Checking xxxxxx2191 Ref #Ib0Hvqyv6Q on 03/03/23 |
| | 03/06 | 39.90 | Interest Payment |
| | 03/06 | 10,000.00 | Mark Ricigliano Sender 230306 637567124 |

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

*Electronic deposits/bank credits* (continued)

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/06 | 5,000.00 | WT Fed#02425 Capital One, NA /Org:Ayo Kolawole Srf# US230303941212 Trn#230306103450 Rfb# MMF7Jadmda1Y9Ptk |
| | 03/07 | 30,000.00 | WT Fed#08263 Jpmorgan Chase Ban /Org:Dominic Camany Srf# 3324873066Es Trn#230307096831 Rfb# Boh of 23/03/07 |
| | 03/07 | 55,000.00 | WT Fed#03515 Td Bank, NA /Org:Joel O Piggott Srf# 230307123357Xi00 Trn#230307105599 Rfb# Atvt-Cpphz9 |
| | 03/07 | 55,000.00 | WT Fed#00906 Synovus Bank /Org:Dustin Lynn Weber Srf# 230307144934Pj21 Trn#230307125613 Rfb# |
| | 03/07 | 45,000.00 | WT Fed#06762 The Golden 1 Credi /Org:Larry Moore Srf# 3211752610289949 Trn#230307157009 Rfb# |
| | 03/08 | 75,000.00 | WT Fed#00017 Red River Bank /Org:Redline USA Srf# P202303080046887 Trn#230308120543 Rfb# |
| | 03/09 | 55,000.00 | WT Fed#07712 Jpmorgan Chase Ban /Org:Rgz LLC DBA Island Life Pools and Srf# 3302743068Es Trn#230309121411 Rfb# Dcd of 23/03/09 |
| | 03/09 | 55,000.00 | WT Fed#00492 Catalyst Corporate /Org:Complex Community Fcu Srf# 230309131750H200 Trn#230309126669 Rfb# |
| | 03/09 | 75,000.00 | WT Fed#02554 Citizens Bank, NAT /Org:Paul Zlotnikoff Srf# 202303090008989 Trn#230309142839 Rfb# |
| | 03/09 | 55,000.00 | WT Fed#01510 Oregon State Credi /Org:Tri Force Construction LLC Srf# Trn#230309177380 Rfb# |
| | 03/10 | 55,000.00 | WT Fed#03559 Bank of America, N /Org:Thompson Products LLC Srf# 2023031000399726 Trn#230310124910 Rfb# 429329112 |
| | 03/13 | 55,000.00 | WT Fed#08606 1St Source Bank /Org:Tk Steel Inc Srf# 0712121280127371 Trn#230313078208 Rfb# |
| | 03/13 | 55,000.00 | WT Fed#01011 Cache Valley Bank /Org:Bill Fowler Enterprises LLC Srf# 202307211324726 Trn#230313122971 Rfb# |
| | 03/14 | 50,000.00 | WT Fed#02072 Jpmorgan Chase Ban /Org:Michael Kirkpatrick Srf# 3625243072Es Trn#230314017350 Rfb# Dcd of 23/03/13 |
| | 03/15 | 0.07 | Ramp Business CO Acctverify S301442 Wells Fargo Bank |
| | 03/15 | 0.09 | Ramp Business CO Acctverify S301443 Wells Fargo Bank |
| | 03/16 | 0.80 | Taxcite LLC Acctverify 025Yveaibbg6Leh Carroll - Wealth Assis |
| | 03/17 | 55,000.00 | WT Seq#18491 Gad Giladi Revocable Tr /Org:: Srf# Ow00003041698869 Trn#230317018491 Rfb# Ow00003041698869 |
| | 03/17 | 55,000.00 | WT Fed#00202 Boeing Employees C /Org:Katherine Gadsden Srf# 2023076005700 Trn#230317128431 Rfb# |
| | 03/22 | 75,000.00 | WT Fed#06543 National Financial /Org:1/David F Lynch Srf# 1010605081Fs Trn#230322105056 Rfb# Swf of 23/03/22 |
| | 03/23 | 55,000.00 | WT Fed#07487 Jpmorgan Chase Ban /Org:David F Shurtz OR Teresa L Shurtz Srf# 3213453082Es Trn#230323075157 Rfb# Ppl of 23/03/23 |
| | 03/23 | 125,000.00 | WT Fed#01093 Jpmorgan Chase Ban /Org:Nathanael W Byron OR Melony M Byron Srf# 3383763082Es Trn#230323132222 Rfb# Dcd of 23/03/23 |
| | 03/24 | 75,000.00 | WT Fed#04515 Jpmorgan Chase Ban /Org:Bowman Capital LLC Srf# 3392473083Es Trn#230324114818 Rfb# Dcd of 23/03/24 |
| | 03/24 | 55,000.00 | WT Fed#01401 Hometown Bank NA /Org:Patrick Dru Brents Srf# 5013 Trn#230324153585 Rfb# |
| | 03/24 | 45,000.00 | WT Fed#00410 Fulton Bank, NA /Org:Domenico Coppola Srf# 230324151823Bj11 Trn#230324163010 Rfb# |
| | 03/27 | 30,000.00 | WT Fed#02320 Capital One, NA /Org:Irmeen Ashraf Srf# US230327096090 Trn#230327109685 Rfb# Mmoowxf5Lfhq8Dni |
| | 03/27 | 55,000.00 | WT Seq173778 Parveen K McGhee /Org:: Srf# 0000483086221975 Trn#230327173778 Rfb# |

