Nico Banks (CA SBN:344705)
**BANKS LAW OFFICE**
712 H St NE, Unit #8571
Washington, DC 20002
Tel.: 971-678-0036
Email: nico@bankslawoffice.com

Richard A. Nervig (CA SBN:226449)
**RICHARD A. NERVIG, P.C.**
501 West Broadway, Suite 800
San Diego, CA 92101
Phone: 760-451-2300
Email: richard@nerviglaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID HOUGH; *et al.* | Case No.: 2:24-cv-02886-WLH-SK |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO JURISDICTIONAL DEFENDANTS' MOTION TO RELEASE FUNDS** |
| vs. | |
| RYAN CARROLL; *et al.* | Presiding Judge: Hon. Wesley L. Hsu |
| Defendants. | Hearing Time: December 13, 2024, 1:30 p.m |
| | Hearing Location: First Street Courthouse, 350 W, 1st Street, Courtroom 9B, 9th Floor, Los Angeles, California 90012 |
| | Trial Date: N/A |

# PLAINTIFFS' OPPOSITION TO JURISDICTIONAL DEFENDANTS' MOTION TO RELEASE FUNDS

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ - 3 -

**LEGAL STANDARD** .......................................................................................... - 6 -

**ARGUMENT** ........................................................................................................ - 8 -

    **I.    The Court Has Previously Recognized The Merits Of Plaintiffs' Claims And The High Likelihood That Defendants Will Dissipate Assets** ................................................ - 8 -

    **II.    Jurisdictional Defendants Continue To Disobey The Court's Asset Disclosure Order And Limitations On Ordinary Personal Expenditures** .......................................... - 10 -

    **III.    Jurisdictional Defendants Breach Their Fiduciary Duty To Their Creditors When They Spend Wealth Assistants' Remaining Assets On Attorneys' Fees For Jurisdictional Defendants' Own Benefit** ........................................................................................ - 14 -

    **IV.    Jurisdictional Defendants Failed To Pay Fees That The Court Ordered Them To Pay To Plaintiffs' Attorneys And The American Arbitration Association** ...................... - 17 -

    **V.    Jurisdictional Defendants Refused Plaintiffs' Offer To Jointly Move The Court To Stay Related Matters And Refused To Specify The Amount They Sought To Spend** ..... - 19 -

    **VI.    Jurisdictional Defendants Have Offered No Details About Why It Is Necessary To Obtain Separate Counsel** ....................................................................................... - 20 -

    **VII.    The Court Limited Jurisdictional Defendants To Spending $10,000 Per Month On Attorneys' Fees** ................................................................................................... - 21 -

**CONCLUSION** ................................................................................................... - 22 -

# INTRODUCTION

The uncontradicted evidence in this case has shown that Jurisdictional Defendants operated a fraudulent enterprise that stole approximately $57 million from Plaintiffs and members of the putative class since 2022. According to Jurisdictional Defendants,[1] almost all of that money has already disappeared; they have collectively disclosed less than $500,000 of cash that is controlled by them or their fraudulent enterprise (excluding the attorney-fee fund which, as discussed below, seems to have been exhausted).

Yet, Jurisdictional Defendants already have permission to spend—collectively—$36,000 per month on personal expenditures and $10,000 per month on attorneys' fees. That permission alone would be enough to exhaust what they have said remains of the money they stole from Plaintiffs. Nonetheless, Jurisdictional Defendants now ask for a blank check to spend additional money on attorneys' fees in related matters, as well as "accounts payable" to attorneys for unspecified amounts. Granting the request would likely enable Jurisdictional Defendants to immediately spend their currently identified funds, and if Plaintiffs find the other money stolen

---

[1] The defendants who filed the motion, who refer to themselves as "Jurisdictional Defendants," include Precision Trading Group, LLC and WA Distribution LLC. There may be some confusion about which entities constitute "Jurisdictional Defendants." In particular, the Court found that Plaintiffs had not shown sufficient evidence that the Court had personal jurisdiction over Precision Trading Group and WA Distribution. (ECF 49). However, those defendants later moved to compel arbitration, which the Court granted in part, which likely subjects those defendants to the Court's jurisdiction. (ECF 127). As a practical matter, it should be of no consequence whether Precision Trading Group and WA Distribution are subject to the Court's personal jurisdiction because those entities are entirely owned and controlled by the other Jurisdictional Defendants.

from them before they obtain a judgment in this case, Jurisdictional Defendants would be able to quickly spend that on their own attorneys' fees too.

