Robert E. Barnes
Barnes Law LLP
CA Bar #325919
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
P:(310) 510-6211; F:(310) 510-6225
Robertbarnes#barneslawllp.com

Bradford L. Geyer (PHV pending)
NJ 022751991; PA 62998
Attorney at Law, PHV
Suite 141 Route 130 S.  303
Cinnaminson, NJ 08077
P:(856) 607-5708
Brad@FormerFedsGroup.Com

*Specially Appearing Attorneys for Wholesale Universe
and Bonnie Nichols, Pro Hac Vice*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DAVID HOUGH; *et al* | **Case No.: 2:24-cv-02886-WLH-SK** |
| Plaintiffs, | Presiding Judge: Hon. Wesley L. Hsu |
| v. | Hearing Date: |
| | Hearing Time: |
| RYAN CARROLL; *et al.* | Courtroom 9B |
| | Hearing Location: 350 W, 1st Street, 9th Floor |
| Defendants. | Los Angeles, California 90012 |
| | Trial Date: TBD |

========================================================================

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND INCLUDED MEMORANDUM IN SUPPORT THEREFORE

- 1 -

MOTION TO DISMISS ON JURISDICTION

**BY SPECIAL APPEARANCE TO CONTEST JURISDICTION**

Defendants Bonnie Nichols and Wholesale Universe, residents of the State of Texas, hereby enter their special appearance and contest the *in personam* jurisdiction of the Court against them in this case, as stated in the now operative Second Amended Complaint, and in support of their motion present the following Memorandum of Law.

It is important to take note that the circumstances of different defendants can be different and the analyses applied by other defendants do not dictate the result here. "Each defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, (1984) 465 U.S. 783, 788. Nevertheless, these Defendants repeat precedents of general application asserted by other defendants for simplicity, consistency, and ease of analysis, with credit and due regard for the extensive motion to dismiss filed by the Carroll Defendants at ECF Dkt. #40 and relied upon here.

Defendants Nichols and Wholesale Universe intend to file a motion to dismiss for failure to state a case and other further responsive and supplemental pleadings if necessary, if their motion is denied.

On November 27, 2024, the Court approved by order leave of court for the Plaintiffs to further amend their Complaint by filing their proposed Second Amended Complaint ("SAC" or "2nd Am. Complaint"). By order of the Court, the SAC which was previously an Exhibit to the Motion filed at ECF Dkt. # 148, is deemed filed as of November 27, 2024.

## I. INTRODUCTION

Based on communications with Wealth Assistants ("WA") since July 2023 in the last three (3) months of WA's operations, Wholesale Universe ("WU") led by Bonnie Nichols became one of

about 90 suppliers of product inventory to Wealth Assistants' client's on-line e-commerce stores.

It would appear to be informative that clients of Wealth Assistants LLC ("WA") and related Defendants relied upon Wealth Assistants to set up independent third party "e-commerce stores" on Amazon and work with Amazon.  This by the way, is far from easy.  Working with Amazon is not user friendly nor simple.

Therefore, WA's clients were in effect self-selected by wanting WA to handle these difficult procedures for them to not readily understand what was happening, what should be happening, and what has happened with their on-line e-commerce stores at Amazon.

In most cases, Defendants Bonnie Nichols and Wholesale Universe are not able to determine the status of these on-line Amazon e-commerce stores without all of the log-in credentials and information about each e-commerce store.  The WA clients usually do not know this information because WA set up the accounts and did not cooperate in providing these crucial details to the e-commerce stores, their clients, nor to Nichols and Wholesale Universe.

Unfortunately, based on the allegations of the SAC and WU's interactions with WA, WA also did not have a handle on this topic either.  As a result, there are a great many ways in which we do not actually know what happened.  The facts of the allegation are not specific enough under *Twombly* and *Iqbal* to establish that Plaintiffs would know what happened.

In terms of the internal consistency of the allegations of the second amended complaint ("SAC"), Plaintiffs allege such things as whether WA actually set up e-commerce stores or not on Amazon.  But WA's clients would usually not know whether the stores were set up or not.  Without the behind-the-scenes log-in credentials one cannot see if there is a registered e-commerce store on Amazon, if the store is waiting for activation or some missing detail, or is waiting for inventory to be loaded into the store.  One is not able to see publicly if there is a store set up or not.

MOTION TO DISMISS ON JURISDICTION

WA's clients believe they lost money.  But without the ability to review the history of activity inside Amazon – not visible to the public – the WA clients do not know if they made money, have money sitting on deposit with Amazon, or lost money.  The few WA clients who chose to work with and stay with Wholesale Universe made a profit from their initial efforts on Amazon and continue to earn profits today.

The WA clients claim that no product inventory was purchased for them or delivered, but they would be unable to know that without the ability to examine the non-public details and history of the Amazon e-commerce store accounts.  Again, WA's clients depended on WA for these technical details, which WA failed to handle and left confused and mysterious.

