Nico Banks, Esq.
nico@bankslawoffice.com
Filing on behalf of all Plaintiffs
CA Bar No. 344705
Banks Law Office
712 H St NE,
Unit #8571,
Washington, DC 20002
Tel.: 971-678-0036

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

DAVID HOUGH; *et al.*

                    Plaintiffs,

        vs.

RYAN CARROLL; *et al*.

                    Defendants.

Case No.: 2:24-cv-02886-WLH

**PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS**

Presiding Judge: Hon. Wesley L. Hsu

Hearing: January 10, 2024, 1:30 pm

Trial Date: N/A

**PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS**

Plaintiffs submit this Opposition to Wholesale Universe and Bonnie Nichols' (hereinafter, "Defendants") Motion to Dismiss (hereinafter, the "Motion"):

**SUMMARY**

Wealth Assistants' fraudulent scheme included asking its clients to send "inventory capital" to stock the clients' stores. Unbeknownst to Plaintiffs, Wealth Assistants was sending many of its clients' inventory capital to Bonnie Nichols' company, Wholesale Universe. Nichols and Wholesale Universe claim that they intended to use that money to supply inventory to the clients' stores, but Nichols and Wholesale Universe did not use most of the money they received from Wealth Assistants for that purpose. Nichols and Wholesale Universe kept the money for themselves instead.

When Wealth Assistants shut down, Nichols and Wholesale Universe contacted the clients to offer to return the inventory capital, but they rarely followed through on that offer. They made excuses instead. In summary, Nichols and Wholesale Universe's purported inventory-supply services were a ruse like the rest of Wealth Assistants.

In carrying out that fraudulent scheme, Wholesale Universe intentionally targeted two Plaintiffs and many other California residents. That theft from many Californians is more than enough to subject Wholesale Universe to the Court's personal jurisdiction.

## BACKGROUND

Wealth Assistants obtained more than $50 million by defrauding more than 600 individuals. Specifically, Wealth Assistants advertised that it would provide its clients with substantial income by setting up and managing lucrative online Amazon stores that the clients would own. But Wealth Assistants did not provide the promised services. Instead, it stole almost all of the money it collected from Plaintiffs and its other clients by fraudulently transferring the money to its principals and affiliates before declaring bankruptcy. (ECF 173 ("SAC"), ¶ 16-24).

Wealth Assistants' fraudulent scheme stole more than $1 million from California residents. (SAC, ¶ 3). Plaintiffs in this case are five California residents who are Wealth Assistants' former clients. (SAC, ¶ 35-38).

As discussed in more detail below, Defendants Bonnie Nichols and her company Wholesale Universe played an integral role in Wealth Assistants' scheme and continued to run a similar fraudulent scheme after Wealth Assistants went out of business.

## LEGAL STANDARD

In adjudicating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction, a court must take as true all uncontroverted allegations in the Amended Complaint and resolve all genuine disputes in the plaintiff's favor. *LNS Enters. v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022). If both sides submit affidavits, then conflicts between the parties over statements contained in affidavits

1  must be resolved in the plaintiff's favor. *LNS Enters. v. Cont'l Motors, Inc.*, 22 F.4th

2  852, 858 (9th Cir. 2022).

3  

4  Fed. R. Civ. P. 4(k)(1)(a) provides that a federal court has personal jurisdiction

5  over a party whenever a state court in the state where the federal court is located would

6  have personal jurisdiction over that party. California courts, in turn, may exercise

7  jurisdiction on any basis consistent with the Constitution of California and the United

8  States. Cal. Code Civ. Proc. § 410.10. The exercise of jurisdiction over a nonresident

9  

10  defendant comports with these Constitutions if the defendant has such minimum

11  contacts with the state that the assertion of jurisdiction does not violate traditional

12  

13  notions of fair play and substantial justice. *Snowney v. Harrah's Entertainment, Inc.*,

14  35 Cal.4th 1054, 1061 (Cal. 2005).

15  

16  Courts use the following three-part test to analyze whether a party's "minimum

17  contacts" meet the due process standard for the exercise of specific personal

18  jurisdiction: (1) The non-resident defendant must purposefully direct his activities or

19  consummate some transaction with the forum or resident thereof; or perform some act

20  by which he purposefully avails himself of the privilege of conducting activities in the

21  forum, thereby invoking the benefits and protections of its laws (the "purposeful

22  

23  direction or availment requirement"); (2) the claim must be one which arises out of or

24  relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction

25  must comport with fair play and substantial justice, *i.e.* it must be reasonable. *Learjet,*

26  

27  *Inc. v. Oneok, Inc.*, 715 F.3d 716, 741-42 (9th Cir. 2013).

