# EXHIBIT D

Nico Banks, Esq.
nico@bankslawoffice.com
Filing on behalf of all Plaintiffs
CA Bar No. 344705
Banks Law Office
712 H St NE,
Unit #8571,
Washington, DC 20002
Tel.: 971-678-0036

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

DAVID HOUGH; *et al.*

               Plaintiffs,

   vs.

RYAN CARROLL; *et al.*

              Defendants.

Case No.: 2:24-cv-02886-WLH

**TARAH TAWIL DECLARATION SUPPORTING OPPOSITION TO WHOLESALE UNIVERSE MOTION TO DISMISS**

I, Tarah Tawil, have personal knowledge of the matters set forth below and if called to testify, I would do so competently.

1. My name is Tarah Tawil.

2. My husband is Christopher Tawil, who purchased the business opportunity Wealth Assistants was offering in June of 2022.

3. My husband paid at least $60,000 to Wealth Assistants and has received less than $5,000 in connection with the business opportunity Wealth Assistants was offering.

4. I often manage my husband's emails with his permission, including by checking his emails and responding to emails when it is appropriate to do so.

5. On October 23, 2023, I received an email from Ryan Carroll stating that Wealth Assistants "will not be able to honor any more Buyback Guarantees" and would "cease all operations before December 1, 2023." The same email also stated that Wealth Assistants was offering its clients a "Transition Agreement." Specifically, Wealth Assistants offered its clients the opportunity to transition their stores to management by another ecommerce firm on "favorable terms." The email also attached a "comparison of vendor proposals," which purportedly compared three e-commerce firms that had offered "favorable terms" to manage Wealth Assistants' clients' stores. But the only e-commerce firms actually identified in the "vendor proposals" were "Quantum Ecom" and "Wholesale Universe," which jointly offered a proposal. The other "vendors" offering the proposal were anonymous. Notably, accepting the vendor proposal required releasing any claims against Wealth Assistants. A true and correct copy of the proposed Transition Agreement is attached as Exhibit A.

6. My husband and I did not sign the Transition Agreement.

7. After Wealth Assistants went out of business in October of 2023, my husband's email account began receiving many unsolicited emails from Bonnie Nichols of Wholesale Universe advertising their inventory and store-management services that they provided in partnership with Quantum Ecom.

8. As background, my husband purchased the Amazon store from Wealth Assistants as an investment to earn *passive* income, and neither he nor I had any knowledge about how to manage the Amazon store ourselves.

9. Accordingly, we hired Wholesale Universe in partnership with Quantum Ecom to provide inventory for our store and manage it. A true and correct copy of our contract with Wholesale Universe in partnership with Quantum Ecom is Exhibit B.

10. Wholesale Universe and Quantum Ecom already had the information they needed to access our online Amazon store. I did not need to provide them with any information to access that store.

11. After I hired the Quantum-Wholesale partnership to supply inventory to my store and manage it, Amazon sent my husband an email to request that he verify the bank account that would receive revenue from the Amazon store. The bank account information (e.g., the bank account number) matched the bank account that belonged to my husband, except that the account holder was listed as "Rose Kavanaugh," which is a name I did not recognize.

TARAH TAWIL'S DECLARATION SUPPORTING OPPOSITION TO WHOLESALE UNIVERSE MOTION TO DISMISS

12. Troy Marchand of Quantum Ecommerce informed me that my store had around $10,000 of inventory in it.

13. As the hired manager of our store, Quantum Ecommerce had been responsible for providing the correct bank account information to Amazon. I called Quantum Ecommerce to ask about the unknown bank account holder listed.

14. A representative from Quantum Ecommerce named JJ later called me back and told me that I should verify the bank account information provided by Amazon even though the name was incorrect.

15. Quantum Ecommerce did not perform any meaningful services to make our store profitable, such as inventory research, pricing research, or advertising.

16. In February of 2024, I emailed Troy Marchand of Quantum Ecommerce to terminate my husband's contract with the Quantum-Wholesale partnership.

17. I then learned how to operate the online Amazon store on my own. My goal was to liquidate the inventory in the store so that it could be shut down. I have sold all or the vast majority of the inventory in the store, and it has generated less than $3,000 in revenue.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 20/12/24

Signed: *Tarah Tawil*
Tarah Tawil (Dec 20, 2024 12:39 PST)

TARAH TAWIL'S DECLARATION SUPPORTING OPPOSITION TO WHOLESALE UNIVERSE MOTION TO DISMISS

# Tarah Tawil declaration

Final Audit Report                                                    2024-12-20

| | |
|---|---|
| Created: | 2024-12-20 |
| By: | Nico Banks (nico@bankslawoffice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAeH1C7RlKt_nCGb7iwEtJZjkxoDJiWm0h |

## "Tarah Tawil declaration" History

📄 Document created by Nico Banks (nico@bankslawoffice.com)
2024-12-20 - 8:30:25 PM GMT

📧 Document emailed to Tarah Tawil (christawil18@gmail.com) for signature
2024-12-20 - 8:30:29 PM GMT

