UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:24-cv-02886-WLH-SK | Date | May 5, 2025 |
| Title | *David Hough et al v. Ryan Carroll et al* | | |

Present: The Honorable   WESLEY L. HSU, United States District Judge

| Holidae Crawford | None |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:**   **(IN CHAMBERS) ORDER RE BANK OF AMERICA N.A.'S, WELLS FARGO BANK, N.A.'S, FIRST CITIZENS BANCSHARES' AND CHRISTINE HAGAR'S MOTIONS TO DISMISS [234, 265, 226, 233]**

The Court is in receipt of Bank of America, N.A.'s ("Bank of America") Motion to Dismiss ("Bank of America MTD," Docket No. 234), Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion to Dismiss (Wells Fargo MTD, Docket No. 226), First Citizens Bancshares Inc.'s ("First Citizens") Motion to Dismiss ("First Citizens MTD," Docket No. 233) and Christine Hagar's Motion to Dismiss ("Hagar MTD," Docket No. 265).   No party filed a written request for oral argument stating that an attorney with five years or less of experience would be arguing the matter.   (See Standing Order, Docket No. 14 at 16).   Further, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 7-15, the Court finds this matter appropriate for decision without oral argument.   The hearing calendared for May 9, 2025, is **VACATED**, and the matter taken off calendar.   For the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

following reasons the Court **DISMISSES** all claims against Bank of America, Wells Fargo, First Citizens and Christine Hagar without prejudice.

## I.    BACKGROUND

### A.    <u>Factual Background</u>

This case involves an alleged fraudulent scheme which the Court has detailed in previous orders. (Temporary Restraining Order, Docket No. 17 at 3; at 1-4). In short, Plaintiffs allege that putative class members were fraudulently induced to purchase ecommerce stores from Defendant Wealth Assistants for a buy-in of up to $125,000. (Second Amended Complaint ("SAC") ¶ 17). Wealth Assistants advertised that it would set up and manage clients' online stores which would earn more than $10,000 per month by the end of the store's first year. (*Id.* ¶¶ 17-18). Wealth Assistants promised to buy back any ecommerce store that failed to generate enough income to cover the clients' initial investments. (*Id.* ¶ 80). Plaintiffs allege that Wealth Assistants not only failed to deliver on their promises, but never intended to honor their commitments to clients. (*Id.* ¶ 21 (noting that some customers never received stores and others received stores that were never stocked); *id.* ¶ 82 (alleging that Wealth Assistant never intended to honor its buy-back clause)).

Plaintiffs further allege that Wealth Assistants pursued a "payment processing strategy" to conceal the proceeds of its allegedly fraudulent scheme from creditors, including the putative class members. (*Id.* ¶¶ 142-47). As part of this strategy, Wealth Assistants allegedly broke up large transactions into multiple, small transactions; used many different payment processors; divided assets into myriad bank accounts; and passed money through various accounts and processors "before the money reached its final destination." (*Id.* ¶ 147).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

As relevant to the pending motions, Plaintiffs specifically allege that Christine
Hagar, Wealth Assistants' Finance Manager, aided and abetted Plaintiffs' fraud.  (SAC
¶ 264).  Plaintiffs additionally allege that three banks—Bank of America, First Citizens
and Wells Fargo—aided and abetted Wealth Assistants' fraud against Plaintiffs (*id.* ¶¶
293-295) and aided and abetted Wealth Assistants' breach of fiduciary duty (*id.* ¶¶ 301-
306).[1]  Plaintiffs allege a series of facts regarding all banks and provide specific
allegations as to each of the three banks.

*1.  Allegations Regarding Banking, Generally*

According to Plaintiffs, federal law requires banks to know their customers and
understand their customers' banking behavior.  (*Id.* ¶ 153).  Banks, specifically, are
required to collect information about who controls each account.  (*Id.*)  Banks must also
comply with the Bank Secrecy Act and its anti-money laundering provisions.  (*Id.* ¶ 154).
The BSA requires banks to develop and implement programs to ensure compliance with
the law (*id.* ¶ 155) and to identify unusual or suspicious transactions for each customer
(*id.* ¶ 156).  Per Plaintiffs, bank employees processing outgoing wire transfers are trained
to ask questions to detect possible money laundering.  (*Id.* ¶ 156).  Typically, wire
transfers between $25,000 and $100,000 prompt staff to evaluate the transaction.  (*Id.*)
Wire transfers of larger amounts typically require approval of designated staff.  (*Id.*)
Additionally, banks review accounts for potential red flags, including the following:

> (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or
> received from the same person to or from different accounts; (3) transactions
> inconsistent with the account holder's business; (4) transfers of funds among

---

[1] The Second Amended Complaint implicates the banks and Christine Hagar in a conspiracy to
commit fraud.  As will be discussed *infra* in this Order, Plaintiff has agreed to dismiss the
conspiracy claims against the banks and Christine Hagar.  *See infra* Section I(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

related accounts; (5) depositing of funds into several accounts that are later
consolidated into a single master account; (6) large fund transfers sent in round
dollar amounts; (7) multiple accounts established in various corporate names
that lack sufficient business purpose to justify the account complexities;
(8) multiple high-value payments or transfers between shell companies without
a legitimate business purpose; (9) payments unconnected to legitimate
contracts or revenue sources; (10) fund transfers containing limited content or
related party information; (11) transacting businesses sharing the same address;
and (12) an unusually large number of persons or entities receiving fund
transfers from one company.

(SAC ¶ 166).

2. *Allegations Regarding Bank of America*

Bank of America operated at least twenty accounts owned or controlled by

Defendants Ryan Carroll or Wealth Assistants. (SAC ¶ 167). Plaintiffs allege that Bank

of America knew that Defendants were using the accounts in their fraudulent scheme.

