UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID HOUGH, et al., | Case No. 2:24-cv-02886-WLH-SK |
| Plaintiffs, | **ORDER RE BANK OF AMERICA, N.A.'S MOTION TO DISMISS [320]** |
| v. | |
| RYAN CAROLL, et al., | |
| Defendants. | |

The Court is in receipt of Bank of America, N.A.'s ("Bank of America") Motion to Dismiss Plaintiffs' Third Amended Complaint. ("Bank of America MTD," Docket No. 320). Prior to oral argument, which was set for September 19, 2025, all parties submitted on the Court's tentative order, which is now adopted as a final order. For the following reasons the Court **DISMISSES** all claims against Bank of America with prejudice.

## I.   BACKGROUND

### A.   <u>Factual Background</u>

This case involves an alleged fraudulent scheme which the Court has detailed in previous orders. (Temporary Restraining Order, Docket No. 17 at 1-4). In short, Plaintiffs allege that putative class members were fraudulently induced to purchase

ecommerce stores from Defendant Wealth Assistants, owned by Individual Defendants Ryan Carroll, Max. K. Day, and Michael Day (collectively, the "Wealth Assistants Defendants"), for a buy-in of up to $125,000.  (Third Amended Complaint ("TAC") ¶ 10).  Wealth Assistants advertised that it would set up and manage clients' online stores which would earn more than $10,000 per month by the end of the store's first year.  (*Id.* ¶¶ 11-14).  Plaintiffs allege that Wealth Assistants not only failed to deliver on their promises, but never intended to honor their commitments to clients.  (*Id.* ¶¶ 9, 13).

Plaintiffs further allege that Wealth Assistants pursued a "payment processing strategy" to conceal the proceeds of its allegedly fraudulent scheme from creditors, including the putative class members.  (*Id.* ¶¶ 85-90).  As part of this strategy, Wealth Assistants allegedly broke up large transactions into multiple, small transactions; used many different payment processors; divided assets into myriad bank accounts; and passed money through various accounts and processors "before the money reached its final destination."  (*Id.* ¶ 90).

As relevant to the pending Motion, Plaintiffs specifically allege that Bank of America aided and abetted Wealth Assistants' fraud against Plaintiffs (*id.* ¶¶ 167-73) and aided and abetted Wealth Assistants' breach of fiduciary duty (*id.* ¶¶ 174-79).  Plaintiffs attach over 400 pages of account statements denoting transaction activity for the relevant accounts held at Bank of America.  (*Id.*, Exs. A-H).

### 1.  Allegations Regarding Banking Generally

According to Plaintiffs, federal law requires banks to know their customers and understand their customers' banking behavior.  (*Id.* ¶ 96).  Banks, specifically, are required to collect information about who controls each account.  (*Id.*)  Banks must also comply with the Bank Secrecy Act ("BSA") and its anti-money laundering provisions.  (*Id.* ¶¶ 97-98).  The BSA requires banks to develop and implement programs to ensure compliance with the law (*id.*) and to identify unusual or suspicious transactions for each customer (*id.* ¶ 99).  The Federal Financial Institutions

Examination Council (FFIEC) BSA and Anti-Money Laundering (AML) Examination

Manual ("BSA/AML Manual") sets forth money laundering "red flags" for banks to

monitor and address as needed. (*Id.* ¶ 108). Per Plaintiffs, bank employees

processing outgoing wire transfers are trained to ask questions to detect possible

money laundering. (*Id.* ¶ 107). Typically, wire transfers between $25,000 and

$100,000 prompt staff to evaluate the transaction. (*Id.*) Wire transfers of larger

amounts typically require approval of designated staff. (*Id.*) Additionally, banks

review accounts for potential red flags, including the following:

> (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or
> received from the same person to or from different accounts; (3) transactions
> inconsistent with the account holder's business; (4) transfers of funds among
> related accounts; (5) depositing of funds into several accounts that are later
> consolidated into a single master account; (6) large fund transfers sent in
> round dollar amounts; (7) multiple accounts established in various corporate
> names that lack sufficient business purpose to justify the account
> complexities; (8) multiple high-value payments or transfers between shell
> companies without a legitimate business purpose; (9) payments unconnected
> to legitimate contracts or revenue sources; (10) fund transfers containing
> limited content or related party information; (11) transacting businesses
> sharing the same address; and (12) an unusually large number of persons or
> entities receiving fund transfers from one company.