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

*Electronic deposits/bank credits* (continued)

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/27 | 125,000.00 | WT Fed#01704 American Riviera B /Org=Ai Management Solutions LLC Srf# 707437 Trn#230327182595 Rfb# |
| | 03/29 | 55,000.00 | WT Seq#88515 Abram Clark /Org= Srf# 0002245087380195 Trn#230329088515 Rfb# |
| | 03/29 | 55,000.00 | WT Seq113614 Jake J Brose /Org= Srf# 0006042087194195 Trn#230329113614 Rfb# |
| | 03/29 | 10,000.00 | WT Fed#00438 Jpmorgan Chase Ban /Org=David E Patterson Jr Srf# 3379453088Es Trn#230329127003 Rfb# Bpl of 23/03/29 |
| | 03/29 | 55,000.00 | WT Fed#01698 Comerica Bank /Org=Sheena Estelle Lovitos Wildenhaus O Srf# 230329014770 Trn#230329186185 Rfb# 230329014770 |
| | 03/30 | 55,000.00 | WT Fed#07308 Bank of America, N /Org=Sheree Brose Srf# 202303300501107 Trn#230330171118 Rfb# 431859834 |
| | 03/31 | 10,000.00 | WT Fed#01674 Jpmorgan Chase Ban /Org=Nick A Damelio OR Margie Damelio Srf# 3084963090Es Trn#230331028807 Rfb# Boh of 23/03/31 |
| | 03/31 | 34,000.00 | WT Fed#00511 National Financial /Org=1/Anthony P Nicosia Srf# 5448358090Fs Trn#230331053312 Rfb# Swf of 23/03/31 |
| | 03/31 | 75,000.00 | WT Fed#00894 Security Service F /Org=Eulalio Macias Srf# 3166 Trn#230331176962 Rfb# |
| | | **$2,114,040.86** | **Total electronic deposits/bank credits** |
| | | **$2,114,040.86** | **Total credits** |

## Debits

### Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/02 | 300,000.00 | WT Fed#08675 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# Ow00002998092995 Trn#230302177736 Rfb# Ow00002998092995 |
| | 03/06 | 15.00 | Wire Trans Svc Charge - Sequence: 230306103450 Srf# US230303941212 Trn#230306103450 Rfb# MMF7Jadmda1Y9Ptk |
| | 03/06 | 32.00 | Purchase authorized on 03/04 United 016983 800-932-2732 TX S303063616773386 Card 2693 |
| | 03/06 | 32.00 | Purchase authorized on 03/04 United 016983 800-932-2732 TX S303063616773386 Card 2693 |
| | 03/06 | 699.00 | Purchase authorized on 03/04 United 016247 800-932-2732 TX S303063616773386 Card 2693 |
| | 03/07 | 622.46 | Purchase authorized on 03/04 Wynn Las Vegas Hot Las Vegas NV S383063695025623 Card 2693 |
| | 03/07 | 622.46 | Purchase authorized on 03/04 Wynn Las Vegas Hot Las Vegas NV S383063695068258 Card 2693 |
| | 03/07 | 600,000.00 | WT Fed#06906 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# 0068555066308054 Trn#230307073544 Rfb# |
| | 03/08 | 6,500.00 | Withdrawal Made In A Branch/Store |
| | 03/09 | 100,000.00 | WT Fed#04809 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# 0077106673724644 Trn#230309151125 Rfb# |
| | 03/10 | 29.98 | Purchase authorized on 03/08 Linq Show Room Las Vegas NV S383068123895871 Card 2693 |
| | 03/13 | 24.45 | Purchase authorized on 03/09 Blue Moon Bar Las Vegas NV S303069044318906 Card 2693 |