Plaintiffs suggested to Jurisdictional Defendants that the parties jointly move the Court to stay individual actions brought by members of the putative class[2] so that Jurisdictional Defendants would not need to incur additional costs and fees related to duplicative individual actions. According to Jurisdictional Defendants' own asset disclosures, they do not have the resources to defend all of those cases, and indeed, Jurisdictional Defendants previously filed motions in many of those individual actions to stay those cases. Jurisdictional Defendants, however, declined Plaintiffs' offer to file a joint motion in this case to stay those actions. They also refused to specify the amount they wished to spend on attorneys' fees and costs on those other actions.

Meanwhile, Jurisdictional Defendants' asset disclosures remain incomplete, as discussed in more detail below. Moreover, Jurisdictional Defendants have refused to pay Plaintiffs' attorneys' fees of $14,528.60 that the Court ordered them to pay at the hearing on Plaintiffs' motion for sanctions, and Jurisdictional Defendants have (again) refused to pay arbitration costs after the Court granted their motion to compel arbitration.

---

[2] The proposed definition of the putative class is all individuals who (1) purchased services relating to the setup or management of an online store from the Wealth Assistants Entity Defendants between June of 2021 and November of 2023; (2) did not make a profit on their purchase of that business opportunity; and (3) have never been owners, employees, legal representatives, or successors of the Wealth Assistants Entity Defendants. (ECF 56).

Instead of providing Jurisdictional Defendants with additional funds to spend on matters brought by individuals who are members of the putative class in this case, Plaintiffs respectfully request that the Court stay those individual matters. Plaintiffs also respectfully request that the Court revoke the allowances it provided to Jurisdictional Defendants—for personal expenditures and attorneys' fees—until (1) Jurisdictional Defendants pay Plaintiffs' invoice for attorneys' fees, which the Court ordered Jurisdictional Defendants to pay after Plaintiffs' motion for sanctions, and (2) Jurisdictional Defendants supplement their asset disclosures to reflect assets held by Proficient Supply LLC (which, as shown by the evidence discussed below, was clearly part of Wealth Assistants and controlled by Jurisdictional Defendants).

Finally, Plaintiffs respectfully request that the Court clarify whether Jurisdictional Defendants can *each* spend $10,000 per month on attorneys' fees or can instead *collectively* spend $10,000 per month on attorneys' fees. For the reasons discussed below, Plaintiffs thought it was clear that Jurisdictional Defendants could only *collectively* spend $10,000 per month, but Jurisdictional Defendants have stated that they understood that they could *each* spend $10,000 per month, which is why they have spent more than $280,000 on attorneys' fees in the seven months this case has been pending. Plaintiffs are not requesting that Jurisdictional Defendants' attorneys pay back any fees collected in excess of the attorney-fee limits, but Plaintiffs are requesting that the Court confirm its order that Jurisdictional

PLAINTIFFS' OPPOSITION TO MOTION TO RELEASE FUNDS

1  Defendants not be permitted to spend more than $10,000 per month on attorneys'

2  fees.

3                              **LEGAL STANDARD**

4

5        As the Seventh Circuit has stated, "[j]ust as a bank robber cannot use the loot

6  to wage the best defense attorney money can buy, so a swindler . . . cannot use the

7  victims' assets to hire counsel who will help him retain the gleanings of a crime."

8

9  *SEC v. Quinn*, 997 F. 2nd 287, 289 (7th Cir. 1993).

10       In the Ninth Circuit, "Courts regularly have frozen assets and denied attorney

11 fees or limited the amount for attorneys' fees" *FTC v. World Wide Factors, Ltd.*, 882

12 F.2d 344, 347 (9th Cir. 1989); *see also Fed. Trade Comm'n v. Noland*, 475 F. Supp.

13 3d 992, 999 (D. Ariz. 2020) ("Although requests to unfreeze corporate assets for the

14 purpose of paying attorneys' fees must be considered on a case-by-case basis,

15 because the denial of funds is in tension with the fact that wrongdoing has not yet

16

17 been proved, denial has been upheld when, as here, the frozen assets appear

18 insufficient to satisfy a future restitution award."); *CFTC v. Noble Metals Int'l, Inc.*,

19

20 67 F.3d 766, 775 (9th Cir. 1995) ("A district court may, within its discretion, forbid

21 or limit payment of attorney fees out of frozen assets. According to the record, the

22 frozen assets fell far short of the amount needed to compensate [the alleged victims].