Of course, $50 million being missing is shocking and deeply significant.  Wholesale Universe shares the concern and disturbance about this mystery.  Lots of money seems to have disappeared into a black hole.  Wholesale Universe has no idea where any missing money is or how it is possible to misplace $50 million.

Wholesale Universe has invoices and bank records of payments from Wealth Assistants to Wholesale Universe from July 28, 2024, through November 2024, and corresponding invoices and bank records of payments for all of this money less its standard and agreed fees paid out to product suppliers by the end of the year of 2023.  Wholesale Universe knows and can prove that all of the money received by Wholesale Universe from Wealth Assistants was used to purchase inventory for Wealth Assistants' clients, the products were actually purchased, delivered to Wholesale Universe for WU's quality control services of inspecting the products, repackaging them, etc., and then shipped to Amazon's warehouses under the accounts for each Wealth Assistants' client – except where the client refused to provide the necessary information for WU to "upload" the inventory into Amazon's system.  In several cases, WA's clients have refused to take delivery of the products

- 4 -

1   sitting in Wholesale Universe's warehouse costing WU space and money and in one case the client

2   said that Nico Banks told them not to talk to Wholesale Universe.

3      However, as to any other funds allegedly received from Wealth Assistants' clients, WU has

4   no clue where the money could have gone.

5      Wholesale Universe certainly finds the experiences alleged by the WA clients to be woefully

6   substandard and unacceptable for this kind of business activity.  Moreover, the terms described in

7   the SAC between WA and WA's clients are not what Wholesale Universe would require or

8   condone.  If the SAC's explanation is correct, the fees and arrangements were confiscatory and

9   would leave little room for profit for WA's clients.  This is not how Wholesale Universe does

10  business with its own direct clients.

11

12     This leads to speculation that either this loss estimate is greatly inaccurate or Wealth

13  Assistants is far better at hiding money than they are at running on-line ecommerce stores.  It would

14  seem nearly impossible for anyone to waste $50 million even if that were their determined goal.

15     Nevertheless, Wholesale Universe finds it possible but improbable  for WA's clients to have

16  lost money or failed to earn a profit (other than the overbilling alleged in the SAC) if WA had

17  competently and properly set up and managed the client stores.  (Perhaps if a client insisted upon

18  selling something quixotic and unlikely to sell like Uncle Bob's wood carvings profitability would

19  be unsure.)

20

21     In all or almost all cases, the products for sale were / are not perishable.  The products would

22  remain in inventory and available for automated sales through Amazon until all inventory was sold.

23  An Amazon e-commerce store is not like a brick-and-mortar store in terms of being closed at times.

24  An Amazon storefront is always open, 24 hours a day, 7 days a week, 52 weeks a year.  If the store

25  were properly set up, the inventory would sell until sold out without any human involvement or

26

27                                        - 5 -

28

intervention.

Therefore, a properly set up and supplied store would not be disrupted or affected by WA's collapse.  The inventory would remain visible for purchase and Amazon would deposit the net sales proceeds into the account (assuming WA set up a bank account and did not divert the proceeds to itself).

As a unique (but now emulated) innovation, Amazon a few decades ago expanded the reach and offerings on its massive, diverse internet-based retail store by allowing independent companies to create a page or pages on Amazon, which appear to the end user the same as product offerings of Amazon itself.  This innovation greatly increased the diversity and choices available to end user retail customers, thus driving greatly increased traffic to Amazon who expect to be able to find almost anything they are looking for.  But these private or independent "stores" (really just accounts selling through one or more pages) appear to be seamlessly indistinguishable to the retail buyer from other product offerings of Amazon.  The distinction between Amazon and privately owned "stores" on Amazon exists in the computer systems of Amazon not visible to the end retail customer.  The computer keeps track of which products and product pages are corporate (Amazon) offerings and which ones are separate "stores" set up by separate vendors.

Although the modern developments of on-line internet retail e-commerce stores are extremely sophisticated, virtual, computerized, and internet-based, most of the basic concepts arise from the same functions as traditional "brick and mortar" stores.   To understand the players here, for example, one may walk into a large department store or grocery store and encounter workers stocking the shelves of the retail store who do not actually work for that store.  Their dress is not the uniform of the store and their identification tags visible are not from the retail store.  Very frequently these "jobbers" are employees or agents of specific brands with a large presence who

MOTION TO DISMISS ON JURISDICTION

prefer to manage their store presence and sales independently:  Coca-cola, Pepsi-cola, Lay's potato chips, etc., etc.  Such companies take on the greater responsibility in exchange for greater control and management of their brand.

Through department store's or grocery store's various relationships, suppliers under contract to the store bring inventory in, count inventory on the shelves to determine future shipments, place inventory on the store shelves, price them, and exchange paperwork with the branch manager of the store for inventory delivered and received and now in the custody of the story.