28  

- 4 -

"[T]he purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test" that is derived from *Calder v. Jones*, 465 U.S. 783, (1984). *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). That test has three requirements: the defendant allegedly must have (1) committed an intentional act; (2) expressly aimed at the forum state; (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

Notably, with respect to the third prong ("causing harm…"), some district courts in the Ninth Circuit used to apply a rule that the "*brunt* of the harm which is suffered" from the defendant's conduct must have been suffered in the forum state. *Id*. (emphasis added) (citing *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482 (9th Cir. 1993)). However, the Ninth Circuit expressly rejected that test and held that "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Id*. at 1207. For example, online sales to California residents totaling $325,000 easily satisfy that "jurisdictionally sufficient amount of harm" requirement, even if the non-resident defendant sells nationwide and has no additional contact with California. *Thurston v. Fairfield Collectibles of Ga.*, LLC, 53 Cal.App.5th 1231, 1240 (Cal. Ct. App. 2020).

"[P]urposeful availment is satisfied even by a defendant 'whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state.'" *Dole*, 303 F.3d at 1111 (quoting *Haisten v. Grass Valley Med.*

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

*Reimbursement Fund*, 784 F.2d 1392, 1397 (9th Cir. 1986)); *Brainerd v. Governors of the Univ. of Alta.*, 873 F.2d 1257, 1260 (9th Cir.1989) (noting that it is easier for a plaintiff to meet the purposeful direction or availment requirement in a case involving an intentional tort than in a case involving negligence because in intentional-tort cases the "acts are performed for the very purpose of having their consequences felt in the forum state."); *Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997) (finding personal jurisdiction over defendant Feltner where plaintiff Columbia alleged that Feltner was the owner of television stations in the southeast that continued to broadcast Columbia-licensed shows after failing to pay that company royalties; the fact that Feltner *knew* the impact of his willful violation would be felt in California was "sufficient to satisfy the 'purposeful availment' requirement.").

## ARGUMENT

**A. Bonnie Nichols and Wholesale Universe Profited By Helping Wealth Assistants Defraud Plaintiffs And Other California Residents**

Bonnie Nichols is the sole owner and controller of Wholesale Universe. Neither Nichols nor Wholesale Universe are California residents, but while intentionally participating in Wealth Assistants' scheme to defraud, they intentionally targeted Plaintiffs Michael Nibarger, Amund Thompson, and many other California residents.

More specifically, Wholesale Universe—speaking through Bonnie Nichols— has stated that it came "onboard" Wealth Assistants around July of 2023. (SAC, ¶

137).  Around that time, Wealth Assistants sent Nichols and Wholesale Universe at least $1 million. (SAC, ¶ 136). According to Nichols, that money was inventory capital that Wealth Assistants' clients transferred to Wealth Assistants to stock the clients' stores with inventory. (SAC, ¶ 137). Wealth Assistants, in turn, purportedly transferred that inventory capital to Wholesale Universe as a purchase of inventory for specified clients' stores (without telling the clients). (SAC, ¶ 137). Wholesale Universe purportedly accepted responsibility for providing those specific clients with inventory. (SAC, ¶ 137). Those clients included Plaintiffs Michael Nibarger, Amund Thompson, and many other California residents. (*See generally,* Nibarger Declaration; Thompson Declaration).[1]

Unfortunately, Wholesale Universe did not use the $1 million it received from Wealth Assistants to stock the clients' stores. Instead, Nichols and Wholesale Universe held most of that money for themselves. (SAC, ¶ 141).

**B. Bonnie Nichols And Wholesale Universe Continued Defrauding Plaintiffs And Other California Residents After Wealth Assistants Went Out Of Business**

Wealth Assistants announced it was going out of business on October 23, 2023. (SAC, ¶ 133). At that time, Wealth Assistants' CEO, Defendant Ryan Carroll, sent Wealth Assistants' clients a "Transition Agreement" offer. Specifically, Wealth Assistants offered its clients the opportunity to transition their stores to management

---

[1] Exhibit A is referred to herein as the "Nibarger Declaration." Exhibit B is referred to herein as the "Thompson Declaration." Exhibit C is referred to herein as the "Dias Declaration." Exhibit D is referred to herein as the "Tawil Declaration." Exhibit E is referred to herein as the "Stoops Declaration."

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

by another ecommerce firm on "favorable terms." The email also attached a "comparison of vendor proposals," which purportedly compared three e-commerce firms that had offered "favorable terms" to manage Wealth Assistants' clients' stores. But the only e-commerce firms actually identified in the "vendor proposals" were "Quantum Ecom" and "Wholesale Universe," which jointly offered a proposal. The other "vendors" offering the proposal were anonymous. Notably, accepting the "transition agreement" required waiving all claims against Wealth Assistants. (SAC, ¶ 133); (Tawil Declaration, Exhibit A).