📄 Email viewed by Tarah Tawil (christawil18@gmail.com)
2024-12-20 - 8:37:32 PM GMT

🖋 Document e-signed by Tarah Tawil (christawil18@gmail.com)
Signature Date: 2024-12-20 - 8:39:10 PM GMT - Time Source: server

✅ Agreement completed.
2024-12-20 - 8:39:10 PM GMT

Adobe Acrobat Sign

# EXHIBIT A

EXH "6"

TRANSITION AGREEMENT

The Parties named below ("**Client**" and "**Service Provider**") desire to transition the management of Client's ecommerce store(s) (the "**Store**") from Service Provider to a new services provider of Client's choice ("**New Provider**"), by entering this Transition Agreement (the "**Agreement**") in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. The Parties hereby terminate their agreement of _date_, along with all other understandings between them regarding its subject matter (the "**Service Agreement**"), and agree as follows:

1.  Features of the Transition Plan.

    Service Provider shall no longer be entitled to any:
    - ☐ **success fees** or any percentage of earnings of the Store; or
    - ☐ **transfer fees** in connection with any future transfer of the Store by Client or transfer of any rights to manage it; or
    - ☐ **annual fees**; or
    - ☐ **security interest** in the Store and associated proceeds, accounts, and inventory.

    Client shall not be required to:
    - ☐ pay any outstanding invoices; or
    - ☐ return or re-convey the Store (or any of its inventory) to Service Provider.

    On behalf of Client, Service Provider has negotiated favorable terms with New Provider, including:
    - ☐ No set-up fees; and
    - ☐ No initial fees.

2.  Continuity. Client hereby authorizes Service Provider to provide to New Provider information required to affect an orderly transition.

3.  Settlement and Release. In consideration of this Agreement, Client does hereby release and forever discharge Service Provider and its predecessors, successors, parents, subsidiary and affiliated companies and persons, all present and former principals, agents, partners, officers, directors, board members, trustees, committee members, attorneys, employees, agents and contractors, producers, composers, authors, performers, insurers, and all other persons (hereinafter collectively referred to as "**Releasees**"), of and from all claims, demands, actions and causes of action, including but not limited to claims for any monetary damages, equitable relief, punitive damages, attorneys' fees and costs, arising out of or in any way connected with the Service Agreement or this Agreement.

    This is a full and final release of any and all claims, and the Parties agree as a further consideration and inducement for this compromise settlement that it shall apply to all unknown and unanticipated damages or injuries resulting from said occurrences as well as those that are now disclosed. CLIENT UNDERSTANDS THAT THIS AGREEMENT INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS. In giving the release herein, which includes claims which may be unknown to you at present, you acknowledge that you have read and understand Section 1542 of the California Civil Code, which reads as follows: "*A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.*" You hereby expressly waive and relinquish all rights and benefits under that section and any law of any other jurisdiction of similar effect with respect to your release of any unknown or unsuspected claims herein.

Initials: Client _____ Service Provider _____

4.   <u>Representations and Warranties</u>. Client hereby represents and warrants the following:

<u>Authority</u>. Client has consulted an attorney and is authorized to enter this Agreement.

<u>No Claims</u>. Client shall not file any complaint, charges, civil actions, administrative or other legal proceedings of any nature, concerning or relating to the claims released in this Agreement, against Releasees in any forum. Client also agrees that it shall not encourage, either directly or indirectly, any individuals or entities to make or file any claims against the Releasees, and will not participate in the filing, making, or assertion of any such claims by any third parties.

<u>No Other Representations</u>. Service Provider (nor any agent, employee, representative, or attorney of or for Service Provider) has not made any statement or representation to Client regarding any fact relied on in entering into this Agreement, and Client is not relying on any statement, representation or promise of any other party (or such party's agent, employee, representative or attorney) in executing this Agreement, or in reaching the settlement provided for herein. Further, Client acknowledges that it has made such investigation of the facts and the law pertaining to the matters being settled as it and its attorneys deem necessary, and each party therefore assumes any risk that its understanding of the facts and/or the law is incorrect or incomplete.

5.   <u>General</u>.

<u>Entire Agreement</u>. With respect to the subject matter hereof, this Agreement exclusively governs the relationship between the Parties and constitutes their entire agreement and understanding.

<u>Dispute Resolution</u>. Any controversy or claim arising out of or relating to this Agreement, or the Service Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Claims shall be heard by a single arbitrator. The place of arbitration shall be Harris County, Texas. The arbitration shall be governed by the laws of the State of Texas. Each party will, upon written request of the other party, promptly provide the other with copies of all relevant documents. There shall be no other discovery allowed. The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute.

The arbitrator shall not award consequential damages in any arbitration initiated under this section. Each party shall bear its own costs and expenses and an equal share of the arbitrator's and administrative fees of arbitration; however, In the event of a breach of this Agreement, the arbitrator shall find the non-breaching party is entitled to recover attorneys' fees and costs incurred as a result of that breach. The award of the arbitrator shall be accompanied by a reasoned opinion. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

<u>Assignment</u>. This Agreement shall not be assigned or transferred by Client but shall be binding on and shall inure to the benefit of Client's heirs, executors, administrators, and successors in interest.