(*Id.* ("Bank of America operated those accounts despite knowing that other Defendants

were using them in furtherance of a fraudulent scheme."); *see also id.* ¶¶ 182, 183, 188

(alleging Bank of America's knowledge of Ryan Carroll and Wealth Assistants' fraud)).

Defendant Ryan Carroll opened ten or more Bank of America accounts under the

names of Wealth Assistants, "WA Brand Management LLC" and "Dreams to Reality."

(*Id.* ¶¶ 176-77). One Bank of America account held by Wealth Assistants ending in

-4905 (the "-4905 Account") began accepting transfers from Wealth Assistants clients as

early as May 2022. (SAC ¶ 168). Many of the wire-transfers from putative class

members stated that the transfers were for an "investment." (*Id.* ¶ 169). Though the

account began accepting transfers in May 2022, the only account-opening documentation

for the -4905 account that Bank of America has produced is dated and signed September

19, 2022. (*Id.* ¶ 171). Defendant Ryan Carroll and Defendant Christine R. Johnson are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

listed on the account documentation as the two people authorized to use the account. (SAC ¶ 172).

In July and August of 2022, Carroll transferred about one million dollars from the -4905 account to an account owned by Dreams to Reality. (*Id.* ¶ 178). Carroll then dispersed the money to other accounts. (*Id.*). Around the same time, the -4905 account made five wire transfers, each worth $166,666.67 to accounts held by a company which was later shut down by the Federal Trade Commission for an alleged fraud similar to the one at issue in the present case. (*Id.* ¶ 174). In October of 2022, over $4 million was withdrawn from the -4905 account and transferred to other accounts. (*Id.* ¶ 180).

On or around November 17, 2022, Ryan Carroll lost access to at least one Bank of America account. (*Id.* ¶ 181). Bank of America told Carroll that it would close Wealth Assistants' Bank of America accounts on November 22, 2022, and provide Carroll with a cashier's check for outstanding balances. (*Id.*). Before the accounts were closed, the -4905 account transferred more than $100,000 to an unknown bank account. (*Id.* ¶ 184). On January 26, 2023, Bank of America wrote a cashier's check to Wealth Assistants for about $3.7 million. (*Id.* ¶ 184). Bank of America did not close other bank accounts controlled by Ryan Carroll nor Dreams to Reality. (*Id.* ¶¶ 189, 192).

Plaintiffs' final set of allegations regarding Bank of America pertains to actions taken after the Court issued an order freezing several defendants' assets. On April 15, 2024, the Court issued a Temporary Restraining Order restraining a set of defendants, including Ryan Carroll, from "withdrawing, transferring, spending, or otherwise disposing of any assets" without leave of the Court. (Temporary Restraining Order at 6-7). The Temporary Restraining Order explicitly provided an exception of up to $9,000 per human defendant for living expenses. (*Id.* at 7). Plaintiffs provided Bank of America

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

with this asset-freeze order on April 16, 2024. (SAC ¶ 189). On May 13, 2025, the
Court converted the Temporary Restraining Order into a Preliminary Injunction.
(Preliminary Injunction, Docket No. 49). Plaintiffs notified Bank of America
"immediately." (SAC ¶ 189). Plaintiffs allege that Bank of America did not enter the
freeze order "into is computer system" and "ignored the asset-freeze order entirely." (*Id.*
¶ 191). Plaintiffs allege, on information and belief, that Bank of America is continuing to
operate banks accounts for defendants impacted by the asset-freeze order. (*Id.* ¶ 193).

### 3. *Allegations Regarding Wells Fargo*

Wells Fargo operated about thirteen bank accounts controlled by various
Defendants. (*Id.* ¶ 218). Most accounts listed Defendant Max K. Day's home address as
the address for the account holder. (SAC ¶¶ 219). Wells Fargo additionally processed
payments for Wealth Assistants. (*Id.* ¶ 215). Plaintiffs allege that Wells Fargo knew that
Wealth Assistants was a fraudulent scheme when it custodied Wealth Assistants assets
and processed its payment. (*Id.* ¶ 217; *see also id.* ¶¶ 228, 235 (alleging that Wells Fargo
uncovered a fraudulent scheme upon review of accounts)).

In 2004, prior to the creation of Wealth Assistants, Wells Fargo loaned $500,000 to
a venture run by Max K. Day and other members of his family called "Today's Destiny."
(*Id.* ¶ 221). Allegedly, Today's Destiny's "fraud was revealed," and the entity filed for
bankruptcy. (*Id.*) Wells Fargo thereafter filed a proof of claim against Today's Destiny
to recover the loan. (*Id.*) Plaintiffs allege that Wells Fargo therefore knew that Max K.
Day was a "high risk" client. (*Id.*)

Between November of 2022—the same month that Bank of America froze Wealth
Assistants' bank accounts—and January 2023, accounts in the name of Precision Trading
Group were opened at Wells Fargo. (*Id.* ¶ 224). One such account ended in -2209 (the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

"-2209 Account").  On information and belief, Plaintiffs allege that Precision Trading Group did not have a website nor any signs of legitimate business activities at the time the accounts were opened.  (*Id.* ¶ 226).  After Wealth Assistants received a cashier's check from Bank of America for more than $3.7 Million, Wealth Assistants cashed the check at Wells Fargo and deposited it in Precision Trading's -2209 Account.  (*Id.* ¶ 226). Plaintiffs appear to allege that Wells Fargo *should* have known that Bank of America had previously frozen Wealth Assistants' account given that Ryan Carroll filed a lawsuit against Bank of America for freezing the accounts.  (*Id.* ¶ 223 (noting that Bank of America's freezing of the Wealth Assistants account "was publicly available information" given Carroll's lawsuit)).