(TAC ¶ 108).

### 2. Allegations Regarding Bank of America

According to Plaintiffs' TAC, Bank of America operated several bank accounts

owned or controlled by Defendants Ryan Carroll, Wealth Assistants and Dreams to

Reality.[1] (TAC ¶ 21). Plaintiffs allege that Bank of America knew that the Wealth

Assistants Defendants were using the accounts to further their fraudulent scheme. (*Id.*

¶ 122 ("Bank of America knew that Wealth Assistants and Ryan Carroll were using

their accounts at Bank of America in furtherance of a fraudulent scheme and a

---

[1] Defendant Dreams to Reality LLC was dismissed from the action by Plaintiffs on
August 8, 2025. (*See* Docket No. 326).

3

violation of fiduciary duty.")).  Plaintiffs specifically focus on eight bank accounts
(the "Accounts") operated by Bank of America opened by Defendant Ryan Carroll
under the names of Wealth Assistants and Dreams to Reality.  (*Id.* ¶¶ 111-20; *Id.*, Exs.
A-H).

### i.  Defendants Carroll's and Wealth Assistants' -4905 Account

One Bank of America account held by Wealth Assistants ending in -4905 (the
"-4905 Account") began accepting transfers from Wealth Assistants clients as early as
May 2022.  (TAC ¶ 112).  Many of the wire transfers from putative class members
stated that the transfers were for an "investment."  (*Id.* ¶ 113).  The account received
more than $18 million in wire transfers between May and November 2022, with more
than $15 million come from Wealth Assistants' clients.  (*Id., Id.* Ex. A).  These
included, among others, a $55,000 transfer with the information "investment in
Amazon store" on May 17, 2022, and a $35,000 transfer labeled as "investment for
ecommerce business" on June 15, 2022.  (*Id.* ¶ 112).  Much of that money was then
transferred from the -4905 account to another account at Bank of America owned by
Dreams to Reality.  (*Id.* ¶ 114).  Carroll then used it for his own "personal benefit."
(*Id.*).

### ii.  Defendant Carroll's Dreams to Reality Accounts

Defendant Carroll opened an alleged "shell company" account under "Dreams
to Reality, Inc." at Bank of America on July 7, 2022, with an account number ending
in -8720.  (*Id.* ¶¶ 114-17, Ex. B).  Plaintiffs allege this account "showed no signs of
legitimate operating activity," receiving only "large wire transfers from the Wealth
Assistants' -4905 account and then distributing that money to other Dreams to Reality
accounts at Bank of America."  (*Id.* ¶ 118).  Those secondary Dreams to Reality
accounts ended in -8704, -8717, -8681, -8694, -3864 and -1983.  (*Id.* ¶¶ 120, Exs. C-
H).  Plaintiffs allege Defendant Carroll utilized funds from these secondary accounts
to his personal benefit.  (*Id.* ¶¶ 120).

On or around November 17, 2022, Ryan Carroll lost access to at least one Bank

of America account because the bank "had discovered that Ryan Carroll and Wealth Assistants were violating their fiduciary duties and perpetrating a fraud." (*Id.* ¶ 121). Plaintiffs allege the following red flags associated with the Accounts that "enlightened" Bank of America about the fraudulent activity: (1) repetitive or unusual fund transfer activity, (2) fund transfers sent or received from the same person to or from different

accounts, (3) transactions inconsistent with the account holder's business, (4) transfers of funds among related accounts, (5) large fund transfers sent in round dollar amounts, (6) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities, and (7) fund transfers sent or received from the same person to or from different accounts. (*Id.*).