- 80 -

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

**Electronic debits/bank debits** *(continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/13 | 23.17 | Purchase authorized on 03/09 Curb Svc Taxi Lv Y Queens NY S383069262156154 Card 2693 |
| | 03/13 | 22.79 | Purchase authorized on 03/10 Curb Svc Taxi Lv Y Queens NY S383069710202117 Card 2693 |
| | 03/13 | 89.00 | Purchase authorized on 03/11 United 016983 800-932-2732 TX S383071012242597 Card 2693 |
| | 03/13 | 667.62 | Purchase authorized on 03/11 Serenity Bar Linq Las Vegas NV P000000677836003 Card 2693 |
| | 03/13 | 217.84 | Purchase authorized on 03/11 Serenity Bar Linq Las Vegas NV P000000171096336 Card 2693 |
| | 03/13 | 29.70 | Purchase authorized on 03/11 Linq Wine & Spirit Las Vegas NV S463071237469494 Card 2693 |
| | 03/14 | 30.99 | Purchase authorized on 03/13 Curb Svc Taxi Lv N Queens NY S463072690971868 Card 2693 |
| | 03/14 | 251,450.00 | WT Fed#00834 Thread Bank /Ftr/Bnf=Growth Accounts LLC Srf# 0006457072818294 Trn#2303141110536 Rfb# |
| | 03/14 | 250,000.00 | WT Fed#01602 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# 0006457072687243 Trn#2303141110412 Rfb# |
| | 03/15 | 23.24 | Purchase authorized on 03/13 Whittleseablue Las Vegas NV S303072713927317 Card 2693 |
| | 03/15 | 20.05 | Purchase authorized on 03/13 Desert Cab Las Vegas NV S383072791220833 Card 2693 |
| | 03/15 | 30.03 | Purchase authorized on 03/14 Curb Svc Taxi Lv N Queens NY S583073640846102 Card 2693 |
| | 03/15 | 0.16 < | Business to Business ACH Debit - Ramp Business CO Acctverify S301441 Wells Fargo Bank |
| | 03/16 | 8.68 | Purchase authorized on 03/14 Espresso Las Vegas NV S583073614404817 Card 2693 |
| | 03/16 | 0.80 < | Business to Business ACH Debit - Taxcite LLC Acctverify 025Yveaibbg6Leh Carroll - Wealth Assis |
| | 03/16 | 25,000.00 < | Business to Business ACH Debit - Taxcite LLC Bill.Com 025Yxzksdfg5W6L Taxcite LLC - Inv #3384 |
| | 03/17 | 150,000.00 < | Business to Business ACH Debit - Ramp Statement Kp79Bmzpuv 230316 C1942893 NTE*ZZZ*Payment S30356B\ |
| | 03/20 | 9,421.81 | Purchase authorized on 03/15 Wynn Las Vegas Hot Las Vegas NV S583074520341257 Card 2693 |
| | 03/21 | 350,000.00 | WT Fed#01390 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# Ow00003051825470 Trn#230321032599 Rfb# Ow00003051825470 |
| | 03/22 | 208,000.00 | WT Seq#87443 Proficient Supply LLC /Bnf=Proficient Supply LLC Srf# Ow00003057447860 Trn#230322087443 Rfb# Ow00003057447860 |
| | 03/22 | 20,000.00 | WT Fed#00480 First Horizon Bank /Ftr/Bnf=The Feldman Law Firm LLC Srf# Ow00003057722707 Trn#230322115761 Rfb# Ow00003057722707 |
| | 03/24 | 1,945.00 | Purchase authorized on 03/23 Norris Law Group P 801-9321238 UT S463082785688295 Card 2693 |
| | 03/24 | 250,000.00 | WT Fed#07423 Thread Bank /Ftr/Bnf=Carroll Enterprises LLC Srf# Ow00003063331654 Trn#230324079720 Rfb# Ow00003063331654 |

**Electronic debits/bank debits** *(continued)*

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/24 | 155,577.72 < | Business to Business ACH Debit - Ramp Statement Odbcvyqlz2 230323 C1996092 NTE*ZZZ*Payment S308997\ |
| | 03/31 | 50,000.00 | Online Transfer to Max K Day Ref #Ib0J4Zy7Hc Business Checking Productpurchase |
| | | **$2,731,135.95** | **Total electronic debits/bank debits** |
| | | **$2,731,135.95** | **Total debits** |

- 81 -

**Formatted:** Font: 14 pt

**Formatted:** Normal, No bullets or numbering

**Formatted:** Normal, Space After: 0 pt, Line spacing: single, No bullets or numbering

**Commented [NB2]:** Add more specifics and dates – see letter from Wells Fargo

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Formatted:** Font: 14 pt

157.

158.   ~~Upon information and belief, Wells Fargo knew that the accounts mentioned above – and other accounts associated with Wealth Assistants and its principals – were being used to facilitate a fraudulent scheme for the following reasons, among others:~~

234.   The Precision Trading Group bank accounts' activity strongly exhibited most of the red flags that banks are required to search for and review pursuant to the FFIEC BSA/AML Examination Manual discussed above.

235.   Upon information and belief, Wells Fargo did manually review activity in the Precision Trading Group Accounts because of those red flags, and reviewing that activity caused Wells Fargo to know that the accounts were fraudulently concealing assets from Wealth Assistants' creditors.

236.   On July 12, 2023, Wealth Assistants initiated an electronic ACH payment for $18,640 to a Wells Fargo bank account called "Wise US Inc" (a payment processor sponsored by Wells Fargo). The summary of the transaction stated "Wise US Inc. | Payroll." On July 18, 2023, Wise US Inc. rejected the $18,640 electronic payment for an unstated reason.

237.

238.   Likewise, on July 21, 2023, the Wells Fargo bank account called "Wise US Inc." rejected a payment of $6,003.52 that Wealth Assistants attempted to send it for an unstated reason.

239.   Wells Fargo received numerous ~~chargeback~~wire-reversal requests—which contained descriptions of the Wealth Assistants fraudulent scheme—

from Wealth Assistants' clients. Those requests requested reversals of payments the clients had made to the accounts listed above. Wells Fargo failed to respond to many of those ~~chargeback~~ wire reversal requests or unduly delayed responding to them. For example, on October 12, 2023, a bank called Navy Federal sent Wells Fargo an urgent request to recall a wire transfer to the account at Wells Fargo ending in -2209 because Navy Federal's client reported that Wealth Assistants was a scam. Navy Federal followed up with Wells Fargo regarding its urgent request on October 13, October 20, and October 23. On October 26, 2023, Wells Fargo finally responded to Navy Federal by stating that it could not reverse the wire transfer because there were no funds left in the Wealth Assistants account at Wells Fargo (notably, Wells Fargo did not deny that Wealth Assistants was a scam).