23

24 This was reason enough in the circumstances of this case for the district court, in the

25 exercise of its discretion, to deny the attorney fee application.") (citations omitted);

26 *FTC v. Ideal Financial Solutions, Inc.*, 2014 WL 4541191, *2 (D. Nev. 2014)

27

28

(rejecting defendants' unfreezing request, where the frozen funds were sought for attorneys' fees, and noting that "[t]he Ninth Circuit recognizes district courts' discretion in civil cases to 'forbid or limit payment of attorney fees out of frozen assets'") (citation omitted).

Moreover, in almost[3] all federal-court cases that Plaintiffs have identified involving the same scheme at issue in this case—that is, fraudsters selling their purported management of Amazon ecommerce stores with false promises—federal courts have immediately frozen the defendants' assets entirely without providing in the order any allowance for attorneys' fees or costs. *See, e.g.*, *FTC v. Automators LLC*, Case No. 3:23-cv-01444 (S.D. Cal. 2023), ECF 48; *FTC v. THEFBAMACHINE Inc.*, Case No. 24-cv-06635 (D.N.J. 2024), ECF 5; *FTC v. Ascend Capventures Inc.*, Case No. 24-cv-07660 (C.D. Cal. 2024), ECF 30; *FTC v. AWS*, Case No. 18-cv-00442 (D. Nev. 2018), ECF 29.

It is true that the plaintiff in those cases was the FTC. But the FTC cannot prosecute every fraud case, and victims who bring their own cases—with substantially identical underlying facts—should also receive a reasonable opportunity to recover from the perpetrators of a fraudulent scheme. They have that opportunity only if they receive injunctive relief to preserve assets comparable to the relief

---

[3] Plaintiffs identified one case, *FTC v. DK Automation*, 22-cv-23760 (S.D. Fla. 2022), in which the parties immediately stipulated to a permanent injunction and settlement when the case was filed, so there was no need for any preliminary injunction.

afforded in similar cases brought by the government. Otherwise, any remaining assets will be spent before Plaintiffs can collect on any judgment.

Moreover, in this case, unlike the cases brought by the Federal Trade Commission, Jurisdictional Defendants have already had many months to dispute the merits of Plaintiffs' complaint. Yet, as discussed below, Jurisdictional Defendants have submitted no evidence disputing that they orchestrated a fraudulent scheme. Instead, they have focused on diminishing and concealing the assets they stole before any judgment can be entered against them. They should not be granted permission to release even more of those assets.

## ARGUMENT

### I.    The Court Has Previously Recognized The Merits Of Plaintiffs' Claims And The High Likelihood That Defendants Will Dissipate Assets

At the outset of this case, Plaintiffs submitted evidence showing that Jurisdictional Defendants operated a fraudulent scheme to steal Plaintiffs' money.  (ECF 9). As the Court found in its Order implementing an asset freeze:

> Plaintiffs' evidence—which includes around thirty declarations from former Wealth Assistants clients—shows that many of the Jurisdictional Defendants made intentional misrepresentations in connection with Wealth Assistants' services, its potential to earn clients thousands of dollars each month, and its "guarantee" to buy back unprofitable stores. (TRO at 4 (citing Mot. for TRO at 11–15; Exs. B–N)). Moreover, Wealth Assistants' continuous failures to create, stock, and/or maintain the e-commerce stores it promised, paired with its retention of Plaintiffs' investments, evinces the Jurisdictional Defendants' knowledge of falsity and intent to defraud. (*See id.*). Finally, Plaintiffs have suffered damages in the form of their lost investments and, for some, massive credit card debt. (*See id.*).

(ECF 49, 7-8). Moreover, despite ample opportunity, Jurisdictional Defendants still have submitted no exculpatory evidence (except for a declaration by Max O. Day claiming that he was merely a contractor for Wealth Assistants, which the Court has found lacks credibility. (*See* ECF 49 at 4-5)). For those reasons, Plaintiffs have no doubt that their claims against Jurisdictional Defendants are meritorious.