That traditional "jobber" function is not unlike the work today of Wholesale Universe.  And just like the functions of "brick and mortar" stores the store will also purchase its own inventory, sometimes its own store brand, and stock its shelves itself, and manage the inventory itself.  Both functions may be happening in parallel.  This is also true of Amazon "stores."

Therefore, when a person or small business sets up a "store" on Amazon they can "stock" their store (product page(s)) with inventory in various ways.  A small business could have its own products to sell, manufactured by the small business, or perhaps like an artist's paintings or Aunt Martha's crafts or folk costumes imported personally by the small business owner from their favorite foreign country.  Or a product specialist can select inventory most likely to sell based on trends of supply and demand in the market place.

Did Wholesale Universe "deliver" products?  Of course, almost never were products delivered to a store owners' home, storage unit, or business (most certainly NEVER in California).  The products were delivered to Amazon's warehouse(s) outside California as directed and shown as available for sale by Amazon.  Delivery means delivery to Amazon's system.

On Amazon, products are "stocked" as inventory by opening an account with Amazon's sophisticated computer, registering the products, and choosing whether to wait for sales to come in

MOTION TO DISMISS ON JURISDICTION

or to **_PRE-POSITION_** products in Amazon warehouses around the country. Amazon's computer can on election determine which location in the country is most advantageous in all respects, including greatest demand. The Amazon computer will tell a "store" vendor where to ship the products so that they will be sitting and waiting for sales, to be packed and shipped immediately. One assistant in the FormerFedsGroup.com law firm reports ordering some office / computer equipment late on a Sunday and receiving them the following Monday morning. This is possible because Amazon's computer knows which warehouse in the country to park products in.

Therefore, the "inventory" "exists" on the "shelves" due to Amazon's computer system. The store is given a shipping label and scannable documents which instruct the warehouse exactly what zone, row, shelf, and level to park the products on. Therefore, the Amazon computer "knows" exactly where the independent store vendor's inventory is sitting at all times.

However, just as a brick and mortar department store can sell its own store brand or order its own generic inventory or rely on a specialist from large brands to stock the shelves – often all of the above – many Amazon "stores" tend to make the most money (rather than simply being a hobby) by engaging specialists to identify the strongest-selling products in greatest demands, sourcing those products, negotiating good wholesale prices, and purchasing.

This is what Wholesale Universe does, at least the main part in the simplest explanation. While it has always been its goal to help its clients in any way works best for them, typically a client simply tells Wholesale Universe that they have $X funds available to stock their inventory, what Wholesale Universe recommend? Wholesale Universe then employs its continuing knowledge of the market place and any specialized research of supply and demand and recommends the products most likely to make the client money, to sell quickly and with as much certainty as possible and for a decent end retail price. Wholesale Universe then goes through all of the

MOTION TO DISMISS ON JURISDICTION

processing work of negotiating for good wholesale prices for many clients as leverage, obtains the

products, most often many pallets in exchange for cash up front, and then Wholesale Universe

registers the inventory with Amazon under the individual independent store.  Wholesale Universe

opens all the products to ensure that it is clean and in good saleable condition and then ships it as

directed by Amazon's inventory system.

As products are sold through Amazon's computer on the independent stores' product page

or pages, Amazon's computer deducts Amazon's fees including warehouse storage and shipping,

offset by the retail buyer's payments for shipping and handling, and deposits the net proceeds in the

independent "store's" account.

However, Wholesale Universe LLC has had no relationship with Wealth Assistants and did

not know that it existed until the last few months of Wealth Assistants' existence, starting with two

initial contacts in June and July 2023.  Wealth Assistants found Wholesale Universe and asked if

Wholesale Universe could help Wealth Assistants stock its client's stores with inventory.  The first

invoice from Wholesale Universe to start its work for Wealth Assistants was sent to WA's Texas

address on July 28, 2023 and the last invoice was sent on September 28, 2023.

Wholesale Universe typically engages directly with its clients through straightforward

relationships. While it is not uncommon for companies like Wealth Assistants to subcontract

inventory management functions to Wholesale Universe, this arrangement often resulted in limited

or unclear visibility between Wholesale Universe and Wealth Assistants' clients. The success of

such clients, however, heavily depends on the good-faith performance of the intermediary—in this

case, Wealth Assistants. Trusting that Wealth Assistants would act in good faith, Wholesale

Universe reasonably agreed to procure goods under these terms to support their clients' success.

Those responsibilities of the agent include educating their clients on proper management of stores,

- 9 -

MOTION TO DISMISS ON JURISDICTION

providing proper customer service and ensuring in real time that products are priced to sell.

Unfortunately, in regards to Wealth Assistants, these standard practices that work effectively with the typical Wholesale Universe purchasers with proper agency management and guidance, worked out badly.  Wealth Assistants dropped the ball; a ball that Wholesale Universe never was supposed to carry. Even without Wealth Assistants' collapse, being subcontracted (loosely speaking) under Wealth Assistants business practices meant that communication with the stores on Amazon were limited, confused, and dysfunctional. Wealth Assistants only shared logistics information with Wholesale Universe about the accounts, but no contact information for the clients themselves.