Wealth Assistants' clients then began receiving unsolicited emails from Bonnie Nichols, acting in her capacity as an agent of Wholesale Universe. Many of those emails told the recipients that Nichols and Wholesale Universe were in possession of inventory capital that Wealth Assistants had sent to Wholesale Universe on the email-recipient's behalf. (SAC, ¶ 139). However, when the recipients asked Nichols and Wholesale Universe to send them the inventory capital that Wealth Assistants had purportedly sent to Wholesale Universe on their behalf, Nichols and Wholesale Universe refused to do so. (SAC, ¶ 141).

One of Nichols' excuses for not providing the clients with the inventory capital they paid for was that she did not have access to the clients' Amazon stores. (SAC, ¶ 137). But as Nichols now acknowledges in her motion, many of Wealth Assistants' clients did not (and do not) have access to the Amazon stores that Wealth Assistants purportedly set up for them, so Nichols knew that Wealth Assistants' clients would

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

not be able to provide Nichols with access to the online stores. (*See* MTD at 3, "WA clients usually do not know this information [i.e., their stores' login credentials] because WA set up the accounts and did not cooperate in providing these crucial details to the e-commerce stores, their clients, nor to Nichols and Wholesale Universe.").

The reality is that Nichols secretly did have access to the information she needed to access the clients' stores. Behind the scenes, she gathered login information for the clients' stores from Wealth Assistants. (SAC, ¶ 138; Stoops Declaration, Appendix (showing screenshots of messages between Wholesale Universe, Quantum Ecommerce, and Wealth Assistants about gaining access to clients' stores); Tawil Declaration, ¶10 ("Wholesale Universe and Quantum Ecom already had the information they needed to access our online Amazon store. I did not need to provide them with any information to access that store.")). She refused to provide the clients' stores with the inventory capital they had paid for not because she could not, but because she preferred to keep the capital for herself.

Later on, Wholesale Universe informed many of its former clients that Wholesale Universe would be taking a $500 fee for each month that Wealth Assistants' former clients did not claim the inventory capital that Wholesale Universe was purportedly holding for them. (SAC, ¶ 139).

**C. Declarations From Victims Evidence Nichols' Fraudulent Scheme**

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

Shortly after Wealth Assistants went out of business, Plaintiff Michael Nibarger received an email from Nichols stating that Wholesale Universe had received $5,000 of Nibarger's inventory capital from Wealth Assistants. (Nibarger Declaration, ¶ 7). The email stated that Nibarger should contact Wholesale Universe to receive the inventory. (Nibarger Declaration, ¶ 7). Nibarger then called Wholesale Universe to request that the $5,000 be refunded to him. (Nibarger Declaration, ¶ 8). Wholesale Universe refused to refund Nibarger the $5,000 and said that he could only receive the $5,000 as a credit towards an inventory purchase at Wholesale Universe. (Nibarger Declaration, ¶ 9). Because making such a purchase would entail paying Wholesale Universe substantial warehouse fees and shipping fees, and because Nibarger did not trust Wholesale Universe or its partner Quantum Ecom, Nibarger did not use the $5,000 credit. (Nibarger Declaration, ¶ 9). As a result, he lost the $5,000 in inventory capital.

Similarly, Plaintiff Amund Thompson received an email from Nichols stating that Wholesale Universe was holding inventory for him. (Thompson Declaration, ¶ 8). However, because Thompson did not wish to use Wholesale Universe's services, his inventory capital disappeared. (Thompson Declaration, ¶ 9).

Anthony Dias is another Californian who is a victim of Wealth Assistants. Wholesale Universe sent him unsolicited correspondence after Wealth Assistants shut down, offering to supply his store with inventory. (Dias Declaration, ¶ 9). Dias sent $20,000 as an inventory payment to Wholesale Universe, which promised to supply

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

his store with $45,000 worth of specified inventory in return. (Dias Declaration, ¶ 10). Months after Dias made the purchase, Wholesale Universe decided to hold his inventory capital hostage. Specifically, Wholesale Universe told him it would not supply the promised inventory until Dias wrote an email to Wholesale Universe confirming that he had not realized that Wholesale Universe was a named defendant in a lawsuit that Dias had filed against Wealth Assistants. (Dias Declaration, ¶ 11).