[SIGNATURE PAGE FOLLOWS]

TRANSITION AGREEMENT

| SERVICE PROVIDER<br><br>Yax Ecommerce, LLC<br><br>(dba Wealth Assistants) | CLIENT<br><br>_[name]_ |
|---|---|
| By: _____<br><br>*(signature)* | By: _____<br><br>*(signature)* |
| Name and Title: Ryan Carroll, CEO<br><br>Date: _____ | Name: _[name]_<br><br>Date: _____ |

Initials: Client _____ Service Provider _____

# EXHIBIT B

# QUANTUM ECOM IN PARTNERSHIP WITH WHOLESALE UNIVERSE

# SERVICES AGREEMENT

This Services Agreement ("Agreement") is made and entered as of _11 / 16 / 2023_____, ("Effective Date") by and between Quantum Ecom, LLC ("Quantum"), with headquarters located at 13110 Harrell Pkwy, #100, Noblesville, IN 46060 and _Christopher Tawil_____ ("Client"), located at _2303 Mesa Vista Ct Paso Robles,_____, (collectively the "Parties").
_CA 93446_

## RECITALS

**WHEREAS,** Quantum has and continues to develop substantial proprietary rights (including know-how, show-how, copyrighted works, patent applications and trade secrets) relating to the skills, knowledge, experience in the build, development, setup, management, and ongoing operations of online third-party seller accounts (a "Store") authorized on marketplace platforms including, without limitation, Amazon, Walmart, eBay, Shopify, Etsy, Facebook, TikTok and/or other online retailers (each, a "Retailer");

**WHEREAS**, Quantum provides services, by itself and/or through certain subcontractors (each such subcontractor, a "Consultant") to facilitate the development and management of such Stores;

**WHEREAS,** Client desires to retain Quantum to provide such services for Client;

**WHEREAS,** Quantum, by itself or through its Consultant(s), is willing to facilitate the services in accordance with the terms of this Agreement; and,

**NOW, THEREFORE,** in consideration of the recitals set forth above, which are incorporated by reference herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. **Scope of Services.**

   a. Quantum shall arrange for the Consultant to provide the management services described on **Exhibit B**, attached hereto and incorporated herein (the "Management Services", and collectively with the Development Services, the "Services") to Client.

   b. Quantum shall provide consulting and guidance regarding Store operations, and shall communicate with Client, Consultant(s), Retailers, and others as necessary to assist Client with development and operation of the Store.

2. **Compensation.** Assuming performance in compliance with this Agreement, as compensation for the Services provided pursuant to this Agreement, Client shall pay Quantum the amount(s) set forth in **Exhibit B**, attached hereto and incorporated herein, by ACH, Credit Card, or wire, or in such other form as Quantum may require. Payments shall be due and owing on the schedule as set forth on **Exhibit B**.

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

3.    **Term and Termination.**

   a.    Expiration. This term of this Agreement shall begin as of the Effective Date hereof and shall continue until terminated by either party upon thirty (30) days prior written notice to the other party. In addition, this Agreement shall terminate upon thirty (30) days written notice from any contracted Consultant(s) that it/they are discontinuing services related to the Store.

   b.    Effect of Termination. Upon termination, the Parties immediately surrender all rights, licenses, and privileges granted under this Agreement. Quantum shall return to Client all Store account information including login credentials, supplier and customer information, sales and financial data, customer data, and other data necessary for Client to continue to operate the Store in its original condition. The provisions of Sections 3, 5, 7, 8, 9 and 11 shall survive any cancellation or termination of this Agreement.

4.    **Store Ownership.**

   a.    Quantum agrees that the Client is the sole owner of the Store(s) and holds all right, title and interest to the Store and the revenues, profits, and proceeds associated with the Store(s), subject only to Quantum's right to compensation pursuant to this Agreement or otherwise.

   b.    As set forth in **Exhibit A**, Client has certain responsibilities for establishing the Store, with the assistance and guidance of Quantum and/or the Consultant(s).

   c.    As soon as practicable, and no later than immediately upon completion of the Development Services for any particular Store, Quantum and/or the Consultant shall confirm that Client has all passwords, log-in information, account codes, or other access information related to the Store(s). And gives full consent to all parties to obtain confidential information for purposes of gaining access to client accounts.

5.    **Relationship of the Parties.**  The Parties agree that Quantum is an independent contractor and not an employee, agent, joint venturer or other partner of Client. Quantum is retained pursuant to this Agreement solely for the purpose of providing and facilitating the Services to Client. Client expressly assumes all tax liabilities associated with revenue generated pursuant to this Agreement, other than such amounts as may be paid to Quantum pursuant to this Agreement.