Plaintiffs allege, on information and belief, that the $3.7 Million deposit caused Wells Fargo to perform increased due diligence regarding Precision Trading Group and led Wells Fargo to uncover a fraudulent scheme.  (*Id*. ¶ 228).  Plaintiffs allege that Precision Trading Group's account activity "strongly exhibited most of the red flags that banks are required to search for and review. . . ."  (*Id*. ¶ 223).  Plaintiffs further allege, on information and belief, that Wells Fargo manually reviewed these red flags and caused Wells Fargo to know that the accounts were fraudulently concealing assets.  (*Id*. ¶ 235).

Plaintiffs allege that the -2209 Account accepted wire transfers in large, round, similar amounts with memorandums indicating that they were intended as investments. (*Id.* ¶ 228).  Many "of the confirmations for those wire transfers stated that the purpose of the payment was to purchase an Amazon store from Wealth Assistants."  (*Id.* ¶ 231). Shortly after receiving the transfers, Precision Trading Group would transfer the money to various defendants via large transfers.  (*Id.* ¶ 232).  Though the account was held by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Precision Trading Group, the wire transfer often reflected that the account was owned by
Max K. Day.  (*Id.*)

Plaintiffs allege that Wells Fargo received numerous wire-reversal requests from
Wealth Assistants' clients with descriptions of Wealth Assistants allegedly fraudulent
scheme.  (SAC ¶ 239).  In October 2023, for example, Navy Federal bank sent Wells
Fargo an urgent request to recall a wire transfer to the -2209 Account after a Navy
Federal client reported that Wealth Assistants was a scam.  (*Id.*)  Navy Federal was
ultimately informed that there were insufficient funds in the -2209 Account to reverse the
wire transfers.  (*Id.*)  Other clients of Wells Fargo asked Wells Fargo to reverse wire
transfers the clients made to the -2209 account citing Wealth Assistants' allegedly
fraudulent activities.  (*Id.* ¶ 242).  Wells Fargo continued operating Precision Trading
Group accounts after the exchange with Navy Federal and after the requests from Wells
Fargo clients to reverse wire transfers.  (*Id.* ¶ 241-42).

Prior to any order by this Court, plaintiffs' counsel sent Wells Fargo letters
describing the alleged fraudulent scheme.  (*Id.* ¶ 242).  Plaintiffs later notified Wells
Fargo of the temporary restraining order prohibiting Defendants from spending more than
$9,000 in assets.  (*Id.* ¶ 244).  Wells Fargo Senior Counsel responded noting that the
order "is directed only at specific Defendants" and "does not direct Wells Fargo to take
any action or otherwise monitor the accounts."  (*Id.*).[2]

---

[2] The Second Amended Complaint included allegations that Defendant Total-Apps Inc. was an
agent of Wells Fargo and that Total-Apps' alleged knowledge and substantial assistance with the
"payment processing strategy" could therefore be imputed to Wells Fargo.  (*See* SAC ¶¶ 194-
213).  The parties have since stipulated to strike all allegations regarding Wells Fargo's
relationship with Total-Apps.  (Order Granting Stip. to Strike and Amendment of Party Names,
Docket No. 282).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

### 4. *Allegations Regarding First Citizens*

First Citizens operated three bank accounts held by Defendant Providence Oak Properties since at least May 1, 2022. (SAC ¶ 245). The accounts had account numbers ending in -1286, -3241 and -3348. (*Id.*) While Providence Oak Properties initially held itself out as a construction company owned and operated by an individual named Kurt Odom (*id.* ¶ 246), plaintiffs allege that Providence Oak Properties "was in the business of using its bank account at First Citizens Bank to help criminals in money laundering." (*Id.* ¶ 248). Plaintiffs allege that Wealth Assistants used Providence Oak Properties' First Citizens accounts as an intermediary in its payment processing scheme. (*Id.* ¶ 257).

Plaintiffs allege that First Citizens Bank knew that Providence Oak Properties was being used to launder and conceal illegally procured money. (*Id.* ¶ 253). Plaintiffs allege that First Citizens did not keep records of deposits made into the accounts held by Defendant Providence Oak Properties in violation of its laws and obligation. (*Id.*) For example, First Citizens "does not have records" for many transfers from outside bank accounts to Provide Oak Properties' accounts at First Citizens between January through August of 2023. (*Id.* ¶ 249). Plaintiffs allege in conclusory fashion that First Citizens Bank "used wire transfers to transfer money to a different bank to help conceal its origins." (*Id.* ¶ 250). Almost all the transfers out of Provide Oak Properties' accounts during the time relevant to the complaint included "a sentence similar to: 'Invoice amount of [dollar amount] paid by [name of beneficiary] on [date]. Funds of [dollar amount] returned after fees were removed as agreed upon.'" (*Id.* ¶ 251).

### 5. *Allegations Regarding Christine Hagar*

Plaintiffs' allegation regarding Christine Hagar are cabined to three paragraphs in the Second Amended Complaint. (*See* SAC ¶¶ 172, 232 & 264). One paragraph states:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Defendant Christine Carroll[3] served as Wealth Assistants' Finance Manager.
Upon information and belief, she had access to Wealth Assistants' bank
accounts, and she initiated many fraudulent transfers from the Wealth
Assistants Entity Defendants. Upon information and belief, she was also in
charge of maintaining Wealth Assistants' accounting records, and creating
and sending invoices. Upon information and belief, she also monitored
Wealth Assistants financial accounts and records to help ensure that the
assets were concealed from Wealth Assistants' creditors and that the accounts
were not drawing scrutiny from government regulators. She performed those
tasks knowing that Wealth Assistants was operating the fraudulent scheme
described above.