Plaintiffs allege Bank of America "knew" the following facts on or before November 7, 2024:

a. The Wealth Assistants' -4905 Bank of America account had received more than $15 million in wire transfers from Wealth Assistants' investors in the period of May through October of 2022. (*Id.* ¶ 122).

b. The Wealth Assistants' business consisted of selling clients an investment opportunity in which the clients would pay Wealth Assistants to set up and manage a profitable online Amazon store to generate passive income for the clients. (*Id.*)

c. Wealth Assistants owed its clients a fiduciary duty because Wealth Assistants' business model consisted of selling its clients an investment opportunity that Wealth Assistants purported to have expertise in. (*Id.*)

d. Wealth Assistants' only significant cash inflows were cash from Wealth Assistants' investors. (*Id.*)

e. Wealth Assistants was violating its fiduciary duty to its investors, and defrauding them, by transferring the money Wealth Assistants received as investments to Ryan Carroll for his personal use. (*Id.*)

f. Bank of America knew that Ryan Carroll and Wealth Assistants were defrauding investors, and violating their fiduciary duties to them, by

5

representing to the investors that the investments were profitable when in reality the investments were simply being sent to Wealth Assistants' principals for their personal benefit.  (*Id.*)

Bank of America allegedly informed Defendant Carroll that it would close Wealth Assistants' Bank of America accounts on November 22, 2022, and provide Carroll with a cashier's check for outstanding balances.  (*Id.* ¶ 123).  Before the accounts were closed, the -4905 account transferred more than $100,000 to an unknown bank account via 5 transactions described as "Payroll" and received hundreds of thousands of dollars via wire transfer.  (*Id.* ¶ 125-26).  On January 26, 2023, Bank of America wrote a cashier's check to Wealth Assistants for $3,784,191.12.  (*Id.* ¶ 127).  Plaintiffs assert that Bank of America "knew that transferring the money to Wealth Assistants LLC, and giving the cashier's check to Ryan Carroll, would help Wealth Assistants LLC conceal those proceeds of a fraudulent scheme from investors."  (*Id.*)  Moreover, Bank of America allegedly provided the cashier's check to avoid expenses arising from the lawsuit brought by Wealth Assistants and Defendant Carroll alleging that the bank had unlawfully withheld their funds.  (*Id.* ¶ 128).

Bank of America did not close other bank accounts controlled by Defendants Carroll nor Dreams to Reality.  (*Id.* ¶ 130).  According to Plaintiffs, these accounts continued to receive money "misappropriated" from Wealth Assistants, which was then transferred to other Dreams to Reality accounts or utilized for Defendant Carroll's personal benefit.  (*Id.* ¶ 132-33; Exs. B-H).

## B.    Procedural Background

On May 5, 2025, this Court granted Bank of America's Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") and dismissed the case without prejudice pursuant to Rule 12(b)(6).  (MTD SAC Order, Docket No. 295).  Plaintiffs filed their Third Amended Complaint against Defendant Bank of America on June 3, 2025.  (TAC, Docket No. 66).

6

1    Bank of America filed a timely motion to dismiss Plaintiffs' TAC.  (Bank of
2    America MTD, Docket No. 320).  Plaintiffs filed a timely opposition.  (Opp'n, Docket
3    No. 327).  Bank of America filed a timely reply brief.  (Bank of America Reply,
4    Docket No. 334).

5    **II.    MOTION TO DISMISS LEGAL STANDARD**

6        Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss
7    for failure to state a claim upon which relief can be granted.  A complaint may be
8    dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable
9    legal theory; or (2) insufficient facts under a cognizable legal theory.  *Bell Atl. Corp.*
10   *v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med.*
11   *Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

12       In deciding a Rule 12(b)(6) motion, a court must construe the complaint in the
13   light most favorable to the plaintiff, accept all allegations of material fact as true, and
14   draw all reasonable inferences from well-pleaded factual allegations.  *Gompper v.*
15   *VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002).  Plaintiffs typically need only provide
16   sufficient factual material to "plausibly" state a claim for relief.  *Ashcroft v. Iqbal*, 556
17   U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially
18   plausible "when the plaintiff pleads factual content that allows the court to draw the
19   reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,
20   566 U.S. at 678.

21       When a plaintiff alleges claims that "sound in" or are "grounded in fraud,"
22   however, Rule 9(b) imposes a heighted pleading standard.  *Vess v. Ciba–Geigy Corp.*
23   *USA*, 317 F.3d 1097, 1102–06 (9th Cir. 2003); *Meridian Project Sys., Inc. v. Hardin*
24   *Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1219–20 (E.D. Cal. 2005).  Under Rule 9(b),
25   plaintiffs must "state with particularity the circumstances constituting fraud," Fed. R.
26   Civ. P 9(b), including the "who, what, when, where, and how" of the fraudulent
27   activity.  *United States ex rel Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047,
28   1055 (9th Cir. 2011).  Even under Rule 9, states of minds "may be alleged generally."