240. But the only reason that there were no significant funds left in the -2209 account is because, on October 13, 2023, the account had transferred $630,000 to the law firm Lloyd Mousilli with a wire memorandum stating "WA client setup fee funds."

~~7.~~ Incredibly, Wells Fargo continued operating many of the other Precision Trading Group accounts, which Wealth Assistants continued to use to conceal the proceeds of its fraudulent scheme. For example, when Wells Fargo told Navy Federal that there were no assets left in the -2209 Precision Trading Group account, there were still more than $100,000 in the Precision Trading

Group account with an account number ending in -7394, and Wells Fargo continued operating that account.

241.

8. Many of Wells Fargo's own clients were themselves clients of Wealth Assistants and asked Wells Fargo to reverse wire transfers ~~or chargebacks~~ they had made to the ~~Wealth Assistants accounts listed above~~ 2209 account. Wells Fargo spoke to those clients about Wealth Assistants' fraudulent activities but still failed to reverse the wire transfers ~~or chargebacks~~, and still failed to stop operating the bank accounts that were being used to further Wealth Assistants' fraudulent activity.

242.

~~a.~~ 243.    Counsel for Plaintiffs sent Wells Fargo multiple letters describing Wealth Assistants' fraudulent scheme, and informing Wells Fargo that Precision Trading was part of the fraudulent scheme, from January through May of 2024.

~~b. Upon information and belief, Wells Fargo's agent—Total Apps—was corresponding with Wealth Assistants about concealing the fraudulent proceeds of the accounts at issue.~~

~~c. Bank of America froze Wealth Assistants' accounts in 2022. That information was publicly available because Wealth Assistants filed a complaint against Bank of America when the accounts were frozen.~~

- 84 -

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

d. Members of the Day family had previously been the subjects of an adversarial action brought by a bankruptcy trustee alleging that they had perpetrated a fraudulent scheme. Accordingly, Wells Fargo knew that the accounts were high risk and needed to be subject to heightened scrutiny.

2.244.    Moreover, even when Wells Fargo received an asset freeze order from this Court, Wells Fargo refused to take any immediate action to ensure that it did not participate in a violation of the court order or in further fraudulent activity in the accounts at issue. It instead stated "the bank will not be enjoining or freezing any of the accounts of the jurisdictional defendants" as shown below:

Dear Mr. Banks:

Please know that Wells Fargo Bank, N.A. has received the temporary restraining order that you forwarded this afternoon. The bank appreciates receiving the copy of the order. I have reviewed its terms. The order is directed only at specific defendants within the jurisdiction of California (which the court has deemed the "jurisdictional defendants") and not Wells Fargo or any other bank. The defendants are enjoined from dispersing or removing funds with the monthly exception that each human may draw $9000 per month for living expenses.

The order does not direct Wells Fargo to take any action or otherwise to monitor the accounts. The bank does not have a means to freeze an account and monitor a withdrawal limit of $9000 per month per human.

Please let us know the outcome of the April 19, 2024, hearing on the preliminary injunction. In the meantime, the bank will not be enjoining or freezing any of the accounts of the jurisdictional defendants. The court has not ordered the bank to take that action.

David E. Pinch
Senior Counsel
Wells Fargo Legal Department
david.pinch@wellsfargo.com

### vii. First Citizens Bank's Knowledge Of And Substantial Participation In The Payment Processing Strategy

245. First Citizens Bank has operated bank accounts held by an entity called "Providence Oak Properties," since at least as early as May 1, 2022. Those accounts had account numbers ending in -1286, -3241, and -3348. The address for all of those accounts was Max K. Day's home address.

246. Providence Oak Properties held itself out to the public as a construction company owned and operated by an individual named Kurt Odom.

247.    However, Providence Oak Properties was, in reality, in the business of using its bank account at First Citizens Bank to help criminals in money laundering activities.

248.    Specifically, Providence Oak Properties used its First Citizens bank account to accept illegally procured money into its own custody. First Citizens Bank did not keep records of many of the deposits into the account, which blatantly violated the bank's most basic record keeping, BSA, and anti money laundering obligations.

249.    For example, from January through August of 2023, more than a million dollars per month flowed into the Providence Oak Properties account ending in -1286 via transactions that the account statements dubbed "Merchant Service Merch Dep *********9106," "Merchant Service Merch Dep *********5805," or "Merchant Service Merch Dep *********2370." First Citizens Bank does not have records for many of those transactions. It knows that the -9106, -5805, and -2370 accounts are not First Citizens Bank accounts, but First Citizens Bank cannot tell what the full account number is or what bank custodies those accounts.

250.    After receiving that money from unknown sources, First Citizens Bank used wire transfers to transfer that money to a different bank account to help conceal its origins. Thus, Providence Oak Properties served as one of the "intermediaries" in Wealth Assistants' Payment Processing Strategy; it

received funds for the benefit of Wealth Assistants only to transfer those funds to other accounts controlled by Wealth Assistants.