But Plaintiffs' prospects of recovering any substantial assets are uncertain because Jurisdictional Defendants may finish their process of concealing or spending all of their assets before Plaintiffs can collect on a judgment. Plaintiffs previously submitted evidence of Jurisdictional Defendants' ongoing strategy to dissipate and conceal their assets before Plaintiffs can collect on any judgment against them. (ECF 9 at 16-19). The Court previously recognized the high likelihood that Jurisdictional Defendants would dissipate assets, stating:

> Plaintiffs have shown that Individual Defendants Max K. Day, Max O. Day, and Michael Day have a history of attempting to hide fraudulently obtained assets from their creditors. (TRO at 4 (citing *Hill v. Day, et al.*, Case No. 06-cv-03285 (Bankr. S.D. Tex. 2006)); *see also Wealth Assistants LLC v. Thread Bank*, Case No. 4:24-cv-00040, Mem. Op. & Order, Docket No. 20 at 7–8 (S.D. Tex. Mar. 29, 2024) (in action brought by Wealth Assistants against bank that froze assets, citing Day Defendants' alleged "denud[ing]" of a past business's assets as a reason to allow former Wealth Assistants clients to intervene)). Moreover, the Jurisdictional Defendants' decision to disclose a trivial amount of their assets to Plaintiffs, in contravention of the Court's TRO, raises serious concerns as to the location of their remaining assets. Therefore, the Court finds there is a high likelihood that Plaintiffs will be unable to recover should they prevail in this action if the preliminary injunction does not issue.

(ECF 49, 6-10). Plaintiffs continue to be concerned that Jurisdictional
Defendants will dissipate their assets, or spend their assets for their own benefit,
before any judgment can be entered against them. Granting Jurisdictional
Defendants' motion to release funds would enable Jurisdictional Defendants to
dissipate or spend their assets even faster.

## II.    Jurisdictional Defendants Continue To Disobey The Court's Asset Disclosure Order And Limitations On Ordinary Personal Expenditures

Jurisdictional Defendants have already hidden, or spent for their own benefit,
almost all of the fruits of their fraudulent scheme. Specifically, according to Yax
Ecommerce's tax returns, the scheme brought in more than $57 million over the past
three years. (Banks Dec., ¶ 2). But Jurisdictional Defendants have collectively
identified less than $500,000 of cash assets currently held for their benefit or
controlled by them (setting aside the $287,950.93 attorney-fee retainer, which
appears to have been exhausted, as discussed in more detail below). (Banks Dec.,
¶ 3).

There is a mountain of other evidence that Jurisdictional Defendants are
continuing to hide assets. For example, Defendant Max O. Day has still disclosed less
than $5,000 in cash assets (Banks Declaration, ¶ 4), despite repeatedly filing a
declaration insisting that he needs to spend at least $13,000 per month in ordinary
personal expenditures. (*See* ECF 31-1, ¶ 10; ECF 48-1, ¶ 10, each stating "the $9,000
that I would be permitted to spend pursuant to Plaintiffs' Application and proposed

PLAINTIFFS' OPPOSITION TO MOTION TO RELEASE FUNDS

preliminary injunction would barely scratch the surface of our needs, which amount

closer to $13,000 monthly.")

One large asset that Jurisdictional Defendants have failed to disclose is

"Proficient Supply" (a.k.a. "Proficient Corporation") despite indisputable evidence

that Jurisdictional Defendants purchased Proficient Supply and that, thereafter,

Jurisdictional Defendants and Proficient Supply intermixed their assets. The evidence

includes:

1.    Wealth Assistants' emails to its clients stating that Wealth Assistants

purchased Proficient Supply. (Banks Dec., ¶ 6-7).

2.    Wire transfers from Wealth Assistants to Proficient Supply stating that they

were for the purpose of purchasing Proficient Supply.[4] (Banks Dec., ¶ 8).

3.    Wealth Assistants' tax returns showing a $2.5 million asset called

"Investment - Proficient Company." (Banks Dec., ¶ 9).

4.    Financial records showing that Proficient Supply accepted payments while

holding itself out as "WA Distribution" and "WA Brand Management,"

which are two of Wealth Assistants' alter egos. (Banks Dec., ¶ 10).

---

[4] A spreadsheet summarizing wire transfers provided by Wells Fargo shows (1) a payment on May 2, 2023 from the -2209 account at Wells Fargo to Proficient Supply LLC for the amount of $208,323.33; (2) a payment on March 22, 2023 from the -2209 account at Wells Fargo to Proficient Supply LLC for the amount of $208,000 with a memorandum stating "1stof12paymentsforassetpurchaseofPROFICIENTSUPPLYLLC"; (3) a payment on April 3, 2023 from the -2209 account at Wells Fargo to Proficient Supply LLC for the amount of $208,000 with a wire transfer memorandum stating "2ndmonthlypaymemtof12."