As a result, Wholesale Universe has product inventory taking up space on its own warehouse floor for which it has never received information or access to "upload" the inventory to Amazon.  Therefore, Wealth Assistants for its clients has paid for inventory that remains unclaimed, and is costing Wholesale Universe space and expenses on its warehouse.

Similarly, the products that Wholesale Universe did upload to Amazon when store details were available have probably been sold through Amazon long ago.  The products were sold for the greatest chance that they would sell and would sell well and quickly.  Many of the clients of Wealth Assistants probably have money on deposit with Amazon as sales proceeds of those products.  But neither Wealth Assistants nor their clients have cooperated with trying to determine the status of those client accounts.

Furthermore, once Wealth Assistants suddenly collapsed or closed, Wholesale Universe put enormous time and effort into trying to help Wealth Assistants' clients salvage their position.  This cost a lot of money for employee time in cleaning up problems left by Wealth Assistants.

MOTION TO DISMISS ON JURISDICTION

## II.  LEGAL STANDARD FOR FACTUAL ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

Of course, it is fully recognized in endless precedents that on a motion to dismiss a plaintiff's allegations must be accepted as (assumed to be) true *for that limited purpose* of analyzing the motion to dismiss.  *Twombly* did not unsettle the well-established practice of taking all facts in the complaint as true, however "doubtful in fact." 550 U.S. at 555.  A court "considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).

However, to survive a motion to dismiss, including on jurisdiction, factual allegations – here in the Second Amended Complaint – must be more than bare conclusions of law and must present more than just the mere possibility of liability.

*Bell Atlantic Corp.  v. Twombly*, 550 U.S. 544, 570 (2007)  requires a complaint to "contain sufficient factual matter, accepted as true, to state a claim for relief that is 'plausible on its face.'" Simply reciting a legal conclusion is not sufficient.  While ***Twombly* has** perhaps generated too much excitement it did clarify that Plaintiffs must state enough facts to "nudge their claim across the line from conceivable to plausible."  550 U.S. at 570.

Similarly, *Ashcroft v. Iqbal*, 129 S.Ct 1937, 1949 (2009) requires that allegations must be more than just "consistent with" liability.  ***That is, a plaintiff must allege that a defendant <u>actually is</u> liable, not that he <u>could possibly be</u> liable:***

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.,* at 556, 127 S.Ct. 1955.  ***The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully*.**  *Ibid.*  ***Where a complaint pleads facts that are "merely consistent with" a defendant's liability,*** it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

- 11 -

MOTION TO DISMISS ON JURISDICTION

*Id.* (emphases added).

Twombly and *Iqbal* provided the helpful and more precise standard of asking if everything alleged in a complaint were proven uncontradicted at trial would the result establish liability for certain or would it merely be consistent with liability. Would liability remain merely a possibility or would the allegations of the complaint taken as true clearly establish liability. Factual allegations must be more than just consistent with liability.

*The complaint must be read "as a whole,"* and all reasonable inferences must be drawn in the plaintiff's favor. *Matrixx Initiatives, Inc., v. Siracusano*, 131 S. Ct. 1309, 1323 (2011) (emphasis added).

## III. LEGAL STANDARD FOR JURISDICTION

### A. Legal Standard for a Rule 12(b)(2) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to file a motion to dismiss based upon a lack of personal jurisdiction.

The court analyzes whether it has personal jurisdiction over a nonresident defendant under a two-part test. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). First, the court examines the forum state's long-arm statute. Id. Second, the court must determine whether sufficient minimum contacts exist between the defendant and the forum state such that jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice" under the Due Process Clause. Id. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts only exist when: (1) the contacts arise from or relate to the cause of action; (2) the defendant purposefully avails himself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of

1   its laws; and  (3) the defendant's contacts within the forum demonstrate that he

2   reasonably anticipated being  hauled into court there. *Id.,* 94 F.3d  at 631.

3       The plaintiff bears the initial burden. *HealthMarkets*, 171 Cal. App. 4th at 1167.

4       If the plaintiff establishes a prima facie case of personal jurisdiction through the

5   allegations of his complaint, the defendant may challenge those allegations through

6   affidavits, shifting the burden back to the plaintiff to prove jurisdiction. *Sculptchair*,

7   94 F.3d at 627 (quoting Jet Charter Serv., Inc. v. Coeck, 907 F.2d 1110, 1112 (11th

8   Cir. 1990)). If the defendant sustains its burden, the plaintiff must substantiate the

9   jurisdictional allegations by affidavits or other competent proof, not merely repeat

10  allegations in the complaint.