After Dias sent the email Wholesale demanded, Wholesale Universe did supply him with some inventory, but the inventory had a sale price of far less than the promised $45,000; Dias generated only about $10,000 of revenue from selling most of the inventory. (Dias Declaration, ¶ 12). Furthermore, when Amazon questioned the authenticity of the inventory that Wholesale Universe had supplied to Dias, Nichols and Wholesale Universe refused to provide any proof of authenticity, suggesting that the inventory may have been counterfeit. (Dias Declaration, ¶ 13). As a result, Amazon shut down Dias's store. (Dias Declaration, ¶ 13). Notably, Dias also suspects that Wholesale Universe gave Quantum Ecommerce unauthorized access to Dias's store. (Dias Declaration, ¶ 16-18).

Chris Tawil is yet another Californian victim of Wealth Assistants who later lost money to Wholesale Universe (in partnership with Quantum Ecommerce). After Wealth Assistants shut down, Chris and his wife, Tarah Tawil, hired Quantum Ecommerce in partnership with Wholesale Universe to manage their Amazon store because Chris and Tarah did not know how to manage it themselves. They signed a

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

contract to pay the partnership $400 per month to manage the store. (Tawil

Declaration, Exhibit A). After signing the contract, they learned that Quantum

Ecommerce and Wholesale Universe already had access to their online Amazon

store; Chris and Tarah did not need to provide Quantum and Wholesale any login

information in order for Quantum and Wholesale to access Chris and Tarah's

Amazon store. (Tawil Declaration, ¶ 10).

For several months, Chris and Tarah paid $400 per month pursuant to the store-

management agreement with the Quantum-Wholesale partnership. (Tawil

Declaration, Exhibit A). But Chris and Tarah quickly realized that they were not

receiving any meaningful store-management services in return for their payments.

And the Quantum-Wholesale partnership did not seem above board; they told Chris

and Tarah to provide false banking information to Amazon, for example. In a word,

Chris and Tarah's experience with Wealth Assistants was repeating itself.

Accordingly, Chris and Tarah terminated their relationship with Quantum-Wholesale

in February of 2024. (Tarah Declaration, ¶ 16).

In summary, Nichols and Wholesale Universe stole the inventory capital of

many of Wealth Assistants' former clients, including at least two Plaintiffs and many

other California residents. Nichols and Wholesale Universe did so by accepting

money from Wealth Assistants that was supposed to be held for those clients' benefit,

and then refusing to return that money to Wealth Assistants' former clients. That

- 12 -

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

conduct constitutes targeting Californians in a fraudulent scheme, and it is sufficient to subject Nichols and Wholesale Universe to the Court's personal jurisdiction.

### D. If The Court Is Inclined To Dismiss Any Of Plaintiffs' Claims, Plaintiffs Should First Be Allowed To Conduct Jurisdictional Discovery

The Court has broad discretion to permit jurisdictional discovery, which "should ordinarily be granted where 'pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *Butcher's Union*, 788 F.2d 535, 540 (9th Cir. 1986). The Court may only deny jurisdictional discovery if "it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977), or when the request is "based on little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).

Here, without the benefit of any jurisdictional discovery, Plaintiffs have submitted four declarations from California residents who have attested that they lost tens of thousands of dollars because of Nichols' and Wholesale Universe's fraudulent acts specifically aimed at those Plaintiffs. Additional jurisdictional discovery would almost certainly demonstrate an even stronger connection between California and the defendants.

### CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety. If the Court finds that Plaintiffs have

- 13 -

not yet shown that Defendants are subject to the Court's jurisdiction, then Plaintiffs respectfully request the opportunity to conduct jurisdictional discovery.

Dated: December 20, 2024

/s/Nico Banks
Nico Banks, Esq.
Banks Law Office
Bar No. 344705
Tel.: 971-678-0036
nico@bankslawoffice.com
712 H St NE,
Unit #8571,
Washington, DC 20002

- 14 -
PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS

## WORD COUNT COMPLIANCE CERTIFICATION

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains fewer than 7,000 words, which complies with the word limit of L.R. 11-6.1

/s/Nico Banks
Nico Banks
Dated: December 20, 2024

## CERTIFICATE OF SERVICE

On December 20, 2024, I served this brief and accompanying papers via first-class mail to the parties listed below with addresses below their names, and via email to the parties with email addresses below their names:

Wholesale Universe and Bonnie Nichols
c/o Brand Geyer, Esq.
bradford.geyer@formerfedsgroup.com

I declare under penalty of perjury under the laws of the State of California that the foregoing statements in this Certificate of Service are true and correct.

/s/Nico Banks
Nico Banks
Dated: December 20, 2024

PLAINTIFFS' OPPOSITION TO WHOLESALE UNIVERSE AND BONNIE NICHOLS' MOTION TO DISMISS