6.    **Quantum Representations, Warranties & Guarantees.** Quantum represents, warrants and covenants to Client that:

   a.    Expertise. Quantum and the Consultant(s) possess the requisite training, knowledge, skills, experience and expertise to provide the Services in a professional and workmanlike manner, in accordance with all applicable laws and regulations, this Agreement and the Exhibits thereto. All guarantees are expressly disclaimed based on a Retailer suddenly changing its policies and systems, causing shifts in strategy and procedures.

   b.    Authorized. Quantum has the right, power and capacity and is duly authorized and empowered to execute, deliver and perform this Agreement.  In addition, Quantum represents that it has contractual relationships in place with the Consultant(s) to facilitate this Agreement, and that Quantum is not in breach or default of such Consultant agreement(s).

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

    c.    <u>Legal</u>**.** Quantum agrees that this Agreement, upon execution thereof by the person representing Quantum below, will be the legal, valid and binding agreement of Quantum, enforceable against Quantum in accordance with its terms and applicable law.

    d.    <u>Diligence</u>**.** Quantum will use all practicable efforts to meet time expectations set forth in **<u>Exhibits A</u>**.

    e.    <u>Retailer Compliance Violations</u>**.** Quantum agrees to respond to all Retailer originated compliance violations and in the event that any Store is disabled, removed, disallowed, or otherwise rendered inactive or obsolete by the relevant Retailer, then Quantum shall promptly confirm that Client has been notified.  Quantum and the Consultant(s) shall make all efforts to seek prompt restoration of the Store with the Retailer, and shall keep Client regularly notified of all such efforts and progress.  In the event that such restoration efforts are determined by Client to be futile, or otherwise upon notice at the discretion of Client, then Quantum agrees to provide the services set forth herein for Consultant for a replacement store, pursuant to the terms of this Agreement, if such a replacement store is secured by the Client.  It is the sole responsibility and cost of the store owner to obtain a new store for management.

**7.**    **<u>Client Representations & Assumptions of Risk</u>**.  Client hereby represents, warrants and covenants to Quantum that:

    a.    <u>Authorized</u>**.** Client has the right, power, capacity, and authorization to execute, deliver and perform this Agreement. In addition, Client represents that it has executed the Statement(s) of Work with such Consultant(s) as may be required by Quantum to facilitate the Services.

    b.    <u>Legal</u>**.** Client agrees that this Agreement, upon execution thereof by the person representing Client below, will be the legal, valid and binding agreement of Client, enforceable against Client in accordance with its terms and applicable law.

    c.    <u>Diligence</u>**.** Client agrees to fulfill all obligations under this Agreement and all Exhibits attached hereto.

    d.    <u>Retailer Approval & Compliance</u>**.** Client will use all practicable efforts to secure Retailer approval for the Store, and Client accepts that the sole risk of Retailer approval is Client's.  In the event that Client is unable to secure Retailer approval for any reason, Client understands that Client shall not be entitled to reimbursement for any costs, expenses, or fees paid to Quantum prior to such rejection by Retailer.  Client agrees to comply with all terms, conditions, and rules of Retailer in the operation of the Store, with guidance and consulting from Quantum.  Client understands that operation of the Store through the Retailer(s) involves risks of the Retailer discontinuing or terminating the Client's Store, discontinuing opportunities for third party seller accounts like the Store, or amending its rules, terms, and/or conditions to make third party seller accounts impermissible, less profitable, or otherwise different from the rules, terms and/or conditions as of the Effective Date.  Client agrees that neither Quantum nor Consultant(s) have made any representations, promises, or guarantees regarding Retailer approval or the possibility, feasibility, or legality of continued operation of the Store through the Retailer, and Client further represents that Client understands that it would be impossible for Quantum or Consultant to make such representations, promises, or guarantees. Client knowingly assumes the entire risk of Retailer rules, terms, conditions, and decisions regarding the Store, including without limitation, all set forth in this paragraph.

    e.    <u>Profitability & Projections</u>.  Client represents that Client understands that operation of the Store is fundamentally risky, and that neither Quantum nor Consultant have made, or could credibly make, any representation, promise, or guarantee regarding revenues to be received in the future

from the Store, profitability related to such revenues, a mix of products to be sold through the Store, or whether any sales will be made through the Store at any time. Client understands that such risk, and the impossibility of such representations, promises, and guarantees by Quantum and Consultant, are due to a plethora of factors including but not limited to: (i) Retailer decisions, rules, regulations, terms, conditions, or actions, which cannot be controlled by Quantum, (ii) market factors, such as the availability of products that can profitably be sold and the demand for the sale, which cannot be controlled by Quantum, (iii) the actions or inactions, whether dutiful or negligent, of Consultant, who is a third party to this Agreement, and (iv) the interest rates or other debt coverage costs associated with the line(s) of credit secured by Client for performance pursuant to this Agreement. Client represents that Client is in a sufficient financial position to assume the risk of loss of some or all of its costs and expenses associate with the Store, including all payments due pursuant to this Agreement, and affirms that Quantum has made no representations, promises, or guarantees regarding any return on investment, if any, that Client may expect to make from the Store or the potential profit to Client from operation of the Store at any time. Client knowingly assumes the entire risk associated with the profitability or loss of the Store, and with all other matters described in this paragraph.