(*Id.*)  Another paragraph alleges that "Defendant Christine R. Johnson (whose title
is listed as 'Finance Manager' for Wealth Assistants)" was listed as an authorized
person for the -4905 Account at Bank of America (*id.* ¶ 172)—an account detailed
in Section I(A)(2), *supra*.  The final potential reference to Christine Hagar appears
in paragraph 232 of the complaint which notes that the memorandum for a wire
transfer out of Precision Trading's Wells Fargo account read "christine ops."
(SAC ¶ 232).

### B.    Procedural Background

Bank of America, Wells Fargo, First Citizens and Christine Hagar filed timely
motions to dismiss.  (Bank of America MTD; Wells Fargo MTD; First Citizens MTD;
Hagar MTD).  Plaintiffs filed timely oppositions.  (Opp'n to Bank of America MTD,
Docket No. 260; Opp'n to Wells Fargo MTD, Docket No. 258; Opp'n to First Citizens
MTD, Docket No. 259; Opp'n to Hagar MTD, Docket No. 277).  Defendants filed timely

---

[3] On April 2, 2025, the Court amended Christine Hagar's name as captioned in the litigation
from "Christine Carroll" to "Christine Hagar, f.k.a. Christine Johnson, f.k.a. Christine Carroll."
(Order Granting Stip. to Strike and Amended of Party Names at 2).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

reply briefs. (Bank of America Reply, Docket No. 268; Wells Fargo Reply, Docket No. 270; First Citizens Reply, Docket No. 267; Hagar Reply, Docket No. 284).

In the opposition to Bank of America, Wells Fargo and First Citizen's motions to dismiss, Plaintiffs explicitly requested that the Court *grant* the banks' motions to dismiss conspiracy claims. (Opp'n to Bank of America MTD at 22; Opp'n to Wells Fargo MTD at 29; Opp'n to First Citizen's MTD at 21). Additionally, parties stipulated to dismissing the conspiracy claim against Christine Hagar (Docket No. 278), striking certain factual allegations against Wells Fargo and amending Christine Hagar's name from "Christine Carroll" to "Christine Hagar f.k.a Christine Carroll f.k.a Christine Johnson. (Order Granting Stip. to Strike and Amendment of Party Names, Docket No. 282).

## II.    MOTION TO DISMISS LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for failure to state a claim upon which relief can be granted. A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

In deciding a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true, and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). Plaintiffs typically need only provide sufficient factual material to "plausibly" state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

the plaintiff pleads factual content that allows the court to draw the reasonable Inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678.

When a plaintiff alleges claims that "sound in" or are "grounded in fraud," however, Rule 9(b) imposes a heighted pleading standard. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1102–06 (9th Cir. 2003); *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1219–20 (E.D. Cal. 2005). Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud," Fed. R. Civ. P 9(b), including the "who, what, when, where, and how" of the fraudulent activity. *United States ex rel Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011). Even under Rule 9, states of minds "may be alleged generally." Fed. R. Civ. P. 9(b). Where a case is dismissed for failure to state a claim, a district court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## III. AIDING AND ABETTING FRAUD CLAIMS

To prevail on an aiding and abetting fraud claim, a plaintiff must establish the aider and abettor "(1) had actual knowledge of the underlying wrongful conduct, and (2) gave substantial assistance or encouragement to another to so act." *Shaterian v. Wells Fargo Bank, N.A.*, 829 F.Supp.2d 873, 884-85 (N.D. Cal. 2011) (citing to *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005).[4]

---

[4] Wells Fargo argues that aiding and abetting fraud claims include a third element: that defendant must have reached "a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." (Wells Fargo MTD at 16 (quoting *Hullinger v. Anand*, No. CV1507185SJOPJWX, 2016 WL 11750270, at *8 (C.D. Cal. July 8, 2016), *on reconsideration*, No. CV1507185SJOFFMX, 2016 WL 4409196 (C.D. Cal. Aug. 11, 2016)). While this purported element appears redundant with the knowledge element, *see Camenisch v. Umpqua Bank*, No. 20-CV-05905-RS, 2022 WL 17740285, at *7 (N.D. Cal. Dec.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

A plaintiff may generally allege actual knowledge of an underlying fraud.  Fed. R.
Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be
alleged generally.").  A plaintiff, however, must plead sufficient facts to make it plausible
that the defendant in question had actual knowledge of the underlying fraud.  *Chang v.
Wells Fargo Bank, N.A.*, No. 19-CV-01973-HSG, 2020 WL 1694360, at *4 (N.D. Cal.
Apr. 7, 2020) ("If a plaintiff directly alleges actual knowledge, the next question is
whether the complaint pleads sufficient facts to make that allegation plausible as required
by *Twombly*.")

While knowledge can be alleged generally, "substantial assistance must be pleaded
with particularity . . . ."  *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d
1164, 1188 (C.D. Cal. 2011).  In California, "'ordinary business transactions' a bank
performs for a customer can satisfy the substantial assistance element of an aiding and
abetting claim if the bank actually knew those transactions were assisting the customer in
committing a specific tort."  *Casey*, 26 Cal. Rptr. 3d. at 406.  As such, in cases where a
plaintiff alleges that a *bank* aided and abetted fraud, "knowledge is the crucial element."
*Id*.

---

16, 2022) ("California law makes clear that a depository bank cannot be liable for aiding and
abetting unless the bank has actual knowledge of the specific tort being committed such that the
bank can be said to have made a conscious decision to help facilitate the commission of the
tort."), the Court need not reach the issue in this order as the Court dismisses all claims on other
grounds.  The Court notes, however, that Plaintiffs do not appear to allege sufficient facts from
which the Court can infer that the present Defendants reached a conscious decision to participate
in Wealth Assistants' and other Defendants' tortious activity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

### A. <u>Actual Knowledge</u>

The parties' briefing on the topic of actual knowledge centers on five cases.  The
Court details each case below.