Fed. R. Civ. P. 9(b). Where a case is dismissed for failure to state a claim, a district court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## III.    AIDING AND ABETTING FRAUD CLAIM

To prevail on an aiding and abetting fraud claim, a plaintiff must establish the aider and abettor "(1) had actual knowledge of the underlying wrongful conduct, and (2) gave substantial assistance or encouragement to another to so act." *Shaterian v. Wells Fargo Bank, N.A.*, 829 F.Supp.2d 873, 884-85 (N.D. Cal. 2011) (citing to *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005).

A plaintiff may generally allege actual knowledge of an underlying fraud. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). A plaintiff, however, must plead sufficient facts to make it plausible that the defendant in question had actual knowledge of the underlying fraud. *Chang v. Wells Fargo Bank, N.A.*, No. 19-CV-01973-HSG, 2020 WL 1694360, at *4 (N.D. Cal. Apr. 7, 2020) ("If a plaintiff directly alleges actual knowledge, the next question is whether the complaint pleads sufficient facts to make that allegation plausible as required by *Twombly*."). While knowledge can be alleged generally, "substantial assistance must be pleaded with particularity . . . ." *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1188 (C.D. Cal. 2011).

California substantive law sets "high bar for bank liability," in light of California policy limiting banks' duties to nondepositors. *See Camenisch v. Umpqua Bank*, No. 20-CV-05905-RS, 2022 WL 17740285, at *8 (N.D. Cal. Dec. 16, 2022); *Casey*, 26 Cal. Rptr. 3d at 409-410 (describing case law limiting liability on banks and justifications for doing so). Thus, in California, "'ordinary business transactions a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." *Casey*, 26 Cal. Rptr. 3d. at 406. As such,

8

in cases where a plaintiff alleges that a *bank* aided and abetted fraud, "knowledge is the crucial element." *Id*.

### A.    Actual Knowledge

Plaintiffs correctly assert that "knowledge need not be pled with particularity" per Rule 9(b). (Opp'n at 15). However, this "does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed.'" *Lorenz v. E. W. Bancorp, Inc.*, No. 215CV06336CASFFMX, 2016 WL 199392, at *7 (C.D. Cal. Jan. 14, 2016) (citing *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003). Plaintiffs must allege "actual knowledge of the primary violation"—or in other words, make allegations sufficient to plausibly suggest that the aider and abetter knew of the *specific fraud* perpetrated by the primary tortfeasor. *Id*.

Plaintiffs believe they have satisfied this standard, arguing that Bank of America knew—primarily through their fraud detection systems aimed at detecting "red flag" activity—that Defendant Carroll was misappropriating investor money for his own benefit through the several Dreams to Reality and Wealth Assistants accounts he controlled. (Opp'n at 22). Bank of America disputes this narrative, characterizing the alleged red flags as merely "potential suspicious activit[y]" that "may warrant additional scrutiny," rather than "actual discoveries of questionable lending practices during its due diligence process." (Bank of America Reply at 4).

This Motion therefore hinges on a key determination: Are these "red flags" as pled sufficient to reasonably infer that Bank of America had *actual knowledge* of the Wealth Assistants Defendants' fraudulent activity? In other words, do such "red flags" plausibly demonstrate that Bank of America *knew* of Defendants' scheme to misappropriate the investments received form its clients? For the Court to answer in the affirmative, Plaintiffs must adduce sufficient facts to demonstrate that the alleged misconduct by Bank of America is more than a "mere possibility." *See Twombly*, 550 U.S. at 557. Moreover, "'while aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a

9

conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.'" *Back Story, LLC v. Amazon.com Servs., Inc.*, No. 2:24-CV-05733-WLH-PVC, 2025 WL 1012304, at \*10 (C.D. Cal. Jan. 30, 2024) (citing *Howard v. Super. Ct.*, 2 Cal.App.4th 745, 749 (1992)). Plaintiffs rely primarily on circumstantial evidence to further their claims, but "actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant 'must have known' and not 'should have known' will an inference of actual knowledge be permitted." *Lin v. JP Morgan Chase Bank*, No. 2:24-CV-01837-JLS-E, 2024 WL 5182199, at \*6 (C.D. Cal. Aug. 15, 2024). This burden must be read alongside California substantive law's "high bar for bank liability." *See Camenisch*, 2022 WL 17740285, at \*8; *Casey*, 26 Cal. Rptr. 3d at 409-10 (describing case law limiting liability on banks and justifications for doing so).