251.    Incredibly, almost all of Providence Oak Properties' outgoing wire transfers since May of 2022 have included in the wire memorandums a sentence similar to: **"Invoice amount of [dollar amount] paid by [name of beneficiary] on [date]. Funds of [dollar amount] returned after fees were removed as agreed upon."**

252.    Providence Oak Properties made no attempt to conceal its money laundering activities from First Citizens—and instead bluntly described those activities in the wire memorandums—because First Citizens was aware of the money laundering activities and chose to assist with them.

253.    First Citizens Bank knew that the Providence Oak Properties bank account was being used to launder and conceal illegally procured money.

254.    Wealth Assistants and its principals referred to Providence Oak Properties, euphemistically, as a "payment processing" business (even though Providence Oak Properties had no payment processing license and instead served as an illegal intermediary in money laundering activities).

*    *    *

255.    As discussed above, in the beginning of 2023, Wealth Assistants was experiencing difficulties related to its Payment Processing Strategy, in part because Bank of America had recently frozen some of Wealth Assistants' bank

~~FIRST~~ SECOND AMENDED COMPLAINT — CLASS ACTION

accounts. As a result, Wealth Assistants could not accept payments from many individuals that Wealth Assistants had convinced to purchase the business opportunity that Wealth Assistants was offering.

256.    To help fix that problem, Wealth Assistants purchased Providence Oak Properties from Kurt Odom around June of 2023, and Wealth Assistants then used Providence Oak Properties to alleviate the bottlenecks in Wealth Assistants' Payment Processing Strategy.

257.    Wealth Assistants used the Providence Oak Properties bank account as an intermediary in Wealth Assistants' Payment Processing Strategy. That is, Wealth Assistants would transfer money to Providence Oak Properties, and then transfer the money from Providence Oak Properties to Wealth Assistants' other accounts.

**H. The Human Defendants All Conspired To Carry Out The Fraud Described Above**

~~G.~~

~~3.~~258.    Defendant **Ryan Carroll** is the Chief Executive Officer of Wealth Assistants. He participated in the conspiracy described above in the following ways:

    a. Ryan Carroll claims that he founded Wealth Assistants and led the company's growth.

    b. Ryan Carroll used videos of himself to recruit new clients for Wealth Assistants. Those videos included intentionally false statements. For example, he stated in those recorded videos that Wealth Assistants'

stores could be expected to generate more than $10,000 in profits per month.

c. Ryan Carroll fraudulently transferred money from Wealth Assistants to himself and used that money for personal gain. For example, Carroll stated on social media that he had purchased a Lamborghini.

d. Ryan Carroll is the founder and owner of **Defendant Yax Ecommerce LLC**, which did business as "Wealth Assistants LLC."

e. Carroll is also the owner of **WA Amazon Seller LLC** and the manager of the North Carolina branch of Defendant **WA Distribution LLC**, both of which collected payments from Wealth Assistants' victims on behalf of Wealth Assistants.

f. Carroll also created the company Daddy Jules LLC which, upon information and belief, serves the sole purpose of concealing Ryan Carroll's personal assets.

g. Carroll is also the owner of **Dreams to Reality LLC**, which is an owner of Defendant Yax Ecommerce LLC. Upon information and belief, the sole purpose of Dreams to Reality LLC is to serve as an alter ego for Ryan Carroll to make it more difficult for victims of Wealth Assistants to collect judgments from him.

4.259.  **Max K. Day** is an owner of Wealth Assistants. He participated in the conspiracy described above in the following ways:

a. Max K. Day formed and managed Defendant **Precision Trading Group, LLC**. According to Precision Trading Group's corporate registration, it operated under the "assumed names" of "Wealth Assistants LLC," "WA Distribution, LLC," "WA Brand Management, LLC," and "WA Amazon Seller, LLC" beginning on December 14, 2022. Precision Trading accepted payments on behalf of Wealth Assistants from many Wealth Assistants clients.

b. Max K. Day is the Director of Defendant **Providence Oak Properties, LLC.** Providence Oak Properties, LLC accepted payments on behalf of Wealth Assistants from many of Wealth Assistants' clients. A representative of Wealth Assistants stated, "Providence Oak Properties is a part of Wealth Assistants."

c. Ryan Carroll described Max K. Day as his "mentor" and "business partner" in starting and managing Wealth Assistants.

d. Max K. Day represented to one or more of Wealth Assistants' clients that they would receive a refund on their store. When he made that representation to Wealth Assistants' client Dominic Camany in September of 2023, Max K. Day knew that it was not true, and in fact Camany never received a refund.

e. Max K. Day aided and abetted the fraudulent scheme at issue by drawing on his past experiences in fraudulently transferring assets. For example,

in 1992, Max K. Day agreed to injunctive relief after being charged by the Federal Trade Commission with operating a fraudulent credit card scheme. Likewise, in 2006, Max K. Day and his family ran a fraudulent enterprise called "Today's Destiny." Today's Destiny—much like the fraudulent scheme at issue in this case—lured victims by promising to make them rich if they paid for the business opportunity Today's Destiny was offering. Today's Destiny took money from its victims and did not provide the promised services. The Days then transferred the money collected by Today's Destiny to themselves, and they had Today's Destiny declare bankruptcy. The United States Trustee for Today's Destiny brought an adversary complaint against the Days for their fraudulent transfers.