5.  Financial records showing that Proficient Supply's bank accounts sent more than $500,000 to WA Distribution and WA Brand Management's other bank accounts without any apparent business purpose. (Banks Dec., ¶ 11).

When Plaintiffs wrote a letter to Jurisdictional Defendants asking them to identify Proficient Supply's assets, which the Court ordered Jurisdictional Defendants to respond to, Jurisdictional Defendants identified no assets. Instead, they only stated in response to the letter: "[Wealth Assistants] was purchasing Proficient Company and paid Proficient an estimated total of $600K. WA has not made additional payments since WA ceased operation. This is a warehouse lease. All bank accounts used during the acquisition were under WA Distribution." The answer is unhelpful, and the sentence "this is a warehouse lease" lacks credibility given the evidence that Proficient Supply was an entity that received hundreds of thousands of dollars from Wealth Assistants and also made payments to Wealth Assistants for hundreds of thousands of dollars. Jurisdictional Defendants have refused to identify bank accounts that held Proficient Supply's assets (which were in fact Wealth Assistants' assets). Plaintiffs respectfully request that the Court find that Proficient Supply is under Jurisdictional Defendants' control to avoid any doubt about whether Proficient Supply's assets are subject to the asset-freeze order and asset-disclosure order.

Jurisdictional Defendants also failed to identify many bank accounts under their control. For example, in response to a subpoena, Thread Bank identified 22 bank accounts held by Carroll Enterprises LLC, WA Amazon Seller LLC, WA Brand

Management LLC, WA Brand Ventures LLC, or WA Distribution LLC.[5]

Jurisdictional Defendants identified the bank account numbers for only three of those

accounts in their disclosures to Plaintiffs. (Banks Dec., ¶ 5).

Jurisdictional Defendants have also failed to identify their offshore accounts,

even though their bank statements show that they wired hundreds of thousands of

dollars to offshore accounts clearly under their control. For example, wire transfers

from a Wealth Assistants account at Thread Bank (with an account number ending in

1232) to an account called "Wealth Assistants Virtual Assistance Services" at Union

Bank of the Philippines (with an account number ending in 7656) exceeded $55,000.

(Banks Dec., ¶ 12). Other wire transfers from Jurisdictional Defendants' accounts to

various bank accounts at the same bank totaled hundreds of thousands of dollars.

(Banks Dec., ¶ 13).

It is clear, therefore, that Jurisdictional Defendants are hiding assets. They

should not be allowed to pay their attorneys by exhausting the few stolen assets that

Plaintiffs have found, while simultaneously illegally concealing their other assets.

Moreover, Plaintiffs have identified numerous instances in which Jurisdictional

Defendants have violated the Court's $9,000 per month limitation for personal and

household expenses. The Court previously stated:

> Plaintiffs attest—and Jurisdictional Defendants do not refute—that the
> bank activity of several of the Jurisdictional Defendants shows they have

---

[5] Plaintiffs presented evidence that Carroll Enterprises LLC, WA Amazon Seller LLC, WA Brand Management LLC, and WA Distribution LLC are under Jurisdictional Defendants' ownership or control at the outset of the case. (ECF 9 at 12-13, presenting evidence of their common ownership and interchangeable operations).

repeatedly been violating the asset freeze order. (Opp'n at 9–10; Banks Decl. ¶¶ 18–19). Nevertheless, the Court is sensitive to Jurisdictional Defendants' financial situation—just as it is sensitive to Plaintiffs'.

(ECF 127). Although the Court must be sensitive to all parties' interests, repeated violations of the Court's orders must have consequences.

## III.   Jurisdictional Defendants Breach Their Fiduciary Duty To Their Creditors When They Spend Wealth Assistants' Remaining Assets On Attorneys' Fees For Jurisdictional Defendants' Own Benefit

"When a corporation becomes insolvent and ceases doing business, its assets become a trust fund for the benefit, primarily, of its creditors, and the officers and directors owe a fiduciary duty to the creditors, breach of which gives rise to a cause of action for the creditors against the officers and directors." *White v. Zhou Pei*, 452 S.W.3d 527, 541 n.16 (Tex. App. 2014).

Here, Wealth Assistants announced that it was ceasing operations on October 6, 2024, and it was clearly insolvent. Accordingly, its remaining assets should have been held primarily for the benefit of its creditors. Yet, since Wealth Assistants announced it was going out of business, Jurisdictional Defendants have already spent most of Wealth Assistants' remaining assets on themselves in violation of their fiduciary duties to their creditors, including Plaintiffs.