11      As further explained by co-Defendants (simpler than considering entirely

12  different precedents on these same points):  "In opposing a defendant's motion to

13  dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing

14  that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015)

15  (citation omitted).

16      A plaintiff may not simply rest on the "bare allegations of [the] complaint." *Id.*

17      Personal jurisdiction in federal court is governed by the law of the state in which

18  the federal court sits. *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citations omitted).

19      "Federal courts ordinarily follow state law in determining the bounds of their

20  jurisdiction over [defendants]." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)

21  (citing FED.R.CIV.P. 4(k)(1)(A)).

22      A California court may exercise personal jurisdiction over a nonresident

23  defendant to the extent allowed under the state and federal Constitutions. See CODE

- 13 -

MOTION TO DISMISS ON JURISDICTION

CIV. PROC., § 410.10. "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under California state law and federal due process are the same. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citation omitted); *Accord Daimler*, 571 U.S. at 125.

The exercise of personal jurisdiction is constitutionally permissible only if the defendant has sufficient "minimum contacts" with the forum state so that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, (1945) 326 U.S. 310, 316.

Absent substantial, continuous, and systematic contacts with the forum state creating general jurisdiction, *Perkins v. Benguet Mining Co.*, (1952) 342 U.S. 437, 445–446, a defendant may only be subject to so-called "specific jurisdiction" of a non-resident defendant. *Helicopteros Nacionales de Colombia v. Hall*, (1984) 466 U.S. 408, 414, fn. 8. Specific jurisdiction "depends on the quality and nature of the defendant's forum contacts in relation to the particular cause of action alleged." *HealthMarkets, Inc. v. Superior Court*, 171 Cal. App. 4th 1160, 1167 (2009).

A nonresident defendant is subject to specific jurisdiction only if

   "(1) the defendant purposefully availed itself of the benefits of

   conducting activities in the forum state;

   (2) the controversy arises out of or is related to the defendant's

   forum contacts; and

   (3) the exercise of jurisdiction would be fair and reasonable."

MOTION TO DISMISS ON JURISDICTION

*Id.* (Citing *Burger King Corp. v. Rudzewicz*, (1985) 471 U.S. 462, 472, 475-478).

However, as is well-trodden territory of news reports, books, magazines allegedly defamatory, or national products – where general, nation-wide actions just happen to include the forum state, a non-resident defendant that marketed its services throughout the United States not uniquely to California does not satisfy *International Shoe* and the limits of personal jurisdiction.  *Goehring v. Superior Court*, (1998) 62 Cal. App. 4th 894, 907 (finding no purposeful availment based solely on the defendants' execution of [a limited number of] "sales, security and escrow agreements" with a forum resident); *Doe v. Unocal Corp.*, (9th Cir. 2001) 248 F.3d 915, 924 (finding no purposeful availment based solely on the defendant's contractual relations with a forum resident); *McGlinchy v. Shell Chemical Co.*, (9th Cir. 1988) 845 F.2d 802, 816.

For example, nationwide circulation of a book and broadcast of interviews are insufficient to confer personal jurisdiction. See *Buckley v. New York Times Co*., 338 F.2d 470, 474 (5th Cir. 1964) (holding "mere circulation" of national newspaper and "sporadic news gathering by reporters on special assignment" in the forum do not satisfy due process); *Alternate Energy Corp. v. Redstone*, 328 F. Supp. 2d 1379, 1383 (S.D. Fla. 2004) ("[U]nder Calder, the mere fact that allegedly libelous statements appeared in a publication sold to Florida residents is not sufficient to give a defendant fair warning that he may be hauled into court here.")

"The purposeful availment inquiry ... focuses on the defendant's intentionality." *HealthMarkets*, 171 Cal. App. 4th at 1168 (citations omitted). "This prong is only satisfied when the defendant purposefully and voluntarily directs his activities

- 15 -

toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on his contacts with the forum." *Pavlovich v. Superior Court*, (2002) 29 Cal. 4th 262, 269.

Also, "Allegations of conspiracy [also] do not establish as a matter of law that if one conspirator comes within the personal jurisdiction of our courts, then California may exercise jurisdiction over other nonresident defendants who are alleged to be part of that same conspiracy." *In re Automobile Antitrust*, 135 Cal. App.4th at 113.

## IV. ASSERTIONS OF PARTNERSHIP DO NOT SATISFY CALIFORNIA LAW

The Second Amended Complaint repeatedly asserts the existence of "The Quantum-Wholesale Partnership" involving Wholesale Universe. However, there is no entity named or called formally or informally A or The "Quantum-Wholesale Partnership" other than in the allegations of the SAC. See SAC ¶¶ 8, 28, 126-128, 130-132, 139, 140-141.

On full discovery and summary judgment, Defendants Nichols and WU would show conclusively that no such partnership existed and that it did not purposely avail itself of California in business. Wholesale Universe makes bulk purchases of designer goods (in 2023, well over $7 million) while Quantum is a tech company. They have no more formal partnership as does the gardener harvesting tomatoes with the cook that makes spaghetti sauce (or "gravy" in some quarters).