**8.    Confidential Information.**

    a.    The Parties acknowledge that in connection with this Agreement and the Services provided by Quantum under this Agreement, each party may acquire and make use of certain Confidential Information of the other party or the Consultant(s) relating to the provision of the Services. For purposes of this Agreement, "Confidential Information" shall include, without limitation, all information shared by either party (or by Consultant(s)) with another party that is not generally available to the public, including without limitation financial information or results, this existence of this Agreement or any terms or conditions contained herein, reports, methods of operation, trade secrets, training materials, policies, protocols and procedures, credit availability, budgeting, databases, marketing research, equipment capabilities, fee schedules, and other proprietary, business, financial and other information connected with or related to the Parties that is not generally known to the public.

    b.    Each party receiving Confidential Information (the "Receiving Party") agrees and covenants not to use the Confidential for any purpose other than to facilitate the Services, calculate compensation, and otherwise perform duties and obligations pursuant to this Agreement. Each Receiving Party agrees and covenants not to share any Confidential Information to any third party without the prior express written consent of the party (or Consultant, as appropriate) disclosing the Confidential Information (the "Disclosing Party").

    c.    Each party agrees to safeguard all Confidential Information in its possession, custody, and control with commercially reasonable security measures, that are at least as robust as those security measures the party uses to safeguard its own Confidential Information. In the event that any party believes that Confidential Information in its possession, custody, or control has been or may have been disclosed to any third party, whether through data security breach, negligence, or other disclosure of any kind, then the party shall immediately notify the Disclosing Party of the breach or potential breach, and shall fully cooperate with the Disclosing Party to secure return, deletion, or destruction of it.

    d.    The obligations with respect to Confidential Information shall not apply to Confidential Information that: (a) Receiving Party already knows at the time it is disclosed as shown by the Receiving Party's written records; (b) is publicly known without breach of the Agreement; (c) the Receiving Party received from a third party authorized to disclose it without restriction; (d) the Receiving Party, its agents, or subcontractors developed independently without the use of

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

the Confidential Information or (e) based on advice of legal counsel, the Receiving Party is required by law, regulation, or valid court or governmental agency order to disclose; provided, however, that the Receiving Party first notifies the Disclosing Party of its intent to make such a disclosure, so the Disclosing Party may seek a protective order or similar protections at law.

e.    Upon expiration or termination of this Agreement, the Receiving Party shall not take nor retain, without prior written consent from the Disclosing Party, any Confidential Information or copies thereof in any form or medium of any kind.    Upon the expiration or termination of this Agreement or otherwise upon the request of the Disclosing Party, all Confidential Information received by the Receiving Party shall be promptly returned to the Disclosing Party or, upon request of the Disclosing Party, destroyed with such destruction confirmed in writing by the Receiving Party in a form reasonably satisfactory to the Disclosing Party.  Without limiting other possible remedies for the breach of these covenants relating to Confidential Information, the Parties agree that injunctive or other equitable relief shall be available to enforce any and all of these covenants, such relief to be without the necessity of posting a bond, cash or otherwise, and the Parties agree that monetary damages are insufficient to mitigate or eliminate losses or damages associated with unauthorized disclosure or use of it.

9.    **Compliance with Laws.**  Each party shall comply with all applicable international, federal, state and local laws in connection with the performance of this Agreement, as well as all regulations, terms and conditions, and other obligations set out from time to time by the Retailers.

10.    **Indemnification.**

a.    Client hereby agrees to defend, indemnify and hold harmless Quantum and Consultant, if any, as well as each of their directors, officers, employees, representatives and agents (each a "Quantum Indemnified Party") from and against any claims, demands, suits, settlements, damages, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (each a "Claim") paid or incurred by, or asserted against any Quantum Indemnified Party relating to or arising out of or in connection with (i) the breach of any of this Agreement by Client; (ii) any of the risks of Client expressly assumed pursuant to Section 7; or (iii) the negligence or willful misconduct of Client or any of its officers, directors, trustees, employees, representatives and/or agents except to the extent such Claim relates to, arises out of or is in connection with the negligence of the relevant Quantum Indemnified Party.

b.    Quantum hereby agrees to defend, indemnify and hold harmless the Client and its directors, officers, employees and agents (each a "Client Indemnified Party") from and against any Claims paid or incurred by, or asserted against any Client Indemnified Party relating to or arising out of or in connection with (i) the breach of any of this Agreement by Quantum; or (ii) the negligence or willful misconduct of Quantum or any of its officers, directors, students, trustees, employees, representatives, and/or agents except to the extent such Claim relates to, arises out of, or is in connection with the negligence of the Consultant.