In *Casey*, the California Court of Appeal discussed at length the actual knowledge
element of an aiding and abetting claim.[5]  *Casey v. U.S. Bank Nat. Assn.*, 26 Cal. Rptr. 3d
401, 408 (Cal. Ct. App. 2005).  *Casey* emphasized that, to prevail on an aiding and
abetting claim, a plaintiff must precisely identify the conduct for which a plaintiff seeks
to hold the alleged aider and abettor liable.   *Id.* at 409; *Id.* at 411 ("[T]he complaint must
allege the defendant's actual knowledge of the specific breach of fiduciary duty for which
it seeks to hold the defendant liable."); *see also In re First All. Mortg. Co. ("First
Alliance")*, 471 F.3d 977, 993 (9th Cir. 2006) ("The court in *Casey* specified that to
satisfy the knowledge prong, the defendant must have 'actual knowledge of the *specific
primary wrong* the defendant substantially assisted.'") (emphasis added).

In *Casey* where a plaintiff alleged that banks aided and abetted fiduciaries'
misappropriation of corporate funds, the "relevant inquiry" was, therefore, whether the
plaintiff "adequately allege[d] the banks had knowledge the [fiduciaries] were
misappropriating funds from [the corporation]."  *Casey*, 26 Cal. Rptr. 3d. at 409.  The
California Court of Appeal found that the plaintiff's allegations that "banks knew
*something* fishy was going on with the accounts opened" by the fiduciaries were
insufficient.  *Id.*  (emphasis in the original).  Even factual allegations suggesting that the
banks knew that some type of wrongful or illegal conduct was afoot were insufficient

---

[5] While federal law governs the pleading standard in present case, California law governs the
substance of Plaintiffs' aiding abetting claims.  *See In re First All. Mortg. Co.*, 471 F.3d 977,
993 (9th Cir. 2006) (applying *Casey* to California aiding and abetting case).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

because allegations of "'wrongful or illegal conduct' do[] not constitute sufficient pleading that the banks had actual knowledge the DFJ Fiduciaries *were misappropriating funds* from DFJ." *Id.* at 412 (emphasis in the original).

The Ninth Circuit addressed the actual knowledge requirement *First Alliance*. 471 F.3d at 983. In *First Alliance*, plaintiffs sued Lehman Brothers, Inc. ("Lehman") for aiding and abetting *First Alliance*, a lender which allegedly fraudulently induced borrowers to agree to unconscionable loan terms. *Id.* at 983 (describing suit against Lehman); *id.* at 992 (describing *First Alliance*'s alleged fraud). A jury found that Lehman was liable for aiding and abetting First Alliance's fraud. *Id.* at 994 (discussing procedural history). The district court denied Lehman's motion for judgment as a matter of law, and Lehman appealed. *Id.* Three portions of *First Alliance* are relevant to this Court's analysis.

First, in articulating the actual knowledge standard for aiding and abetting under California tort law, the Ninth Circuit heavily cited to *Casey*. *Id.* at 993. The Ninth Circuit explained that the "court in Casey specified that to satisfy the knowledge prong, the defendant must have 'actual knowledge of the *specific* primary wrong the defendant substantially assisted." *Id.* at 993 (emphasis added).[6] The Ninth Circuit explicitly applied this standard to the claims in *First Alliance*. *Id.*

---

[6] The sentence is followed by a footnote emphasizing language from *Casey* which this Court cites above—language which makes it clear that to ultimately prevail on an aiding and abetting claim, a plaintiff must forth sufficient evidence of a defendant's actual knowledge of the specific, primary tort. *Id.* at 993 n.4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

In the second relevant section of *First Alliance*, the Ninth Circuit sustained the
jury's factual finding that Lehman had actual knowledge of First Alliance's primary
wrong. *Id.* at 994. The Ninth Circuit summarized the following evidence:

> Among other evidence in the record, the Borrowers highlighted the facts that
> throughout its investigations into First Alliance, Lehman received reports
> that detailed the fraudulent practices in which First Alliance was engaged,
> and that in one report, a Lehman officer noted his concern that if First
> Alliance "does not change its business practices, it will not survive
> scrutiny." That same evaluation recounted that First Alliance "does not have
> the clear-cut defenses that the management believes" and that "at the very
> least, this is a violation of the spirit of the Truth in Lending Act."

*Id.* While the Ninth Circuit noted that the evidence was "not overwhelming" it concluded
that "it was not unreasonable for the jury to rely upon these evaluations in concluding
that Lehman had actual knowledge of First Alliance's fraudulent loan origination
procedures." *Id.*

In the third relevant section, the Ninth Circuit affirmed the district court's decision
to preclude plaintiffs from seeking punitive damages. *Id.* at 989. While this section is
not, on its face, relevant to the present case, it contains dicta quoted by Plaintiffs and by
district courts evaluating similar claims. (Opp'n to Bank of America MTD at 14; Opp'n
to Wells Fargo MTD at 18; Opp'n to First Citizens at 13; *In re Woodbridge Invs. Litig.*,
No. CV 18-103-DMG (MRWX), 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020)
(citing dicta for the proposition that "The Ninth Circuit, on the other hand, has suggested
that a bank's decision to ignore suspicious activity or red flags is sufficient to demonstrate
actual knowledge.")). On summary judgment, a district court held that plaintiff could not
seek punitive damages against Lehman because the facts in the record were insufficient,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

as a matter of law, to show that Lehman's conduct was "despicable" or malicious. *Id.* at 989. The Ninth Circuit affirmed. *Id.* at 999. In doing so, the court wrote: "[t]hat Lehman came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard, but not the intent to injure or despicable conduct that punitive damages requires." *Id.* The phrase: "[t]hat Lehman came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard" must be read in the context of the rest of the Ninth Circuit's opinion. The rest of the opinion—specifically the two subsections detailed above—makes it clear that the Ninth Circuit sustained the jury's finding of Lehman's actual knowledge because Lehman came across and seemingly ignored "red flags" about First Mortgage's specific primary fraudulent conduct, *not* general "red flags" of "something fishy" or misfeasance.