The Court finds Plaintiffs fail to meet this burden via direct or circumstantial evidence—even when drawing all reasonable inferences in their favor. The deficiencies in Plaintiff's allegations are addressed in turn.

### 1. The Accounts' "Red Flags"

Plaintiffs allege that following the freeze of at least one Wealth Assistants' bank account in November 2022, Bank of America knew and understood the contours of the Wealth Assistants Defendants' fraudulent scheme—primarily because the freeze was allegedly prompted by the bank's "discover[y] that Ryan Carroll and Wealth Assistants were violating their fiduciary duties and perpetrating a fraud." (TAC ¶ 121). Plaintiffs do not specify which Wealth Assistants account was subject to the freeze. Yet, they assert that "red flags" associated with the unspecified account(s) "enlightened" Bank of America about the fraud. (*Id.*). The Court finds these allegations to be wholly conclusory and unsupported by the TAC's factual allegations. It addresses each purported "red flag" below.

1          *i.   Repetitive or unusual fund transfer activity; fund transfers sent or*
2               *received from the same person to or from different accounts;*
3               *transfers of funds among related accounts.*

4          To illustrate the prevalence of "red flags" associated with the Accounts at Bank
5     of America, Plaintiffs note (1) the -4905 account's acceptance of more than $15
6     million in wire transfers "described as investments," (2) subsequent transfers from the
7     -4905 account to the Dreams to Reality -8720 account, (3) the movement of funds
8     from the -8720 account to other Dreams to Reality Accounts controlled by Defendant
9     Carroll, and (4) use of these funds for Defendant Carroll's "personal benefit."  (TAC ¶
10    121(a)).  What Plaintiffs fail to make clear is how Bank of America's role in this
11    activity falls *outside* of banking services in the ordinary course.  Deposits into
12    accounts and transfers between accounts—even if labeled as "investments" or
13    "payroll" (*see* TAC ¶¶ 122, 125)—are commonplace in the banking industry.
14    Plaintiffs set forth no meaningful distinction between this "red flag" activity and that
15    of most accounts held by Bank of America.  When "a bank provides ordinary services
16    that effectuate financial abuse by a third party, the bank may be found to have
17    'assisted' the financial abuse *only if it knew of the third party's wrongful conduct*."
18    *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 745, 112 Cal. Rptr. 3d 439, 454
19    (2010) (emphasis added).  Imputing actual knowledge of the fraudulent scheme to
20    Bank of America here would, in effect, hold them liable for their regular provision of
21    banking services.  Without additional facts[2] showing Bank of America knew of the
22    underlying wrong perpetrated by the Wealth Assistants Defendants, Plaintiffs' theory
23    of liability is fanciful.  The Court finds no support in the TAC or its supporting
24    exhibits that Bank of America *knew* the investment deposits in the Accounts were

25    _____

26    [2] Plaintiffs assert that wire transfers of large amounts typically require approval of
      designated staff (TAC ¶ 107) but fails to allege that these approval processes were
27    triggered with wire transfers to/from the Accounts.  As such, the Court finds this to
      cut against an inference that additional diligence by Bank of America on the Accounts
28    in fact occurred.

1    misappropriated for fraudulent purposes.  The mere allegation that Bank of America

2    employs *some* type of fraud detection system is insufficient to infer the bank's actual

3    knowledge of Defendants' misconduct.

4                        *ii.  Large fund transfers sent in round dollar amounts.*

5            Plaintiffs additionally allege that "dozens of large round-number value wire

6    transfers" into the -4905 account triggered "red flag" treatment by Bank of America.