**f.** Max K. Day also created each of the following entities, which are defendants in this case: **MKD Investment Advisor, LLC; MKD Family Beneficiary, LLC; MKD Family Private Management Company, LLC; Max Day Consulting, LLC; HouTex Farm Equity Partners LLC; Business Financial Solutions Advisory LLC; and Evo Maxx LLC.** Upon information and belief, Max K. Day created those entities for the sole purpose of concealing his assets, including concealing proceeds of the fraudulent scheme described above.

5.260.  **Defendant Max O. Day** was the Chief Growth Officer at Wealth Assistants. He participated in the conspiracy described above in the following ways:

a.  As discussed above, Wealth Assistants' "payment processors" recruited intermediaries to accepted payments on behalf of Wealth Assistants' clients and then payaid that money to other bank accounts associated with Wealth Assistants or its principals. Upon information and belief, Wealth Assistants used "payment processors" Wealth Assistants used those intermediaries to make it more difficult for its victims to track where their money had gone once the victims realized they had been defrauded. Max O. Day asked an individual named Zach Henson of Mint Solutions to serve as a "payment processor"n intermediary for Wealth Assistants.

b.  Max O. Day often stated that online stores managed by Wealth Assistants would likely earn tens of thousands of dollars per month. Many of Wealth Assistants' clients relied on Max O. Day's statements when deciding to purchase the business opportunity Wealth Assistants was selling. For example, in or around August of 2023, Max O. Day helped convince an individual named Craig Dillehay to purchase the business opportunity Wealth Assistants was offering, in part by telling Dillehay that stores Wealth Assistants was managing were very

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at:  0.5"

profitable. Max O. Day also helped convince an individual named Korey McAleesejergins to purchase the business opportunity Wealth Assistants was offering by making similar statements.

c.  Like his uncle Max K. Day, Max O. Day brought to Wealth Assistants his experience with similar fraudulent schemes and fraudulent transfers. He, like his uncle, helped perpetrate the "Today's Destiny" fraud described above.

d.  Max O. Day created the entity Defendant **Yax IP and Management LLC**. Upon information and belief, that entity was an alter ego for the other Wealth Assistants Entity Defendants, and it served no purpose other than helping Defendants conceal the proceeds of the fraudulent scheme from Defendants' creditors.

6.261.   **Defendant Michael Day** was another owner of Wealth Assistants and provided financing for the company knowing that it was a fraudulent scheme. He also made false statements to many of Wealth Assistants' clients that they relied upon when deciding to purchase the business opportunities Wealth Assistants offered. For example, on October 12, 2022, Michael Day told Wealth Assistants' former client Haider Istanbouli, "we have developed a 72 point SOP protocol that virtually eliminates any possibility for deactivations or suspensions," when in fact Michael Day knew that Amazon stores that Wealth Assistants set up were frequently deactivated or suspended for not complying

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at:  0.5"

with Amazon's policies. Moreover, Michael Day co-owns **WWKB LLC**, which is an owner of Yax Ecommerce LLC. Michael Day was also one of the perpetrators of the Today's Destiny fraud described above.

7.262.    Defendant **Jared Day** was another Wealth Assistants employee who intentionally made false statements to many of Wealth Assistants' clients. For example, he told Wealth Assistants' former clients Afshin Salehi and Michael Whitten that they would likely be earning more than $10,000 in profits per month one year after they purchased the business opportunity Wealth Assistants was offering. He made similar statements to Isabel Ramos. Moreover, like the other Defendants who are members of the Day family, Jared Day was a central perpetrator of the Today's Destiny fraud, and he used his past experience in perpetrating frauds to assist with the Wealth Assistants fraudulent scheme.

8.263.    Defendant **Matthew Crouch** was the President of Wealth Assistants beginning sometime in 2022 and continuing until October of 2023. He participated in the conspiracy described above in the following ways:

    a.e.    Crouch told many of Wealth Assistants' clients that Wealth Assistants was a prudent investment and that most of Wealth Assistants' clients were very satisfied with their investments.

    b.f.    Crouch guaranteed Wealth Assistants' former clients that they would be able to exercise their buyback guarantees.

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

e.g.    Crouch told many of Wealth Assistants' clients that Wealth Assistants would supply their stores with inventory if the clients paid the invoices that Wealth Assistants had sent them.

9.264.    Defendant Christine Carroll served as Wealth Assistants' Finance Manager. Upon information and belief, she had access to Wealth Assistants' bank accounts, and she initiated many fraudulent transfers from the Wealth Assistants Entity Defendants. Upon information and belief, she was also in charge of maintaining Wealth Assistants' accounting records, and creating and sending invoices. Upon information and belief, she also monitored Wealth Assistants financial accounts and records to help ensure that the assets were conealedconcealed from Wealth Assistants' creditors and that the accounts were not drawing scrutiny from government regulators. She performed those tasks knowing that Wealth Assistants was operating the fraudulent scheme described above.

10.265.    Defendant **Troy Marchand** is the owner of Quantum Ecommerce. He has directed Quantum Ecommerce's conduct described above and aided in that conduct. Upon information and belief, he is also the sole control person of Quantum Ecommerce.