For example, beginning on October 11, 2024—the same day that Ryan Carroll noticed that Thread Bank had frozen some of Wealth Assistants' accounts,[6] and five

[6] *See Wealth Assistants LLC v. Thread Bank*, 24-cv-0040 (S.D. Tex. 2024), ECF 1 (Wealth Assistants' complaint against Thread Bank for wrongfully freezing assets. The complaint states, in part, "Beginning on October 11, 2023, Mr. Carrol noticed that account numbers 200000001232, 200000001233, 200000001234, 200000001235, 200000001236 (**"Accounts"**) were frozen.").

- 14 -

days after Wealth Assistants announced it was ceasing all operations—Wealth Assistants emptied many of its available bank accounts into accounts held by its attorneys, Lloyd & Mousilli. In particular:

- On October 11, 2023, an account at Thread Bank held by WA Distribution, with an account number ending in -4085, made a payment of $26,818.28 to Lloyd & Mousilli. The transaction reduced the balance in the transferring bank account to $0.

- On October 11, 2023, an account at Thread Bank held by WA Distribution, with an account number ending in -9257, made a payment to Lloyd & Mousilli of $6,696.96. The transaction reduced the balance in the transferring bank account to $0.

- On October 11, 2023, an account at Thread Bank held by WA Distribution, with an account number ending in -0635, made a payment of $73,409.70 to Lloyd & Mousilli. The transaction reduced the balance in the transferring bank account to $0.

- On October 11, 2023, an account at Thread Bank held by WA Brand Management with an account number ending in -1052, made a payment of $134.78 to Lloyd & Mousilli. The transaction reduced the balance in the transferring bank account to $0.

- On October 11, 2023, an account at Thread Bank held by WA Distribution, with an account number ending in -1268, made a payment of $13,865.57 to Lloyd & Mousilli. The transaction reduced the balance in the transferring bank account to $0.

- On October 13, 2023, an account at Thread Bank held by WA Distribution, with an account number ending in -1052, made a payment of $8,252.17 to Lloyd & Mousilli. The transaction reduced the balance in the transferring bank account to $0.

- On October 13, 2023, an account at Wells Fargo held by "Precision Trading Group LLC DBA Wealth Assistants LLC," with an account number ending in -2209, wired Lloyd & Mousilli $630,000 in a transaction with wire memorandum stating "WA client fund set up fee funds." The transaction reduced the balance in the transferring bank account to less than $5,000.

Thus, although the assets of an insolvent corporation that ceases operations must be held for the benefit of the business's creditors, none of Wealth Assistants' funds were held for the benefit of Plaintiffs, who were Wealth Assistants' creditors. Instead, those assets were all sent to Wealth Assistants' attorneys' trust account to spend for Jurisdictional Defendants' benefit, including payments for attorneys' fees to defend Wealth Assistants and its principals in this action. And the timing of the transfers strongly indicates that those assets were transferred to the attorney trust account in

order to prevent the assets from being forfeited as a result of Thread Bank's asset freeze.

Jurisdictional Defendants should not be permitted to continue to breach their fiduciary duties to creditors (to say nothing of continuing their scheme to defraud) by spending Wealth Assistants' remaining assets to pay attorneys' fees. Instead, consistent with Texas law, those assets should be preserved for the benefit of Wealth Assistants' creditors. Therefore, the $10,000 per month that Jurisdictional Defendants are permitted to collectively spend on attorneys' fees (as discussed in more detail below) should only be spent from the human Jurisdictional Defendants' accounts, not from the Wealth Assistants Entity Defendants' accounts. To enforce that requirement, Jurisdictional Defendants should be required to identify the bank accounts from which they will spend attorneys' fees.

## IV. Jurisdictional Defendants Failed To Pay Fees That The Court Ordered Them To Pay To Plaintiffs' Attorneys And The American Arbitration Association

While Jurisdictional Defendants have made many improper payments for their own benefit, they have also refused to make any of the payments that the Court previously ordered them to make. In particular, at the hearing on Plaintiffs' motion for sanctions, the Court ordered Jurisdictional Defendants to pay the attorneys' fees that Plaintiffs incurred in bringing the motion for sanctions. Thereafter, Plaintiffs' attorneys sent Jurisdictional Defendants an invoice for those fees. (Exhibit A, Exhibit B). Jurisdictional Defendants have refused to pay those fees despite multiple requests

from Plaintiffs. Jurisdictional Defendants did offer to pay Plaintiffs' attorneys-fees

invoice if Plaintiffs would stipulate to unfreezing Jurisdictional Defendants' bank

accounts at Thread Bank (Motion, Exhibit A), but Plaintiffs' counsel could not accept

that offer because doing so would prioritize his own interest in receiving attorneys'

fees above his clients' interests in preserving collectible assets.