However, at this stage, the SAC does not contain enough factual allegation to move the idea of a partnership from the merely possible to plausible under the standards of *Twombly* and *Iqbal*. Plaintiffs hang their claim of a partnership on Bonnie Nichols' explanation as owner of Wholesale Universe that Wholesale Universe and Quantum Ecommerce operated "like a

MOTION TO DISMISS ON JURISDICTION

brother-sister company" in which Nichols and WU "lock[s] down the inventory" and Troy

Marchand through Quantum Ecommerce "provides the account management services."

However, that is not the definition of a partnership.

In *April Enterprises, Inc. v. KTTV, supra*, 147 Cal.App.3d 805, the court set forth the
requirements to determine whether a joint venture exists. "'A joint venture . . . is an
undertaking by two or more persons jointly to carry out a single business enterprise
for profit.' . . . The elements necessary for its creation are:
     (1) joint interest in a common business;
     (2) with an understanding to share profits and losses; and
     (3) a right to joint control. . . ." (Id. at p. 819, citations omitted.)
These elements were identified in instruction 58 as well as instruction 60 given by
the trial court.

Plaintiffs' proposed instruction was based upon a statement in April Enterprises that
"where a joint venture involves the contribution of capital by one party and services
by the other, . . . [i]n the event of loss, the party contributing capital loses his capital
and the one contributing labor loses the value of his efforts." (*April Enterprises, Inc.
v. KTTV, supra*, 147 Cal.App.3d at p. 819.) The court therefore held that even if one
party's loss was in the form of lost labor, a joint venture could still be recognized as
in existence. (Id. at p. 820.)

The trial court also refused an instruction defendants proposed based upon the
principle that if a party is guaranteed substantial compensation, such as a salary and a
share of the profits, in return for his labor, such labor does not satisfy the "shared
loss" element of a joint venture. (*Brockman v. Lane* (1951) 103 Cal.App.2d 802, 805
[no partnership where the owner of the land ran all the risk of loss, whereas the man
who farmed it on behalf of the owner was paid a monthly salary and a share of
profits, if any]; *Wiltsee v. California Emp. Com., supra*, 69 Cal.App.2d at pp. 127-
128 [no joint venture where man dredging gold on Wiltsee's behalf was paid a
monthly salary and, in the nature of a bonus, a percentage of net profits.]) Whether
Slaughter and Kohl equally shared the risk of loss with respect to Corazon and its
retail stores was a factual issue to be determined by the jury. It was, therefore,
appropriate for the attorneys for plaintiffs as well as defendants' lawyers to argue the
issue before the jury, as occurred in this case. (*Moreno v. Fey Manufacturing Corp.,
supra*, 149 Cal.App.3d at p. 29.)

In any event, any error by the court in refusing Slaughter's proposed instruction was
harmless. (*Moreno v. Fey Manufacturing Corp., supra*, 149 Cal.App.3d at p. 27
[instructional error requires reversal if it is reasonably probable that a more favorable
decision would have resulted in the absence of the error].) Because the jury answered
"No" to special verdict form Question 7 as to whether Slaughter and Kohl " ;shared
losses," the jury did not proceed to answer questions as to whether Slaughter and
Kohl shared control over Corazon (Question 9) and whether Slaughter and Kohl each

MOTION TO DISMISS ON JURISDICTION

had the right to direct and control the conduct of the other with respect to Corazon (Question 10). If the jury had reached the questions, however, the record indicates that they would also have been answered "No."...

*Slaughter v. Kohl*, B209539 (Cal. App. 11/19/2009), B209539 (Cal. App. Nov 19, 2009).

"'A partnership connotes coownership in the partnership property with a sharing in the profits and losses of a continuing business. [Citations.]...'"

*Slaughter v. Kohl*, B209539 (Cal. App. 11/19/2009), B209539 (Cal. App. Nov 19, 2009)

The explanation of the different roles that Quantum Ecommerce and Wholesale Universe play do not establish a partnership including because there is no allegation of shared profits or losses nor joint management or control of any partnership.  On the contrary, Nichols' statement clearly distinguishes the two companies as different companies performing different functions like a football stadium and a cheesesteak vendor.  On the face of the SAC, the allegations are not sufficient to move the idea from the merely possible to a plausible allegation of fact.

## V.  INSUFFICIENT FACTUAL ALLEGATIONS

Although Defendants do not wish to convert their motion into a motion for summary judgment at this time in advance of more extensive discovery, Defendants Nichols and Wholesale Universe present publicly available information and argue that the factual allegations in the Second Amended Complaint are not sufficient to establish personal jurisdiction.