c.    For those Claims which an indemnitee wishes the indemnifying party to defend, the indemnitee will (i) provide prompt notice to the indemnifying party of the existence of such Claim; (ii) tender control of the defense to the indemnifying party, provided that the indemnifying party may not enter into any settlement affecting indemnitee's interests without indemnitee's consent; and (iii) provide reasonable assistance to the indemnifying party in the defense of such Claim.  Indemnitee may participate in the defense with counsel of its choice at its own expense.

d.    **EXCEPT IN CONNECTION WITH BREACHES OF SECTIONS 7 OR 8, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, INCIDENTAL, OR CONSEQUENTIAL**

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

**DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER, EVEN IF A PARTY KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. QUANTUM'S TOTAL CUMULATIVE LIABLITY ARISING FROM OR RELATED TO THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER WHETHER IN CONTRACT OR TORT OR OTHERWISE, WILL NOT EXCEED THE AMOUNT OF FEES ACTUALLY PAID TO QUANTUM FOR THE RELEVANT STORE PURSUANT TO THIS AGREEMENT DURING THE THREE (3) MONTHS PRECEEDING ACCRUAL OF THE CLAIM. THE PARTIES ACKNOWLEDGE THAT THESE TERMS REFLECT THE ALLOCATION OF RISK SET FORTH IN THIS AGREEMENT, AND THAT THE PARTIES WOULD NOT ENTER INTO THIS AGREEMENT WITHOUT THESE LIMITATIONS OF LIABILITY.**

11.  **Notices.** All notices, demands and other communications required or permitted hereunder or in connection herewith shall be in writing and delivered in person or sent electronically, by facsimile, nationally recognized overnight courier or registered or certified mail, return receipt requested and postage prepaid to the applicable party at its address or e-mail set forth below or at such other address or e-mail address as any party hereto may designate as its address or facsimile number for communications under this Agreement by notice so given. Such communications shall be deemed effective on the (i) day on which delivered or sent if delivered in person, electronically (with confirmatory response electronically sent), or by facsimile (with answered back confirmation received); (ii) first (1st) business day after the day on which sent, if sent by a nationally recognized overnight courier; or (iii) third (3rd) business day after the day on which mailed, if sent by registered or certified mail to:

If to Quantum:                                  If to Client:

Attn: Legal Department
Quantum Ecom, LLC

13110 Harrell Pkwy, Ste. # 100
Noblesville, IN 46060

Christopher Tawil

2303 Mesa Vista Ct

Paso Robles, CA 93446

12.  **Captions; Entire Agreement; Amendments.** The caption headings are furnished for the convenience and reference of the Parties and do not define, limit, extend or describe the scope of this Agreement or any provision in this Agreement. This Agreement, exhibits and other documents incorporated by reference in this Agreement, including any executed Statements of Work, set forth the entire understanding between the Parties hereto regarding the subject matter hereof and supersede all prior and contemporaneous negotiations, agreement and undertakings between the Parties with respect to the subject matter. All exhibits, including without limitation, **Exhibit A**, and **Exhibit B,** to this Agreement are attached hereto and made a part hereof by this reference. In the event of any inconsistency or conflict between the terms hereof and any exhibit or other document incorporated by reference into this Agreement, the terms hereof shall govern and control. This Agreement may not be amended or modified except by an instrument in writing signed by both Parties.

13.  **No Waiver.** Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under the Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence. No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

14.  **Assignment.**

    a.   Neither party may assign or transfer any rights or obligations under this Agreement without the express written consent of the other party, not to be unreasonably withheld. This Agreement shall be binding on successors in interest and permitted assigns of the Parties. This Agreement is being entered solely for the benefit of the Parties hereto and nothing in this Agreement shall confer nor be interpreted as having conferred any benefit to any third party.

**15.**    **Governing Law.** The validity, construction, interpretation and all other matters relating to this Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio, without regard to its conflict of law principles. In the event of any action or proceeding to enforce any term of this Agreement, the Parties shall submit to the exclusive venue of any court located in Cuyahoga County, Ohio.

**16.**    **Force Majeure.** If either party's performance of obligations (except for payment of fees for Services already rendered) under this Agreement is rendered impossible for unforeseen reasons outside the control of such party, including without limitation fire, casualty, lockout, strike, labor conditions, unavoidable accident, riot, war, earthquake, landslides, acts of nature, shutdowns due to pandemic or mass infection, the enactment, issuance, or operation of any municipal, county, state, or federal law or ordinance, an executive, administrative, or judicial regulation, order, or decree, or any local, state, or national emergency, then such party shall be excused from performance of this Agreement to the extent that such performance is impossible. The party claiming such force majeure excuse must immediately notify the other party of the scope, nature, and duration of such force majeure event, and shall take all practicable steps to resume performance as promptly as possible. The other party shall be entitled to suspend its own performance pursuant to the Agreement during the period of the force majeure period.

**17.**    **Severability.** If any provision of this Agreement is found invalid or unenforceable by a court of competent jurisdiction, then such provision shall be deemed stricken herefrom and the remainder of this Agreement shall remain at all times in full force and effect and such invalid or enforceable provision shall, to the extent legally permitted, be replaced by the valid and enforceable provision that seems closest to the Parties' intent underlying the invalid or unenforceable provision.