As in *Casey* and *First Citizens*, the three district court cases cited by Plaintiffs focus on a bank's knowledge of specific tortious acts, not general wrongful conduct, of the alleged primary tortfeasors. *Chang v. Wells Fargo Bank, N.A.*, No. 19-CV-01973-HSG, 2020 WL 1694360 (N.D. Cal. Apr. 7, 2020) (concluding that plaintiff adequately alleged a bank's actual knowledge of a Ponzi scheme and of misuse of investor funds); *In re Woodbridge Invs. Litig.*, No. CV 18-103-DMG (MRWX), 2020 WL 4529739 (C.D. Cal. Aug. 5, 2020) (concluding that plaintiff adequately alleged a bank's actual knowledge of a Ponzi scheme); *Camenisch v. Umpqua Bank,* No. 20-CV-05905-RS, 2021 WL 9181171 (N.D. Cal. Jan. 28, 2021*)* (concluding the same). In all three cases, plaintiffs provided factual allegations that suggested that banks knew of the primary tortfeasors specific underlying wrongful conduct. *Chang*, 2020 WL 1694360 at *5 (summarizing allegations supporting inference that bank defendant knew primary

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

tortfeasor comingled money from investors); *Woodbridge*, 2020 WL 4529739 at *6
(summarizing allegations supporting inference that bank defendant knew of Ponzi
scheme); *Camenisch*, 2021 WL 9181171 at *2. (summarizing allegations that bank
defendant knew of a Ponzi scheme).

     Read together, the case law cited by the parties reveals that, to survive a motion to
dismiss on an aiding and abetting a fraud claim, the plaintiff must plead factual
allegations sufficient to plausibly suggest that the aider and abetter knew of the *specific*
fraud perpetrated by the primary tortfeasor.  This requirement makes sense for two
reasons.  First, "California law 'necessarily' requires that for aiding and abetting liability
to attach, a defendant have made 'a conscious decision to participate in tortious activity
for the purpose of assisting another in performing a wrongful act.'"  *George v. eBay, Inc.*,
286 Cal. Rptr. 3d 492, 508 (Cal. Ct. App. 2021).  In other words, "an alleged aider and
abettor must have 'acted with the intent of facilitating the commission of that tort.'"  A
defendant that does not know of the specific tortious act cannot be said to have acted with
the intent to facilitate the tort.  Second, California case law "set[s] a high bar for bank
liability," *Camenisch*, 2022 WL 17740285, at *8, in light of California policy limiting
banks' duties to nondepositors.  *See Casey*, 26 Cal. Rptr. 3d at 409-410 (describing case
law limiting liability on banks and justifications for doing so).  Allowing a plaintiff to
plead knowledge of merely some type of wrong-doing would lower the bar for bank
liability.

     Construing the Second Amended Complaint in the light most favorable to the
Plaintiffs, Plaintiffs allege that the bank defendants and Christine Hagar aided and
abetted two related frauds: fraudulent misrepresentations to Wealth Assistants' clients
and fraudulent concealing of assets.  (SAC ¶¶ 293-95).  The Court's inquiry regarding

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

knowledge is, therefore, as follows: do non-conclusory allegations in the Second Amended Complaint plausibly suggest that Bank of America, Wells Fargo, First Citizens and Christine Hagar knew that other defendants were (a) fraudulently inducing clients to send Wealth Assistants money; and/or (b) fraudulently concealing assets?[7]  The Court answers "no" as to the bank defendants and "yes" as to Christine Hagar.

> 1. *Bank of America*

Most of Plaintiffs' allegations provide no support for the Court to infer that Bank of America knew that Plaintiffs were either (a) fraudulently inducing clients to send Wealth Assistants money; and/or (b) fraudulently concealing assets from creditors. Allegations of supposedly suspicious transactions suggest, at most, that Bank of America may have known that "something fishy" was happening, *Casey*, Cal. Rptr. 3d. at 409, not that Bank of America knew of Wealth Assistants' specific primary wrongful conduct. *See supra* Section I(a)(2) (describing allegations in SAC ¶¶ 174-180).  The allegation that the -4905 account began accepting transfers in May of 2022 but that Bank of America has only produced account-opening documentation signed in September of 2022 does not support an inference that Bank of America used atypical banking procedures because it knew Carroll and Wealth Assistants were perpetrating fraud.  Indeed, it is more consistent with an inference that Bank of America simply has not produced the correct account-opening documentation.  Two sets of allegations warrant further discussion:

---

[7] The Court notes the oddity that Plaintiffs plead aiding and abetting a fraud claim in a case where Plaintiffs plead *conspiracy* to commit fraud, rather than fraud.  *See* SAC ¶¶ 293-95.  The Court further notes that Plaintiffs' allegations would be better if Plaintiffs clarified *which* fraudulent scheme each bank purportedly knew about. But because Defendants did not raise either issue, the Court need not dwell on either issue.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

allegations regarding Bank of America's "freezing" at least one of Wealth Assistants'
accounts and allegations regarding Bank of America's notice of the Court's orders
restraining Carroll from accessing his assets.