7    (TAC ¶ 121(e)).  However, the Court struggles to understand how round dollar

8    amount deposits labeled as investments for an ecommerce business mandate "red

9    flag" treatment by Bank of America.  Even the BSA/AML Manual outlining common

10   money laundering "red flags"—cited by Plaintiffs in their TAC—notes that these

11   potentially suspicious activities "*may* warrant additional scrutiny.  The mere presence

12   of a red flag is not by itself evidence of criminal activity."  BSA AML Manual,

13   Appendix F, https://bsaaml.ffiec.gov/manual/Appendices/07.[3]  Plaintiffs proffer no

14   allegations that point to Bank of America treating this as a "red flag" requiring

15   investigation.  Only then might Bank of America have ascertained knowledge of the

16   fraudulent scheme.  Instead, Plaintiffs mischaracterize BSA/AML guidance as a

17   mandate obliging Bank of America to dutifully investigate any instance of round

18   number deposits.  The Court declines to hold that this speculative assertion can form

19   the basis of "actual knowledge" for purposes of aiding and abetting liability.

20                        *iii.  Multiple accounts established in various corporate names that lack*

21                                *sufficient business purpose to justify the account complexities;*

22                                *transactions inconsistent with the account holder's business.*

23   _____

24   [3] The Court finds it may properly consider the BSA/AML Manual under the
     incorporation by reference doctrine because Plaintiffs explicitly reference it
25   throughout their TAC and rely on it to substantiate their "actual knowledge"
     allegations related to what Bank of America *should have known*.  (TAC ¶¶ 104, 105,
26   108).  Under this doctrine, courts may "take into account documents 'whose contents
     are alleged in a complaint and whose authenticity no party questions, but which are
27   not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d
     1068, 1076 (9th Cir. 2005) (internal citation omitted).  The authenticity of the manual,
28   published by a U.S. government agency, is undisputed.

1    Plaintiffs allege that Defendant Carroll opened several accounts in "various
2    corporate names" without justification for such "account complexities." (TAC ¶
3    121(f)).  Yet, Plaintiffs proffer evidence of eight accounts held by just two separate
4    entities:  Wealth Assistants LLC and Dreams to Reality Inc.  (*See id.*, Exs. A-H).
5    Absent other facts, one entity holding multiple accounts to manage its businesses'
6    inflows and outflows does not immediately trigger the alarm bell.  Plaintiffs' concerns
7    with the Dreams to Reality account network "are still only suspicions, and no
8    reasonable inference can be made to transform these alleged suspicions into [Bank of
9    America's] actual knowledge." *Superclinics USA, Inc. v. JPMorgan Chase Bank,*
10   *N.A.*, No. 223CV00699ODWMAAX, 2023 WL 5007873, at *3 (C.D. Cal. Aug. 4,
11   2023).

12   Secondly, Plaintiffs cursorily allege that the Accounts' activity was "not
13   consistent with any legitimate business activity." (TAC ¶ 121(c)).  Other than
14   asserting that the -4905 account received $15 million in investments that was later
15   transferred to the Dreams to Reality accounts, Plaintiffs set forth no basis for Bank of
16   America's actual knowledge—other than a limited set of transaction data—of (1) the
17   respective business purposes of the Accounts, and (2) the Accounts' divergence from
18   these business purposes that would rise to the level of fraud.  *See Casey*, 127 Cal.
19   App. 4th at 1148 (finding that the "complaint fail[ed] to establish that the banks had
20   actual knowledge of the primary violation in which they purportedly participated.").

21            *2.  November 2022 Account Freeze*

22   The Court is similarly unconvinced by Plaintiffs' allegations related to Bank of
23   America's freeze of an unspecified account (or accounts) held by Wealth Assistants
24   and its subsequent provision of a nearly $3.8 million cashier's check.  (TAC ¶¶ 123-
25   28).  Plaintiffs attempt to construe the account freeze as Bank of America's actual
26   knowledge of fraudulent activity by the Wealth Assistants Defendants.  Plaintiffs
27   decline to detail the justification behind Bank of America's freeze, while at the same
28   time alleging that Bank of America "provided Ryan Carroll with th[e] cashier's check

13

1    in part to avoid the expense of litigating the lawsuit filed by Wealth Assistants and

2    Ryan Carroll alleging that Bank of America had unlawfully withheld their funds (even

3    though that lawsuit had no merit)."  (TAC ¶ 128).  If Plaintiffs are indeed as familiar

4    with these proceedings as they represent, they surely could have alleged further details

5    about the account freeze if it was in fact due to fraud.  They did not.  Thus, the Court

6    finds these allegations "'too generic to satisfy the requirements of actual knowledge of

7    a specific primary violation' under California law."  *Bradshaw v. SLM Corp.*, 652 F.