11.266.    Marchand is also the owner and director of all of the following entities, all of which are alter egos of Quantum Ecommerce: Quantum Health, LLC; Quantum Staffing, LLC; Quantum Distribution, LLC; Quantum Ecommerce,

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

LLC; Quantum Ecom, LLC; Quantum Capital Group, LLC; and Quantum Marketing, LLC.

12.267.   In 2021, Marchand was permanently barred from serving as a stockbroker or investment advisor after he settled charges brought by the Securities and Exchange Commission alleging that he defrauded investors.

13.268.   Defendant **Bonnie Nichols** is a co-owner of Wholesale Universe. Bonnie Nichols is Wholesale Universe's sole control person. She has directed Wholesale Universe's conduct described above and aided in that conduct.

14.269.   Defendant **Travis Marker** is the owner and control person of Marker Law and Parlay Law Group. He directed those entities conduct, as described above.

15.270.   Defendant **Rey Pasinli** is the owner and control person of Total-Apps. He directed that entity's conduct, as described above.

## CLASS ACTION ALLEGATIONS

16.271.   Plaintiffs bring this class action pursuant to: (1) Fed. R. Civ. P. 23(a), and (2) either Rule 23(b)(1) (which allows a class to be certified only if adjudicating the matters individually would create a risk of inconsistent adjudications or adjudications that impede other class members' rights) or, alternatively, Rule 23(b)(3) (which allows a class to be certified only if issues common to the class predominate over individualized issues and a class method of adjudication is superior to other available methods).

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

17.272.  **Class Definition:** Plaintiffs bring an action on behalf of a proposed class of all persons who:

a.h.      purchased services relating to the setup or management of an online store from the Wealth Assistants Entity Defendants between June of 2021 and November of 2023;

b.i. did not make a profit on their purchase of that business opportunity; and

c.j. have never been owners, employees, legal representatives, or successors of the Wealth Assistants Entity Defendants.

18.273.  **Numerosity and Superiority:** More than 600 individuals fall within the proposed Class Definition. As a result, a class action is superior to other methods of adjudicating the claims of the putative class members; litigating their claims individually would be impractical.

19.274.  **Commonality and Predominance:**  The issues common to the class—which predominate over issues not common to the class—include:

a.k.      whether Defendants agreed with each other to either (1) operate Wealth Assistants to take assets from Plaintiffs based on false representations, or (2) conceal the assets that Wealth Assistants illegally procured to the detriment of Wealth Assistants' creditors;

b.l. whether Wealth Assistants included in its marketing materials—which , upon information and belief, were shared with nearly all of Wealth Assistants' clients to induce them to purchase the business opportunity

Wealth Assistants was offering—statements that were not true, or omitted to state material facts about that business opportunity necessary to make statements made not misleading;

m. whether those misstatements or omissions were material;

n. whether Defendants knew or should have known that those statements were not true;

o. whether those misrepresentations and omissions—such as the representation that the business opportunities Wealth Assistants was offering were profitable—were necessarily relied upon by any individual who purchased the business opportunity Wealth Assistants was offering;

p. whether the Alter Ego Defendants are their owners' alter egos;

q. whether the Wealth Assistants Entity Defendants and Proficient Supply LLC are each others' alter egos;

r. whether the Wealth Assistants Entity Defendants transferred money to or for the benefit of others without receiving a reasonably equivalent value in exchange and, if so, to whom Wealth Assistants made those transfers.

275. **Typicality:** Like all of the proposed class members, Plaintiffs seek to recover the financial losses they suffered because of Wealth Assistants' misrepresentations regarding the business opportunities sold to them and Defendants' subsequent concealment of assets.

21.276.  **Adequacy of Representation:** Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of other class members.

22.277.  Nico Banks and Richard Nervig are competent and experienced attorneys representing Plaintiffs.

23.278.  **Risk of Inconsistent Or Impeding Adjudications:** Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for at least one party opposing the class.

24.279.  Moreover, adjudications with respect to individual class members would, as a practical matter, substantially impair the ability of other members to protect their interests because of the limited assets that may be available to remedy harms done to Plaintiffs in this case.

**CAUSES OF ACTION**

**COUNT ONE**

**CIVIL CONSPIRACY TO DEFRAUD PLAINTIFFS AND CONCEAL ASSETS**

**(AGAINST ALL DEFENDANTS)**

25.280.  Plaintiffs incorporate by reference all allegations above.

26.281.  The elements of fraud are a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance, and resulting damage.

- 100 -

27.282.   To establish the element of conspiracy, a plaintiff must show (1) formation and operation of the conspiracy; (2) wrongful act or acts done pursuant thereto; and (3) resulting damage.

28.283.   All defendants except Bank of America and First Citizens BancShares~~All Defendants conspired, and agreed among each other, to make misrepresentations to Plaintiffs to entice them to purchase the services of Wealth Assistants~~ conspired to misrepresent business opportunities to Plaintiffs in an effort to induce Plaintiffs to send those defendants money pursuant to false pretenses.