Moreover, Jurisdictional Defendants have refused to pay the arbitration fees for

the arbitration that they previously compelled. Specifically, the Court granted

Jurisdictional Defendants' motion to compel arbitration as to claims against some

plaintiffs, ordered those parties to arbitrate their claims, and gave Jurisdictional

Defendants leave to pay the arbitration fees. (ECF 127). However, Jurisdictional

Defendants have refused to pay the fees associated with the arbitration (indeed, they

still have never paid any arbitration fees for that arbitration since Plaintiffs

commenced it in April of this year) or otherwise participate in it, leaving the

arbitration at a standstill. (*See* Exhibit D). Lloyd & Mousilli withdrew from

representing Jurisdictional Defendants in that arbitration on October 21, the day

before the initial conference in that arbitration, and Jurisdictional Defendants have

not retained other counsel. (*See* Exhibit C).

Jurisdictional Defendants' refusal to make court-ordered payments shows their

intention to save every penny for themselves and their attorneys' fees. Granting their

motion to release additional funds would help them accomplish that goal.

**V.    Jurisdictional Defendants Refused Plaintiffs' Offer To Jointly Move The Court To Stay Related Matters And Refused To Specify The Amount They Sought To Spend**

In almost all of the cases Plaintiffs have found involving a fraudulent scheme that is virtually identical to the scheme alleged in this case, a court has, at the outset of the case, stayed actions brought by any individual victims of the scheme in order to preserve the remaining assets for the benefit of all of the victims. *See, e.g.*, *FTC v. Automators LLC*, Case No. 3:23-cv-01444 (S.D. Cal. 2023), ECF 48 at 23-24; *FTC v. THEFBAMACHINE Inc.*, Case No. 24-cv-06635 (D.N.J. 2024), ECF 5 at 23-24; *FTC v. Ascend Capventures Inc.*, Case No. 24-cv-07660 (C.D. Cal. 2024), ECF 30 at 22-23; *FTC v. AWS*, Case No. 18-cv-00442 (D. Nev. 2018), ECF 29 at 22-23.

Here, when Jurisdictional Defendants conferred with Plaintiffs about their request to release funds, Plaintiffs made an alternative proposal. Specifically, rather than continue to expend Jurisdictional Defendants' supposedly very limited assets by litigating duplicative individual claims brought by people who are members of the putative class, Plaintiffs and Jurisdictional Defendants could jointly move the Court to stay those matters pending the class certification decision. But Jurisdictional Defendants refused Plaintiffs' proposal, stating that they did not want to interfere with the rights of the individuals bringing the cases (even though Jurisdictional Defendants previously moved to stay many of those cases themselves. (*See* Banks Dec., ¶ 21)).

Moreover, Plaintiffs asked Jurisdictional Defendants to specify the amount that they sought to spend on related matters. Jurisdictional Defendants refused and insisted on requesting a blank check. (Banks Dec., ¶ 20).

## VI.    Jurisdictional Defendants Have Offered No Details About Why It Is Necessary To Obtain Separate Counsel

Jurisdictional Defendants state in their brief that "Jurisdictional Defendants have concluded that it is necessary for various defendants among the Jurisdictional Defendants to have separate counsel." (Motion, ¶ 6). But Jurisdictional Defendants do not even specify which defendants need separate counsel, let alone explain why they need separate counsel.

To be clear, Plaintiffs have no objection to Jurisdictional Defendants retaining separate counsel. Plaintiffs' only objection is to Jurisdictional Defendants spending more of the assets they stole from Plaintiffs on their own attorneys' fees. If Jurisdictional Defendants use assets not subject to the asset-freeze—such as funds from friends or family—to hire additional counsel, Plaintiffs will of course have no objection.

Indeed, it seems likely that Jurisdictional Defendants already have unfrozen funds—including, perhaps, funds from family or friends—that they can use to pay their attorneys. It would be surprising if Jurisdictional Defendants' attorneys had accumulated "accounts receivable" *before* moving to release additional funds if their only hope to have those accounts receivable paid was winning that motion to release

additional funds. Jurisdictional Defendants almost certainly have an alternate way to

pay those accounts receivable and other attorneys' fees.