1.  Wholesale Universe, Inc. was incorporated in the State of Texas on April 6, **2017**, with its offices and 50,000 square foot warehouse currently staffed by over 40 full-time employees in Longview, Texas.  Its President is Mrs. Bonnie R. Nichols.

2. Wealth Assistants, LLC, was created in Casper, Wyoming,[1] on October 8, **2021**, under the name of Carroll Enterprises, LLC, by the Organizer INCFile.com, LLC, 17350 State Hwy 249 #220, Houston, Texas 77064.

3. Wealth Assistants, LLC's principal place of business is a virtual "executive suites" rent-an-office facility run by "Alliance Virtual Offices"[2] at 5830 East 2nd Street, Casper, Wyoming, 82609. However, in its 2022 Annual Report, Wealth Assistants identified its mailing address as 650 NE 32nd Street, Unit 3207, Miami, Florida 33137, which is a residential apartment.[3]

4. Effective July 12, 2023, Wealth Assistants, LLC, changed its name to YAX Ecommerce, LLC. The change was filed in Missouri by the Plaintiff's law firm here in this case Lloyd & Mousilli. In its 2023 Annual Report, Ryan Carroll identified its principal business address in Wyoming as 5830 East 2nd Street, Suite 7000 #4224, Casper, Wyoming 82609. This is again in 2023 a virtual office run by Alliance Virtual Offices.[4]

A. **NO ACTIVITY TARGETED ON CALIFORNIA**

The SAC makes the mistake identified under the governing law above of confusing efforts targeted nationwide without regard to California, which happens to also reach California along with the rest of the nation, with purposefully availing oneself of California as a forum.

---

[1] https://wyobiz.wyo.gov/Business/FilingDetails.aspx?eFNum=036195035225174119191225207203158221121227126153
[2] https://www.alliancevirtualoffices.com/virtual-office/us/wy/casper/east-2nd-street-3579
[3] https://www.zillow.com/homedetails/650-NE-32nd-St-UNIT-3207-Miami-FL-33137/306391803_zpid/
[4] https://www.alliancevirtualoffices.com/virtual-office/us/wy/casper/east-2nd-street-3579

MOTION TO DISMISS ON JURISDICTION

In SAC ¶ 5, the allegation is that Quantum and Wholesale "conspired with the Wealth Assistants Entity Defendants and others to defraud individuals ***across the country***. Carrying out that conspiracy included – foreseeably – intentionally defrauding dozens of California residents out of more than $1,000,000."

Therefore, the SAC alleges that California residents were only coincidentally affected, not targeted as Californians. The SAC fails the jurisdictional test.

See also SAC ¶ 8 (Wholesale Universe sent emails to many abandoned clients of WA, some of which were in California – see ¶ 139), and ¶ 139 email "to many of Wealth Assistants' clients" not just those in California.

A generic marketing or communications effort not specifically targeting California which happens to reach some California contacts is insufficient to confer personal jurisdiction. Wholesale Universe did not purposefully avail itself of California with any expectation of being hauled into court in California.

B.    **PLAINTIFFS ADMIT THAT THERE RELATIONSHIP WAS WITH WEALTH ASSISTANTS IN TEXAS**

Furthermore, on the face of the SAC, the Plaintiffs' relationship was with Wealth Assistants – not with Wholesale Universe.

See ¶ 95 alleging that Plaintiff Hough wired approximately $10,000 to Wealth Assistants – not to Wholesale Universe – for inventory.

See ¶ 101 alleging that Plaintiffs Isabel and Anthony Ramos paid inventory invoices to Wealth Assistants – not to Wholesale Universe.

See ¶ 107 alleging that Plaintiff Nibarger paid two inventory invoices

- 20 -

MOTION TO DISMISS ON JURISDICTION

totaling about $10,000 to Wealth Assistants – not to Wholesale Universe.[5]

In fact, Nibarger's products have been sitting in Wholesale Universe's warehouse at WU's expense ever since and he refuses to make arrangements to collect or redirect the products.

Therefore, the SAC's allegations admit that the clients' relationship is not with Wholesale Universe.

## C. ALLEGATIONS ARE LEGAL CONCLUSIONS NOT PLAUSIBLE FACTS

The SAC's allegations are conclusions of law without factual support and do not meet the definiteness and plausibility standards of *Twombly* and *Iqbal.*

For example, in ¶28, the SAC alleges ambiguously that Wholesale Universe "worked for Wealth Assistants." This is transparently untrue including under the claims on the face of the SAC. Neither Bonnie Nichols or Troy Marchand ever worked for Wealth Assistants. The SAC quotes at least two webinar / internet broadcasts by Nichols explaining that Wholesale Universe first met WA only about 90 days before WA shut down. If the SAC means "worked for" in a loose, ambiguous way then it is insufficient to allege definite and plausible facts more than just a possibility.