**18.**    **Counterparts.** This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

       **IN WITNESS WHEREOF,** the Parties hereto have caused this Services Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

**CLIENT**                      **QUANTUM ECOM, LLC**

By: _Christopher Tawil_____    By: _____

Name: ___Christopher Tawil_____    Name: ___Troy Marchand_____

Title: ___Owner_____    Title: ___CEO_____

# EXHIBIT A – MANAGEMENT SERVICES

Quantum represents that it and/or its Consultant(s), agree to deliver commercially reasonable efforts to perform the following Management Services.

## 1. Management Responsibilities

Quantum agrees to provide full, complete, and total management services to sell products through the Store, other than the Client responsibilities, set out below. Specifically, the Management Services includes, without limitation:

A. **Store Uptime.** Maintaining operation and continuity of the sales of the Store at all times, as is commercially reasonable. Upon Store disconnection or interruption, to respond promptly in communication with the Retailer and Client to reconnect and resume Store sales.
B. **Product Research.** Researching the most popular, profitable products to list for sale in the Store;
C. **Product Strategy.** Determining the best products to be sold in the Store, subject to reasonable input from time-to-time from Client;
D. **Order Processing.** Receiving orders for products from the Store;
E. **Order Fulfillment.** Fulfilling product shipments to meet those orders promptly, within a commercially reasonable period of time, after the receipt of order;
F. **Customer Service Management.** Handling all Store customer service inquiries and issues, including without limitation, end customer/buyer complaints, returns, chargebacks, refunds, and questions promptly within a commercially reasonable period of time of the notification of an inquiry or issue;
G. **Accurate Records.** Maintaining clear, accurate, and up-to-date bookkeeping records of all sales and cost of goods sold associated with the Store;
H. **Communication.** Regularly communicating with Client regarding operation of the Store and any issues that may arise associated with the Store;
I. **Dispute Resolution.** Resolving all disputes, claims, and/or inquiries associated with the operation of the Store from Retailer or otherwise;
J. **Appeal Processing.** Processing all appeals and responses necessary to maintain the operation of the Store with the Retailer;
K. **Best Practices.** Maintain the best practices for the Development and Management of the Store;
L. **Industry Savvy.** Stay up to date with industry standard best practices, strategies, and tools.

## 2. Client Responsibilities

To receive the Management Services set out in this **Exhibit A**, Client agrees to do the following:

A. **Store Permissions.** Provide full access to the Retailer's account to Quantum and Consultant(s), including without limitation, granting "User Permissions," "Admin Access," or other owner-level access to the Retailer accounts as requested from time-to-time;
B. **Link Credit Cards.** Provide Quantum and/or the Consultant(s) access to credit and/or debit cards issued through the United States federally insured banking institution, and provide all numbers, codes, and billing information sufficient to allow purchases, in an amount equal to that set forth in the applicable Statement of Work;
C. **Credit Monitoring.** Monitor credit limits on such credit or debit cards, handle all inquiries from the credit or debit card issuers to ensure smooth transactions;

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

D. **Credit Line Paydowns.** Promptly pay down the balance of all credit line, cards, and loans linked to the performance of the Store to ensure credit availability and uninterrupted sales;

E. **Legal Formation.** Handle all business formation or management issues concerning Client's legal entity, including without limitation registration with the relevant state(s) of operations, payment of all taxes due at the Client level, and employment of or contracting with such person(s) as are necessary to perform Client's obligations under this Agreement;

F. **Business Bank.** Obtain a business bank to link to the Store.

G. **EIN.** Obtain a federal tax identification number, an employer identification number,

H. **Good Standing.** Take all reasonable efforts, at all times, in accordance with the guidance of Quantum and/or Consultant(s), to avoid the Store being "Paused", "Suspended," "Disabled" or placed on "Vacation" mode, or any similar limitation on the Store's ability to sell through the Retailer;

I. **Store Operating Expenses**. Monitor and pay for all operating expenses associated with your Store(s), including without limitation, software fees, bookkeeping, sales tax exemption certificates, and all other expenses directly associated with the successful management of your Store(s)

J. **Authorize Agency.** Authorize Quantum and/or Consultant(s) to act on Client's behalf as to all items necessary for the management of Client's store, as may be requested from time-to-time; and

K. **Regular Communication.** Promptly communicate with Quantum, Consultant(s) or Retailer, as required, to facilitate the smooth operation of the Store, and to promptly respond to all communications from Quantum, Consultant(s), and Retailer.

## 3. Nonperformance

In the event that Client fails timely to perform its obligations under this Exhibit, acts negligently, or otherwise fails to exercise a reasonable degree of care in the performance of its duties, then Quantum shall promptly notify Client of its breach in writing. Client shall have five (5) days (the "Cure Period") to cure the deficiencies in its performance, and offer Quantum assurances, determined to be adequate in Quantum's discretion, that the breaches have been cured.