Plaintiffs allege that Carroll lost access to at least one Wealth Assistant account at
Bank of America on November 17, 2022, and that Bank of America told Carroll that it
would soon close Wealth Assistants' accounts and provide Carroll with a cashier's check
for outstanding balances. (SAC ¶ 181). Plaintiffs allege that "Bank of America froze and
then closed bank accounts controlled by Wealth Assistants because Bank of America
knew that Wealth Assistants and Ryan Carroll were perpetrating the fraudulent scheme
described herein."[8] (*Id.* ¶ 182). Plaintiffs further allege that despite Bank of America's
knowledge of Wealth Assistants' fraud, Bank of America allowed Wealth Assistants to
transfer money in and out of the account after it froze the account (*id.* ¶ 184), provided
Carroll with a cashier's check upon account closure (*id.* ¶ 186) and allowed Carroll to
continue to operate other accounts which Carroll used to perpetuate fraud (*Id.* 188).
Plaintiffs' allegation that Bank of America froze and shutdown *because it knew of
Carroll and Wealth Assistants' fraud* is conclusory, however. No other facts from this set
of allegations suggest that Bank of America knew of Wealth Assistants' fraud; indeed,
the balance of the allegations—that Bank of America provided Carroll with a check for
frozen funds and allowed Carroll to maintain some Bank of America accounts—cut
against an inference that Bank of America knew about the specific fraud alleged.

---

[8] As explained in a prior footnote, the Complaint would benefit from specification of *which*
fraudulent scheme Bank of America knew about— fraudulently inducing clients to send Wealth
Assistants money and/or fraudulently concealing assets.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Second, Plaintiffs allege that Bank of America took no action to freeze accounts
after Plaintiffs' attorney notified Bank of America of the Court's temporary restraining
order and preliminary injunction. (SAC ¶¶ 189-193). Bank of America's knowledge of
the temporary restraining order and preliminary injunction cannot be a basis for liability
because the orders impose no specific obligation on banks: both orders restrain a set of
*defendants*, including Ryan Carroll, from spending, withdrawing or transferring most
assets without leave of the Court. (Temporary Restraining Order at 6-7; Preliminary
Injunction at 10-11). Further, both orders specifically allow the defendants to spend up to
$9,000 per month in living expenses without leave of the Court. (Temporary Restraining
Order at 6-7; Preliminary Injunction at 10-11). If the Court imposed aiding and abetting
liability on banks who continued to operate accounts after the asset freeze orders,
defendants would be unable to access the specified funds for living expenses and the
provision would be meaningless. Because Plaintiffs have failed to adequately allege facts
that plausibly suggest that Bank of America knew that Wealth Assistants was either
(a) fraudulently inducing clients to send Wealth Assistants money; and/or (b)
fraudulently concealing assets from creditors, the Court **GRANTS** Bank of America's
Motion to Dismiss as to the aiding and abetting claims.

     2. *Wells Fargo*

As with the allegations against Bank of America, many of the allegations against
Wells Fargo suggest, at the very most, that Wells Fargo may have known about general
red flags of unusual account activity—not red flags that Wealth Assistants and Max K.
Day were either (a) fraudulently inducing clients to send Wealth Assistants money;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

and/or (b) fraudulently concealing assets from creditors.[9]  *See supra* Section I(a)(3)
(describing allegations in SAC ¶¶ 223-238).  Plaintiffs' more specific allegations fare no
better.

Plaintiffs' allegation that Wells Fargo loaned Max K. Day $500,000 in 2004
(SAC ¶ 221) and later sought to recover the loan in bankruptcy cannot support the claim
that Wells Fargo knew of Wealth Assistant's specific fraud 20 years later.  As explained
above, the Court cannot infer knowledge from the fact that Wells Fargo took no specific
action when notified of the Court's temporary restraining and later preliminary
injunction.  The Court likewise cannot find that a letter from Plaintiffs' attorneys prior to
a court order shows that Wells Fargo knew of the fraudulent scheme—doing so would
allow any plaintiff to manufacture "actual knowledge."

The Court is therefore left with two factual allegations related to knowledge:  that
Navy Federal asked Wells Fargo to recall a wire transfer after Navy Federal's client
reported that Wealth Assistants was a scam and that Wells Fargo clients asked Wells
Fargo to reverse wire transfers, citing to Wealth Assistants' alleged fraud.  These two
allegations—standing alone—do not plausibly suggest that Wells Fargo knew of Day and
Wealth Assistants' specific fraud.  It would buck California's policy of limiting liability
of banks to find that banks have actual knowledge of a specific fraud anytime customers
allege fraud while attempting to reverse a payment.  Further, these allegations are

---

[9] The Court agrees with Wells Fargo's characterization that Plaintiffs' opposition brief contains
"stretches, embellishments, and misleading citations to irrelevant paragraphs on the SAC."
(Wells Fargo Reply at 5).  The same criticism applies to much of Plaintiffs' briefing.  Plaintiffs
must state a claim based on the facts alleged in the complaint; not "facts" manufactured only in
their briefing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

distinguishable from the evidence which raised a triable issue of fact of actual knowledge in *First Mortgage* because there Lehman's *own officers* raised concerns about specific practices of primary tortfeasor after Lehman's investigations into the alleged tortfeasor. 471 F.3d at 983.  The Court, therefore, **GRANTS** Wells Fargo's Motion to Dismiss as to the aiding and abetting claim.

### 3. *First Citizens*

Plaintiffs only provide only two factual allegations against First Citizens:  that First Citizens failed to keep records of deposits into Providence Oak Properties' bank accounts (SAC ¶¶ 248-49) and that most of the outgoing wire transfer from the accounts included the same form memorandum: "Invoice amount of [dollar amount] paid by [name of beneficiary] on [date]. Funds of [dollar amount] returned after fees were removed as agreed upon."  (*Id.* ¶ 251).  These two alleged facts do not plausibly suggest that First Citizens knew that other defendants were (a) fraudulently inducing clients to send Wealth Assistants money; and/or (b) fraudulently concealing assets.  The Court therefore **GRANTS** First Citizens' Motion to Dismiss as to the aiding and abetting fraud claim.