8    App'x 593, 594 (9th Cir. 2016) (citing Casey, 127 Cal. App. 4th at 1153.  Moreover,

9    as the Court stated in its previous Order, "the balance of the allegations—that Bank of

10   America provided Carroll with a check for frozen funds and allowed Carroll to

11   maintain some Bank of America accounts—cut[s] against an inference that Bank of

12   America knew about the specific fraud alleged."  (MTD SAC Order at 20).

13         *3. Plaintiffs' Authorities*

14         In their Opposition, Plaintiffs rely heavily on the Ninth Circuit's opinion in

15   *First Alliance* and a handful of district court cases to support their "actual knowledge"

16   positions.  (Opp'n at 15-21).  The Court briefly addresses these authorities and their

17   inapplicability to the instant Motion.

18         Plaintiffs cite to *First Alliance* for the proposition that a bank's disregard of

19   "red flags" is "enough to establish actual knowledge under the California aiding and

20   abetting standard."  (Opp'n at 19 (citing *First All. Mortg. Co.*, 471 F.3d 977, 999 (9th

21   Cir. 2006)).  What Plaintiffs fail to caveat is that the Circuit's review was limited to

22   the jury's factual findings, so those findings were entitled to significant deference.

23   More notable is the panel's acknowledgement that "the evidence supporting

24   [Defendant's] 'actual knowledge' [wa]s not overwhelming."  *First Alliance*, 471 F.3d

25   at 994.  The Circuit went even further to reiterate that "the actual knowledge standard

26   does require more than a vague suspicion of wrongdoing."  *Id.* at 993 n.4.  Plaintiff's

27   allegations are precisely what the Court admonished: speculative suspicions.  As such,

28

14

the Court views its findings on the "actual knowledge" prong as consistent with Circuit precedent.

Secondly, Plaintiffs point to several district court decisions[4] to demonstrate they have established the plausibility of their "actual knowledge" allegations. The facts of those cases are readily distinguishable. In *Chang v. Wells Fargo Bank, N.A.*, the district court found plaintiffs' actual knowledge allegations sufficient to survive a Rule (12)(b)(6) motion because plaintiffs alleged (1) Wells Fargo *manually* processed a number of wires implicated by the fraud scheme, (2) Wells Fargo deviated from their standard course of business by offering "modified" versions of direct deposit forms, and (3) Wells Fargo knew of a number of bounced checks written by the company at issue. No. 19-CV-01973-HSG, 2020 WL 1694360, at *5 (N.D. Cal. Apr. 7, 2020). Here, Plaintiffs rely on nothing more than deposit and wire transfer data to meet the heightened "actual knowledge" standard.

In a similar vein, the courts in *Woodbridge*, *Bhatia* and *Benson* specifically found the respective defendants' "close business relationship" with the fraud-committing companies supported an "actual knowledge" finding. *See Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1117 (S.D. Cal. 2024); *In re Woodbridge Invs. Litig.*, No. CV 18-103-DMG (MRWX), 2020 WL 4529739, at *6 (C.D. Cal. Aug. 5, 2020); *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1526394, at *5 (N.D. Cal. Apr. 15, 2010). Plaintiffs have not alleged a similar relationship here.

Because Plaintiffs "allege[] only that [Bank of America] failed to investigate, permitted withdrawals, and ignored red flags," they cannot plausibly establish Bank of America's "knowledge" of the Wealth Assistants Defendants' scheme.

---

[4] Plaintiff's reliance on the Oregon district court's order in *Fatnani* is misguided, as that action concerned a claim of joint liability for tortious conduct under Oregon state law. *See Fatnani v. JPMorgan Chase Bank, N.A.*, 743 F. Supp. 3d 1253, 1283 (D. Or. 2024).