29.284.   Defendants overtly acted in furtherance of that conspiracy.

30.285.   Defendants knew of the falsity of the misrepresentations to Plaintiffs.

31.286.   Plaintiffs relied on those misrepresentations when purchasing services or goods from Wealth Assistants.

32.287.   Moreover, all Defendants conspired to conceal the assets obtained via the above-mentioned fraudulent scheme from Wealth Assistants' creditors. They did so, in part, by ~~Defendants~~ ~~agreed to t~~ransferring assets ~~from the~~ between different bank accounts held by the Wealth Assistants ~~Entiti~~Entity Defendants, Proficient Supply LLC, or the Quantum-Wholesale Partnerships to the others when the recipients of the transfers did not provide Wealth Assistants anything of comparable value in exchange.

33.288.   Defendants agreed with each other to make the transfers in order to prevent Wealth Assistants' current and future creditors, including Plaintiffs, from collecting those assets.

34.289.   When making that agreement to transfer assets, Defendants believed or reasonably should have believedknew that the Wealth Assistants Entity Defendants would incur had debts beyond their ability to pay as they became due.

35.290.   Defendants did in fact transfer funds from Wealth Assistants in the manner described above, directly or indirectly.

36.291.   The transfers harmed Plaintiffs, in part because the transfers caused Wealth Assistants to be undercapitalized and ultimately to go out of business, rendering it unable to pay any judgment that may be entered against it.

37.292.   Plaintiffs suffered damages as a result of the acts performed pursuant to the conspiracy.

## COUNT TWO

### AIDING AND ABETTING A FRAUD

### (AGAINST ALL DEFENDANTS)

38.293.   Plaintiffs incorporate by reference all allegations above.

39.294.   Defendants had knowledge that the Wealth Assistants Entity Defendants were engaged in the fraudulent scheme described above.

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at:  0.5"

40.295.   Defendants substantially assisted in that fraudulent scheme, either by assisting in the making of fraudulent misrepresentations or assisting in the concealment of assets.

**COUNT THREE**

**FRAUDULENTLY TRANSFER OF ASSETS**

**(AGAINST THE ALTER EGO DEFENDANTS, THE QUANTUM-WHOLESALE PARTNERSHIP, BONNIE NICHOLS, AND TROY MARCHAND — COLLECTIVELY, THE "RECIPIENT DEFENDANTS")**

1.296.   Plaintiffs incorporate by reference all allegations above.

2.297.   Upon information and belief, the Recipient Defendants received payments from the other Defendants.

3.298.   Upon information and belief, the non-Recipient Defendants transferred assets to the Recipient Defendants when the non-Recipient Defendants knew that they were insolvent.

4.299.   The non-Recipient Defendants made those transfers with the intent to hinder, delay or defraud Plaintiffs.

300.   Those transfers by the non-Recipient Defendants were a substantial factor in rendering Plaintiffs unable to collect upon debts that Wealth Assistants owes them.

**COUNT FOUR**

**AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY**

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

**(AGAINST WELLS FARGO BANK, N.A.; BANK OF AMERICA; AND FIRST CITIZENS BANK)**

301.     Plaintiffs incorporate by reference all allegations above.

302.     At all relevant times, Wealth Assistants owed a fiduciary duty to Plaintiffs because it sold them a business opportunity that Wealth Assistants purported to have expertise in, and Wealth Assistants understood that Plaintiffs did not have expertise in the business opportunity. The fiduciary duties included the duty to act in Plaintiffs' best interests.

303.     Wealth Assistants breached its fiduciary duties to Plaintiffs by failing to act in their best interests. For example, Wealth Assistants failed to purchase inventory for Plaintiffs stores, market the stores, or—in some cases—set up the stores in the first place, and Wealth Assistants instead fraudulently transferred Plaintiffs' investments to Wealth Assistants' principals.

304.     Moreover, when a corporation is insolvent or nearing insolvency, the corporation owes fiduciary duties to its creditors to properly wind down the corporation.

305.     Wealth Assistants also breached its fiduciary duties to Plaintiffs—who were its creditors—by failing to properly wind itself down. In particular, while it knew it was insolvent, Wealth Assistants made payments to its principals instead of preserving its assets for payments to its creditors, including Plaintiffs.

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

306.    Wells Fargo Bank, N.A., Bank of America, and First Citizens Bank knowingly helped Wealth Assistants breach its fiduciary duty to Plaintiffs by helping Wealth Assistants transfer Plaintiffs' investments to Wealth Assistants' principals.

5.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Award compensatory damages to Plaintiffs in the amount of $57,000,000, for which all Defendants are jointly and severally liable;

B. Award attorneys' fees and costs to Plaintiffs in an amount to be determined at trial;

C. Enjoin Defendants from fraudulently transferring assets;

D. Grant to Plaintiffs whatever other relief is just and proper.

**Jury Trial Demanded**

Dated: October 31, 2024 DATED: October 14, 2024

/s/Nico Banks
Nico Banks, Esq.
Banks Law Office
Bar No. 344705
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002

Richard A. Nervig
Richard A Nervig, P.C.
Bar No. 226449
Tel.: 760-451-2300
richard@nerviglaw.com
501 Broadway, Suite 800
San Diego, CA 92101

*Attorneys for Plaintiffs*

FIRST SECOND AMENDED COMPLAINT — CLASS ACTION

**Formatted:** Left, Space After: 8 pt, Line spacing: Multiple 1.08 li