## VII.   The Court Limited Jurisdictional Defendants To Spending $10,000 Per Month On Attorneys' Fees

In its Order granting a preliminary injunction freezing Jurisdictional

Defendants' assets at the outset of this case, the Court stated:

> The Court is providing ample protection for the Jurisdictional Defendants in allowing them to (1) pay reasonable attorney's fees, up to $10,000 a month, (2) pay personal and household expenses up to $9,000 a month, and (3) seek leave of court for other reasonable expenses. According to their disclosures, the Individual Defendants each have less than $10,000 in their accounts. These terms are therefore eminently reasonable.

(ECF 127 at 15). The discussion on the record indicated Jurisdictional

Defendants' understanding that they could spend $10,000 per month on attorneys'

fees *collectively*, not spend $10,000 per month on attorneys' fees *each*. (Exhibit F at

16, a highlighted transcript of the hearing at issue wherein William Shibley, counsel

for Jurisdictional Defendants, states "10,000 collectively seems like a small amount

considering everything else that we're dealing with."). Plaintiffs had the same

understanding. And that understanding made sense because Jurisdictional Defendants

were being represented collectively, and the attorneys' fees were being spent out of a

single fund for attorneys' fees.

But when Jurisdictional Defendants filed their motion to release additional

funds, Plaintiffs were surprised to learn that Jurisdictional Defendants had spent their

full attorneys' fee fund—which contained $287,950.93 as of April 24, 2024 (Banks

Dec., ¶ 22)—less than seven months after the case commenced and were now asking for the release of additional funds. Evidently, they have spent more than four times the amount that Plaintiffs understood they were allowed to spend.

Plaintiffs asked Jurisdictional Defendants why they had exceeded the Court's limitation on their attorney-fee spending. Jurisdictional Defendants responded that they understood the Court's Order to mean that they could *each* spend $10,000 per month on attorneys' fees. The interpretation seems inconsistent with their own statements on the record. Moreover, it is unclear what in this case would have necessitated spending more than $287,000 on attorneys' fees.

Nonetheless, Plaintiffs are not requesting that the Court order Jurisdictional Defendants' attorneys to disgorge the fees they have collected above the amount they were permitted to collect. Plaintiffs do, however, respectfully request that the Court confirm the amount Jurisdictional Defendants are allowed to spend on attorneys' fees, and Plaintiffs respectfully request that Jurisdictional Defendants not be permitted to pay their attorneys' "accounts receivable" of unspecified amounts.

## CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request the following relief from the Court:

1. Jurisdictional Defendants' motion to release additional funds should be denied in its entirety, except that the Court should revoke the requirement that Jurisdictional Defendants can only make payments for attorneys' fees from the

amounts previously deposited in the Lloyd & Mousilli IOLTA (since that fund has now been exhausted).

2.  The Court should stay all individual cases and arbitrations brought by members of the putative class in this case.

3.  The Court should find that Proficient Supply LLC is under Jurisdictional Defendants' control and, as such, is subject to the asset-freeze order and asset-disclosure order.

4.  The Court should revoke Jurisdictional Defendants' allowance for personal expenditures and attorneys' fees until Jurisdictional Defendants file a declaration stating that they have paid Plaintiffs' attorneys' fees that they were previously ordered to pay and disclosed Proficient Supply LLC's assets.

5.  The Court should clarify that Jurisdictional Defendants cannot spend more than $10,000 per month collectively on attorneys' fees. Any amount previously paid from the Lloyd & Mousilli IOLTA bank account in excess of $10,000 per month may be retained by the attorneys who received those payments, but no funds controlled by Jurisdictional Defendants may be used to pay their attorneys' currently outstanding accounts receivable.

6.  The Court should order Jurisdictional Defendants to identify the bank accounts that they intend to spend attorneys' fees from. No funds owned or controlled by the entity Jurisdictional Defendants should be unfrozen; the funds should be spent from the individual Jurisdictional Defendants' bank accounts.

Dated: November 22, 2024

/s/Nico Banks
Nico Banks, Esq.
Banks Law Office
Bar No. 344705
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002

## WORD COUNT COMPLIANCE CERTIFICATION

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 5,171 words, which complies with the word limit of L.R. 11-6.1

/s/Nico Banks
Nico Banks
Dated: November 22, 2024