---

[5] To provide context and highlight the minimal connection between California and Wholesale Universe (WU), should jurisdiction be established, we will present evidence of a single $5,000 inventory procurement package made by WA of Texas by WU of Texas on behalf of Niberger's business entity that resides in Wyoming. Acting on legal counsel's advice, Niberger has refused to accept this inventory, which remains on the warehouse floor at WU to this day. Furthermore, neither Nichols nor WU has had any business dealings with plaintiffs Hough and Thompson for the Wyoming entities they own. Regarding the Ramos's store which was fully fulfilled and delivered on within 60 days to Amazon fulfillment centers outside of California , WU purchased $10,000 in inventory from Texas on WA's behalf for the Ramos's. To the best of our knowledge, none of this inventory was destined for any California address, and neither Nichols nor WU has ever shipped goods to California.

MOTION TO DISMISS ON JURISDICTION

Also in ¶28, the SAC alleges that Wholesale Universe "helped it [WA] to carry out its fraudulent scheme." But there are no facts alleged anywhere in the SAC that support any involvement of Wholesale Universe in any fraudulent scheme. The allegation is a conclusion of law without factual allegation.

Also in ¶28, the SAC alleges that Wholesale Universe "helped Wealth Assistants conceal its assets from Defendants" with no factual allegations to support this conclusion of law. The claim of "accepting fraudulent transfers" does not demystify this allegation.

Similarly in ¶5, the SAC alleges that Wholesale Universe was in a conspiracy that included "intentionally defrauding dozens of California residents." Again, there is no factual allegation clarifying in what way, how, or by what means Wholesale Universe is alleged to have defrauded anyone. The conclusion of law is not definite and plausible under *Twombly* and *Iqbal.*

## D. SECOND AMENDED COMPLAINT CONTRADICTS COMPLAINT AGAINST WHOLESALE UNIVERSE

Contrary to the theory of the SAC that Wholesale Universe targeted Wealth Assistants clients in California, the SAC relies upon quotes from Nichols that emphasize that Wholesale Universe had no relationship with Wealth Assistants until just as WA was collapsing. See ¶¶ 130, 137, 139. Again, we are not at a summary judgment stage but further proceedings will only reinforce this.

Furthermore, the SAC makes clear or implies – without contradiction – that under the SAC's theory Wholesale Universe offered to use the same money that the WA clients had already paid to WA to complete the process of purchasing

MOTION TO DISMISS ON JURISDICTION

inventory and getting it registered and uploaded to their Amazon stores. It is not plausible to allege that Wholesale Universe either defrauded anyone or helped WA conceal any fraud by using the same money that WA clients had already paid to WA and getting the WA clients' ecommerce stores on Amazon up and running.

Although Wholesale Universe disputes the allegation, SAC ¶¶ 140 and 141 admit and reinforce the SAC's view that money had been transferred from Wealth Assistants to Wholesale Universe to purchase inventory – not that the WA clients had given any money directly to Wholesale Universe.

## VI. CONCLUSION

Defendants Bonnie Nichols and Wholesale Universe hereby ask the Court to dismiss the case against them in this Court for lack of personal jurisdiction of California over them.

Dated: December 2, 2024

                                    **RESPECTFULLY SUBMITTED,**


                                    **/s/ Robert Barnes**
                                    Robert E. Barnes
                                    Barnes Law LLP
                                    CA Bar #325919
                                    700 S. Flower Street, Suite 1000
                                    Los Angeles, CA 90017
                                    P:(310) 510-6211; F:(310) 510-6225
                                    Robertbarnes#barneslawllp.com


                                    **/s/ Bradford L. Geyer**
                                    Bradford L. Geyer, Esq. (PHV Pending)
                                    FormerFedsGroup.Com LLC
                                    141 "I" Route 130 S, 303

MOTION TO DISMISS ON JURISDICTION

Cinnaminson, NJ 08077
T: 856-607-5708
bradford.geyer@formerfedsgroup.com

*Attorneys For Defendants Wholesale Universe
and Bonnie Nichols*

## Certificate of Consultation

Since January 2024 through present, I hereby certify that I have consulted, discussed, and negotiated, with the lead attorney for the Plaintiffs, Nico Banks, Esq., many times over the preceding year including largely aimed at arguing why the Plaintiffs should not be suing Wholesale Universe and Bonnie Nichols and discussing the litigation in Texas.  In a previous filing in California State court, I raised the lack of personal jurisdiction and for a variety of reasons that case was dismissed or withdrawn prior to its being formally docketed.  Therefore, I certify that the issue of jurisdiction has been discussed with the Plaintiffs' attorney and it would be futile to discuss it further at this time.

    */s/ Bradford L. Geyer*
Bradford L. Geyer, Esq.

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing document, and any attachments, will be served to counsel of record, in accordance with the governing rules of procedure regarding service in this court on this December 1, 2024, via email as follows:

    */s/ Bradford L. Geyer*
Bradford L. Geyer, Esq.

- 24 -

MOTION TO DISMISS ON JURISDICTION