In the event that the breaching party does not cure the breaches within the Cure Period, then Client shall be in material breach of the Agreement.

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

# EXHIBIT B – PRICING DETAILS

Client agrees to the following terms as described in this **Exhibit B**.

## 1. Account Management Pricing Schedule

| Services Description | Pricing |
|---|---|
| Management Services | $400 Per Month |

## 2. ACH Payment Authorization

You authorize regularly scheduled charges to your checking/savings account. You will be charged the amount indicated below each billing period. A receipt for each payment will be provided to you and the charge will appear on your bank statement as an "ACH Debit". You agree that no prior-notification will be provided unless the date or amount changes, in which case you will receive notice from us at least 10 days prior to the payment being collected.

I _____Christopher Tawil_____ authorize _____Quantum Ecom_____ to charge my bank account indicated below for $400 on the 1st of each Month

This payment is for Ecom Management Services.

**Bank Details**

☑ Checking    ☐ Savings

Account Name _____Christopher Tawil_____
Bank Name _____US Bank_____
Account Number _____153465075536_____
Routing Number _____122235821_____

I understand that this authorization will remain in effect until I cancel it in writing, and I agree to notify Quantum Ecom in writing of any changes in my account information or termination of this authorization at least 15 days prior to the next billing date. If the above noted payment dates fall on a weekend or holiday, I understand that the payments may be executed on the next business day. For ACH debits to my checking/savings account, I understand that because these are electronic transactions, these funds may be withdrawn from my account as soon as the above noted periodic transaction dates. In the case of an ACH Transaction being rejected for Non-Sufficient Funds (NSF) I understand that Quantum Ecom may at its discretion attempt to process the charge again within 30 days, and agree to an additional $15 charge for each attempt returned NSF which will be initiated as a separate transaction from the authorized recurring payment. I acknowledge that the origination of ACH transactions to my account must comply with the provisions of U.S. law. I certify that I am an authorized user of this bank account and will not dispute these scheduled transactions with my bank; so long as the transactions correspond to the terms indicated in this authorization form.

SIGNATURE _____Christopher Tawil_____    DATE _____11/16/2023_____
(Account Holder's Signature)

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

## 3. Credit Card Payment Authorization

You authorize regularly scheduled charges to your credit card. You will be charged the amount indicated below each billing period. A receipt for each payment will be provided to you and the charge will appear on your credit card statement. You agree that no prior-notification will be provided unless the date or amount changes, in which case you will receive notice from us at least 10 days prior to the payment being collected.

I <u>Christopher Tawil</u> authorize <u>Quantum Ecom</u> to charge my
    (Cardholder's Name)          (Merchant's Name)

Credit Card indicated below for $400 on the _1st Day of each Month.

**Billing Information**

Billing Address <u>2303 Mesa Vista Ct</u>    Phone # <u>(818) 943-1949</u>

City, State, Zip <u>Paso Robles, CA 93446</u>    Email <u>christawil18@gmail.com</u>

**Card Details**

☐ Visa   ☐ MasterCard   ☐ Discover   ☐ American Express

Cardholder Name   <u>Christopher Tawil</u>
Account/CC Number _____
Expiration Date ____ / ____
CVV ____
Zip Code _____

I understand that this authorization will remain in effect until I cancel it in writing, and I agree to notify Quantum in writing of any changes in my account information or termination of this authorization at least 15 days prior to the next billing date. If the above noted payment dates fall on a weekend or holiday, I understand that the payments may be executed on the next business day. I acknowledge that the origination of Credit Card transactions to my account must comply with the provisions of U.S. law. I certify that I am an authorized user of this Credit Card and will not dispute these scheduled transactions; so long as the transactions correspond to the terms indicated in this authorization form.

SIGNATURE *Christopher Tawil*   DATE <u>11/16/2023</u>
     (Cardholder's Signature)

Doc ID: 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5

**Dropbox Sign**                                                                 Audit trail

| | |
|---|---|
| **Title** | Quantum Ecom Amazon Service Agreement |
| **File name** | Services Agreement.docx |
| **Document ID** | 1eacf1328b7185cf3edfe7fcf11bd1f0020de3f5 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

|  |  |  |
|---|---|---|
| **SENT** | **11 / 08 / 2023**<br>17:04:16 UTC | Sent for signature to Christopher Tawil (christawil18@gmail.com) from support@quantumecom.io<br>IP: 104.180.222.153 |
| **VIEWED** | **11 / 13 / 2023**<br>07:17:38 UTC | Viewed by Christopher Tawil (christawil18@gmail.com)<br>IP: 71.84.10.207 |
| **SIGNED** | **11 / 17 / 2023**<br>03:02:14 UTC | Signed by Christopher Tawil (christawil18@gmail.com)<br>IP: 71.84.10.207 |
| **COMPLETED** | **11 / 17 / 2023**<br>03:02:14 UTC | The document has been completed. |

Powered by **Dropbox Sign**