### 4. *Christine Hagar*

While Plaintiffs allegations regarding Christine Hagar's actual knowledge are brief, they are sufficient for this stage of litigation.  Construing the Second Amended Complaint in the light most favorable to Plaintiffs, Plaintiffs generally allege that Ms. Hagar knew of other defendants' specific fraudulent scheme.  (*Id.* ¶ 264 (alleging that Ms. Hagar performed tasks "knowing that Wealth Assistants was operating the fraudulent scheme described above.").  Plaintiff further alleges that Ms. Hagar was Wealth Assistants' financial manager (*id.*) and that Ms. Hagar was one of two authorized users on the primary account allegedly used to fraudulently conceal assets from creditors (*id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

¶ 264).  At this stage these facts taken together plausibly suggest that Ms. Hagar knew
that other defendants were at least fraudulently concealing assets and, potentially,
fraudulently inducing clients to send Wealth Assistants money.

### B.    Substantial Assistance

Because the Court has already granted Bank of America, Wells Fargo and First
Citizens' motions to dismiss as to claims of aiding and abetting a fraud, it need not reach
whether the banks provided substantial assistance to other defendants' fraud.[10]  The
Court, therefore, need only address whether Plaintiffs adequately allege that Christine
Hagar provided substantial assistance to advance other defendants' fraud.

Plaintiffs must plead substantial assistance with particularity.  *Allstate Ins. Co. v.
Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1188 (C.D. Cal. 2011).  "Allegations of
fraud based on information and belief usually do not satisfy the degree of particularity
required under Rule 9(b)."  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th
Cir. 1987).  In cases where a plaintiff cannot be expected to have personal knowledge of
facts constituting wrongdoing, the "particularity requirement may be satisfied if the
allegations are accompanied by a statement of the facts upon which the belief is
founded."  *Id.*  In her motion to dismiss, Christine Hagar argues that because Plaintiffs'
allegations regarding to Hagar's substantial assistance are made on information and belief

---

[10]Should Plaintiffs wish to file a third amended complaint, the Court urges Plaintiffs to
remember that that while ordinary business transactions can satisfy the substantial assistance
element of aiding and abetting, *Casey*, 26 Cal. Rptr. 3d. at 406, substantial assistance must still
be pled with particularity.  *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164,
1188 (C.D. Cal. 2011).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

and Plaintiffs plead no facts to support that belief, Plaintiffs' pleading should be deemed insufficient. (Hagar MTD at 6). The Court agrees.

The Second Amended Complaint contains three allegations regarding Christine Hagar's assistance of Wealth Assistants' fraudulent schemes—all three are made on "information and belief" with no supporting facts. (SAC ¶ 264 (alleging on *information and belief* that Ms. Hagar initiated fraudulent transfers, was in charge of maintaining records and monitored accounts to ensure that assets were concealed from creditors)).[11] Plaintiffs' only allegations not made on information and belief—that Ms. Hagar was Wealth Assistants' Finance Manager, that Ms. Hagar was authorized to access Wealth Assistants' bank account at Bank of America and that one wire transfer memorandum stated "christine ops"— do nothing to suggest that Ms. Hagar provided substantial assistance to Wealth Assistants' fraudulent scheme. Because Plaintiffs have not sufficiently alleged that Christine Hagar substantially assisted other defendants' fraud, the Court **GRANTS** Christine Hagar's Motion to Dismiss.

## IV.    AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIMS

Plaintiffs' opposition to the banks' motion to dismiss makes clear that Plaintiffs' claims for aiding and abetting a breach of fiduciary duty claims rise and fall with Plaintiffs' claims for aiding and abetting a fraud. *See, e.g.*, Opp'n to Bank of America MTD at 20 ("Bank of America seeks to dismiss Plaintiffs' claim for aiding and abetting a breach of fiduciary duty for most of the same reasons that it seeks to dismiss Plaintiffs' claim for aiding and abetting a fraud . . . Plaintiffs have addressed those arguments above

---

[11] Though the Court need not reach the issue, the allegations additionally appear insufficient because they lack the specificity required by Rule 9(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

and need not reiterate them here.").  Because the Court grants Bank of America, Wells Fargo and First Citizens' motions to dismiss as to Plaintiffs' aiding and abetting claims of fraud claims, the Court **GRANTS** the motions to dismiss as to Plaintiffs' breach of fiduciary duties claims.

Dismissal is also proper on another ground—knowledge of a primary wrongdoer's breach of fiduciary duty necessarily requires knowledge that the primary wrongdoer held a fiduciary duty to those wronged.   Plaintiffs never directly allege that the banks knew Wealth Assistants and other defendants held a fiduciary duty to the putative class members.  "This sort of direct allegation (really, assertion) of actual knowledge is a critical threshold consideration in cases applying California aiding and abetting law in circumstances like these."  *Chang*, 2020 WL 1694360 at *4.

## V.    CONSPIRACY

As requested by Plaintiffs, the Court **GRANTS** Bank of America, Wells Fargo and First Citizens' motions to dismiss as to Plaintiffs' first cause of action for conspiracy to defraud.  (Opp'n to Bank of America MTD at 22; Opp'n to Wells Fargo MTD at 29; Opp'n to First Citizen's MTD at 21 (requesting that Court grant the banks' motions to dismiss as to the conspiracy claim)).

## VI.    CONCLUSION

For the foregoing reasons, the Court **DISMISSES** without prejudice all claims against Bank of America, Wells Fargo, First Citizens and Christine Hagar.  Should Plaintiffs wish to file an amended complaint, Plaintiffs must do so within 30 days of this order.

**IT IS SO ORDERED.**