15

*Superclinics*, 2023 WL 5007873, at *3.  Accordingly, the Court **GRANTS** Bank of America's Motion and **DISMISSES** Plaintiffs' aiding and abetting fraud claim with prejudice.

### B. <u>Substantial Assistance</u>

Because the Court has already granted Bank of America's motion to dismiss as to Plaintiffs' claim of aiding and abetting fraud, it need not reach whether the bank provided substantial assistance to the Wealth Assistants Defendants' scheme.  Bank of America could not have substantially assisted the scheme if it was not privy to the fraudulent activity in the first place.

## IV.    AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CLAIM

To state a claim for breach of fiduciary duty, a complaint must allege the existence of a fiduciary duty, its breach, and damages resulting therefrom.  *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 483, 80 Cal.Rptr.2d 329 (1998) ("The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach").

Plaintiffs' Opposition to Bank of America's motion to dismiss seemingly concedes that Plaintiffs' claims for aiding and abetting a breach of fiduciary duty claims rise and fall with Plaintiffs' claims for aiding and abetting a fraud.  *See, e.g.*, Opp'n at 26 ("Bank of America seeks to dismiss Plaintiffs' claim for aiding and abetting a breach of fiduciary duty for most of the same reasons that it seeks to dismiss Plaintiffs' claim for aiding and abetting a fraud (i.e., lack of substantial assistance, and lack of knowledge of the underlying wrongdoing).  Plaintiffs have addressed those arguments [in the aiding and abetting fraud section].").  Plaintiffs nevertheless highlight two distinctions between the claims.  First, Plaintiffs acknowledge their allegation that "'Bank of America knew that Wealth Assistants owed its clients a fiduciary duty' must be plausible."  (*Id.* (citing TAC ¶ 122(c)).  Second, Plaintiffs contend that an aiding and abetting a breach of fiduciary duty claim

16

1  "requires less wrongdoing than fraud," meaning that Bank of America would be liable

2  if it "knew Wealth Assistants was violating its duty of care by not acting in its

3  clients'/investors' best interests." (*Id.* at 27).

4        The Court agrees that the allegations concerning Bank of America's actual

5  knowledge of the fiduciary duty at issue must be plausible.  But even if the Court

6  found that Bank of America *knew* Wealth Assistants owed a fiduciary duty to its

7  investors (it does not), the question of whether Bank of America *knew* Wealth

8  Assistants breached said duty remains.  Without allegations to enable this Court to

9  reasonably infer that Bank of America knew of the primary wrong (here, a breach of a

10  specific fiduciary duty), Plaintiff's claim fails under Rule 12(b)(6).  *See First Alliance*,

11  471 F.3d at 977.

12        Accordingly, the Court **GRANTS** Bank of America's Motion and **DISMISSES**

13  Plaintiffs' claim for aiding and abetting a breach of fiduciary duty with prejudice.

14  **V.    LEAVE TO AMEND**

15        Plaintiffs, now on their Third Amended Complaint, fail to state claims against

16  Bank of America.  Leave to amend may be denied where a party has previously

17  amended and failed to cure pleading defects.  *Foman v. Davis*, 371 U.S. 178, 182

18  (1962); *Carvalho v. Equifax Info. Servs.*, LLC, 629 F.3d 876, 892 (9th Cir. 2010).

19  "Complaints that are filed in repeated and knowing violation of Federal Rule 8's

20  pleading requirements are a great drain on the court system, and the reviewing court

21  cannot be expected to 'fish a gold coin from a bucket of mud.'"  *Knapp v. Hogan*, 738

22  F.3d 1106, 1111 (9th Cir. 2013) (citation omitted).  That gold coin has yet to be seen.

23  Because Plaintiffs received several opportunities to cure the deficiencies in their

24  complaint and failed to do so, the Court declines to grant leave to amend.

25  //

26  //

27  //

28  //

1    **VI.    CONCLUSION**

2        For the foregoing reasons, the Court **DISMISSES** with prejudice the two

3    claims against Bank of America.

4

5        **IT IS SO ORDERED.**

6

7    Dated: 9/23/2025 _____

8                      HON. WESLEY L. HSU
                       UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28